# Exhibit F

```
                    IN THE UNITED STATES
                 DISTRICT COURT FOR THE
                 DISTRICT OF CONNECTICUT

                                    )
BLACK WIDOW TERMITE & PEST          )
CONTROL CORP.,                      )
                                    )
         Plaintiff,                 )
                                    )
   – vs –                           )
                                    )
                                    )
BLACK WIDOW PEST SPECIALIST,        )
LLC                                 )
         Defendant.                 )
                                    )
_____)
```

     Pursuant to Rule 30 of the Federal Rules of Civil Procedure, the deposition of the corporate representative, BLAKE JOSEPH BLACK was taken at the law offices of Farber, LLC, 1234 Summer Street, Stamford, CT, before Mercedes Marney, RPR, CT-LSR #530 and a notary public in and for the State of Connecticut, on Tuesday, September 24, 2024 at 10:00    a.m.

```
 1                A P P E A R A N C E S:

 2

 3    ATTORNEYS REPRESENTING THE PLAINTIFF/S:

 4    Farber, LLC

 5            4 Corporate Drive, Suite 287

 6            Shelton, CT 06484

 7            (203) 286-5140

 8    BY:  Jonathan A. Winter, Esquire

 9            j.winter@farberllc.com

10    BY:  Samantha Gerold, Esquire

11            samantha.gerold@farberllc.com

12

13

14    ATTORNEYS REPRESENTING THE DEFENDANT:

15    Cohen & Wolf PC

16            1115 Broad Street

17            Bridgeport, CT 06604

18            (203) 337-4122

19    BY:  Ari J. Hoffman, Esquire

20            ahoffman@cohenandwolf.com

21    BY:  Wilson T. Carroll, Esquire

22           wcarroll@cohenandwolf.com

23

24

25
```

1                    I N D E X

2    ---------------------------------------------------------

3    TESTIMONY OF:  BLAKE JOSEPH BLACK

4    EXAMINATION:                                    PAGE

5              Direct - Mr. Winter................ 8

6    ---------------------------------------------------------

7    INFORMATION REQUESTS:

8    INSTRUCTION NOT TO ANSWER:

9              By Mr. Hoffman................... 274

10   ---------------------------------------------------------

11   INFORMATION REQUESTS:

12     Request for Production by Mr. Winter......... 108

13     Request for Production by Mr. Winter......... 115

14     Request for Production by Mr. Winter......... 119

15     Request for Production by Mr. Winter......... 121

16     Request for Production by Mr. Winter......... 232

17     Request for Production by Mr. Winter......... 276

18   ---------------------------------------------------------

19                  E X H I B I T S

20   ---------------------------------------------------------

21   Exhibit 10  Notice of Deposition                10

22   Exhibit 11  Notice to take 30(b)(6)deposition   11

23   Exhibit 12  Plaintiff's request for             14
                 production of documents
24

25

1                    INDEX CONTINUED

2 ----------------------------------------------------

3  Exhibit 13   Letter dated August 10, 2023,        48
                 from Charney IP Law, LLC
4

5  Exhibit 14   Letter dated August 17, 2023 to      51
                 Scott Charney, Esq.
6

7  Exhibit 15   Certificate of Organization          60

8  Exhibit 3    PREVIOUSLY MARKED EXHIBIT:           72
                 Video of podcast "Pest Control
9                Millionaire" episode

10 Exhibit 16   Black Widow Pest Specialtist Logo    84

11 Exhibit 17   Document titled:  Responsive to      92
                 request(s) for Production No. 4.
12               ARM-BLACK-000113

13 Exhibit 18   Answer, Affirmative Defenses and     97
                 Counterclaim
14

15 Exhibit 19   REQUEST FOR PRODUCTION NOS. 15,     106
                 27, 34 & 48.  CUSTOMER LIST.
16               ARM-BLACK-000010

17 Exhibit 20   Request for production No. 10.      109
                 Landing Page.   ARM-BLACK-000104
18

   Exhibit 21   Request for production No. 11.      113
19               Estimates.   ARM-BLACK-000116

20 Exhibit 22   Facebook post of the Burlington
                 Chamber of Commerce
21

22 Exhibit 23   Text message                        178

23 Exhibit 24   Request for production Nos. 36 &    185
                 40.   Test messages.
24               ARM-BLACK-000123

25

```
 1                      INDEX CONTINUED

 2   ---------------------------------------------------

 3
     Exhibit 25   Logo of Black Widow Termite &      192
 4                Pest Control Corp. and Black Widow
                  Pest & Wildlife Specialists
 5

 6   Exhibit 26   Black Widow pest Specialists logo  205
                  on a T-shirt.  BLACK_000132
 7
     Exhibit 27   Request for production No. 10.     205
 8                Truck Lettering.  ARM-BLACK000112

 9   Exhibit 28   Request for production Nos. 9,     205
                  14, 15, 16, 22, 23, 32, 35.
10                ARM-BLACK-000122

11   Exhibit 29   Request for production No. 10.     206
                  ARM-BLACK-000108
12
     Exhibit 30   E-mail blast - RFP83.             225
13                BLACK_000131

14   Exhibit 12   PREVIOUSLY MARKED EXHIBIT:        229
                  Plaintiff's first set of requests for
15                production of documents, Numbers 1
                  through 6 Request for production
16                No. 12

17   Exhibit 31   Request for production No. 12.    230

18                ARM-BLACK-000095

19   Exhibit 32   Revenue report through June 2024.  30
                  BLACK_000124
20

21   Exhibit 33   Request for production No. 16.    244
                  Advertising Expenses.
22                ARM-BLACK-000001

23   Exhibit 34   Hubert W. Pfabe letterhead.       248
                  Defendant's Responses and
24                Objections to Plaintiff's First
                  Set of Interrogatories Nos. 1-24.
25
```

```
 1                      INDEX CONTINUED

 2    -----------------------------------------------------

 3
      Exhibit 35  United States Patent and              276
 4                Trademark Office

 5    -----------------------------------------------------

 6

 7                    TRANSCRIPT LEGEND

 8      INST  -  Do-not-answer instruction

 9      REQ   -  Request for documentation or information

10

11                    *  *  *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    S T I P U L A T I O N S

2

3        It is stipulated by counsel for the parties

4     that all objections are reserved until the time of

5     trial, except those objections as are directed to

6     the form of the question.

7

8        It is stipulated and agreed between counsel

9     for the parties that the proof of the authority of

10    the notary before whom this deposition is taken is

11    waived.

12

13       It is further stipulated that any defects

14    in the notice are waived.

15

16       It is further stipulated that the reading and

17    signing of the deposition transcript by the witness

18    may be signed before any notary public.

19                    * * * * * * *

20

21

22

23

24

25

1              THE COURT REPORTER:  For the record, I

2    need to ask you your name and address.

3              THE WITNESS:  Sure.  Blake-Joseph Black,

4    108 Curtiss Street, Naugatuck, Connecticut.

5              THE COURT REPORTER:  Usual stips?

6              MR. HOFFMAN:  All objections except as to

7    form are reserved until trial.

8              And we reserve the right to read and sign.

9                        -   -   -

10                   BLAKE JOSEPH BLACK

11   called as a witness, having been first duly sworn by

12    a Notary Public of the State of Connecticut, was

13              examined and testified as follows:

14                        -   -   -

15                   DIRECT EXAMINATION

16                        -   -   -

17

18   BY MR. WINTER:

19        Q.   Good morning, Mr. Black.  As you probably

20   know, I represent Black Widow Termite & Pest Control

21   Corp, the plaintiff.

22             And are you represented by counsel today?

23        A.   I am.

24        Q.   Who -- would you say their names, please?

25        A.   Ari Hoffman.  Wilson Carroll.

1       Q.    Thank you.

2             So what will happen here is I will ask you

3    some questions.  You'll give me answers.

4       A.    Sure.

5       Q.    If you don't understand a question, just

6    tell me.  I will rephrase it so that you can

7    understand it.  But if you do answer a question, I

8    will assume that you did understand it.

9             Do you understand those?

10      A.    Yes.

11      Q.    From time to time your attorney may

12   object.  Unless he instructs you not to answer, you

13   then just answer after the objection.

14            Do you understand that?

15      A.    Yes.

16      Q.    And then since our court reporter here has

17   to type down everything that's said, what we should

18   try to do is I'll speak and then you speak, you

19   speak, then I speak, so we don't speak over each

20   other, so it's easier for her.

21      A.    Sure.

22      Q.    If you need a break, just let me know.  I

23   just ask that if there's any pending question, you

24   answer that question and then we can take a break.

25      A.    Sure.

1      Q.    And then answers need to be verbal, not

2   just head nods, because she needs to type down the

3   verbal answer.

4      A.    Understood.

5      Q.    Okay.  Is there any reason that you cannot

6   testify truthfully today?

7      A.    No.

8      Q.    Have you ever been deposed before?

9      A.    No.

10      Q.    Have you ever testified under oath before?

11      A.    Not that I can recall.

12      Q.    Have you ever been involved in a legal

13   action as a defendant or a plaintiff before?

14      A.    No.

15            (Plaintiff's Exhibit Number 10 was marked

16   for identification, as of this date.)

17   BY MR. WINTER

18      Q.    Plaintiff's Exhibit 10.  It's just a

19   notice of deposition.

20            Can you take a look at that document.

21      A.    (Witness reviews document).

22      Q.    Have you seen that document before?

23      A.    I don't remember.

24      Q.    Okay.  Do you see that the second

25   paragraph references a deposition, 10:00 a.m. today

1    at this location?

2        A.    Yes.

3        Q.    And then you are an officer of Black Widow

4    Pest Specialist, LLC; is that correct?

5        A.    Yes.

6        Q.    Do you own it 100 percent?

7        A.    Yes.

8              (Plaintiff's Exhibit Number 11 was marked

9    for identification, as of this date.)

10   BY MR. WINTER:

11       Q.    So this is a 30(b)(6) notice, and attached

12   to it are a number of topics.

13             Do you see that?

14       A.    Yes.

15       Q.    And at the end there are a few document

16   requests.  That's on page -- after the topics.

17       A.    Uh-huh.

18       Q.    Do you see that?  122 to 124?

19       A.    Yes.

20       Q.    And then there's an exhibit as well, if

21   you keep going.  Do you see that?

22       A.    This?

23       Q.    Yes, the exhibit.

24       A.    Yes, I see that.

25       Q.    Have you received this document before?

1        A.    Referring to the entire packet or the

2    section that you referenced?

3        **Q.    The entire packet.**

4        A.    Let me go through and I will give you an

5    answer.

6              (Witness reviews document).

7              Yes.

8        **Q.    And so you are here as a corporate**

9    **deponent for Black Widow Pest Specialist, LLC, as to**

10   **each and every one of those topics; is that correct?**

11       A.    Yes.

12       **Q.    What did you do to prepare for this**

13   **deposition?**

14       A.    Reviewed documents that were provided to

15   me.

16       **Q.    Is that it?**

17       A.    Yes.

18       **Q.    You didn't meet with your attorneys at**

19   **all?**

20       A.    I did.

21       **Q.    When was that meeting?**

22       A.    I can't recall the date exactly.

23       **Q.    Was it before the previous scheduled time**

24   **for this deposition?**

25       A.    Yes.

1    Q.    So would that have been in August?

2    A.    Perhaps.

3    Q.    And who was at that meeting?

4    A.    The two gentlemen with me.  Ari Hoffman

5    and Wilson Carroll.

6    Q.    How long did that meeting last?

7    A.    I'm not sure.

8    Q.    An hour, two hours, four hours; roughly

9    how long?

10    A.    I don't know.

11    Q.    Did it last ten minutes or longer?

12    A.    Longer.

13    Q.    Longer than an hour?

14    A.    Maybe.

15    Q.    Longer than two hours?

16    A.    No.

17    Q.    Okay.

18          You said you reviewed documents at that

19    meeting?

20    A.    Yes.

21    Q.    What documents?

22    A.    The ones you handed me.

23    Q.    Just this 30(b)(6) notice and everything

24    attached to it?

25    A.    That's the one I remember, yes.

1          Q.    What did you -- were there other

2    documents?

3          A.    I don't remember.

4          Q.    Did you keep copies of any of the

5    documents?

6          A.    This one, yes.  That's why I remember it.

7          Q.    "This one," meaning PX11 in front you; is

8    that right?

9          A.    That is correct.  Yes.

10          Q.    Did you bring any documents with you

11    today?

12          A.    No.

13          Q.    So nothing in response to request

14    Number 122 to 124; is that correct?

15          A.    Correct.

16                (Plaintiff's Exhibit Number 12 was marked

17    for identification, as of this date.)

18    BY MR. WINTER:

19          Q.    All right.  I've given you

20    plaintiff's first set of requests for production of

21    documents, Numbers 1 through 6.

22                Do you see that on the first page of this

23    document?

24          A.    Yes.

25          Q.    It's been marked PX12, correct?

1      A.    Yes.

2      Q.    **Have you seen this document before?**

3      A.    I will respond after I've reviewed it.

4            (Witness reviews document).

5      Q.    **I'll actually just strike that question.**

6            **At a point in this lawsuit while Hugh**

7  **Pfabe was still representing your company, were you**

8  **ever tasked with collecting documents to provide to**

9  **me or my client?**

10     A.    Yes.

11     Q.    **When you went and searched for those**

12 **documents, where did you look for them?**

13     A.    Anywhere I had to.

14     Q.    **Where were those locations?**

15     A.    Well, it depends on the request.

16     Q.    **Well, so you -- my question is generally**

17 **you must have looked at several different places.  I**

18 **would like a list of what those places are?**

19     A.    Would you care to be more specific and

20 I'll understand what you mean.

21     Q.    **Did you look on a computer?  Did you look**

22 **on a file storage?  Did you look at paper documents?**

23           **Where did you look to collect documents?**

24     A.    Yeah, computer.  Cell phone.  Maybe a

25 Google Doc.  I'm -- I can't really think of anything

1  else.

2      Q.    In connection with your business, do you

3  have a central storage for business documents, such

4  as a cloud storage, or do you just store them

5  locally on a computer?

6      A.    Depends on the document.  I guess both.

7      Q.    So what types of documents would be stored

8  in a central or cloud-based storage?

9      A.    Maybe like time-off requests, time-off

10 bookings for employees.  Physical documents for

11 customers.  Anything like that.

12     Q.    You said physical documents for customers.

13           What do you mean by that?

14     A.    Like agreements, service agreements.

15           (Reporter clarification.)

16           THE WITNESS:  Yeah, like service

17 agreements.

18 BY MR. WINTER:

19     Q.    Do you enter into service agreements with

20 each one of your customers?

21     A.    Depends on what our state requires.  So

22 not for every single situation.  Only with the ones

23 that are required.

24     Q.    Which ones are required?

25     A.    Depends on the service.

1      Q.    So can you give me example of some ones

2  that are required?

3      A.    Like the application of pesticide.  You're

4  required to enter into an agreement.

5      Q.    Anything else?

6      A.    Well, depends on what you're asking.

7  Could you be more specific, please?

8      Q.    So I asked for -- categories of documents

9  for the state requires you to have a written

10  agreement.  You said application pesticide is one.

11          Is there another -- is there another

12  example where you're required to have a written

13  agreement?

14      A.    That's probably the best one for me to

15  give you.

16      Q.    Are there others?

17      A.    I'm not sure.

18      Q.    So you're not sure what state regulations

19  require you, in terms of entering into written

20  agreements for your business?

21      A.    Of course I'm aware of what state

22  regulations require for business.

23      Q.    So what state regulation -- what other

24  written agreements does the state require you to

25  keep?

1      A.    What other ones do they require us to

2   keep?

3      **Q.    So you said you have to enter into a**

4   **written service agreements for certain customers,**

5   **depending on what you're doing for them.  You gave**

6   **me the example of application of the pesticide.**

7           **My question is, does the state require you**

8   **to get written agreements for anything else?**

9      A.    The abutters list.

10     **Q.    The what?**

11     A.    Abutters list.

12     **Q.    What's that?**

13     A.    It's for pesticide application for the

14   neighboring properties.

15          That should answer your question.

16     **Q.    So the abutters list would be the list of**

17   **properties that are adjacent to the one that you're**

18   **applying pesticide to?**

19     A.    Correct.

20     **Q.    You need to get an agreement from each of**

21   **the abutting properties?**

22     A.    Only the ones that are on the list.

23     **Q.    And how is that list determined?**

24     A.    The state provides it to you every year.

25     **Q.    It's called an abutters list?**

1    A.    Yes.

2    **Q.    So if you were going to come and service**

3    **this building, do pest control, apply pesticide,**

4    **there would be a list of properties adjacent to this**

5    **that you would have to get written agreements from?**

6    A.    The state provides a written abutters list

7    every year.  You are supposed to know the

8    surrounding properties that are on that list.

9    **Q.    What gets a company to be listed on the**

10   **abutters list?**

11   A.    They fill out an application.

12   **Q.    They fill out an application with the**

13   **state?**

14   A.    Correct.

15   **Q.    So this would be if a property right next**

16   **to us was concerned whether pesticides were being**

17   **applied here, they would apply to be listed on the**

18   **abutters list.  Then you would have to get a written**

19   **agreement from that property.**

20   **Is that accurate?**

21   A.    You would have to make them aware, yes.

22   **Q.    How would you make them aware?**

23   A.    Through the document that I stated.

24   **Q.    Through the abutters list?**

25   A.    No.  The document that I provided.

1          Q.    What's the document that you provided?

2          A.    The document stating that I made them

3     aware.

4          Q.    Well, do you have copies, examples of

5     those documents?

6          A.    Sure.

7          Q.    Have you produced any of those?

8          A.    I have not.

9          Q.    Why not?

10         A.    I don't believe I was asked for that.

11         Q.    But those are notices that you give to

12    other people in the ordinary course of conducting

13    business of pest control; is that right?

14         A.    Only when specifically necessary.

15         Q.    So when specifically necessary, those are

16    documents in the ordinary course of conducting

17    business in the pest control industry that you

18    provide; is that correct?

19         A.    Could you re-ask that question, please.

20         Q.    When specifically necessary, those

21    documents sent to the abutters list are documents

22    that you generate in the ordinary course of business

23    and provide to those properties on the abutting --

24    on the abutters list; is that correct?

25         A.    Yes.

1        Q.    Are there any other examples, other than

2    the abutters list and application of pesticide,

3    where you have service agreements with your

4    customers?

5        A.    For wildlife trapping.

6              (Reporter clarification.)

7              THE WITNESS:  Wildlife trapping.  Or

8    quarterly services.

9    BY MR. WINTER:

10       Q.    Is that it?

11       A.    Exclusion.

12             That's all I can think of.

13       Q.    Do you get service agreements in -- with

14   every customer under those categories?

15       A.    Yes, for the most part.

16       Q.    And those services agreements, where are

17   they stored?

18       A.    CRM software called GorillaDesk.

19       Q.    If you were to go and collect each and

20   every one of your service agreements, how would you

21   go about doing that?

22       A.    I would go into GorillaDesk and get them

23   from there.

24       Q.    Would it be challenging to do?

25       A.    Yes.

1      Q.    In what way?  Explain to me how it would

2    be challenging.

3      A.    It's a lot of information.

4      Q.    Okay.  But is there an automated way to

5    collect them?

6      A.    I'm not sure.

7      Q.    Have you checked?

8      A.    I can't recall.

9      Q.    When you did your search for documents

10   related to PX12 in front of you, where did you look

11   for documents?

12     A.    Didn't I already answer that question?

13     Q.    Your job is not to ask questions.  Your

14   job is to answer them.  So unless there's an

15   objection, please answer the question.

16     A.    I was just confused.  That's why I was

17   asking you --

18     Q.    Okay.  So --

19     A.    -- for clarification, so...

20     Q.    Please answer the question.

21     A.    Well, I looked on the computer and a cell

22   phone.

23     Q.    And did you look in GorillaDesk?

24     A.    Well, that's on the computer.

25     Q.    So yes?

```
 1        A.    I think.  I don't recall.
 2        Q.    Where are customer invoices stored?
 3        A.    My CRM.
 4        Q.    So in GorillaDesk?
 5        A.    Yes.
 6        Q.    I'd like you to look at PX11, which is
 7    right there.
 8        A.    Sure.
 9        Q.    Turn to topic 21.
10              Do you see topic 21?
11        A.    Yes.
12        Q.    "Defendant's efforts to respond to
13    plaintiff's discovery request, including the
14    collection of documents and responses and other
15    information provided in response to said discovery
16    request."
17              Did I read that correctly?
18        A.    Yes.
19        Q.    What did you do specifically to prepare to
20    answer questions on that topic?
21        A.    Did the best I could.
22        Q.    What did you do to prepare to answer
23    questions on that topic?
24        A.    I don't remember.
25        Q.    Really?  You don't remember what you did
```

1    to prepare for this topic?

2        A.    No.

3        Q.    You're the corporate designee for your

4    company at this deposition, right?

5        A.    Correct.

6        Q.    Do you understand that you have an

7    obligation to prepare for this deposition and be

8    knowledgeable about these topics?

9        A.    There's 53 of them.  I did the best I

10   could.

11       Q.    So what did you do for topic 21?

12       A.    I went through the list of these and

13   prepared the best I could.

14       Q.    So where did you look to collect documents

15   in response to the discovery request, which is PX12?

16       A.    Could you repeat that one more time.

17            MR. WINTER:  Could you read it back.

18        (The Record was read back.)

19            THE WITNESS:  (Witness reviews document).

20   BY MR. WINTER:

21       Q.    Withdraw that.

22            I will ask you to turn back to topic 21 in

23   PX11, if you would just keep that open.

24            Are you looking at topic 21?

25       A.    Yes.

1          Q.    What did you do to prepare to answer

2     questions on that topic?

3          A.    I told you.  I don't remember.

4          Q.    Did you do anything to prepare?

5               MR. HOFFMAN:  Objection as to form.

6     BY MR. WINTER:

7          Q.    Go ahead and answer.

8               MR. HOFFMAN:  You can answer if you

9     understand the question.

10              THE WITNESS:  I don't remember.

11    BY MR. WINTER:

12         Q.    Did you do anything to prepare for the --

13              MR. HOFFMAN:  Objection as to form.

14    BY MR. WINTER:

15         Q.    Did you do anything to prepare to respond

16    to questions as to topic 21 today?

17              MR. HOFFMAN:  Objection.  Asked and

18    answered.

19              THE WITNESS:  I answered that.

20    BY MR. WINTER:

21         Q.    You don't remember?

22              So you could have done nothing or you

23    could have done something.  Did you do nothing?  Do

24    you just not remember if you did something or not?

25    What is it?

1          A.    I told you I don't remember.

2          **Q.    So you could have done absolutely nothing**

3     **to prepare to answer questions on topic 21 today; is**

4     **that correct?**

5               MR. HOFFMAN:  Objection.

6               THE WITNESS:  I don't remember for that

7     specific question.  But I remember preparing as best

8     I could to answer all of these for you.

9     BY MR. WINTER:

10         **Q.    When you said prepare "as best I could,"**

11    **what did you do?**

12              MR. HOFFMAN:  Objection as to form.

13    Specifically with respect to --

14              MR. WINTER:  Ari, we don't need a speaking

15    objection.

16              MR. HOFFMAN:  I'm just -- I'm trying to

17    understand your question specifically as to which

18    one.  Was it 21 or the 59 various subject matters?

19    BY MR. WINTER:

20         **Q.    When you said prepare "as best I could"**

21    **for all of these topics, what did you do?**

22         A.    I read through the questions.  Reviewed

23    information.  And did the best I could with the time

24    I had.

25         **Q.    You said best "with time I had."  What do**

1    you mean by that?

2         A.   I mean in my time to prepare for it.

3         Q.   **How much time did you prepare for it?**

4         A.   As much time as I could.

5         Q.   **How much time was that?**

6         A.   I'm not sure.

7         Q.   **Was it more than ten minutes?**

8         A.   Yes.

9         Q.   **Was it more than an hour?**

10        A.   Yes.

11        Q.   **Was it more than two hours?**

12        A.   Yep.

13        Q.   **Was it more than three hours?**

14        A.   Yeah.

15        Q.   **Was it more than four hours?**

16        A.   I'm not sure.

17        Q.   **Was it less than five hours?**

18        A.   I'm not sure.

19        Q.   **Was it less than ten hours?**

20        A.   Yeah.

21        Q.   **When you said you reviewed information,**

22   **what information?**

23        A.   All the information that we were speaking

24   about.  Anything pertinent to the case.

25        Q.   **Specifically what?**

1        A.    Anything I could find.

2        **Q.    Are those all documents that were provided**

3    **to me?**

4        A.    Absolutely.

5        **Q.    So can you give me examples of documents**

6    **you reviewed?**

7        A.    I don't remember the names of them,

8    anything that's been pertinent to the case thus far.

9        **Q.    How about general categories of documents?**

10   **Can you give me a general category?**

11       A.    No.

12       **Q.    Not a single general category that you**

13   **reviewed in preparation for this deposition?  You**

14   **can't recall any of them?**

15       A.    Any of them that's been given to you thus

16   far.

17       **Q.    So you reviewed all the documents you've**

18   **provided to me thus far in response to -- in**

19   **preparation for all of these topics; is that**

20   **correct?**

21       A.    Yeah.  I believe so.

22       **Q.    Text messages, I think, was a category of**

23   **documents you mentioned you looked at.**

24       **Do you recall that?**

25       A.    Yes.

1      Q.    Are text messages something you normally

2   use to communicate with customers?

3      A.    Sure.

4      Q.    Are those text messages stored on your

5   personal phone or are they routed through

6   GorillaDesk?

7      A.    A work phone, another work phone.  An

8   application called Grasshopper.  And also

9   GorillaDesk, as well as employees' work phones --

10  or, well, employees' phones, I should say.

11     Q.    You mentioned a work phone and a work

12  phone.  Is that two separate work phones?

13     A.    It is.

14     Q.    With two separate numbers?

15     A.    Yes.

16     Q.    Who uses those phones on a day-to-day

17  basis?

18     A.    One is a spare, so nobody.

19           And the other would be Kara.

20     Q.    Who?

21     A.    Kara.  Secretary.

22     Q.    Can you give me that name?  Spell it,

23  please?

24     A.    K-A-R-A.  S-A-N-S-O-N-E.

25     Q.    Is Kara your employee?

1       A.    Yes.

2       Q.    What's her job responsibilities?

3       A.    To answer the phone and respond

4    accordingly.

5       Q.    How long has she been in that role?

6       A.    Few months.

7       Q.    Who previously held that role?

8       A.    Merina.

9       Q.    Can you spell Merina's name, please?

10      A.    M-E-R-I-N-A.  S-A-B-A-T-U-C-H-I [sic].

11      Q.    Is she still -- is Merina still employed

12   with your company?

13      A.    No.

14      Q.    When did her employment cease?

15      A.    A few weeks ago.

16      Q.    And when did Merina begin employment with

17   your company?

18      A.    About a year prior.

19      Q.    So roughly in August or September of 2023?

20      A.    Sometime around there.

21      Q.    And that work phone that Kara now uses and

22   Merina used to use, is that a cell phone?

23      A.    It is.

24      Q.    Is that the main number of your company?

25      A.    No.

1      Q.    Where does the -- is there a main number

2   of your company?

3      A.    Yes.

4      Q.    What is it?

5      A.    (203)651-6871.  Previously the main number

6   was (203)828-7729.

7      Q.    (203)828?

8      A.    7729.

9      Q.    And before Merina was employed, who

10  answered calls?

11     A.    I've had a series of different people

12  answer calls for us.  People that I hired for the

13  role, people that tried to just help assist us.

14  There's high call volumes in this industry, so it's

15  one of the hardest things is keeping that phone

16  answered.

17          So I had an employee named Debbie.  Debbie

18  was there for a couple of months.  I don't even

19  remember her last name.  I can get it for you if you

20  need it.

21          Who else.  A girl named Kaitlin was very

22  temporary, maybe a couple of weeks.  It wasn't a

23  good role for her.

24          Colleen was another one, just a -- same

25  thing.  Probably lasted two weeks.  Not a good fit

1    either.

2            That's all I can recall right now.

3        Q.    You mentioned that Merina recently left

4    the company.  Is there a reason why?

5        A.    Termination.

6        Q.    You fired her?

7        A.    Correct.

8        Q.    Why did you fire her?

9        A.    Insubordination.

10       Q.    Can you explain what sort of

11   insubordination?

12       A.    Attitude.  Not following job tasks.

13   Argumentative.

14            She's a great person.  Just not a great

15   fit.

16       Q.    You mentioned Grasshopper before?

17       A.    Uh-huh.

18       Q.    What is Grasshopper?

19       A.    A call forwarding application for

20   communication.

21       Q.    Can you explain to me how Grasshopper

22   would be used in your business, under what scenario?

23       A.    Incoming calls, outbound calls, text

24   messages.

25       Q.    So then would they all be routed through

1   Grasshopper?  Is that the design of it?

2        A.   That's the idea.  But as I stated, there's

3   other phone numbers too.

4        Q.   So you mentioned your current main number

5   and the prior main number previously.

6        A.   Uh-huh.

7        Q.   Are those routed through Grasshopper?

8        A.   They're not.  The 828 is routed to a cell

9   phone.  And Grasshopper can be routed to any cell

10  phone.  But primarily it's routed to that one phone.

11       Q.   You say "that one phone."  What do you

12  mean "that one phone"?

13       A.   The phone that contains the 828 number,

14  but it was previously routed to the secondary

15  number, which we use so infrequently that I don't

16  know the number of it.

17       Q.   So calls into the (203)828-7729 were

18  routed to Grasshopper; is that correct?

19       A.   Incorrect.  That goes directly to a phone.

20       Q.   So what is Grasshopper used for then?

21       A.   For communication.

22       Q.   Communication with who?

23       A.   Customers.

24       Q.   Is that it?

25       A.   Yeah.

1    **Q.    And is Grasshopper for voice calls only?**

2    A.    No.  It's also for text messages.

3    **Q.    Does Grasshopper ever send automated**

4    **replies to text messages?**

5    A.    Yes.  To any phone calls that are missed.

6         So if a call comes in and they don't leave

7    a message, it sends an automated message back.

8    **Q.    What's the content of that message?**

9    A.    Well, it was changed.  I don't remember

10    what the previous one was, and I didn't set up this

11    one.  So I can provide that to you, but I can't

12    answer that at this moment.

13    **Q.    How about the previous one, the previous**

14    **automated message?  Do you remember what that was?**

15    A.    I don't want to say anything incorrectly

16    so I don't want to speculate.  And I don't remember

17    exactly what it said.

18         It included my name and my company name,

19    and something about sorry we missed them and --

20         (Reporter clarification.)

21         THE WITNESS:  That's okay.  And that we

22    were sorry we missed them and that we'd get back to

23    them.

24         I -- I just don't remember exactly what I

25    said.  So, again, I don't want to speculate.

1    BY MR. WINTER:

2        **Q.    Okay.  Does Grasshopper keep copies of**

3    **those text messages?**

4        A.    I'm not sure.  They might delete after a

5    certain amount of time.  I would have to look into

6    that on the application.

7        **Q.    Have you made any efforts to stop**

8    **automated deletion of documents during the course of**

9    **this lawsuit?**

10       A.    No.  I'm not sure if it deletes anything.

11   I'm under the impression that it saves it, but I'm

12   not sure.

13       **Q.    In general, are you aware of any automatic**

14   **deletion of documents?**

15       A.    No.

16       **Q.    All right.  GorillaDesk, is that used**

17   **for -- what's that used for in your business?**

18       A.    It's a CRM.  So it's a software that keeps

19   track of the customers and schedules and a little

20   bit of communication.

21       **Q.    Is there any other software that you use,**

22   **other than Grasshopper and GorillaDesk?**

23       A.    For what specifically?

24       **Q.    For your business in general.**

25       A.    Google.  Or, like, Excel and, you know,

1    Word if we had maybe a document we needed to -- to

2    make if we had to.  Asana, which is a task platform,

3    to task each other, which is something we started

4    recently.

5            The question was any other -- one more

6    time?

7            (The Record was read back.)

8            THE WITNESS:  Thank you.  I just want to

9    make sure I provide the accurate answer.

10           Tactacam, which is a trail camera

11   monitoring, for pictures for traps.

12           Arlo Go is another application.  That's a

13   software.

14           Nothing else I can think of at this time.

15   BY MR. WINTER:

**16       Q.   The last one you said was Arlo Go?  Can**

**17   you spell that please?**

18       A.   A-R-L-O is the application.  They're for

19   Arlo Go cameras to monitor traps, cages, animals.

**20       Q.   Tactacam was another one?  Does that have**

**21   a similar purpose?**

22       A.   Yep.  Same thing.

**23       Q.   Asana, you said, is a task platform?**

24       A.   Uh-huh.

**25       Q.   Can you tell me what you do in Asana on a**

1   day-to-day basis?

2       A.   Check what tasks come in.  If there's

3   anything pertinent to me or our employees, maybe

4   task an employee to do something.

5            It's like a to-do list.

6       Q.   Okay.  How do you handle creating a route

7   for someone to go give -- provide pest control

8   services to a customer?

9       A.   I don't.  Kara does.

10      Q.   Do you know what app -- what she uses to

11  create a route?

12      A.   GorillaDesk.

13      Q.   So getting back to GorillaDesk --

14      A.   Sure.

15      Q.   -- I think you said it was a CRM software

16  that is used to keep track of customers and

17  schedules and, now, routes?

18      A.   Uh-huh.

19      Q.   Is that accurate?

20      A.   Yes.

21      Q.   Is there anything else that you use

22  GorillaDesk for?

23      A.   Well, there's a lot of features in

24  GorillaDesk, a lot of which I don't yet understand.

25  I haven't taken the time to understand that software

1  as much as we could use it for.  So, I mean, that's

2  what we use it for, as well as, like, material

3  tracking, things like that.

4        Q.    Okay.  So for GorillaDesk, we've got

5  keeping track of customers, schedules, routes,

6  material tracking.

7             What else do you use it for?  Not what

8  GorillaDesk can do.  I'm asking what you use

9  GorillaDesk for, other than keeping track of

10 customers, schedules, routes and material tracking?

11       A.    I don't think anything else.

12       Q.    What do you use for accounting?

13       A.    A company called Frxan.  F-R-X-A-N.

14             Oh, and QuickBooks.  I'm sorry.  But it's

15 done through Frxan.

16       Q.    Is Frxan an online software, or is it a

17 locally installed software?  What is it?

18       A.    No, so they're a company that we contact

19 that they track everything through QuickBooks.

20       Q.    How does revenue get input into Frxan?

21       A.    They have a login on GorillaDesk and they

22 track all that for us.

23       Q.    So when you get paid by a customer, does

24 it get put into GorillaDesk?

25       A.    Yes.

**Q. So then GorillaDesk would have accounting records on it; is that correct?**

A. Yeah, it could.

**Q. What else do you use to track incoming revenue from your customers?**

A. Strike Capital, which is routed through GorillaDesk. I forgot about that.

**Q. Strike Capital, is that a credit card processor?**

A. Yes. Third-party.

**Q. And where does Strike Capital deposit any credit card money that comes in?**

A. Into a bank account.

**Q. Where is that bank?**

A. TD Bank.

**Q. Do you ever accept checks for your services?**

A. Yes.

**Q. How are those deposited?**

A. Into the bank account, TD Bank, and inputted into GorillaDesk, either by a technician or a secretary or myself.

**Q. Did you grow up in Connecticut?**

A. Yes.

**Q. Where in Connecticut?**

```
 1      A.   Seymour.
 2      Q.   And now you live in Naugatuck; is that
 3  right?
 4      A.   Yes.
 5      Q.   Where did you go to school?
 6      A.   Seymour High School.
 7      Q.   Do you have any education after high
 8  school?
 9      A.   A few months at a technical school for
10  mechanics.  I hated it.
11      Q.   "Technical school for mechanics" as in
12  automotive?
13      A.   Yes.
14      Q.   What was your first job after high school?
15      A.   I have to think about it.  I've a lot of
16  jobs, to be honest.
17           I worked at Sunoco in Ansonia, pumping
18  gas.  I worked at Charter Arms in Shelton, building
19  firearms.  I worked at Fox Pest Control as a
20  technician.  I worked at Yale Termite and Pest
21  Elimination as a technician.
22      Q.   After Yale Termite and Pest, is that when
23  you started working exclusively for your current
24  company?
25      A.   Yes.
```

1    **Q.    How long did you work for Fox Pest**
2    **Control?**

3    A.    Less than a year.

4    **Q.    Do you do any sort of training to have**
5    **that job at Fox Pest Control?**

6    A.    Yes.

7    **Q.    What's that training?**

8    A.    In-the-field training.  They would bring
9    us out and show us what to do.

10    **Q.    What sorts of examples of things would**
11    **you -- did you do for Fox Pest Control?**

12    A.    Quarterly maintenance services.  One-time
13    services, problem accounts.  Things like that.

14    **Q.    Would that include wildlife trapping?**

15    A.    No.

16    **Q.    What would the actual service be, examples**
17    **of the actual services that you did?**

18    A.    Can you please, like, be specific?  I
19    don't know what you mean.

20    **Q.    Well, did you trap mice?  Did you apply**
21    **termite --**

22    A.    Oh.  Oh.

23    **Q.    -- pest -- what did you specifically do at**
24    **Fox Pest Control?**

25    A.    So the general maintenance services that

Case 3:23-cv-01246-RNC    Document 123-8    Filed 06/18/25    Page 43 of 383

Page 42

1    we would do included replenishing rodenticide, bait

2    stations, treating foundations, removing spider

3    webs.  Things like that.  Customer service.

4         Q.   And then Yale Termite and Pest, how long

5    did you work for them?

6         A.   Nearly seven years.

7         Q.   Where is Yale Termite and Pest based?

8         A.   Ansonia.

9         Q.   And did -- were you a technician for them

10   the entire time?

11        A.   Yes.

12        Q.   Was your role exclusively going out to

13   customer sites to apply pesticides or deal with

14   wildlife, things like that?  Is that the exclusive

15   purview of your job at Yale Termite and Pest?

16        A.   Yes.  Also sales, problem accounts, things

17   like that.

18        Q.   When you say "sales," what types of tasks

19   would you do in sales?

20        A.   Well, I would sell them the jobs that I

21   had been trained on.  So if they didn't know how to

22   quote it over the phone based off square footage or

23   whatever the case may be, I'd provide them a more

24   accurate estimate.

25        Q.   When you say "provide them a more accurate

1    estimate," who is "them"?

2          A.    The customers that I would be sent to.

3          Q.    **And how would those customers normally**

4    **come in such that you would be sent to them?**

5          A.    Through our office.

6          Q.    **Would they call, would they e-mail, text,**

7    **all of the above?**

8          A.    I have no idea.  I was just given a route

9    and told to follow it.  Or the office would give me

10   an address and tell me where to go.  So I really

11   don't know.

12         Q.    **And were you provided a work truck to use**

13   **to get to those addresses?**

14         A.    Yes.

15         Q.    **Did that work truck have the Yale Termite**

16   **and Pest branding on it?**

17         A.    Yes.

18         Q.    **Did you aware a Yale termite and pest**

19   **shirt?**

20         A.    Yes.

21         Q.    **Did you leave any signs with the customer**

22   **or door tags or anything that had the Yale Termite**

23   **and Pest logo on it?**

24         A.    Well, we would leave post signs after we

25   would treat, with our name, our company name on it.

1          We would also leave door hangers if we

2   missed the customer under certain situations.  Maybe

3   an occasional business card.  A copy of a work

4   order, because we had physical paperwork there.

5          **Q.   Do you use physical paperwork at your**

6   **current company?**

7          A.   Not really.  It's inefficient.

8          **Q.   Have you ever worked for any other company**

9   **that uses "black widow" as their branding?**

10         A.   No.

11         **Q.   So do you recall you were on the "Pest**

12  **Control Millionaire" podcast several months ago?**

13         A.   Uh-huh.  Yes.

14         **Q.   So I'm going to play for you a recording**

15  **of that.**

16         A.   Sure.

17              (Video playing.)

18  BY MR. WINTER:

19         **Q.   So I just played you a portion of the**

20  **"Pest Control Millionaire" podcast; is that**

21  **accurate?**

22         A.   Yes.

23         **Q.   In that, you were discussing how for**

24  **several years you were trying to become a cop; is**

25  **that accurate?**

1      A.    Yes.

2      Q.    **And in that portion of the podcast, you**

3  **mentioned you were exiled out of the Academy; is**

4  **that right?**

5      A.    Yes.

6      Q.    **What happened?**

7      A.    Do I have to answer that?

8      Q.    **Yes.  You do.**

9      A.    They disqualified me for something they

10  knew about from the beginning of the process.

11      Q.    **What was that something?**

12      A.    Marijuana usage between friends when I was

13  younger, about 15 years old.

14      Q.    **And you disclosed that to them early on in**

15  **the process; is that accurate?**

16      A.    Yes.  Before my lie detector test, that I

17  also passed, by the way.

18      Q.    **There was a lie detector test?**

19      A.    It's part of the process to become a

20  police officer.  Yes, sir.

21      Q.    **And is during the lie detector test when**

22  **they asked you about marijuana use?**

23      A.    Yes.

24      Q.    **And you told them that you had used**

25  **marijuana previously?**

1     A.   Yes.

2     Q.   And that's what disqualified you; is that

3  correct?

4     A.   Yes.  Ultimately.

5     Q.   On the podcast, you mentioned it was a

6  "charged" situation?

7     A.   Yes.

8     Q.   Why?

9     A.   Because it's still a charged topic today.

10    Q.   Marijuana use is a charged topic today?

11    A.   To my belief, yes.

12    Q.   It is legal in Connecticut to your

13  knowledge; is that right?

14    A.   That's correct.

15    Q.   Was that prior to your job at Fox Pest

16  Control?

17    A.   Was what prior to my job?

18    Q.   The Police Academy situation, was that

19  prior to your employment at Fox Pest Control?

20    A.   No.  It was after that.

21    Q.   So then your first pest control job was

22  Fox Pest Control.  Then you spent about four, four

23  and a half years trying to become a cop.  And then

24  you worked for Yale Termite and Pest Control.  And

25  then after that, you worked for your current

1    company, Black Widow; is that right?

2        A.    There was an overlap.  My time spent

3    trying to become a police officer, I was still

4    working full time to support myself and pay my

5    bills.  So I was still working for Yale Termite and

6    Pest Elimination, which my boss encouraged was aware

7    of, the fact that I was under that -- or I should

8    say in that process.

9        Q.    How many people do you currently employ?

10        A.    Six.

11        Q.    Does that include you?

12        A.    No.

13        Q.    Are all -- are all of those individuals

14    full time?

15        A.    Yes.

16        Q.    How many of them are technicians?

17        A.    Five.

18        Q.    And the other one -- what was her name?

19        A.    Kara.

20        Q.    Kara?

21        A.    Uh-huh.

22        Q.    And she's -- is she your office manager?

23        A.    I don't have an office manager currently.

24        Q.    Was Merina your office manager?

25        A.    Technically, yes.

1      Q.    Are you looking to employ a new office

2   manager now?

3      A.    I haven't decided yet what I'm going to

4   do.

5            MR. WINTER:  Okay.  We'll mark this 13.

6            (Plaintiff's Exhibit Number 13 was marked

7   for identification, as of this date.)

8   BY MR. WINTER:

9      Q.    I handed you a letter from Charney IP Law,

10   LLC, dated August 10th, 2023.

11           Do you see that?

12     A.    August 10th 2023, yes.

13     Q.    When did you receive that letter?

14     A.    I'm assuming August 10th, 2023.

15     Q.    You did receive that letter on or about

16   August 2023 -- is that -- August 10th, 2023; is that

17   correct?

18     A.    Give me one moment to review and I will

19   confirm.

20           (Witness reviews document).

21           Yes.  I believe so, to the best of my

22   knowledge at this point.

23           There's actually a typo here.  W.  It

24   looks like this --

25           THE COURT REPORTER:  I have to understand

1  you.  "It looks like"?

2          THE WITNESS:  Sorry.  It looks like

3  there's a typo in the name here.  The W is not

4  pronounced.  Just to mention it.

5  BY MR. WINTER:

6      Q.    **I think it's a printing error.**

7      A.    I just wanted to make sure about that.

8      Q.    **How did you come up with the name Black**

9  **Widow?**

10     A.    Well, my last name is Black, so I wanted

11 to include something with my last name that didn't

12 come off as -- maybe abrasive.

13          I thought of a bunch of different things

14 with it.  And one day I had a conversation with my

15 mother about it.  And we were talking about her old

16 widow/widowers group.

17          I said "Widow"?  And I went, "Huh."  So

18 kind of how to be a tribute to my mom and my name

19 and it is a pest that's commonly controlled in this

20 industry.  That would work.

21          So I came up with the term Black Widow.

22     Q.    **So there's a secondary meaning to the**

23 **brand in the sense that it refers to your last name**

24 **and your mom being a widow; is that accurate?**

25     A.    My mother is not a widow.  She used to run

1    a widow/widowers group, so...

2         Q.   So then the secondary meaning to the brand

3    Black Widow you adopted is that it refers to your

4    last name and your mom being involved with a widow

5    or widowers group; is that accurate?

6              MR. HOFFMAN:  Objection.

7              You can answer if you understand.

8              THE WITNESS:  Re-ask the question if you

9    don't mind.

10             MR. WINTER:  Can you read it back.

11        (The Record was read back.)

12             THE WITNESS:  Yes.

13   BY MR. WINTER:

14        Q.   Your personal name is not Black Widow; is

15   that correct?

16        A.   My personal name is not Black Widow?

17             My name is Blake-Joseph Black.  So no.  My

18   last name is Black, like the color.

19        Q.   So your birth certificate doesn't include

20   "Black Widow" on it; is that correct?

21        A.   Yes, that's correct.

22        Q.   Okay.

23             We were talking about how you came up with

24   your name and how you wanted to include your last

25   name, Black, and you said, I believe, that you

1    considered a bunch of different things.

2              Is that accurate?

3        A.   When coming up with a name, I was trying

4    to snowball a bunch of different ideas, but nothing

5    stuck.

6        Q.   What were those bunch of different ideas?

7        A.   I don't remember.  That was four years

8    ago.

9        Q.   Can you remember any --

10       A.   I have no idea.  It was four years ago.

11   Sorry.

12             MR. WINTER:  So this will be 14.

13             (Plaintiff's Exhibit Number 14 was marked

14   for identification, as of this date.)

15   BY MR. WINTER:

16       Q.   So I have Exhibit 14, and I would ask you

17   to have both 14 and 13 in front of so you can refer

18   to both of them.

19       A.   Sure.

20       Q.   Have you seen PX14 before?

21       A.   Give me one moment to answer the question

22   so I may review.

23             (Witness reviews document).

24             Yes.

25       Q.   And PX14 is dated August 17th, 2023; is

1  that accurate?

2       A.   Could you repeat that one more time.

3       Q.   **PX14 is dated August 17th, 2023; is that**

4  **correct?**

5       A.   That is correct, yes.

6       Q.   **And at the time Hugh Pfabe was your**

7  **attorney; is that accurate?**

8       A.   Yes.

9       Q.   **Both you and your company; is that**

10 **accurate?**

11      A.   Yes.

12      Q.   **And how did it come about that Hugh Pfabe**

13 **was writing this letter?**

14      A.   I hired him.

15      Q.   **In response to PX -- were you receiving**

16 **PX13; is that correct?**

17      A.   Correct.

18      Q.   **What did you think when you received PX13?**

19      A.   What did I think?

20           MR. HOFFMAN:  Objection.

21           Just in terms of time frame, what did he

22 think at the time that -- upon review of Exhibit 13?

23           MR. WINTER:  Sure.

24 BY MR. WINTER:

25      Q.   **What did you think upon receiving PX13?**

1          A.    Well, I didn't understand it, which is why

2     I looked for legal representation, to better

3     understand the letter I received.

4          **Q.    Do you understand what a trademark is?**

5          A.    Do I understand what a trademark is?

6     Somewhat.

7          **Q.    Do you own a trademark?**

8          A.    No.

9          **Q.    You don't own any rights to "Black Widow"?**

10         A.    I'm not sure anyone does.

11         **Q.    So you don't own any exclusive rights to**

12    **"Black Widow" in Connecticut; is that accurate?**

13              MR. HOFFMAN:  Objection.

14              THE WITNESS:  I wouldn't agree to that

15    statement.

16    BY MR. WINTER:

17         **Q.    So anybody can use the words "black widow"**

18    **in connection with termite and pest Control in**

19    **Connecticut?**

20         A.    I can't answer that.

21         **Q.    Would you object to anybody else using**

22    **"black widow" in termite and pest Control in**

23    **Connecticut?**

24         A.    Would I object to anybody else using

25    "black widow" for termite and pest control in

1    Connecticut?  I'm not sure.

2        **Q.    Have you ever objected to anybody using**

3    **"black widow" for Termite and Pest control in**

4    **Connecticut?**

5        A.    I'm not sure.

6        **Q.    Do you have a counterclaim in this**

7    **lawsuit?**

8        A.    Yes.

9        **Q.    Is that a counterclaim where you've**

10   **accused my client of infringing your rights in**

11   **"Black Widow"?**

12       A.    Yes.

13       **Q.    So then do you own rights in "Black Widow"**

14   **or not?**

15             MR. HOFFMAN:  Objection.  Calls for a

16   legal conclusion.

17             THE WITNESS:  Does anyone?

18   BY MR. WINTER:

19       **Q.    I'm looking for the answer to the**

20   **question; not a question.**

21             MR. HOFFMAN:  Same objection.

22             THE WITNESS:  That was my answer.

23   BY MR. WINTER:

24       **Q.    So your answer is that nobody owns the**

25   **rights to the term "Black Widow" --**

1          MR. HOFFMAN:  Objection.

2    BY MR. WINTER:

3        Q.    -- in Connecticut; is that right?

4          MR. HOFFMAN:  Objection.

5    Mischaracterizing testimony.

6          Is there a question pending?

7          MR. WINTER:  Uh-huh.

8          THE WITNESS:  Do you mind being more

9    specific, please.

10    BY MR. WINTER:

11       Q.   So is your position that nobody owns the

12    right to the term "Black Widow" for termite and pest

13    control in Connecticut; is that right?

14          MR. HOFFMAN:  Objection.

15          THE WITNESS:  I'm not sure.

16    BY MR. WINTER:

17       Q.   Do you own exclusive rights to "Black

18    Widow" for termite and pest control in Connecticut?

19          MR. HOFFMAN:  Same objection.

20          THE WITNESS:  I'm not sure.

21    BY MR. WINTER:

22       Q.   Have you made a counterclaim against my

23    client, asserting that you own common-law rights to

24    "Black Widow" for termite and pest control in

25    Connecticut?

1      A.    Yes.

2      Q.    **So then you assert that you own rights to**
3   **"Black Widow" for termite and pest control in**
4   **Connecticut; is that right?**

5      A.    Yes.

6      Q.    **How did you develop those rights?**

7      A.    I don't know.

8      Q.    **So you have rights but you don't know how**
9   **you acquired those rights; is that accurate?**

10          MR. HOFFMAN:  Objection.

11          THE WITNESS:  I don't know.

12   BY MR. WINTER:

13      Q.    **You have rights to "Black Widow" for**
14   **termite and pest control in Connecticut, but you**
15   **don't know how you acquired those rights; is that**
16   **accurate?**

17          MR. HOFFMAN:  Same objection.

18          THE WITNESS:  I don't know how to answer
19   that question.

20   BY MR. WINTER:

21      Q.    **Well, you either know how you acquired the**
22   **rights or you don't know how you acquired the**
23   **rights.**

24          MR. HOFFMAN:  Same objection.

25

1   BY MR. WINTER:

2       Q.   Do you know how you acquired rights to

3   "Black Widow" for termite and pest control in

4   Connecticut?

5       A.   I'm not sure.

6       Q.   Do you know how rights are acquired in

7   a -- for a trademark?

8       A.   I'm not sure.

9       Q.   Have you made any effort to promote your

10  brand in Connecticut?

11          MR. HOFFMAN:  Objection.

12          THE WITNESS:  In terms of what?

13  BY MR. WINTER:

14      Q.   Have you made any effort to promote

15  your -- the brand "Black Widow" for termite and pest

16  control in Connecticut?

17          MR. HOFFMAN:  Same objection.

18          THE WITNESS:  What does that mean exactly?

19  BY MR. WINTER:

20      Q.   What have you done to promote your brand,

21  Black Widow Termite and Pest Control, in

22  Connecticut?

23      A.   In terms of just what exactly?

24      Q.   Have you done anything to promote your

25  brand, Black Widow Termite and Pest Control in

1    Connecticut?

2        A.    Yes.

3        Q.    What?

4        A.    Created social media accounts.  Create

5    content for social media accounts.  Gone to

6    networking events.  BNI events.  Visited businesses.

7    Given presentations to home inspectors, to real

8    estate professionals.  Several things.

9        Q.    When you go and promote your brand to

10    those individuals or the societies you mentioned,

11    what do you promote to them?  Do you promote the

12    name Black Widow?  Do you promote your personal

13    name?

14            What do you promote?

15        A.    Our company.

16        Q.    You say "our company," what are the --

17    what words do you use to promote your company?

18            MR. HOFFMAN:  Objection.

19            THE WITNESS:  Our name.

20    BY MR. WINTER:

21        Q.    What's your name?

22        A.    Black Widow Pests Specialists.

23        Q.    And you promote that name, Black Widow

24    Pest Specialists, to those individuals and

25    organizations that you mentioned; is that correct?

1      A.   Absolutely.  And some, I represent myself

2  as an educator.

3      Q.   Why is it that you use your company name

4  to promote to those individuals and organizations?

5      A.   So we can help them.

6      Q.   So that they can hire you to do pest

7  control or wildlife trapping for them; is that

8  accurate?

9      A.   Of course.

10      Q.   So they can refer customers to Black Widow

11  Termite and Pest Specialists; is that right?

12      A.   Of course.

13      Q.   And you always use your company name -- it

14  includes the words "Black Widow" -- and it's to

15  promote to those individuals; is that accurate?

16      A.   Correct.

17      Q.   And it's your hope that, in doing so, that

18  they call you to hire you to do work for them; is

19  that accurate?

20      A.   Yes.

21      Q.   Or that they refer your name to one of

22  their clients or contacts; is that accurate?

23      A.   Correct.

24      Q.   I'd like you to look at PX14 again.

25           Can you look at the last paragraph on

1    page 2.

2              And after the first sentence, it says:

3    "As you have sent this letter to my client and one

4    other business, which is not affiliated with my

5    client (blackwidowpestmanagement@gmail.com)."

6              Do you see that statement?

7    A.    Yes.

8    Q.    The e-mail address,

9    blackwidowpestmanagement@gmail.com, is not

10   affiliated with your company; is that accurate?

11        A.    Correct.

12        Q.    And the next e-mail address,

13   blackwidowpestspecialists@gmail.com, is affiliated

14   with your company; is that correct?

15        A.    Correct.

16              MR. WINTER:  We'll mark -- you just keep

17   that open.

18              THE WITNESS:  Okay.

19              (Plaintiff's Exhibit Number 15 was marked

20   for identification, as of this date.)

21   BY MR. WINTER:

22        Q.    All right.  Can you look at PX15 right

23   there.

24        A.    Sure.

25        Q.    So this is a certificate of organization

1    from the secretary of state of Connecticut.

2              Do you see that at the top there?

3       A.   I do.

4       Q.   And then there's a box.  It says, "Filing

5    party."  It says, "Rosenberg Whewell & Hite, LLC."

6              Do you see that?

7       A.   I do.

8       Q.   Is that the lawyer who formed your LLC?

9       A.   It was.

10      Q.   And then at block 1, name of limited

11   liability company, Black Widow Pest Specialists,

12   LLC; is that correct?

13      A.   Yes.

14      Q.   So to your knowledge this is the

15   certificate of organization for your company; is

16   that correct?

17      A.   Yes.

18      Q.   Can you look at the second page, Number 7.

19      A.   Uhm.

20      Q.   Can you tell me what e-mail address is

21   there?

22      A.   Yeah.  The wrong one.

23      Q.   Is that --

24      A.   Blackwidowpestmanagement@gmail.com.  One

25   that we're not affiliated with.

1      Q.   I see.

2           But this was filed with the Connecticut

3    secretary of state, indicating that that was your

4    e-mail address; is that accurate?

5      A.   Yes.  But I'd also like to point out how

6    they also improperly spelled the street name.  It's

7    Curtiss, with two S's.  They improperly spelled my

8    name, which is Blake-Joseph Black.

9           So it looks like there was a couple of

10   typos here.

11     Q.   These good attorneys?

12          MR. HOFFMAN:  Objection.

13          THE WITNESS:  I'm not sure, but...

14   BY MR. WINTER:

15     Q.   So you can understand why my client

16   would've sent an e-mail to

17   blackwidowpestmanagement@gmail.com, because of this

18   document?

19     A.   Sure.

20     Q.   So it would be reasonable to assume from

21   this document that that would be your e-mail

22   address, right?

23     A.   Would it be reasonable, yes.  But that is

24   not my e-mail.

25     Q.   Got it.

1            So then on page 2 of Hugh Pfabe's letter,

2    on the last paragraph --

3        A.   One moment, please.  I just want to look

4    at some things.

5            (Witness reviews document.)

6            Because if I remember correctly, they also

7    had the improper phone number for me on there.

8    There was another typo.  But I don't see it here,

9    so...

10       Q.   So these guys made a lot of mistakes,

11   didn't they?

12           MR. HOFFMAN:  Objection.

13           THE WITNESS:  I'm not sure.

14   BY MR. WINTER:

15       Q.   Well, you identified a couple of mistakes

16   on your certificate of organization, correct?

17       A.   Correct.

18       Q.   Phone number, the address, and the e-mail

19   address are all wrong on your certificate of

20   organization; is that right?

21       A.   And my name, yes.

22       Q.   Is Joseph your middle name?

23       A.   No.  It's my first name.  Blake-Joseph.

24   It's hyphenated.

25           MR. WINTER:  Okay.

1          MR. HOFFMAN:  When it's convenient for

2   you, let's take a break.

3          MR. WINTER:  Yeah, let's take a break.

4      (Off the record.)

5   BY MR. WINTER:

6      Q.   You understand you're still under oath?

7      A.   I do understand it, yes.

8      Q.   Earlier we were talking about how you

9   developed your name for the company, the combination

10  of your last name and reference to your mom being

11  involved in a widowers group.

12          Do you remember that?

13     A.   I do.

14     Q.   So the adoption of the name "Black Widow"

15  is a play on words; is that correct?

16     A.   Was a what?

17     Q.   Play on words; is that correct?

18     A.   Yes.  It's also a pest that's controlled

19  in the industry commonly, which I also said with

20  that answer.

21     Q.   So you agree that it's also a play on

22  words; is that correct?

23     A.   Yes.

24     Q.   I'll just repeat that.

25          So "Black Widow" is a play on words; is

1    that correct?

2        A.    It could be, yes.

3        Q.    **For your business it is; is that correct?**

4              MR. HOFFMAN:  Objection.

5              THE WITNESS:  It could be, yes.

6    BY MR. WINTER:

7        Q.    **Why do you say "it could be"?**

8        A.    Because it could be defined lot of

9    different ways.

10       Q.    **How else could it be defined?**

11       A.    As a pest commonly controlled in this

12   industry.

13       Q.    **How else?**

14       A.    I just explained.

15       Q.    **So it's either a pest in the industry or**

16   **it's a play on words, your reference to a**

17   **combination of your last name and your mother being**

18   **associated with a widowers group; is that correct?**

19       A.    Yes.

20       Q.    **So one way in which "Black Widow" could be**

21   **understood is as a play on words; is that correct?**

22       A.    I suppose.

23       Q.    **You say you "suppose."  You seem not**

24   **100 percent clear one way or the other.**

25             **Is that accurate or is it a play on words?**

```
 1              MR. HOFFMAN:  Objection.
 2              THE WITNESS:  The play on words was your
 3    definition, not mine.
 4    BY MR. WINTER:
 5         Q.   How else would you define it, then?
 6         A.   I already did.
 7              It's a pest commonly controlled in this
 8    industry by technicians.
 9         Q.   How much -- how many jobs in the last
10    month has your company done with black widow
11    spiders?
12         A.   None that I can think of because they're
13    not in the -- this side of the country.
14         Q.   So they're not common in Connecticut?
15         A.   No.
16         Q.   Black widow spiders are not common pests
17    in Connecticut; is that accurate?
18         A.   Correct.  They're not common on this side
19    of the country.
20         Q.   When you say "this side of the country,"
21    where does "this side" begin and end?  The
22    Mississippi?  Where does it become common?
23         A.   I don't know.
24         Q.   Where do black widow spiders become common
25    pest?
```

1      A.   I'm not sure.  They're commonly controlled

2  in our industry.

3      Q.   But you don't know where?

4      A.   No.

5      Q.   Have you ever dealt with a black widow

6  spider pest control job in Connecticut?

7      A.   No, not that I can recall.

8      Q.   Have you ever dealt with a black widow

9  spiders pest control job at all?

10      A.   No.

11      Q.   Sitting here today, can you identify any

12  amount of revenue from your company related to

13  control of black widow spiders?

14      A.   Probably zero, unless it was misidentified

15  because we don't have them in this state.

16      Q.   So black widow spiders are not in this

17  state, correct?

18      A.   Correct.

19      Q.   Is that why you -- one of the reasons that

20  you thought Black Widow was a good name because it's

21  not a common pest in Connecticut?

22      A.   Is that why I thought it was a good name?

23           MR. HOFFMAN:  I will object to that

24  question.

25           THE WITNESS:  That doesn't make sense.

1              Could you please be more specific.

2    BY MR. WINTER:

3        Q.    Did you conduct any search when adopting

4    the name "Black Widow" for your business?

5        A.    Did I conduct any search?  No, I hired a

6    lawyer to search for me and for my LLC.

7        Q.    And that lawyer was associated with

8    Rosenberg Whewell & Hite; is that correct?

9        A.    That's correct.

10       Q.    What was that lawyer's name?

11       A.    I don't recall.  It was somebody at that

12   firm.

13       Q.    Max Rosenberg?

14       A.    I suppose.

15       Q.    What sort of search did they conduct?

16       A.    I have no idea.

17       Q.    Do you have a copy of any search results?

18       A.    No.

19       Q.    Do you know if any search results were

20   generated?

21       A.    I'm not sure.

22       Q.    Do you know if any written document was

23   generated to deliver the results of that search?

24       A.    I'm not sure.

25       Q.    Have you asked them?

```
 1                MR. HOFFMAN:  Objection.
 2                THE WITNESS:  I don't know.  I don't think
 3     so.
 4     BY MR. WINTER:
 5         Q.    In connection with gathering documents for
 6     this lawsuit, have you contacted Rosenberg Whewell &
 7     Hite to see if they have any documents?
 8         A.    I'm not sure.
 9         Q.    Have you personally contacted them?
10         A.    Well, I personally haven't, no.
11         Q.    Has anybody in your company contacted
12     them?
13         A.    Not to my recollection, no.
14         Q.    If anybody else would have contacted them,
15     who would that be?
16         A.    Nobody else would have.
17         Q.    So your company would not have contacted
18     Rosenberg Whewell & Hite upon receipt of our
19     document production requests to obtain any documents
20     in their files; is that accurate?
21                MR. HOFFMAN:  Objection.
22                THE WITNESS:  Yeah, I don't think so.
23     BY MR. WINTER:
24         Q.    Do you know if Hugh Pfabe ever contacted
25     them?
```

1      A.   I'm not sure.

2      **Q.   Did you ever identify this law firm to**

3   **Hugh Pfabe?**

4      A.   Yes.

5      **Q.   Would you have identified your contact**

6   **person at that law firm?**

7      A.   I don't remember.

8      **Q.   You said that they conducted a search, the**

9   **law firm; is that accurate?**

10     A.   I believe so.  That's what I hired them to

11   do, so I'm not sure.  Unless there's a

12   misunderstanding.

13     **Q.   Did you hire them to do a trademark**

14   **search?**

15     A.   I hired them to form an LLC.

16     **Q.   Did you hire them to do a trademark**

17   **search?**

18     A.   At the time of forming my business, I

19   didn't know what any of that was.

20          I hired them to form an LLC.

21     **Q.   Look, you can just answer "no" to "did you**

22   **hire them to do a trademark search," right?**

23          **So did you hire them to do a trademark**

24   **search, "yes" or "no"?**

25     A.   What I'm trying to do is provide you the

1    best quality answer for your question.

2         Q.   The answer to that question is either

3    "yes" or "no."  You either hired them to do a

4    trademark search or you did not hire them to do a

5    trademark search, right?

6              I'd like to know -- the question is, did

7    you hire Rosenberg Whewell & Hite to perform a

8    trademark search for your business, "yes" or "no"?

9              MR. HOFFMAN:  To the best of your

10   recollection, you can answer.

11             THE WITNESS:  No.

12   BY MR. WINTER:

13        Q.   Okay.  And you personally never conducted

14   a trademark search on your own?

15        A.   No.  I didn't know what a trademark was.

16        Q.   Did you conduct any other search on your

17   own related to the term "black widow"?

18        A.   What do you mean?

19        Q.   Did you do any searching?  Did you look on

20   Google, did you look on the Internet, did you look

21   at any -- anything?

22             Did you do anything to search for whether

23   "black widow" was an available name?

24        A.   I relied on this lawyer to do that for me.

25        Q.   You did not do any personal searching for

1    **yourself for the term "black widow"?**

2        A.    No.

3            (Plaintiff's Exhibit Number 3, previously

4    marked.)

5    BY MR. WINTER:

6        **Q.    Okay.**

7            **I have here the podcast, which is marked**

8    **as PX3 starting at 33:36.**

9            **I want you to watch some of this.**

10       A.    Is there any audio for this?

11           MS. GEROLD:  It might be muted.

12           MR. WINTER:  So hold on.  I'm starting it

13   at -- PX3 33:35.

14           (Video playing.)

15   BY MR. WINTER:

16       **Q.    I will pause that at 34:56.**

17           **Do you see that?**

18       A.    I sure do.

19       **Q.    You just said on that podcast you did a**

20   **search and nothing came up?**

21       A.    Yeah.  Referencing talking to the lawyers

22   about it.  I didn't search myself.  The lawyer did.

23   And just before that, I also referenced the -- the

24   importance of having a good lawyer, so...

25       **Q.    Why is that important?**

1      A.    To make sure there's no errors or

2  conflicts.

3      **Q.    But they didn't do a trademark search,**

4  **correct?**

5      A.    I'm not sure what they did.  I'm not them.

6      **Q.    Why do you think you wanted to give the**

7  **listeners some good advice to get a good lawyer; why**

8  **is that?**

9      A.    So they don't have to sit here, waste

10  valuable time of other people and themselves.

11      **Q.    Do you think this is a waste of time?**

12      A.    No, sir.  I just don't want them to go

13  through that.

14      **Q.    Do you want to go through it?  Are you**

15  **enjoying this?**

16          MR. HOFFMAN:  Objection.

17          THE WITNESS:  Isn't that a personal

18  question, unrelated to the topics at hand?

19  BY MR. WINTER:

20      **Q.    Can you answer the question, please.  Do**

21  **you enjoy this?**

22          MR. HOFFMAN:  What is the question?

23          THE WITNESS:  Off what basis?

24  BY MR. WINTER:

25      **Q.    Are you enjoying this, being involved in a**

1    lawsuit?

2            MR. HOFFMAN:  Objection.  Objection.

3    BY MR. WINTER:

4        Q.    Are you refusing to answer my question?

5        A.    Isn't that a personal situational-type

6    question that's unrelated to this topic?

7        Q.    Mr. Black, your role here is to answer my

8    questions.  If you don't understand my questions,

9    you can tell that to me.

10            If your attorney objects and tells you not

11   to answer, that is the only time that you do not

12   answer, unless you decide personally that you're

13   refusing to answer my question.

14            Do you understand that?

15            MR. HOFFMAN:  So let me understand this.

16   Are you asking the witness whether he's enjoying --

17            MR. WINTER:  Ari -- Ari --

18            MR. HOFFMAN:  No, no.  Let me -- can I

19   finish?

20            MR. WINTER:  Look --

21            MR. HOFFMAN:  Can I finish?

22            MR. WINTER:  I'd like him to understand --

23            MR. HOFFMAN:  Can I finish?

24            MR. WINTER:  Yeah.  Sure.  Go ahead.

25            MR. HOFFMAN:  Thank you.

1                    Are you asking the witness during this

2    deposition whether he's enjoying this lawsuit?  Is

3    that your question in this deposition?

4                    MR. WINTER:  I think that's what I just

5    asked, yeah.

6                    MR. HOFFMAN:  Okay.  Okay.

7                    You can answer it if you'd like to.

8                    The question is, are you enjoying this

9    lawsuit?

10                    That's what Attorney Winter just asked

11    you.

12                    THE WITNESS:  Give me just one moment to

13    respond, if you will.

14    BY MR. WINTER:

**15        Q.    Sure.**

16        A.    My answer is, I'm not sure anybody enjoys

17    lawsuits.  But I am enjoying the time that we're

18    spending together, because you all seem to be good

19    people.

**20        Q.    Is your brand name important to you, Black**

**21    Widow?**

22        A.    It is.

**23        Q.    Why is it important?**

24        A.    Because it's something I created.

**25        Q.    What in your mind did you create?**

1      A.    Well, not in my mind, but in reality I

2   created a company.

3      Q.    **Is that company successful?**

4            MR. HOFFMAN:  Objection.

5            THE WITNESS:  I'm not sure.  How do you

6   define success?

7   BY MR. WINTER:

8      Q.    **Do you think it's successful?**

9      A.    I'm not sure.

10     Q.    **You don't know if your company is**

11  **successful or not?**

12     A.    I don't know.  There's a lot of different

13  ways to define success.  On what basis do you define

14  success?

15     Q.    **How do you define success?**

16     A.    I don't.  Success is something you work

17  hard for every day.  I don't know if anybody ever

18  achieves success.

19     Q.    **Do you work hard for your business?**

20     A.    I'd like to think so, yes.

21     Q.    **Why is the name "Black Widow" important to**

22  **your business?**

23     A.    Because it's the name of my business.

24     Q.    **Is it important because that's how**

25  **customers recognize you?**

1       A.   There's several -- several reasons why

2  it's important.

3       **Q.   Is that one of the reasons?**

4       A.   Maybe.

5       **Q.   So the use of the name "Black Widow" is**

6  **important to your business because that's how**

7  **customers recognize you; is that accurate?**

8       A.   It's one of the ways.  Because of the

9  reputation that we have built.

10      **Q.   What's the reputation you've built?**

11      A.   Go on Google.  Five stars.  We have a

12  great reputation.

13      **Q.   Do you ever get any negative reviews?**

14      A.   One once.  Over a miscommunication.

15           But I thanked that customer for her

16  valuable feedback.  I put things in places to avoid

17  that from happening again.

18      **Q.   Who is that customer?**

19      A.   I don't recall her name.

20           It's on Google.  You can go find it.

21      **Q.   When was that?**

22      A.   I don't recall.

23      **Q.   Two days ago, two weeks ago, two years**

24  **ago?  Roughly when was it?**

25      A.   I'm not sure.

1     Q.   Was it more than two days ago?

2     A.   Yes.

3     Q.   Was it more than ten days ago?

4     A.   Yes.

5     Q.   Was it more than two weeks ago?

6     A.   Yes.

7     Q.   Was it more than two months ago?

8     A.   Yes.

9     Q.   Was it more than five months ago?

10    A.   Yes.

11    Q.   Six months ago?

12    A.   Yes.

13    Q.   Eight months ago?

14    A.   I don't know.

15    Q.   So somewhere between one year and a month

16 and six months ago?

17    A.   Maybe.  It's all right there on Google,

18 so...

19    Q.   In connection with starting your business,

20 did you buy a domain name?

21    A.   I did not.  There was a website guy that

22 did that for us.

23    Q.   Who is this website guy?

24    A.   His first name was Don.  I don't remember

25 his last name.  Paris-something.

1          Q.    D-O-M or D-O-N?

2          A.    D-O-N.  Don.

3          Q.    And the last name you thought was

4     P-E-R-R-A?  Something like that?

5          A.    No.  No, no, no.  It begins with a P.  I

6     can't remember.

7          Q.    Okay.  And he's a website designer?

8          A.    Yeah.  Yeah, he does it on the side.

9          Q.    Is he currently engaged as your website

10    designer?

11         A.    No.  Somebody else has taken over.

12         Q.    Who is that somebody else?

13         A.    Josh Phillipas.

14               My girlfriend has also been helping me.

15               (Reporter clarification.)

16               THE WITNESS:  Phillipas.  I think it's

17    spelled P-H-I-L-L-I-P-A-S, maybe?  Or maybe it's

18    one L.  I can't remember.

19               Excuse me.  You'll have to excuse my bad

20    spelling.

21    BY MR. WINTER:

22         Q.    When did Josh take over for Don?

23         A.    Couple months ago.  Few months ago.

24         Q.    And what was Josh engaged to do when he

25    took over?

1       A.   Make it look prettier.  We don't do any

2  SEO or Google Search things.

3       **Q.   Why don't you do SEO or Google Search**

4  **things?**

5       A.   I don't know.  I believe in finding

6  customers the old-fashioned way, word of mouth.  The

7  only time that I've ever done any sort of that, I

8  didn't like it.

9       **Q.   "The old-fashioned way, word of mouth."**

10 **Can you elaborate a little bit more on what you**

11 **believe "the old-fashioned way, word of mouth,"**

12 **means, what that is?**

13      A.   Sure.

14           Incentivizing happy customers to tell

15 their friends.

16      **Q.   And you're incentivizing to tell them**

17 **about your company, Black Widow?**

18      A.   Only if they're happy to do so, yes.

19      **Q.   So you want them to refer their friends to**

20 **your company, Black Widow, for pest control or**

21 **wildlife control, things like that?**

22      A.   Correct.

23      **Q.   So you want them to use your company name**

24 **so that those individual referral sources will**

25 **contact you, and you can go and take care of**

1  whatever problems they have; is that accurate?

2      A.   That would be accurate, yes.

3      Q.   **When Don obtained a domain, do you give**

4  **him any direction on what domain terms to include?**

5      A.   No.  He approached me with some ideas and

6  informed me that he already found the one that he

7  believed would be best for us.

8      Q.   **What was that?**

9      A.   Blackwidowct.com, which he had already

10  purchased at that point, which --

11          (Reporter clarification.)

12          THE WITNESS:  I'm sorry.

13  Blackwidow.ct.com.

14          And he informed me that he thought that

15  would be the best choice and that he already

16  purchased it for us, which I thought showed

17  initiative.  So I hired him on the spot for it.

18      Q.   **So he bought that domain before you had**

19  **hired him?**

20      A.   Correct.  Yep.  We had entered into a

21  conversation about it, and then a contract.

22      Q.   **And that conversation, was that over the**

23  **phone, was it via e-mail, was it via text?**

24      A.   It was in person.  I met him at a local

25  diner.

1      Q.    Okay.

2      A.    In Southbury.

3      Q.    **And explain to me that conversation.  What**

4   **was discussed?  What -- you know, what did you tell**

5   **him that got him interested in working with your**

6   **company?**

7      A.    I told him who we were and what we did.

8   And I told him that we didn't have a website yet.

9   We were just getting started.  And he was excited to

10  work with us.

11        Turned out he had worked with a friend of

12  mine.  So it just worked out perfect.

13     Q.    **What friend of yours had he worked with?**

14     A.    I don't remember now.  It's been a while.

15  Some other plumber, maybe, or another HVAC guy or

16  something.

17        I don't know.  It's been a while.  Few

18  years.

19     Q.    **And that conversation happened -- was this**

20  **when you had first started your company?**

21     A.    Yeah.  It was just after we started.

22  Maybe two months in.

23     Q.    **So after you had --**

24     A.    Somewhere around then.

25     Q.    **So then looking at PX15, it would be**

1  roughly after, couple months after that filing date

2  of June 7, 2021, shown in the box on the top right

3  there?

4      A.   I think so.  Right around there.  Or maybe

5  it was when we first started.  I don't -- I don't

6  really remember, to be honest.  It's been four

7  years, so -- I don't know.  Or three and a half.

8  Whatever.

9      Q.   And when you had this conversation with

10  him, did you tell him about what your business name

11  was?

12     A.   Yeah.

13     Q.   And why did you tell him what your

14  business name was?

15     A.   Because that's how you identify a

16  business.

17     Q.   And then did you have any discussions

18  about what the content of the website would be, what

19  it would look like, anything like that?

20     A.   I didn't give him very much direction.  I

21  just gave him some pictures of things we did.

22     Q.   At that point did you have a logo

23  designed?

24     A.   Yeah.

25     Q.   Who designed your logo?

1          A.    A buddy of mine who at the time was

2    selling hot tubs.  And they had a -- a program for

3    design there, and he had taken one design course in

4    college.  And I loved it.  It came out great.

5          **Q.    Was this before your company was organized**

6    **or after?**

7          A.    The -- the logo production?

8          **Q.    Yeah.**

9          A.    I don't remember.

10          (Plaintiff's Exhibit Number 16 was marked

11    for identification, as of this date.)

12    BY MR. WINTER:

13          **Q.    You've got in front of you PX16.**

14          **Is this your logo?**

15          A.    It is.  With the original phone number on

16    it.

17          **Q.    So the current logo, the only change would**

18    **be the phone number has been updated; is that**

19    **accurate?**

20          A.    That is correct.

21          **Q.    So it is otherwise an accurate**

22    **representation of your logo, right?**

23          A.    Absolutely.

24          **Q.    You said, "It came out great."  What did**

25    **you like about it?**

1      A.    The simplicity, as far as branding,

2   because it can be legible, well read from across a

3   parking lot on a truck, or simplistically stitched

4   or etched into something.

5      Q.    Is that it?

6      A.    Yeah.  I mean, it was great.  It has

7   exactly what I wanted on it, which is a black widow.

8   It's got our colors.  That's it.  Simple.

9      Q.    You mentioned the colors.  What did you

10   like about the colors?

11      A.    Well, those are my two favorite colors,

12   black and red.  And it's also the color of a black

13   widow, which is black, with a little red hourglass.

14      Q.    And do you use that black and red with a

15   little bit of white color scheme throughout your

16   branding in your company?

17      A.    The white, less important.  But the black

18   and red, absolutely.  It just depends on what's

19   going to make it pop on something.

20          So, you know, depending on the color of

21   what it's on, I've use it as just a black logo, all

22   black, or black and white, or, you know, whatever.

23      Q.    But your main branding color scheme is --

24   it puts an emphasis on the colors black and red; is

25   that accurate?

1      A.    Absolutely.

2      Q.    And that's because those are your two

3  favorite colors?

4      A.    Correct.

5      Q.    So then looking at this -- this logo in

6  front of you, PX16, this shows the words "Black" and

7  "Widow" in bold font, which is the largest size.

8  And then "Pest Specialist" is below it with a

9  smaller size.  And then there's a phone number below

10  it in an even smaller font.  And then there's a

11  drawing of a spider.

12           Is that accurate description of your logo?

13     A.    I think so, with a circle behind the

14  spider.

15     Q.    You don't ever use colors in your logo

16  other than red, black, and white; is that correct?

17     A.    Not that I can recall, but if you look at

18  the cup on the table, it's etched in.  So sometimes

19  the color might differ just slightly.  So that

20  doesn't really specifically have a color.

21           So that color specifically is like

22  stainless steel.  So it would be a silver mark,

23  depending on if it's etched in to something or not.

24     Q.    Your cup is an example of something that

25  you hand out to customers?

1      A.    Potentially.

2      **Q.    Have you handed that out to customers?**

3      A.    Absolutely.

4      **Q.    Which customers do you -- do you recall**

5      **handing that out to?**

6      A.    I don't know.

7      **Q.    Do you recall any?**

8      A.    Yeah, but I've handed out several.  So I

9      don't remember exactly who.

10     **Q.    Well, tell me which ones you remember,**

11     **please.**

12     A.    You'd like me to give out customers'

13     information?

14     **Q.    Yes.**

15     A.    Is this something I have to answer?

16           MR. WINTER:  His customers' information?

17           THE WITNESS:  That's personal information.

18           MR. WINTER:  There's a protective order.

19           MR. HOFFMAN:  Can we go off the record.

20           MR. WINTER:  Yeah.  We can go off the

21     record.

22        (Off the record.)

23           MR. HOFFMAN:  We're going to go back on

24     the record.

25           And the question was asked -- as I

Page 88

1  understand it, Attorney Winter asked --

2          MR. WINTER:  Can I just -- I'll just ask

3  the question, and then you can enter your --

4          MR. HOFFMAN:  Sure.  Sure, sure.

5  BY MR. WINTER:

6      Q.   **So you have a cup in front of you, a**

7  **stainless steel mug that has the logo without colors**

8  **on it in stainless steel, in front of you.**

9          **And I'd asked, have you handed that out to**

10 **customers.**

11         MR. HOFFMAN:  And?

12 BY MR. WINTER:

13     Q.   **And then I asked for the identity of the**

14 **customers.**

15         MR. HOFFMAN:  Okay.

16         And I'm going to -- there's an agreement

17 that this particular response or the responses to

18 this series of questions will be designated as

19 attorneys' eyes only under the applicable protective

20 order.

21         MR. WINTER:  Okay.

22         MR. HOFFMAN:  You can answer the question,

23 if you know.

24         THE WITNESS:  I'll give first names.  I'm

25 not going to give last names.

1   BY MR. WINTER:

**2        Q.    Unfortunately it doesn't work like that.**

**3   You have to give every name that you remember.**

4             MR. HOFFMAN:  If you remember.  Whatever

5   you remember.

6             THE WITNESS:  Well, I mean --

7   BY MR. WINTER:

**8        Q.    Customers.  This is customers I'm asking**

**9   about.**

10        A.    Right.

11             Joe Perrara.

12             Who else did I give them to -- let me

13   think about it for a second, because I know there's

14   more, and I want to give you an accurate answer.  If

15   I am providing them, I will give you an accurate

16   answer.

17             I gave one recently to a maintenance man,

18   but I don't know his last name.  His name is Jeff --

19   I don't know his last name.

**20        Q.    Is this man who's named Jeff associated**

**21   with one of your customers?**

22        A.    Yes.

**23        Q.    Which one?**

24        A.    Contractor Nation.

**25        Q.    Contractor Nation?**

```
 1        A.    Contractor Nation, which is known as
 2   Basement Systems.
 3              (Reporter clarification.)
 4              THE WITNESS:  Basement Systems.
 5   BY MR. WINTER:
 6        Q.    Is Contractor Nation & Basement Systems a
 7   referral source of yours?
 8        A.    Not yet, but they will be.
 9        Q.    Why do you say that?
10        A.    Because we're just starting our
11   relationship.
12        Q.    When did that relationship start?
13        A.    I don't know.  A month and a half ago.
14        Q.    Do you give these types of products to
15   large clients of yours?
16        A.    Not necessarily.
17              You know, I -- the maintenance guy wasn't
18   a large client, you know?  He was just somebody who
19   complimented the mug and liked it and wanted
20   something to keep his coffee warm.  So I gave him an
21   insulated mug.  I thought it'd be a good -- good
22   idea.
23        Q.    Who is Joe Perrara?
24        A.    Customer and friend.
25        Q.    Under what -- a customer personally or his
```

1    business?

2        A.    Personally.

3        Q.    His personal home?

4        A.    Yep.

5        Q.    Where is that?

6        A.    Shelton, Connecticut.

7        Q.    Have you worked for him for a while?

8        A.    Yeah.

9        Q.    How long?

10       A.    I don't know.  A couple years.

11       Q.    Did you work for him in any of your prior

12   pest control jobs?

13       A.    No.

14       Q.    Is he one of your first customers?

15       A.    No.  Just a good guy.

16       Q.    When was the first time that you used that

17   logo in commerce, in front of you?

18       A.    I'm not sure.  Sometime between three and

19   four years ago, I think.

20       Q.    Does May 8th, 2022, sound familiar?

21       A.    Maybe.  I mean, I think it was being used

22   before that.  But I really don't know.

23            MR. WINTER:  We'll mark 17, please.

24

25

1                    (Plaintiff's Exhibit Number 17 was marked

2     for identification, as of this date.)

3     BY MR. WINTER:

4          Q.    I've handed you PX17.  There you go.

5                Do you see that bottom there it has some

6     text, ARM-BLACK-00113, at the bottom right, below

7     the sticker?

8          A.    Yes.

9          Q.    And at the top it says, "Responsive to

10    request for production Number 4."

11               Do you see that?

12         A.    Sure.

13         Q.    Is this a document that you prepared?

14         A.    That I prepared personally?

15         Q.    Yes.

16         A.    No.

17         Q.    Did you provide this in response to

18    request for production Number 4, shown in PX12?

19         A.    PX12?  I'm sorry.

20               MR. WINTER:  We're missing some of the

21    exhibits.  Are they back there?

22               MR. HOFFMAN:  No.

23               THE WITNESS:  This is everything you

24    handed me, unless something disappeared when I

25    walked out.

1              I have not taken anything with me.

2    BY MR. WINTER:

3         Q.    A marked copy of PX12?

4         A.    This is 15.

5              And this is 12 right there.

6         Q.    Oh, okay.  Okay.

7              I'm shuffling papers.

8              All right.  So I've placed in front of a

9    page containing request Number 4 of PX12.

10             Can you read request for production

11   Number 4 for the record?

12             Can you read it for the record?

13        A.    Sure.

14             "All the documents and things sufficient

15   to show the circumstances of defendant's first use,

16   current use, and planned use of defendant's marks in

17   US commerce."

18             (Reporter clarification.)

19             THE WITNESS:  "Defendant's marks in US

20   commerce."

21   BY MR. WINTER:

22        Q.    And so in response to that, you produced

23   PX17; is that correct?

24        A.    We did, yes.

25        Q.    And then if you look can on that PX17, do

1    you see May 8th, 2022?

2         A.   Yes.

3         Q.   Is that your first use in US commerce?

4         A.   First use in US commerce -- I think so.

5    Yeah, to the best of my knowledge.

6         Q.   So you're using "Black Widow" in commerce?

7         A.   Did you say am I using it in commerce?

8         Q.   Yes.

9         A.   Yes.

10        Q.   In interstate commerce?

11        A.   In what?

12             MR. HOFFMAN:  Objection.

13   BY MR. WINTER:

14        Q.   You're using "Black Widow" in US commerce;

15   is that correct?

16             MR. HOFFMAN:  Objection.

17             THE WITNESS:  Yes.  US commerce in

18   Connecticut.

19   BY MR. WINTER:

20        Q.   So is that Facebook post, to your

21   knowledge, distributed outside Connecticut?

22        A.   I have no idea where a Facebook post goes.

23   It goes into the worldwide web.  It's worldwide.

24        Q.   So, to your knowledge, it would be

25   accessible from states other than Connecticut; is

1    that correct?

2        A.    I don't see why not.

3        Q.    **You mentioned earlier you had a social**

4    **media following; is that correct?**

5        A.    Absolutely.

6        Q.    **Do you feel you're independently famous?**

7              MR. HOFFMAN:  Objection.

8              THE WITNESS:  How do you define fame?

9    BY MR. WINTER:

10       Q.    **Do you feel that you're independently**

11   **famous?**

12             MR. HOFFMAN:  Objection.

13             THE WITNESS:  You asked if I feel

14   independently famous.

15             We've had several things go viral.  So

16   fame could be defined a lot of different ways.  Some

17   people might call us famous.

18   BY MR. WINTER:

19       Q.    **Would you call yourself famous?**

20       A.    I wouldn't define myself.

21       Q.    **So you wouldn't define yourself as famous?**

22       A.    I wouldn't define myself at all.

23       Q.    **So then you wouldn't define yourself as**

24   **famous if you wouldn't define yourself at all; is**

25   **that correct?**

1     A.    I wouldn't define myself at all.

2     **Q.    So if you wouldn't define yourself at all,**

3  **then you also wouldn't define yourself as famous; is**

4  **that correct, "yes" or "no"?**

5     A.    I've answered the question.

6     **Q.    You haven't answered it "yes" or "no."**

7     A.    I don't know.

8     **Q.    So you don't know if you're famous?**

9     A.    I don't know if I'm famous.

10    **Q.    Do you think you're famous?**

11          MR. HOFFMAN:  Objection.

12          THE WITNESS:  I don't think I'm anything.

13  BY MR. WINTER:

14    **Q.    Have you ever alleged that you're famous**

15  **in this lawsuit?**

16    A.    Have I ever alleged that I'm famous in

17  this lawsuit.  Well, we're very known online.  Some

18  can define that as fame.

19    **Q.    Have you alleged in this lawsuit that you**

20  **are famous?**

21    A.    Maybe.  I think we're pretty famous

22  online.

23          (Reporter clarification.)

24          THE WITNESS:  I said I think we're pretty

25  famous online.  We have millions of views on videos.

1    BY MR. WINTER:

2        **Q.    So then you think you're famous online; is**

3    **that correct?**

4        A.    Sure.

5            MR. WINTER:  Can you mark this.

6            (Plaintiff's Exhibit Number 18 was marked

7    for identification, as of this date.)

8    BY MR. WINTER:

9        **Q.    Do you believe that your company is**

10   **independently famous?**

11       A.    In our service area, absolutely.

12       **Q.    You, in fact, alleged that defendant has**

13   **become independently famous in this lawsuit; is that**

14   **correct?**

15       A.    Ask that question again, please.

16           MR. WINTER:  Would you read it back.

17        (The Record was read back.)

18           THE WITNESS:  Meaning myself has become

19   independently famous or my company?

20   BY MR. WINTER:

21       **Q.    Defendant is the company.**

22       A.    Has become famous in the lawsuit?  Just

23   for clarification.  I want to make sure I answer it

24   properly.

25       **Q.    Did you ever write in any pleading in the**

1    lawsuit, quote, unquote:  "Defendant has also become

2    independently famous," unquote?

3         A.    Yes.

4         Q.    Do you believe that's accurate?

5         A.    I believe it is.

6         Q.    So your company is independently famous;

7    is that accurate?

8         A.    I think so.

9         Q.    So you're not willing to define yourself?

10        A.    I'm not willing to define myself.  You

11   asked about my company.

12        Q.    So you're willing to define your company?

13        A.    Absolutely.  I'm representing it.

14        Q.    And you understand that you are here on

15   behalf of your company, testifying for your company;

16   is that right?

17        A.    Correct.

18        Q.    Okay.

19        A.    Sorry if I misunderstood the question.  I

20   thought as though you were asking me about myself.

21        Q.    So here's PX18.  And I'm going to hand you

22   page 12.

23        A.    Thank you.

24        Q.    You see the second line down.  Can you

25   read right after the period, starting with

1    "defendant."

2        A.    "Defendant has also become independently

3    famous, such as seen in defendant's TikTok videos

4    having as many as 2.1 million views.  And 13.8

5    thousand views on some videos.  And 2,132 followers.

6    101.1 thousand likes on an account and videos."

7        Q.    I will stop you right there.  We'll keep

8    reading later.

9        A.    Sure.

10       Q.    Is all -- is all that accurate?

11       A.    It might not be anymore.  It might have

12   gone up since last time we spoke.

13       Q.    So at the time this was filed, it is

14   accurate; is that right?

15       A.    That is correct.

16       Q.    Okay.  Keep reading, starting at

17   "further."

18       A.    "Further Facebook search of Black Widow

19   Pest, the words which plaintiff claims have become

20   famous, returns five different pest control

21   businesses.  On the first page of the results alone

22   including 'Black Widow Pest Specialists,' the first

23   relevant search" -- or result, excuse me -- "Black

24   Widow Termite and Pest Control Corp., plaintiff's

25   business page; Black Widow Pest Control, an

1  independent business; Black Widow Pest Management,

2  an independent business; and another Black Widow

3  Pest Control, a different independent business."

4       **Q.    Okay.   Stop.   Stop right there.**

5       A.    Sure.

6       **Q.    "Black Widow Pest Specialists" in that**

7  **refers to your company; is that right?**

8       A.    Yep.   That's correct.

9       **Q.    "Black Widow Termite and Pest Control**

10 **Corp., parens, plaintiff's business page."**

11           **You understand that to refer to my client;**

12 **is that right?**

13      A.    Correct.

14      **Q.    "Black Widow Pest Control, parens, an**

15 **independent business."**

16           **You're not affiliated with them; is that**

17 **accurate?**

18      A.    I'm not affiliated with anybody on that

19 page.   That's accurate.   Other than the one that we

20 mentioned as our name.

21      **Q.    You have no independent knowledge of that**

22 **business' operations; is that correct?**

23      A.    Correct.

24      **Q.    You've never spoken to anybody at that**

25 **business; is that correct?**

```
 1        A.   Correct.
 2        Q.   You can't identify any individual
 3   associated with that business; is that correct?
 4        A.   Correct.
 5        Q.   Next one:  "Black Widow Pest Management,
 6   parens, an independent business."
 7        A.   Uh-huh.
 8        Q.   So you're not -- you're not affiliated
 9   with that company; is that correct?
10        A.   No.
11        Q.   You never spoken to them; is that correct?
12        A.   I met somebody from Black Widow Pest
13   Management in Connecticut, that used to own Black
14   Widow way back.  That was the only other Black Widow
15   that I ever met.
16        Q.   When did you meet them?
17        A.   About a year ago.  Really nice woman.
18        Q.   And "used to own," they're out of
19   business; is that correct?
20        A.   That's correct.
21        Q.   They have been for at least two years; is
22   that correct?
23        A.   I'm not sure.
24        Q.   So you have no knowledge when they stopped
25   operations; is that correct?
```

1        A.   No idea.

2        **Q.   You have no independent personal knowledge**

3   **of them; is that correct?**

4        A.   Yes.

5        **Q.   Where did you meet that person?**

6        A.   It was a -- one of the -- I think it's

7   called C -- CT -- something -- CPCA -- something

8   like that.  It's one of the pest control

9   associations.

10            Pest control association-something.

11       **Q.   And in what context did you meet that**

12  **person?**

13       A.   I said hello.

14       **Q.   And then you got to talking, you figured**

15  **out that they used to use --**

16       A.   Yeah.

17       **Q.   -- the words "Black Widow"?**

18       A.   Yeah.

19       **Q.   Did you think that was interesting?**

20       A.   Do I think that was interesting?

21            I'm not sure.

22       **Q.   Then on that same paragraph:  "Black Widow**

23  **Pest Control, a different independent business."**

24            **Do you see that reference?**

25       A.   Yes.

1          Q.    You're not affiliated with that company;

2    is that right?

3          A.    No.

4          Q.    You never met anybody affiliated with that

5    company?

6          A.    Nope.

7          Q.    Okay.  Have you obtained most of your

8    business from your social media following?

9          A.    Hard to say, really.  That's a hard metric

10   to track.

11         Q.    So you have no way to associate your

12   social media following with revenue; is that

13   correct?

14         A.    Well, we ask our customers where they find

15   us.  And most of them find us on social media.  But

16   I don't know exactly the number.  So I don't want to

17   give you an inaccurate description when you ask the

18   question most.  So I don't know.

19         Q.    How do you find out that they find you on

20   social media?

21         A.    We ask the customer when they call us.

22   It's the last question we ask before we hang up the

23   phone.

24         Q.    Got it.

25               Are there set -- a set -- is there a set

1   **script for someone answering the phone, what they**

2   **say -- or a framework, I'll say?**

3       A.   Not really.  You know, a couple basic

4   things to go off of.  But we like to have good

5   interactions with customers.  So I don't have a

6   script.

7       **Q.   How do they answer the phones?**

8       A.   Depends on who answers it.

9       **Q.   How are they supposed to answer the**

10  **phones?**

11      A.   By clicking "accept."

12      **Q.   Okay, but what do they say first?**

13      A.   I would assume "hello."  I really don't

14  know.  Everybody is different.  I would -- I would

15  hope they would say that we were Black Widow, you

16  know, when we answer the phone.

17           When I answer the phone, I say, "Hey, this

18  is Blake from Black Widow Pest Specialists.  How can

19  I help you?"  But I don't know how anybody else

20  answers it.

21      **Q.   "Hey, this is Blake from Black Widow Pest**

22  **Specialists."**

23           **That's how you try to answer the phone**

24  **from a customer's call; is that accurate?**

25      A.   Not "try."  That's how I answer every

1  single call that comes to me, yes.  I don't say

2  hello.

3       Q.    Every single one without fail, correct?

4       A.    I would hope so.  I'm pretty consistent.

5             MR. WINTER:  Now is a decent time to take

6  a break for lunch.

7             MR. HOFFMAN:  Okay.

8             (LUNCHTIME RECESS:  12:46 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1             A F T E R N O O N   S E S S I O N

 2                    (Time Noted:  )

 3                  BLACK JOSEPH BLACK,

 4                  remaining under oath,

 5              resumed and testified as follows:

 6

 7                    DIRECT EXAMINATION CONTINUED

 8              (Plaintiff's Exhibit Number 19 was marked

 9   for identification, as of this date.)

10   BY MR. WINTER:

11        Q.    I marked PX19 there.

12              Do you see at the bottom, the first page,

13   it says ARM-BLACK-000010?

14              Do you see that?

15        A.    Yep.

16        Q.    And if you go to the last page, it says

17   ARM-BLACK-000094.

18        A.    Oh.  Way in there?

19        Q.    Yeah.

20              Do you see that?

21        A.    Yep.

22        Q.    So those numbers I gave you are accurate?

23        A.    The numbers of the page, you're saying?

24        Q.    Yes.

25        A.    Oh, yeah, I -- I see -- I see a page
```

1    marked as something.

2              Is that what you're referring to?

3         **Q.    The bottom right corner.  The bottom right**

4    **corner.  Those --**

5         A.    94, here?

6         **Q.    Yeah.**

7         A.    Okay.  It says "Confidential 85."  Is that

8    the one you're talking about?

9         **Q.    Correct.**

10        A.    Okay.  Accurate.

11        **Q.    If you scroll back a couple pages, just**

12   **sort of thumb through, you'll see cities or towns**

13   **and states.  Then you keep going back through it,**

14   **you'll probably see some addresses?**

15        A.    All I see is locations -- oh, I see.

16   Okay.  Yeah.  I see them here.  Yeah.

17        **Q.    Keep going back through it.**

18        A.    Uh-huh.  Yep.  Okay.

19        **Q.    What -- just stop there.**

20             **What page are you on there?**

21        A.    This is 84.  Is that where you'd like me

22   to stop?

23        **Q.    Yeah.**

24        A.    "Confidential 75."

25        **Q.    ARM-BLACK 84?**

1      A.    Yes.

2      Q.    So those show at least partial addresses

3   of some of your customers.

4            Would you agree with that?

5      A.    Yes.

6      Q.    And then if you go just to the first page,

7   that's ARM-BLACK 10.

8            Do you see it's all blacked out?

9      A.    Uh-huh.

10     Q.    And it's blacked out under "customer name"

11  and "company name."

12           You see that?

13     A.    Uh-huh.

14     Q.    So you then would have an unredacted copy

15  of these somewhere in your files; is that right?

16     A.    I would believe so, yes.

17           MR. WINTER:  Can I have a copy of the

18  customer list?

19           MR. HOFFMAN:  Are you asking me whether I

20  have a copy now?

21           MR. WINTER:  No, no, no.  Like, we will --

22  would ask for production of that.

23           MR. HOFFMAN:  Okay.

24  REQ

25           MR. WINTER:  You can designate it as

1  attorneys' eyes only, but I don't think there's a

2  basis to redact anything unless it's privileged.

3  BY MR. WINTER:

4      Q.    Okay.  You can put that to the side.

5      A.    So you're saying you want a customer list

6  of all of our customers?

7      Q.    Yes.

8            I'm asking your attorney to produce a list

9  of all your customers, unredacted, which will be --

10  you -- if you would like to, you're entitled to mark

11  it however you want subject to the protective order,

12  mark it as attorneys' eyes only, if that's what you

13  believe it should be.

14            (Plaintiff's Exhibit Number 20 was marked

15  for identification, as of this date.)

16  BY MR. WINTER:

17      Q.    PX20.  Tell me what that is.

18      A.    It looks like the landing page of our

19  website.

20      Q.    I think you said at some point you had

21  a -- had a website redesign; is that right?

22      A.    Correct.

23      Q.    That was in the last several months; is

24  that correct?

25      A.    Yeah.  Yep.

1        Q.    At the top left, it includes a variant of

2    your logo; is that correct?

3        A.    Yes.

4        Q.    And it varies because the spider is to the

5    left instead of above; is that correct?

6        A.    I guess so.  That's the way he put it on

7    the page.  But it appears so, yes.

8        Q.    What other variations of your logo do you

9    use?

10        A.    None.

11        Q.    So either the spider is on the top or the

12    spider is to the left.

13              Is that -- those are the only two

14    variations; is that correct?

15        A.    I'm not sure.  I was under the impression

16    the logo could just be the spider in and of itself,

17    or the spider with the name.

18        Q.    Do you ever use the spider in and of

19    itself?

20        A.    Well, in this instance here, the spider is

21    off to the side.  So technically the spider is of

22    itself.

23        Q.    I see.

24              So the spider is not part of your logo?

25        A.    The spider is part of the logo.  But it's

1  separated there, which would form two separate

2  logos.

3         Q.   I see.

4              Do you ever use the spider logo alone,

5  without Black Widow next to it or below it?

6         A.   I don't think we have.  Not to my

7  recollection.

8         Q.   Just for the record, this is produced as

9  ARM-BLACK-000104 at the bottom.

10             Did I read that correctly?

11        A.   Yes.

12        Q.   It says, "Litchfield county's Number 1

13 pest control company."

14             Do you see that?

15        A.   Yes.

16        Q.   Do you only work in Litchfield county?

17        A.   No.  I'm not sure why that was put there.

18        Q.   Did you have any input on the content of

19 this website?

20        A.   I did.  I had some.

21        Q.   What was that input?

22        A.   What was that input?

23        Q.   Let me strike that.  That's too vague.

24             How would you have communicated that input

25 to your website designer?

1    A.    Verbally, varied discussion that we had in

2  which what we were looking for.

3    Q.    And that's -- the new person is Josh; is

4  that right?

5    A.    That's correct.

6    Q.    And is your girlfriend involved in the

7  website design as well?

8    A.    Well, she's not involved in the website

9  design.  More so with -- she wanted to be a part of

10  the layout, but we haven't gotten to that phase yet.

11  So she is going to be involved with the layout when

12  we kind of shift it around, because we still have to

13  tweak it.  We did that during a busy time, so...

14    Q.    What do you mean by the "layout"?

15    A.    Making it look favorable.  To catch your

16  eye.

17    Q.    In what way?

18    A.    Appealing to customers.

19    Q.    No.  What -- what do you -- what changes

20  to the website are you referring to in terms of the

21  layout?

22    A.    Well, I haven't made them yet.  I don't

23  know.  We have to sit down and discuss it with Josh.

24    Q.    Did any documents get generated from any

25  of those phone calls or meetings, such as notes or

1    e-mails or texts or anything like that?

2        A.   No.  He's an old high school friend, so we

3    didn't have to make any documents.

4        Q.   Is your -- can customers contact you

5    through your website?

6             Is there like a contact form?

7        A.   I don't even remember, to be honest.

8             I think maybe.  There might be a refunnel,

9    the thing that says "contact us."  I would assume

10   there's probably a contact form.

11            I haven't really looked much at our

12   website since it's been changed, to be honest with

13   you.  It's not really my forte.

14       Q.   On the top right, would you agree with me

15   that Black Widow -- or it's -- excuse me, top left.

16   Would you agree with me that "Black Widow" is used

17   with emphasis?

18       A.   I guess, yeah.

19            (Plaintiff's Exhibit Number 21 was marked

20   for identification, as of this date.)

21   BY MR. WINTER:

22       Q.   I'll hand you PX21.

23            That says 21 on the bottom, right?  Does

24   that say 21 on the bottom?

25       A.   Yes.  It says 21.

1      Q.    Can you tell me what these are?

2      A.    Yes.  These all appear to be agreements.

3            Estimates.

4      Q.    And in that -- looking at the first page,

5   there's some redactions there.

6            Do you see that?

7      A.    What do you mean, "redactions"?

8      Q.    Black boxes?

9      A.    Yes.

10     Q.    So the black boxes would contain your

11  customer's name, address, service address, and their

12  signature; is that right?

13     A.    Yes.

14     Q.    None of that in there is attorneys'

15  eyes -- is -- excuse me.

16           None of that in there is attorney-client

17  privileged information; is that correct?

18           MR. HOFFMAN:  Objection.

19           THE WITNESS:  Can you please be specific?

20  What do you mean?

21  BY MR. WINTER:

22     Q.    Do any of those -- does any of that

23  information contain advice from your attorney?

24     A.    What do you mean, "advice"?

25     Q.    Do those redactions contain advice from

1    your attorney?

2         A.    It's customers' information.

3         Q.    So no?

4         A.    Is your question is this advice from my

5    attorney in the customers' --

6         Q.    The redacted information --

7         A.    Right.

8         Q.    -- right?  That does not contain attorney

9    advice.  I'm saying the decision to apply the

10   redactions.  I'm saying what is behind the

11   redactions.

12              There's not attorney advice in the

13   information that is behind the redaction; is that

14   correct?

15        A.    Yes.

16              MR. WINTER:  I would again ask for

17   production of unredacted copies of these.  It's

18   ARM-BLACK-000116 through 120.

19   REQ

20   BY MR. WINTER:

21        Q.    Is that accurate, those numbers?

22        A.    I shall look.

23              Yes.  That's accurate.

24        Q.    So under what context would this document

25   be generated?

1          **You would get a call from a customer, you**
2     **would go walk out, look at the property, then give**
3     **them an estimate?  Or would you -- how would this --**
4     **how would this come about that you would be**
5     **generating this document, your company would be?**
6          A.    Depending.  It could be if they called.
7     They called our company and had one of us come out
8     specifically to evaluate, which is the most normal
9     way for that to happen.
10         Could also be if they called and wanted to
11    switch and could explain enough about the property
12    over the phone.  If they were switching over from
13    another company, then potentially we could give an
14    estimate over the phone.  But for most of the things
15    it would require us going on site.
16         **Q.   In a given month, if you had to**
17    **approximate, how many estimates do you think you**
18    **generate or send out?**
19         A.    I have no idea.
20         **Q.   Is it like five?  Is it 10, 50, 20?  What**
21    **-- what order of magnitude is it?**
22         A.    I have no way to track the metrics.  I
23    literally don't know.
24         **Q.   Where are these -- how are these**
25    **generated?  Is there a -- what program do you use to**

1    generate and store these documents?

2          A.    GorillaDesk.

3          Q.    Have you done a search for a way to

4    produce all of these estimates from GorillaDesk?

5          A.    I don't think so.

6          Q.    Is that possible?

7          A.    I don't know.

8          Q.    So you -- but you haven't looked into

9    whether or not that's possible; is that correct?

10         A.    I don't remember.

11         Q.    So on this estimate, on the first page of

12    PX21, your logo appears there; is that correct?

13         A.    Yes.

14         Q.    Why do you include your logo on the

15    estimate?

16         A.    So the customer knows who sent it to them.

17         Q.    When you're providing the estimate, you

18    haven't yet won the customer; is that correct?

19         A.    Not until both parties sign and a deposit

20    is made.

21         Q.    Do you always require a deposit before you

22    do work for your customers?

23         A.    Most situations.

24         Q.    What situations would be ones where you

25    don't require a deposit in advance?

1    A.    If it was something we didn't deem

2    necessary.

3        **Q.    Why would you not deem something**

4    **necessary?**

5        A.    Oh.    Maybe it's a recurring customer that

6    we've already done and no pesticide is being

7    applied.    And it was something like a -- maybe a

8    clean-up, a sanitary clean-up.    That might be

9    something we wouldn't really acquire a deposit.

10       **Q.    What else?**

11       A.    Maybe camera monitoring.

12             I can't think of very many instances.

13       **Q.    Other than recurring -- a recurring**

14   **customer or camera monitoring, are there other**

15   **instances where you don't ask for deposit before**

16   **starting work?**

17       A.    Not that I can think of.

18       **Q.    The last page of this document, if you**

19   **would look at that please.    It's 000120.**

20             **Do you see that?**

21       A.    Yep.

22       **Q.    This again has redactions under the black**

23   **box; is that correct?**

24       A.    Yes.

25       **Q.    And this would just be customer**

1    information, such as their name, address, location

2    of the building; is that accurate?

3         A.   I think.

4         Q.   None of -- none of the doc -- none of the

5    information under the redactions contains

6    attorney-client information -- excuse me --

7    attorney-client privileged communication; is that

8    correct?

9         A.   Yes, I think.

10             MR. WINTER:  I would ask for production,

11   unredacted.  They're already marked AEO, so I don't

12   think there's any basis to redact anything here.

13   REQ

14   BY MR. WINTER:

15        Q.   Now, looking at all the black boxes within

16   this document -- there's several of them.  They're

17   all contained non-privileged information.

18             It's not attorney-client advice, correct?

19        A.   Yes.

20        Q.   Okay.

21             Do you ever have customers who -- the

22   building or facility where you're servicing might be

23   located in Connecticut, but the customer itself is

24   located outside of Connecticut?

25        A.   Yes.

1        Q.    Tell me who those customers are?

2        A.    There's no way for me to gauge that.

3              I have people who call from California,

4   all over the place.

5        Q.    So it's entirely possible that someone

6   from California owns a building in Connecticut that

7   you service; is that correct?

8        A.    Sure.  Absolutely.

9        Q.    You have no way to track that; is that

10  correct?

11       A.    Correct.

12       Q.    But you think there are definitely

13  customers who are outside of the state of

14  Connecticut that own buildings that you service

15  inside of Connecticut; is that correct?

16       A.    Yes.

17       Q.    Do you have any examples that you can

18  think of?

19       A.    No.

20       Q.    You would be able to find that, though,

21  through your business records and --

22       A.    I don't know.  I would have to call every

23  person with an area code that wasn't Connecticut.

24  So I don't know that that would work.

25       Q.    Do you have a list of customer phone

1   numbers with their area codes?

2       A.   Yes.

3       Q.   And like the customer list here that was

4   marked as PX19, you'd be able to produce a document

5   something like that, that has the customer's name

6   and their phone number; is that correct?

7       A.   Yes.

8            MR. WINTER:  I would like to ask that the

9   customer list be provided in full with all that

10  information.

11  REQ

12           MR. HOFFMAN:  Are you asking whether or

13  not he can produce it, or whether in the ordinary

14  course of business they maintain such a record?

15           MR. WINTER:  He said he can produce it,

16  which would mean it's maintained in the ordinary

17  course of business.

18           MR. HOFFMAN:  Well, I'm not sure that it

19  does, actually.

20  BY MR. WINTER:

21      Q.   Do you maintain -- do you maintain your

22  customers' phone numbers within your -- within your

23  business management software in the ordinary course

24  of business?

25      A.   What do you mean?

1      Q.   Do you maintain records of your customers'
2  phone numbers?
3      A.   Yeah.
4      Q.   And are you able to run a report that
5  lists the identity of the customer and their phone
6  number?
7      A.   I'm not sure.
8      Q.   Have you tried?
9      A.   I can't recall.
10      Q.   If you want to call up a customer, how
11  would you find their phone number?
12      A.   I would type in their name.
13      Q.   Where would you type their name?
14      A.   GorillaDesk.
15      Q.   And then GorillaDesk would provide that
16  customer's number for you to call; is that correct?
17      A.   It would provide their account, yes.
18      Q.   So that's on the record of the account,
19  what their phone number is?
20      A.   Yep.
21      Q.   Looking back at PX20 right there, are
22  there any restrictions that you're aware of that
23  would prevent that website from being accessed by
24  people outside the state of Connecticut?
25      A.   I don't know enough about websites to

1  answer that.

2      Q.    You're not aware of any restriction that

3  would prevent someone in the state of New York from

4  accessing your website; is that correct?

5      A.    I just didn't know you could do that with

6  websites.

7      Q.    Have you ever tried to look at your

8  website from outside the state of Connecticut?

9      A.    Have I ever looked at my website from

10 outside the state of Connecticut?  Maybe.  But if

11 so, it would be very hard to find.

12     Q.    Why would it be hard to find?

13     A.    I don't do any Google marketing.  It's

14 hard to find within the state of Connecticut.

15     Q.    I'm talking about you personally looking.

16 Right?

17           You know where to find your website; is

18 that correct?

19     A.    Do I know where to find my website?

20     Q.    Yeah.

21     A.    Right online.  Yes.

22     Q.    Yeah.  You know the domain, right?

23     A.    Yeah.

24     Q.    Have you ever typed that into a computing

25 device outside of the state of Connecticut?

1      A.    I don't remember.

2      Q.    Okay.  But to your knowledge, there would

3   be no restriction from someone knowing what the

4   website is from being able to access your website,

5   correct?

6      A.    Sure.

7      Q.    Within your company, what is your role

8   personally versus your employees?

9            Do you go out and do certain services that

10   other people don't do?  Do you tend to not do

11   servicing and focus on business development?

12            Can you explain what your role is versus

13   what you have your employees do?

14      A.    Well, as the owner, I do everything,

15   unfortunately.

16      Q.    And then are there -- and then your

17   employees -- I think you said you had four

18   technicians; is that correct?

19      A.    I just hired a fifth.

20      Q.    So you have five technicians.

21            Is their role only to do service calls, or

22   do they also do sales?

23      A.    My guys pretty much do it all.

24      Q.    Do you -- on a day-to-day basis, do you

25   tend to be going out on a route servicing customer

1    locations, or do you tend to be -- to spend more of

2    your time in the office?

3         A.    It changes.

4         Q.    In a given month, what proportion of your

5    time do you think you spend in the office versus out

6    in the field?

7         A.    It really depends on the month.  I don't

8    know how to answer that.

9         Q.    Do you have plans to expand your business?

10        A.    Further into Connecticut.  Yeah.

11        Q.    And to do that, would you need to hire

12   more employees?

13        A.    It's hard to grow if you don't, unless you

14   work on efficiency.  But you can only be so

15   efficient.

16        Q.    Where is your company address?

17        A.    108 Curtiss Street, Naugatuck,

18   Connecticut.

19        Q.    Do you have a dedicated office in that --

20   is that -- is that your personal residence?

21        A.    It is.  And yes, I do.

22        Q.    You have a dedicated office space in

23   there; is that correct?

24        A.    Uh-huh.

25        Q.    Do you write that off on your taxes?

1        A.   Do I write my office off on my taxes?

2        Q.   Yes.

3        A.   You have to ask my accountant.  I don't

4    know.

5        Q.   Do you deduct any expenses associated with

6    your home address within your business?

7        A.   That would be a question for my

8    accountant.  I don't know.

9        Q.   Do you provide your accountant any

10   information to file your taxes?

11       A.   Everything they ask for.

12       Q.   Has he ever asked for information about

13   office expenses?

14       A.   I don't remember.

15       Q.   Have you filed your taxes this year?

16       A.   No.

17       Q.   For the LLC?

18       A.   Not yet.

19       Q.   When is the last time you communicated

20   with your accountant?

21       A.   Maybe a month ago.  But I might be

22   switching accountants.

23       Q.   Who is your -- are you the person who is

24   responsible for gathering everything for the

25   accountant?

1       A.   Yeah.

2       **Q.   Roughly how many locations do you**

3  **currently service, your business?**

4       A.   So literally I have no idea.

5       **Q.   Is it 10,000, is it 1,000, is it 200?**

6       A.   I -- I don't know.

7       **Q.   Is it more than 500?**

8       A.   Absolutely.

9       **Q.   Is it more than 1,000?**

10      A.   Absolutely.

11      **Q.   Is it more than 1,500?**

12      A.   I think so.

13      **Q.   Is it more than 2,000?**

14           MR. HOFFMAN:  I'm going to object, just in

15  the sense that --

16           THE WITNESS:  I don't know.

17           MR. HOFFMAN:  "I don't know" is vague.  I

18  don't know what "service" means.  And I don't know

19  the timeframe.

20           But you can answer if you understand it.

21           THE WITNESS:  Are you referring to, like,

22  how many have we serviced, how many do we service,

23  like...

24  BY MR. WINTER:

25      **Q.   How many active customers do you have?**

```
 1              MR. HOFFMAN:  And I'm going to object to
 2    that because I'm not sure what --
 3              MR. WINTER:  Ari.  Ari.  Speaking
 4    objections.
 5              Please, just object.
 6              MR. HOFFMAN:  I'm just trying to help out.
 7              MR. WINTER:  I get it.
 8              THE WITNESS:  What do you mean by
 9    "active"?
10    BY MR. WINTER:
11         Q.   How many customers do you currently
12    service?
13         A.   On what basis?  Weekly, daily, monthly,
14    yearly?  I don't know what you mean.
15         Q.   How many -- how many active customers do
16    you have?
17         A.   (Gesturing.)
18         Q.   You don't know how many customers you
19    have?
20         A.   Would you mind defining "active"?
21         Q.   How do you define "active"?
22         A.   I don't.
23              You're asking the question, that's why I'm
24    asking you what it means.  I don't know what that
25    means.
```

1      Q.    So you --

2      A.    I'd love to answer it.

3      Q.    So do you have -- on a -- in a given year,

4    how many customers do you believe you service,

5    unique customers?

6      A.    Maybe between -- between 500 and 2,000.  I

7    don't -- I don't know an accurate number.

8      Q.    Have you ever alleged how many customers

9    you have in this lawsuit?

10     A.    I don't know.  Maybe.  I think we did.

11     Q.    For that allegation to come in this

12   lawsuit, you would have to provide your attorney

13   with that number; is that correct?

14     A.    I'm not sure.

15     Q.    Well, your attorney wouldn't independently

16   know how many customers you have; is that correct?

17           MR. HOFFMAN:  Objection.

18           THE WITNESS:  I don't know.

19   BY MR. WINTER:

20     Q.    Give you PX18, page 14.  In front of you

21   is paragraph 7.

22           Do you see that?

23     A.    Uh-huh.

24     Q.    Can you read that to yourself, please.

25     A.    Silently or aloud?

1    Q.    Just silently is fine.

2          Just tell me when you've read it.

3    A.    (Witness reviews document.)

4          Yep.

5    Q.    So this information that's in there, you

6    would have provided that to your attorney; is that

7    correct?

8    A.    Absolutely.

9    Q.    Is that information accurate as of

10   October 20th, 2023?

11   A.    That date you're asking, was that the date

12   that I provided it to you?

13   Q.    If you look at the top of that -- you see

14   that all the way at the top in blue, it says

15   "filed"?

16   A.    Oh, okay.  Understood.  Thank you for the

17   clarification.

18         Yeah.  At -- at that point it would have

19   been, yes.

20   Q.    Do you have more customers than that as of

21   now?

22   A.    Absolutely.

23   Q.    How many more do you think?

24   A.    I'm not sure.

25   Q.    Double?

1      A.    Probably not double.

2      **Q.    Fifty percent more?**

3      A.    I'm not sure.  Yeah, I don't know.

4      **Q.    In 7 it says, "By way of example, one such**

5      **customer has 97 buildings with almost 1,000 units**

6      **managed under a single account."**

7            **Who does that refer to?**

8      A.    Success Village.

9      **Q.    Is Success Village your largest customer?**

10     A.    Uh-huh.

11     **Q.    Who is David Cass?**

12     A.    David Cass is a customer we've done work

13     for.

14     **Q.    Is he associated with Success Village?**

15     A.    I don't believe so.

16     **Q.    Where is Success Village located?**

17     A.    In Bridgeport, Connecticut.

18     **Q.    And what type of building is it?  Is it**

19     **residential, is it commercial?**

20     A.    It would be considered commercial because

21     of the account, but they're residential buildings

22     that house a lot of people.

23     **Q.    So this is a -- so is it a thousand units**

24     **in Bridgeport?  Is that Success Village?**

25     A.    Yep.  Just shy of a thousand.  It's like

1    990 or 980, whatever it was, last count.

2        Q.   And did you have a contract with that

3    company?

4        A.   Do I have a contract with that company?

5    What do you mean by "contract"?

6        Q.   Do you have an agreement with them,

7    anything in writing?

8        A.   In terms of what?

9        Q.   Well, you've seen some examples of your

10   contracts today, haven't you?

11       A.   I've seen some of my estimates.  Yes, sir.

12       Q.   Right.

13            And also after -- after an estimate is

14   done, do you ever -- does it ever get signed by the

15   customer?

16       A.   It should.  Absolutely.

17       Q.   So does that in -- does that create an

18   agreement in your mind?

19       A.   Well, I'm not sure what the definition of

20   "agreement" is, but...

21       Q.   Well, did you agree to perform the

22   services in the estimate by the client signing and

23   you signing?

24       A.   I'm not sure if that would constitute an

25   agreement without payment, unless it was formed

1    under that assumption in writing.

2          Q.    Right.

3                So the intention of the estimate is to

4    provide it to a customer.   Then the customer agrees

5    to it and pays for the services; is that correct?

6          A.    Yeah.

7          Q.    So you provide the estimate.

8                And then the customer says:  Yes.  I'll

9    take those services and pay you for them.

10               Is that generally what happens?

11         A.    Yeah.

12         Q.    And that gets done in writing most of the

13   time; is that correct?

14         A.    I think.  I'd say so.

15         Q.    And do you have a -- do you have a writing

16   such as that for Success Village?

17         A.    I think so.

18         Q.    Have you looked for it?

19         A.    Have I looked for it?

20               I'm not sure.

21               They call us and we go out there.   And

22   they send us work orders.

23         Q.    I see.

24               But you're responsible for collecting

25   documents in this lawsuit to provide to me; is that

1    correct?

2         A.    Is the question am I responsible for

3    collecting documents in this lawsuit to provide to

4    you?

5         Q.    Yes.

6         A.    Yes.

7         Q.    So in connection with that responsibility,

8    did you obtain any written documents from Success

9    Village -- or with Success Village?

10        A.    We don't have an agreement that states

11   what we do over what period of time in Success

12   Village.

13               They call us.  Send us work orders.  And

14   we perform them.

15        Q.    I see.

16               So they send you a work order; is that

17   correct?

18        A.    Yes.

19        Q.    They draft the work order; is that right?

20        A.    Yes.

21        Q.    And then where does that work order get

22   saved?

23        A.    It gets sent via e-mail.

24        Q.    Right.

25               When you receive it, where do you save it?

1       A.   We don't save it.  We go out and perform

2   the work.

3       **Q.   I see.**

4            **Is it -- do you delete anything from your**

5   **e-mail?**

6       A.   I'm not sure.  I wasn't in charge of the

7   e-mail for a while.

8       **Q.   Have you instructed anybody in the course**

9   **of this lawsuit to not delete any e-mails?**

10      A.   No.  I haven't instructed anybody to do

11  anything as far as deletion.  But -- not that I can

12  think of.

13      **Q.   Do you have any policies on deleting any**

14  **e-mails?**

15      A.   No.

16      **Q.   And you use a Gmail address; is that**

17  **correct?**

18      A.   Yeah.

19      **Q.   Do you use any other e-mail address?**

20      A.   We switched to a domain not long ago.  So

21  office@blackwidowct.com is the new e-mail.

22      **Q.   That's new as of what date?**

23      A.   I don't know.

24      **Q.   Last month, two months?**

25      A.   Few months.

1      Q.    Before that, you have -- and when did you

2   start working for Success Village?

3      A.    I don't know.  Maybe three years,

4   something like that.

5      Q.    So they are a pretty early customer of

6   yours; is that correct?

7      A.    I guess.

8      Q.    How did -- how did that customer come to

9   you?

10     A.    I don't remember.

11           I think maybe one of the maintenance guys.

12   Somebody working there gave them our information.

13   And they needed a new company.

14     Q.    Gave them information which would have

15   included, what, the name of your company?

16     A.    Our phone number and our name, yeah.

17     Q.    Have you personally gone to Success

18   Village to perform any pest control services?

19     A.    Yes.

20     Q.    How frequently during the -- how many

21   times during this year have you gone to Success

22   Village?

23     A.    I really don't know.

24     Q.    More than two?

25     A.    More than two.

1    **Q.    More than 10?**

2    A.    More than 10.

3    **Q.    More than 20?**

4    A.    I'd say probably more than 20, yeah.

5    **Q.    More than 50?**

6    A.    Maybe.  Probably not.

7    **Q.    So we're about three-quarters of the way**

8    **through the year.  So more than 50 would be more**

9    **than once a week, just for reference.**

10    A.    Not necessarily.  We've gone there several

11    times in a day, let alone in a week.

12           So if you're asking me, myself, how many

13    times I've been there, I'm not sure.  I'm also not

14    sure how many times my company has been there.  We

15    go there frequently, if that's what you're asking.

16    **Q.    Would you say, on average, more than once**

17    **a week?**

18           MR. HOFFMAN:  Objection.

19           Are you asking --

20           THE WITNESS:  I really don't understand

21    the question.

22           MR. HOFFMAN:  -- whether he goes

23    individually or whether the company goes?

24           MR. WINTER:  Company.

25           THE WITNESS:  Depends.  Some weeks we

1    don't go.  Some weeks we go multiple times a week.

2    BY MR. WINTER:

3          Q.    Right.

4                So on average, over the course of the last

5    year, how many times has your company been to

6    Success Village, if you had to approximate it?

7          A.    I wouldn't be able to approximate it.  I

8    don't know.  Sometime -- somewhere between 100 and

9    1,000.  I really don't know.

10               I'd love to answer the question.  I just

11   don't have that metric for you.

12         Q.    Do you know how big of a client they are

13   in terms of revenue?

14         A.    I'm not sure.

15         Q.    Are they your largest client?

16         A.    In terms of size, absolutely.

17         Q.    In terms of revenue, are they your largest

18   client, Success Village?

19         A.    I think.  I'm not sure.

20         Q.    Who is your -- who else would be one of

21   your largest other clients that you're not sure

22   about, whether Success Village or somebody else,

23   that might be your largest?

24         A.    I'm not sure.

25         Q.    Do you have any other large clients?

1      A.    "Large clients" in terms of what?

2      **Q.    What do you consider a large client to be?**

3      A.    It depends on what you're asking.  Because

4    that could be largest volume or --

5      **Q.    What do you consider a large client in**

6    **terms of revenue?**

7      A.    I don't know.  Maybe somebody who spends

8    over $10,000 yearly.

9      **Q.    $10,000 a year, you would consider that**

10   **would be a large client?**

11     A.    I think so.

12     **Q.    How many clients above $10,000 a year do**

13   **you think you have?**

14     A.    Several.  I have no idea.

15     **Q.    Can you list everyone that you can**

16   **remember right now?**

17     A.    I don't know.  What type of work are you

18   referring to specifically?

19     **Q.    There's no qualifier in that question,**

20   **Mr. Black.**

21           **I just asked of your customers who have**

22   **more than $10,000 of annual revenue, please tell me**

23   **any of the names that you can remember, other than**

24   **Success Village?**

25     A.    So you want me to list customers' names

1    that have spent over $10,000 with us this year?

2        Q.    Sure.

3            MR. HOFFMAN:  So that the record is clear,

4    any -- like in the past, any names --

5            MR. WINTER:  Let me withdraw this.

6    BY MR. WINTER:

7        Q.    Look, do you know who your customers are?

8    Generally, you know who they are?

9        A.    Most of them.

10        Q.    Have you personally visited your

11    customers?

12        A.    A lot of them.

13        Q.    Most of them?

14        A.    Depends.

15        Q.    Have you personally visited most of your

16    customers who use your services in the amount of

17    more than $10,000 a year?

18        A.    Not necessarily.

19        Q.    Have you visited a lot of them?

20        A.    Maybe.

21        Q.    Have you visited more than two of them?

22        A.    Maybe.

23        Q.    So you don't know if you've visited more

24    than one customer who spends more than $10,000 a

25    year with you?  You don't know that?

1          **Did you do anything to prepare for this**
2    **deposition?**

3                MR. HOFFMAN:  Objection.

4                THE WITNESS:  I thought I already answered
5    that.

6    BY MR. WINTER:

7        **Q.   Did you do anything to prepare for this**
8    **deposition to identify your customers?**

9                MR. HOFFMAN:  Objection.

10               THE WITNESS:  Did I do anything to
11   identify my customers?

12               What is it that you would like me to go
13   through and identify of my customers?

14   BY MR. WINTER:

15       **Q.   I would like to know who your largest**
16   **customers are.**

17               MR. HOFFMAN:  You just withdrew that
18   question.

19               THE WITNESS:  I'm doing my best to answer
20   these questions for you.

21   BY MR. WINTER:

22       **Q.   So other than Success Village, you cannot**
23   **name a single customer of yours that spends more**
24   **than $10,000 a year; is that correct?**

25               MR. HOFFMAN:  Objection.  That's a

1  mischaracterization of his testimony.

2          THE WITNESS:  I would be happy to answer

3  if you want to give me a little while to think about

4  it.  Like I said, I was trying to think about it

5  when you withdrew the question.  I need a little bit

6  of time to think on it.

7  BY MR. WINTER:

8     **Q.   Okay.  Go ahead and think about it.**

9          **Is that fair?**

10         MR. HOFFMAN:  And where we were three

11 minutes ago was I was putting on the record that to

12 the extent that the deponent identifies any names on

13 the record, that those names -- like with respect to

14 the entirety of his testimony today -- will be

15 attorneys' eyes only, pursuant to the protective

16 order.

17 BY MR. WINTER:

18    **Q.   So I will ask the question again just so**

19 **it's on the record.**

20         **Other than the Success Village, can you**

21 **name any of your customers that spend more than**

22 **$10,000 per year with your company?  And if so,**

23 **please name them.**

24         MR. HOFFMAN:  Are you asking for this

25 year?  Are you asking last year?

 1                MR. WINTER:  Ari --

 2                MR. HOFFMAN:  Come on.

 3                MR. WINTER:  Object to form and let's move

 4    on.

 5                MR. HOFFMAN:  Objection as to form.

 6                THE WITNESS:  I'm happy to answer if you

 7    want to just give me a minute.

 8    BY MR. WINTER:

 **9        Q.    I'm giving you a minute.  Your counsel is**

**10    not objecting properly.**

**11                Go ahead.**

12                MR. HOFFMAN:  Objection as to form.

13                I'm doing my best to make sure that the

14    transcript is clear to help both parties.

15                MR. WINTER:  Just object to form.  That's

16    fine.

17                MR. HOFFMAN:  Objection as to form.

18                THE WITNESS:  I know there was a -- a big

19    exclusion.

20                I think Belette?  Belette, B --

21    B-E-L-E-T-T-E.  We've done quite a bit -- a bunch of

22    work for him.

23                Burke [ph.].  Last name Burke.  But I

24    don't know if she's over 10,000.  She has to be now.

25                I don't know a lot of these off the top of

1    my head.

2    BY MR. WINTER:

3        Q.    **Those are the only ones you can remember,**

4    **Success Village, Belette and Burke?**

5        A.    I'm trying to think of other ones.

6              Nothing's popping in my head.

7        Q.    **Do you ever look at financial reports of**

8    **your business?**

9        A.    I'm starting to.

10       Q.    **Do those financial reports ever identify**

11   **your largest accounts?**

12       A.    Not what I'm looking at, to be honest.

13       Q.    **You said Belette.  What is Belette -- how**

14   **do you spell that?**

15       A.    I spelled it to the best of my ability.  I

16   think it's B-E-L-E-T-T-E.

17             It's a customer's name.

18       Q.    **Where is that customer located?**

19       A.    Weston.

20       Q.    **Is it like a personal residence?**

21       A.    Yep.

22       Q.    **You said a big "exclusion" job?**

23       A.    Uh-huh.

24       Q.    **What is that?  What was that specifically?**

25       A.    Sealing up a home to prevent bats, flying

1  squirrels, red squirrels, from entering.  It's

2  wildlife-proofing a home.

3          We've also done some pest control there.

4  So that's why I believe that was probably one of

5  them.

6          Again, I'm trying to provide the

7  information to you.

8      **Q.   How did you get that customer?**

9      A.   Came as a referral from another guy.  I

10 don't remember what company referred us to that one,

11 but I remember it was too big for them.

12     **Q.   "Another guy" is another person in the**

13 **pest control industry?**

14     A.   Yeah.  I have a bunch of guys who refer

15 us.

16     **Q.   Are there some guys who are top referral**

17 **sources for you?**

18     A.   What do you mean, "top referral sources"?

19     **Q.   Well, when someone refers you business --**

20 **right? -- that there's -- that's a referral source.**

21          **Do you agree with me there?**

22     A.   That's a what?

23     **Q.   When someone refers business to you,**

24 **that's a referral source.**

25          **Do you agree?**

1      A.   Right.  Yep.

2      **Q.   Of those referral sources that you --**

3  **exist in your business, that refer work to you, do**

4  **any of them stand out as one that refers you either**

5  **large jobs or a large amount of jobs?**

6      A.   I mean, there's several of them.

7           If -- if somebody doesn't have time for a

8  job that's too big for him, they could refer us.

9  Or -- you know, there's -- there's a few of them.

10     **Q.   And of those "several," can you give me**

11  **their names?**

12     A.   North 40 Pest Control.  Scribner Pest and

13  Wildlife.  KC Wildlife.  KAC Wildlife; two different

14  companies.

15          We have suppliers that refer us business.

16  Wildlife Control Supplies being one of them.

17          That's all I can think of off the top of

18  my head.

19     **Q.   When you say suppliers, who would those be**

20  **specifically?**

21     A.   Wildlife Control Supplies.  It's a company

22  out in Suffield, Connecticut.

23     **Q.   Wildlife Control Supplies?**

24     A.   Correct.

25     **Q.   In preparation for this deposition, what**

1  **did you do to prepare yourself to testify on the**

2  **topic of the nature of defendant's customers and**

3  **types thereof, for example, residential, commercial,**

4  **density, size, location?**

5      A.   Are you asking what I look at to prepare

6  for this?

7           I don't understand what you mean.

8      **Q.   Yes.**

9      A.   I did the best I could.  Tried to go

10  through customer information best I could, but

11  there's a lot of customers.

12      **Q.   What customer information did you go**

13  **through?**

14      A.   Started at A and worked my way down.

15      **Q.   And so if you started at A, the first one,**

16  **what did you specifically look at?**

17      A.   Tried to look at how many services they do

18  with us or -- you know.  If they had a plan with us

19  or anything recurring.

20           I can only remember so many things.

21      **Q.   Did you look at that for Success Village?**

22      A.   Did I look at that for Success Village?  I

23  don't remember.

24           I went through a lot of different

25  accounts.

1        Q.    Were you aware that someone from Success

2    Village called my client looking for you, because

3    you all missed a service call?

4        A.    I am.

5        Q.    What was that service call?

6        A.    I don't know what the service call.  But I

7    know who the person was.

8        Q.    Who was the person?

9        A.    Charlene Jenkins or Charlene Parks.  She

10    goes by both names.

11            She's a very part-time employee there.

12        Q.    What's her role?

13        A.    I literally don't know.  She works there

14    occasionally to help sort out paperwork, to my

15    understanding.

16        Q.    How often do you communicate with her?

17        A.    I don't.  I've had communication with her.

18    No more than a handful of times.

19        Q.    When Success Village sends your company a

20    work order, who sends it?

21        A.    Vanessa usually, I believe.

22        Q.    What's Vanessa's last name; do you know?

23        A.    Newman, maybe.  Maybe.  I think that's

24    right.

25        Q.    So its Vanessa.  It starts with an N.  Are

1  you certain of that?

2      A.   I think.  I'm pretty sure it is.

3           Again, I'm trying to give you an accurate

4  answer.  I'm pretty sure it's Newman.

5      Q.   All right.

6           So Vanessa -- likely Newman, but at least

7  it starts with an N, you're pretty certain of that?

8      A.   Yeah.  Yeah.  I'm pretty sure that's her

9  name but I'm not -- just not positive.

10     Q.   And when Vanessa sends you e-mail with a

11 work order, where does it get sent to?

12     A.   E-mail.

13     Q.   Which e-mail?

14     A.   It would have been the

15 blackwidowpestspecialist@gmail.com.

16     Q.   Had you ever deleted any e-mails from

17 Vanessa?

18     A.   I haven't, no.

19     Q.   Has anybody in your company to your

20 knowledge deleted any of those e-mails?

21     A.   I don't know.  I don't think so.

22     Q.   And you said you're aware that Charlene

23 Jenkins or Parks called my client, looking for you;

24 is that right?

25     A.   It was on that list, yeah.

1      Q.    On what list?

2      A.    The list that was produced to us.  The

3  list of phone numbers.

4      Q.    Okay.  And that's how you became aware of

5  it?

6      A.    Yeah.

7      Q.    Did you ever speak to Charlene Jenkins or

8  Parks about that call that was made to my client?

9      A.    I don't remember.  I don't think so.

10     Q.    Would anybody at your company have spoken

11  to Charlene Jenkins or Parks, to your knowledge?

12            MR. HOFFMAN:  Objection.

13            THE WITNESS:  I really don't know.

14  BY MR. WINTER:

15     Q.    And it was in relation to a missed service

16  call; is that correct?

17     A.    That's what you stated.  I'm not sure.  I

18  literally don't know.

19     Q.    Had you ever missed a service call with

20  Success Village?

21     A.    Are you sure it was a service call to

22  Success Village and not her home?

23     Q.    Have you ever missed a service call to

24  Success Village?

25     A.    I'm not sure if.  I did it, I don't know

1  about it.  I don't think we have.  But we're not

2  perfect.

3      Q.    Do you know who Rachael Burr [ph.] is?

4      A.    Rachael Burr?

5      Q.    Rachael Burr?

6      A.    Yes.  Yep.

7      Q.    Who is that?

8      A.    It's a customer we did a big exclusion

9  for.

10      Q.    How big?

11      A.    I shouldn't say a big exclusion.  It was

12  maybe like a $3,000 exclusion.

13      Q.    Where was that?

14      A.    Either Brookfield or Danbury.  Somewhere

15  out that way.

16      Q.    Roughly when was that?

17      A.    I don't know.  A year ago, maybe.

18      Q.    After this --

19      A.    Maybe more.

20      Q.    After this lawsuit was filed?

21      A.    Probably because we've been --

22            (Reporter Clarification.)

23            THE WITNESS:  I said probably.  Probably.

24            I'm just thinking.

25

1    BY MR. WINTER:

2        Q.    **How did you get Rachael Burr as a client?**

3        A.    Came from a referral from Scrivener Pest

4    and Wildlife.

5        Q.    **And how did she first contact you?**

6        A.    By phone.

7        Q.    **Did you speak to her personally?**

8        A.    I didn't.  No.

9        Q.    **Who would have?**

10       A.    I'm not sure.  Whoever was answering the

11   phones at the time.  I think -- it might have been

12   Merina.  I'm not sure.  I think -- I think it might

13   have been Merina.

14       Q.    **Do you have any documents related to her,**

15   **such as an estimate or a quote or letter, any**

16   **written documents?**

17       A.    I think maybe.

18       Q.    **What do you think those documents would --**

19   **would be?**

20       A.    Where do I think they would be?

21       Q.    **Where -- where would they be stored?**

22       A.    GorillaDesk.

23       Q.    **And if you look at PX21, that example of**

24   **an estimate, would you have sent her something**

25   **obviously with the content description address,**

1  different but specific to her job?

2      A.   Absolutely.

3      Q.   What was the job?

4           I mean, you said it was an exclusion job.

5  But what specifically was involved?

6      A.   For bats.

7      Q.   So what's involved in an exclusion job for

8  bats and -- in her house?

9      A.   Sealing a home so the bats cannot re-enter

10  into the home.

11          Putting one-way doors.

12          Going back towards the end of a season or

13  in about a month's time, and removing the one-way

14  doors and then finishing the completion of the seal.

15          We use custom metal.

16     Q.   Custom metal?  Where do you get the custom

17  metal from?

18     A.   We make it.  It's custom.

19     Q.   All right.

20     A.   So we just get the metal and customize it.

21     Q.   And so you're putting these pieces of

22  metal over holes and things in the -- in the eaves

23  of the house, various different locations?

24          Where -- where are you looking to, to put

25  these exclusion devices, so to speak?

1      A.    Any entry points they could be getting

2    into.  It's hard to explain.

3      **Q.    Did you personally prepare the estimate**

4    **for her?**

5      A.    I don't remember if I did or if Mike did.

6    But I know I was on that job.  That's what I know

7    of.

8      **Q.    Who -- you were there with -- who else was**

9    **there with you on the job?**

10     A.    I believe Mike.

11     **Q.    Mike was there?**

12     A.    Yeah.

13     **Q.    And that's Mike who is supposed to testify**

14   **on Thursday?**

15     A.    You'll -- you'll meet him on Thursday,

16   yeah.

17     **Q.    Okay.  How long has Mike been working with**

18   **you?**

19     A.    Maybe about a year.  Probably a little

20   over maybe.  I think.  Probably a little over.

21     **Q.    How did he come to know about your**

22   **business?  How did you guys, you know, develop the**

23   **employee relationship?**

24     A.    Friend of friends.

25     **Q.    Is he a friend of -- did he ever work for**

1  another pest control business, to your knowledge?

2       A.    Yeah.  He worked at Cat's Eye.

3       Q.    Cat, C-A-T, apostrophe S, E-Y-E?

4       A.    That's correct.

5       Q.    In terms of TV chemicals and materials for

6  your business, do you use chemicals and other

7  materials for your business?

8       A.    Yes.

9       Q.    Give me a couple of examples of what those

10  would be?

11      A.    A couple of chemicals?

12      Q.    Sure.

13      A.    Sure.  Talstar.  Temprid.

14            (Reporter clarification.)

15            THE WITNESS:  Sorry.

16            Talstar, T-A-L-S-T-A-R.  Temprid,

17  T-E-M-P-R-I-D.  Precor, P-R-E-C-O-R-E [sic].

18            How many do you want me to list?

19  BY MR. WINTER:

20      Q.    What generally are those chemicals for?

21      A.    It all depends.  Depends on the

22  application.

23      Q.    The ones you just identified, what are

24  those for?

25      A.    Well, Talstar is an exterior treatment.

1   You can put it on the foundation.  It's great as a

2   repellent.

3        Q.    To repel what?

4        A.    General pests, like small ants, carpenter

5   ants.  Maybe spiders, depending on the situation.

6   But it's dependent on the application.

7             Temprid is a good interior product.  It's

8   labeled for a lot of the general pests.

9             You could use it as preventative

10  treatment, could use it for spiders, ants.  It's a

11  good all-around product.

12            Could also use it for bees.

13       Q.    Where do you buy those chemicals from?

14       A.    We have a supplier called Target Specialty

15  Products.

16            (Reporter clarification.)

17            THE WITNESS:  "Target," yep.  Like the

18  big-box store, but "Specialty Products."

19  BY MR. WINTER:

20       Q.    And where is Target Specialty Products

21  located?

22       A.    I don't know.  It's somewhere out by --

23  it's near Wildlife Control Supplies, somewhere out

24  there.  Near Suffield, maybe.  Closer to Hartford.

25  Somewhere in that general vicinity.

1          But they deliver it to us, so I'm not sure
2    where they're located.
3          Q.    They're in Connecticut though?
4          A.    Absolutely.  That branch of them.
5          Q.    Is that a national brand?
6          A.    I don't know if it's national.  I just
7    know they have other branches in other places.
8    Because sometimes they send things.
9          Q.    So they sometimes send things from other
10   places, outside of Connecticut?
11         A.    Like warehouses.
12         Q.    To your knowledge, where are those
13   warehouses located?
14         A.    I have no idea.
15         Q.    But you know they're located outside of
16   Connecticut?
17         A.    Yeah.  It's a distribution center.
18         Q.    And they're also located inside the United
19   States though?
20         A.    I would assume so.  If not, shipping would
21   cost a lot more.
22         (Discussion off the record.)
23         (Off the record.)
24   BY MR. WINTER:
25         Q.    Do you understand you're still under oath?

1    A.    Yes, I do.

2    Q.    In terms of -- you mentioned Target

3  Specialty Products is one of your suppliers; is that

4  right?

5    A.    Yes.

6    Q.    How often do you order products from them,

7  would you estimate?

8    A.    Weekly, biweekly, monthly.  Depending.

9    Q.    Do they -- would they then send you an

10  invoice for those products?

11    A.    Yeah.

12    Q.    Then you would pay it on some form of

13  commercial terms, like 30 days, or something like

14  that?

15          How does it work?

16    A.    It's already paid.  They have my card on

17  file, so...

18    Q.    So you would call them up to order

19  something, they would just charge your credit card,

20  and that would be -- and then it would get

21  delivered; is that right?

22    A.    Yeah.  But I -- I wasn't always the one

23  ordering, so...

24    Q.    Is it on your personal credit card?

25    A.    No.  Business credit card.  Everything is

1    through the company.

2        Q.    Earlier in the deposition you talked about

3    BNI events with home inspectors, real estate

4    professionals, as examples of people you market to,

5    to get business.

6              Do you recall that?

7        A.    I do.

8        Q.    In terms of networking events, can you,

9    you know -- last two you've been to, what's kind of

10   the context of those?

11       A.    The last one I went to, it was called

12   Burlington Day in Burlington, Connecticut,

13   Litchfield county.

14             Just talking to people.  Representing the

15   brand well.

16       Q.    Did you wear a shirt containing your logo?

17       A.    Sure did.

18       Q.    And where was Burlington Day?  Was it

19   outside, was it at a --

20       A.    Outside in Burlington.  Right in the

21   center.

22       Q.    So were there other local service

23   businesses there too?

24       A.    Several.

25       Q.    What types of other businesses were there?

1        A.    Plumbing, gardening centers.  I mean, food

2    trucks.  Everything.  You name it.

3        **Q.    Are there, I guess, events or activities**

4    **there for, say, kids or adults to partake in, or is**

5    **it --**

6        A.    Yeah.  They actually have a small rowing

7    section.

8        **Q.    What -- was it a one-day event?**

9        A.    Like four hours.  Few hours.

10        **Q.    What did your setup look like?  Did you**

11    **have a tent or did you have a table?  What did it**

12    **look like?**

13        A.    Yeah, a table.

14            There's a picture on our social media.

15        **Q.    And that table would -- does it have a**

16    **banner that shows your logo?**

17        A.    Yep.

18        **Q.    And the phone number and everything?**

19        A.    Yep.

20        **Q.    Did you hand out anything at that event?**

21        A.    Trifolds, pamphlets with our name.  Some

22    information about the company.

23        **Q.    So the trifold pamphlet would include your**

24    **logo; is that correct?**

25        A.    Yes.

1      Q.   And when I say "Your logo," we're

2   referring to -- it's somewhere...

3      A.   PX16.

4      Q.   There we are.

5           And when I say "Your logo," you understand

6   that I'm referring to --

7      A.   PX16.

8      Q.   Yes.

9           And when I said that throughout this

10  deposition, is that what you understood me to be

11  referring to?

12     A.   It is.

13     Q.   Was Burlington Day sponsored by the

14  Burlington Chamber of Commerce?

15     A.   Yeah.  That was one of the sponsors of it.

16     Q.   Are you -- did you advertise with them or

17  have a paid relationship with the Burlington Chamber

18  of Commerce?

19     A.   We are a member of the Burlington Chamber

20  of Commerce, yes.

21     Q.   What type of member are you?

22          Do they have different types of members?

23     A.   You're going to hate me; I don't know.

24     Q.   You just sign up for something or...

25     A.   Yep.

1    Q.    And when you signed up for that, what did

2    you get out of it?

3    A.    All I know they have meetings monthly.  I

4    try to make a couple of them, you know.  I don't

5    really know what else is included yet.  I'm a very

6    bad member of it, so...

7    Q.    In joining the Burlington Chamber of

8    Commerce, did they make any Facebook posts about

9    your company to your knowledge?

10    A.    I hope they do.  But I don't know.

11    Q.    You don't know if that's a condition of --

12    A.    No.

13    Q.    -- you joining?

14    A.    I literally don't know.

15    Q.    Did you ever ask the Burlington Chamber of

16    Commerce to do a Facebook post for you?

17    A.    No.  But it'd be great if they did.

18    Q.    In being a member of the Burlington

19    Chamber of Commerce, are you -- do you know if

20    you're listed on their website?

21    A.    I'm not sure.  But I think I remember

22    somebody saying something about that.  So maybe.

23    Q.    That somebody saying something about that,

24    who you think --how does that -- like, how does that

25    come to be something that you're telling me?

1          **Like, what -- is it someone who works for**

2   **them or --**

3          A.   I do remember hearing it, but I don't

4   remember exactly what it was.  Because, again, I

5   haven't put a lot of time and effort into the -- the

6   Chamber of Commerce, so...

7          (Exhibit  22 was marked for identification as

8       of this date.)

9   BY MR. WINTER:

10         **Q.   So does that look like a post from the**

11  **Burlington Chamber of Commerce?**

12         A.   It does.  I wish I saw it.

13         **Q.   Is the reason you didn't see it, could**

14  **that be that they tagged my client?**

15         A.   (Witness reviews document).

16         **Q.   Is that -- could that be the reason you**

17  **didn't see it?**

18         A.   I was going with because I wasn't engaged

19  in the Chamber of Commerce.

20         **Q.   But you see on the second page that they**

21  **tagged my client in the Facebook post about you,**

22  **your business; is that correct?**

23         A.   Yes.

24         **Q.   So would you agree that Burlington Chamber**

25  **of Commerce couldn't tell the difference between**

1   your company and my client's company, you both using

2   "Black Widow"?

3              MR. HOFFMAN:  Objection.

4              THE WITNESS:  I would disagree.

5   BY MR. WINTER:

6        Q.   Why?

7        A.   Clearly there was a mistake.

8        Q.   Why is it clearly a mistake?

9        A.   Because the wrong person is tagged.

10             I don't think that deems that they don't

11  know the difference.

12       Q.   Well, if they knew the difference, they

13  would have tagged you correctly; isn't that correct?

14             MR. HOFFMAN:  Objection.

15             THE WITNESS:  Disagree.

16  BY MR. WINTER:

17       Q.   Why?

18       A.   People make mistakes all the time.

19       Q.   I see.

20             So you think this was an innocent mistake

21  by the Burlington Chamber of Commerce?

22       A.   Yes.

23       Q.   I see.

24             So they weren't particularly careful in

25  terms of determining whether they were tagging you

1    or my client; is that correct?

2        A.    Yeah.

3        Q.    Are customers in the pest control industry

4    careful about the name of the company they hire?

5            MR. HOFFMAN:  Objection.

6            THE WITNESS:  I don't know.

7    BY MR. WINTER:

8        Q.    You don't know if the customers are

9    careful?

10       A.    I don't know.

11       Q.    You have no evidence one way or the other

12   as to whether they're highly discerning or whether

13   they're not very careful about who they hire; is

14   that correct?

15       A.    Well, I have no evidence whether or not

16   customers are careful because I don't know who

17   you're referring to.

18       Q.    Customers in pest control industry.

19           MR. HOFFMAN:  Objection.

20           THE WITNESS:  Very generalized.

21           What customers?

22   BY MR. WINTER:

23       Q.    What kind of customers do you service?

24       A.    All kinds.

25       Q.    Name a few.

1      A.   A few customers?

2      **Q.   A few types of customers.**

3      A.   Few types of customers.

4           MR. HOFFMAN:  Objection.

5           THE WITNESS:  Can you give me something

6    more specific.

7    BY MR. WINTER:

8      **Q.   How would you characterize your customers,**

9    **if you had to divide them into different assorted**

10   **categories?**

11     A.   I would consider them family.

12     **Q.   How about -- do you have residential**

13   **customers?**

14     A.   Sure.

15     **Q.   Is that a category?**

16     A.   Okay.  Sure.

17     **Q.   Do you have commercial customers who are**

18   **large residential buildings?**

19     A.   Yes.

20     **Q.   Do you have commercial customers who are**

21   **basically just a business?**

22     A.   Yes.

23     **Q.   Do you have any other types of customers,**

24   **other than those three that we talked about?**

25     A.   Yes.

1      Q.    What others?

2      A.    I don't know.

3      Q.    Well, you said -- I asked, Do you have any

4 other types of customers other than those we talked

5 about.

6            You said, "Yes."

7      A.    Uh-huh.

8      Q.    What are you thinking of there, when you

9 say --

10     A.    I don't know how to classify them.

11     Q.    You can't classify customers?

12           Is construction a way to classify

13 customers?

14     A.    Not a good way.  It's too generalized.

15     Q.    Why is it too generalized?

16     A.    Because construction is an industry.  It's

17 not a customer base.

18     Q.    Are home builders and people who renovate

19 houses customers of yours or referral sources?

20     A.    Not very much.

21     Q.    Okay.

22           So other than residential, commercial

23 properties that are residential units, and

24 businesses, other than those three, what's another

25 type of customer of yours?

1      A.    I think those are great classifications.

2      **Q.    So those are the only three**

3  **classifications, general classifications that you**

4  **would identify; is that correct?**

5      A.    Are you talking about for general pests

6  specifically?  Or like --

7      **Q.    In your industry.**

8      A.    I think that pretty well covers it.

9      **Q.    Within those three categories, would you**

10  **consider there to be subcategories of customers?**

11      A.    Maybe.

12            I don't know.

13      **Q.    When you went to the Burlington Day, of**

14  **those three categories we talked about, generally**

15  **what types of customers were you speaking with?**

16      A.    Residential.

17      **Q.    Why did you join the Burlington Chamber of**

18  **Commerce?**

19      A.    Well, somebody told me it would be a good

20  idea.  And I thought it was a good area to work in.

21  Burlington is beautiful.

22            It's about 20 minutes away.  Great spot.

23      **Q.    Do you regret becoming a member of the**

24  **Burlington Chamber of Commerce now that you have a**

25  **Facebook post of them improperly tagging you?**

```
 1            MR. HOFFMAN:  Objection.

 2            THE WITNESS:  I don't regret anything,

 3    sir.

 4            Everything happens for a reason.

 5    BY MR. WINTER:

 6       Q.   The third page of that PX22 exhibit.  Do

 7    you see that?

 8       A.   Yep.

 9       Q.   Tell me what that looks like to you?

10       A.   It looks like a bunch of businesses on a

11    website.

12       Q.   And would you agree that it looks like the

13    Burlington Chamber of Commerce website with your

14    logo on it?

15       A.   Yes.

16       Q.   Who was it that you mentioned thought that

17    it would be a good idea for you to join the

18    Burlington Chamber of Commerce?

19       A.   Somebody in another networking group of

20    ours.  Jordan Sandford.

21       Q.   And what's -- what's that networking

22    group?

23       A.   LABA, L-A-B-A.  Litchfield Associates --

24    or Litchfield -- I told you I'm not a good member.

25    Litchfield something business association.
```

1                Litchfield Associates Business

2    Association, something like that.

3        Q.    And who is Jordan -- did you say

4    "Stamford"?

5        A.    Sandford.  Sandford.

6        Q.    Who is that?

7        A.    Mutual friend I met through the networking

8    groups.

9        Q.    And to your knowledge, what industry is

10   Jordan Sandford in?

11       A.    Banking.

12       Q.    PX22, you looked at the first page, and

13   your initial reaction was that it's great that they

14   made a Facebook post; is that correct?

15       A.    Yeah.

16       Q.    And then when you turned the next page to

17   the second one, you started laughing; is that

18   accurate?

19       A.    Is what accurate?

20       Q.    That you started laughing after you looked

21   at the second page?

22       A.    Is it accurate that I started laughing?

23             Maybe.

24       Q.    Well, did you laugh or not?

25       A.    I laugh at a lot of things.

1       Q.    Answer the question, please.

2       A.    Yeah.

3       Q.    So you laughed when you looked at the

4   second page, right?

5       A.    Yeah.

6       Q.    Why did you laugh?

7       A.    I don't know.

8       Q.    What's funny about it?

9       A.    That I didn't know about the post.

10      Q.    Well, you didn't laugh when you looked at

11  the first page, right?

12            MR. HOFFMAN:  Objection.

13            THE WITNESS:  I was laughing at the first

14  page.

15  BY MR. WINTER:

16      Q.    You were laughing at the first page?

17      A.    Uh-huh.  Into the second.

18      Q.    I see.

19            And you laughed at the second page when

20  you saw that my client showed up; is that correct?

21      A.    That's incorrect.  I laughed the whole

22  time.

23      Q.    Oh.  You thought the last thing was funny?

24      A.    Absolutely.

25      Q.    You think it's funny that somebody is

1   confusing my client with you?

2           MR. HOFFMAN:  Objection.

3           THE WITNESS:  No.  I don't believe that's

4   funny.

5   BY MR. WINTER:

6       Q.   Why don't you think that's funny?

7           MR. HOFFMAN:  Objection.

8           THE WITNESS:  I don't know.

9   BY MR. WINTER:

10      Q.   You just don't think it's funny?

11      A.   As I stated on the record, I thought the

12  whole thing was funny.

13      Q.   I see.

14           So the whole thing is funny, but someone

15  being confused between my client and you is not

16  funny?

17      A.   Can you be a little more direct with the

18  question.

19      Q.   The whole exhibit is funny, correct?

20      A.   The exhibit is not funny.  What was funny

21  was that I did not know about it.

22      Q.   Did you think it was great when you only

23  saw the first page?

24           MR. HOFFMAN:  Objection.

25           THE WITNESS:  Did I think it was great?

1            Can you be more specific with your line of

2    questioning, please.

3    BY MR. WINTER:

4        **Q.   Was it positive that you saw that the**

5    **Burlington Chamber of Commerce made a post about**

6    **your company?**

7        A.   Maybe.

8        **Q.   Is marketing a positive thing?**

9        A.   To some.

10       **Q.   Is marketing positive to you?**

11       A.   Sure.

12       **Q.   Does marketing drive customers to come and**

13   **hire you?**

14       A.   It could.

15       **Q.   When you turned to the second page, you**

16   **continued laughing; is that correct?**

17            MR. HOFFMAN:  Objection.

18            THE WITNESS:  As stated, I laughed through

19   the whole thing.

20   BY MR. WINTER:

21       **Q.   So you continued laughing when you looked**

22   **at the second page; is that correct?**

23            MR. HOFFMAN:  Objection.

24            THE WITNESS:  Would you care to be more

25   specific?

1  BY MR. WINTER:

2       **Q.   You laughed through the whole thing,**

3  **correct?**

4            MR. HOFFMAN:  Objection.

5            THE WITNESS:  I laughed looking at this.

6  BY MR. WINTER:

7       **Q.   You laughed looking at this, and when you**

8  **turned the page, you continued to laugh; is that**

9  **accurate?**

10      A.   If I continued to laugh.  You're asking is

11  it accurate if I continued to laugh?

12      **Q.   Yes.**

13      A.   I continued to laugh.

14      **Q.   That's your answer.**

15           **This is not complicated.  You were**

16  **laughing -- you said you were laughing through the**

17  **whole thing, and when you turned to the second page,**

18  **you continued to laugh; is that accurate?**

19           MR. HOFFMAN:  Objection.

20           THE WITNESS:  At which point I stopped

21  laughing, after we got into the topic.

22           The reason I was laughing was because I

23  missed the post, as I stated.

24  BY MR. WINTER:

25      **Q.   I see.**

1          **So when you saw that there was confusion**
2   **between my client and you, that became much more**
3   **serious and was no longer a laughing matter; is that**
4   **accurate?**
5              MR. HOFFMAN:  Objection.  Asked and
6   answered multiple times.
7              THE WITNESS:  What's your question?
8              MR. WINTER:  Can you read it back, please.
9         (The Record was read back.)
10             THE WITNESS:  I wouldn't call that
11  accurate.
12  BY MR. WINTER:
13        **Q.   Why?**
14        A.   Because I stated I was laughing when I saw
15  the post.  I stopped laughing when I stopped
16  laughing.  There was no reason for me to start or
17  stop laughing.
18             I laughed at the post.
19        **Q.   But the whole thing is funny, right?**
20             MR. HOFFMAN:  Objection.  Argumentative,
21  asked and answered.
22             THE WITNESS:  Are you asking for my sense
23  of humor?
24             MR. HOFFMAN:  Vague.
25             THE WITNESS:  I don't understand the

1  question.

2  BY MR. WINTER:

3      **Q.   Well, you testified already that you**

4  **thought the whole post --**

5              MR. HOFFMAN:  Argumentative.

6              MR. WINTER:  Can I finish my question?

7  BY MR. WINTER:

8      **Q.   You've testified already that the whole**

9  **occurrence of the post was funny, right?  That you**

10 **didn't know about it?**

11             MR. HOFFMAN:  Argumentative.

12 Mischaracterizing his testimony.  Vague.

13             Objection for the record.

14 BY MR. WINTER:

15     **Q.   Are you refusing to answer my question?**

16     A.   I'm just waiting for a descriptive one.

17     **Q.   Are you telling me you don't understand my**

18 **question?**

19     A.   That's correct.

20     **Q.   What don't you understand about my**

21 **question?**

22     A.   All of it.

23             Would you mind rephrasing it for me so

24 that I could understand it better.

25     **Q.   When you first saw this exhibit --**

1      A.   Yes.

2      Q.   -- you began to laugh; is that right?

3      A.   It is.

4      Q.   And then when you first saw this exhibit,

5   you'd only saw the first page; is that accurate?

6      A.   Yes.

7      Q.   Then I asked you to flip to the second

8   page; is that correct?

9      A.   Yes.

10      Q.   And when you flipped to the second page,

11   did you keep laughing?

12      A.   I didn't abruptly stop laughing.  My

13   laughter continued until my laughter was finished.

14           I was laughing at the initial thing still,

15   to answer your question thoroughly.

16      Q.   Why did you stop laughing when you looked

17   at the second page?

18      A.   I can't define my sense of humor so I

19   really don't know.

20      Q.   Do you think it's funny that someone made

21   a mistake to tag my client instead of you?

22           MR. HOFFMAN:  Objection.

23           THE WITNESS:  Why would I feel that's

24   funny?

25

```
 1   BY MR. WINTER:
 2         Q.   So you don't feel it's funny?
 3         A.   No.
 4         Q.   Do you think it's a serious matter that
 5   somebody made a mistake to tag my client instead of
 6   you; is that correct?
 7              MR. HOFFMAN:  Objection.
 8              THE WITNESS:  No.
 9   BY MR. WINTER:
10         Q.   You don't think it's serious?
11         A.   I don't think about it at all.  So the
12   answer is I don't know.
13              (Plaintiff's Exhibit Number 23 was marked
14   for identification, as of this date.)
15         Q.   Is that a document you produced in this
16   matter?
17         A.   Yes.
18         Q.   It's marked PX23, correct?
19         A.   Correct.
20         Q.   The -- in grey there, there's a response,
21   the very small text at the bottom.  It says,
22   "Instant response."
23              Is that the automated response that your
24   software sends out when you miss a call?
25         A.   Correct.
```

1        Q.    When you went to get this document, where
2   did you find it?

3        A.    In the cell phone.

4        Q.    In which cell phone?

5        A.    It would have been the 828 number.

6              (Reporter clarification.)

7              THE WITNESS:  The 828-7729 number.

8   BY MR. WINTER:

9        Q.    So that would be the number that appears
10  on PX16, correct?

11       A.    That is correct.  Wait.  Is this -- it
12  says 23.  Exhibit 23?

13       Q.    Right.  So --

14       A.    Oh, the number on PX16?

15       Q.    Yeah.

16       A.    Yes.  That's correct.  That's the one.

17       Q.    So you use that phone number in the
18  ordinary course of your business; is that correct?

19       A.    That's our secondary number now.

20       Q.    At the time, you used that number in the
21  ordinary course of business; is that correct?

22       A.    It's still in the ordinary course of
23  business.  That's just a secondary number.

24       Q.    So at this time, this text on PX23 was
25  sent, the number that appears on PX16 was used by

1  your business in its ordinary course of business,

2  correct?

3      A.   Just to clarify:  This is texted to the

4  (203)651-6871 number.  That's the phone it was found

5  on.

6           This is through Grasshopper, which is our

7  app.

8      Q.   So the text, it says:  Hey, this is Blake

9  Black -- Blake with Black Widow -- excuse me.

10          The text says:  "Hey, this is Blake with

11  Black Widow Pest Specialists.  Sorry I missed your

12  call.  I will get back to you as soon as possible.

13  Thank you for your patience."

14          That came from Grasshopper, correct?

15     A.   Correct.  It's an instant response.  This

16  is what stays there.

17     Q.   And what's the number associated with

18  Grasshopper?

19     A.   (203)651-6871.

20     Q.   Now, is that 651 number currently your

21  primary number?

22     A.   Yes.

23     Q.   And so at the time when someone called the

24  828 number that appears on PX16 in front of you, if

25  that call was missed, Grasshopper from

1    (203)651-6871, would send this instant response

2    shown on PX23; is that correct?

3         A.   Incorrect.

4         Q.   Why is it incorrect?

5         A.   It's incorrect because, as I stated, this

6    is the (203)651-6871 number.  This number is

7    dissociated.

8              This might have come from that phone, but

9    this number is not associated with this text message

10   as stated.

11        Q.   So the mechanics of PX23, this instant

12   response getting generated, the person would have

13   had to call what number?

14        A.   (203)651-6871.

15        Q.   And then that call would have had to been

16   missed, correct?

17        A.   Correct.

18        Q.   And then this instant response would have

19   been sent, correct?

20        A.   Correct.

21        Q.   And then you see below a text message:

22   "Sorry, wrong office.  Wanted NYC Black Widow

23   office.  Best wishes."

24             Do you see that?

25        A.   I do.

1    Q.    And that document -- this entire document
2    was found in your business records; is that correct?
3    A.    It is.
4    Q.    And those business records are kept in the
5    ordinary course of your business, correct?
6    A.    That's correct.
7    Q.    And if you see on the second page there,
8    that shows a missed call and an instant response to
9    that (917)669-995 [sic] number; is that accurate?
10    A.    Yep.
11    Q.    Did you investigate what that customer
12    meant by the NYC Black Widow office?
13    A.    Did I investigate what they meant?
14    Q.    Yeah.
15    A.    Not that I remember, no.
16    Q.    Did you call this number back?
17    A.    I didn't have that phone at the time.  So
18    no.
19    Q.    Did anybody call this number back?
20    A.    It appears as though they did.  It appears
21    as though we had a missed call, and it looks like we
22    responded to the call, if you look at the call log.
23    Q.    Well, the call log on the second page, the
24    second thing shows an instant response; is that
25    correct?

1        A.    The first page shows an instant response.

2   The second page shows a call.

3        Q.    **An out -- an outbound call?**

4        A.    That's what it shows, yes.

5        Q.    **So who would have made that outbound call?**

6        A.    Somebody in the office.

7        Q.    **At the time who could that have been?**

8        A.    Probably Merina.  Maybe Kara.  It could

9   have been one of the two.  I'm not sure.

10       Q.    **Kara is currently employed by you; is that**

11  **correct?**

12       A.    She is.

13       Q.    **And you said she's been with you for**

14  **roughly a month?**

15       A.    No.  Few months.

16       Q.    **Few months.**

17             **Would her start date have been after**

18  **July 1st of this year?**

19       A.    I think it was before that.  I'm not sure.

20       Q.    **After June 1st of this year?**

21       A.    Maybe before that.  I don't remember.

22       Q.    **After May 1st of this year?**

23       A.    It's been a few months.  I'm not sure.

24       Q.    **After March 1st of this year?**

25       A.    Maybe.  It was definitely after January.

1        Q.    Do you have any idea what they're

2   referring to on the first page of "NYC Black Widow

3   office"?

4        A.    No idea.

5        Q.    No guesses?

6        A.    (Witness shakes head.)

7        Q.    You have no guesses?

8        A.    Why would I guess?

9        Q.    Okay.

10              Do you know of any New York-based company

11  called Black Widow, have you heard of any one?

12       A.    After I got a cease-and-desist is when I

13  first heard about that company.

14       Q.    You never received any text messages with

15  my client's brand?

16       A.    I never received any text messages?

17              You must be referring to Horton.

18       Q.    Yeah.

19       A.    Yes.  But at the time we believed that to

20  be the Black Widow that went out of business in

21  Connecticut.

22       Q.    Why did you believe that?

23       A.    Because we didn't know of any other Black

24  Widows.

25       Q.    Where is Jim Horton located?

 1       A.    So he lives on the New York border.  He

 2   services both New York and Connecticut.

 3             He also refers us, by the way.

 4             (Plaintiff's Exhibit Number 24 was marked

 5   for identification, as of this date.)

 6   BY MR. WINTER:

 7       Q.    **Is that the Jim Horton text you were**

 8   **referring to just now?**

 9       A.    It was.

10             I believe that was the same you were

11   referring to.

12       Q.    **And that's marked as PX24 with a Bates**

13   **number on the bottom, ARM-BLACK-000123; is that**

14   **correct?**

15       A.    Repeat that one more time.

16       Q.    **The Bates numbers ARM-BLACK-000123 and the**

17   **exhibit number is PX24.**

18       A.    000123, PX24, yes.

19       Q.    **Okay.  To your knowledge, what phone**

20   **number would Jim Horton have been texting this to?**

21       A.    Likely my old phone number, which is the

22   (203)828-7729 that is located on PX16.

23       Q.    **Got it.**

24             **Why do you say that?**

25       A.    Why do I say that?

1          Q.    Why do you think it's that number?  I

2    mean, you can't -- you don't see (203)828-7729 on

3    this text string anywhere.

4                So how do you know that it's that number?

5          A.    Because the texts were blue.  If it was in

6    Grasshopper, the texts would be green.  It's an

7    application versus an iPhone to iPhone.

8                And it's also my old phone number, which

9    is why my speculation is that it would be 828

10   number.

11         Q.    And it says, "Hi, this is Merina," in the

12   first blue box on the left.

13               Do you see that?

14         A.    I do.

15         Q.    That refers to the employee fired for

16   insubordination named Merina; is that right?

17         A.    It sounds right.

18         Q.    In terms of the actual typing of this,

19   would this be something that would be typed on an

20   actual phone, or would this show up on a computer

21   screen for her to type this back?

22         A.    I don't know.  I would assume either.  But

23   it was a cell phone, so I think it would probably

24   show up on a phone.

25         Q.    Did you speak with Merina on or around the

1    time that you received this, these text messages?

2        A.   She called me and asked me about it.   And

3    I told her that, Oh, yeah, that's probably the old

4    Black Widow.

5        Q.   Did you look into it more than that?

6        A.   No.

7        Q.   Why not?

8        A.   I didn't have a reason to.   The company

9    that went out of business that was in our area, and

10   Jim works in Connecticut.   It didn't register as

11   anything more than that.

12       Q.   Are you sure that this job was in

13   Connecticut?

14       A.   I'm not sure.   That was my assumption.

15       Q.   That assumption turned out to be wrong; is

16   that correct?

17       A.   I guess.

18       Q.   Do you see a -- would you call that a glue

19   trap, and a spring trap on there?

20       A.   Glue board, snap traps, yeah.

21       Q.   So on the glue board you see the words --

22   the large words "Black Widow," and then you see a

23   drawing of a spider next to it.

24            Is that correct?

25       A.   It looks like that, yeah.

1          Q.    And below it are some -- some text writing

2     in black and red that may be a little hard to read

3     from this --

4          A.    Yeah.  I can't read that.

5          Q.    Do you recognize that as my client's logo,

6     at least the Black Widow and the spider drawing?

7          A.    Would you mind showing me your client's

8     logo?

9          Q.    Actually, we have the -- we already have

10    it marked on -- so I have in front of you PX13,

11    showing the attachment, which is registration

12    Number 4624108.

13              Do you see that?

14         A.    Yes.  The colors are wrong, but the logo

15    looks the same.

16         Q.    So now looking again at the Jim Horton

17    text, PX24, that glue board, that appears to be my

18    client's logo; is that correct?

19         A.    Seems as though, yeah.

20         Q.    And at the time you did nothing to

21    investigate the existence of any Black Widow company

22    in New York; is that correct?

23         A.    That's correct.

24         Q.    You didn't see the need to go investigate;

25    is that correct?

1      A.   That's correct.

2      **Q.   That's because you believed it to be an**

3  **old company in Connecticut that was no longer in**

4  **existence, correct?**

5      A.   Yes.  That's correct.

6      **Q.   Did you talk with Jim Horton about this**

7  **job at all?**

8      A.   He stated that he was there fixing a job

9  for a client.  Nothing more.  So I didn't feel the

10  need to investigate any further.

11           We sealed glue boards in attics all the

12  time so I didn't think anything of it.

13      **Q.   When did you have that conversation with**

14  **Jim?**

15      A.   I don't recall.

16      **Q.   Was it around the time that these -- was**

17  **it around the time that these text messages were**

18  **sent?**

19      A.   No.  Much later than that.

20      **Q.   Was it after this lawsuit was filed?**

21      A.   No.  I think it was before then.  I think.

22           I don't remember.

23      **Q.   Was it after you received the letter that**

24  **is in front of you, marked PX13?**

25      A.   I don't remember.

1        Q.    What was that conversation?  Was it by

2   phone, was it by e-mail, by text?

3        A.    I think it was in person at some event

4   somewhere.  I don't remember where.  One of the many

5   that we've attended together.

6        Q.    You said he refers you business?

7        A.    Sure does.

8        Q.    What type of business does he refer to

9   you?

10       A.    Things that are outside of his area that

11  he doesn't want to go to.  Things that may be

12  outside of the scope of work that he's interested in

13  doing.

14       Q.    What would be examples of that?

15       A.    A bat exclusion, maybe.  Maybe it was too

16  far from the New York border.

17             We love our referrals.

18       Q.    So you said Jim does work in both

19  Connecticut and New York; is that correct?

20       A.    That's correct.

21       Q.    So he couldn't tell if this was you when

22  you -- when you got the text; is that right?

23       A.    Rephrase that again.

24       Q.    Well, Jim's text says -- gives the photo

25  of the glue board and traps, and below it says, "Is

1    this you," question mark.

2              Is that accurate?

3        A.   Yes.

4        Q.   So from there, from that text, Jim didn't

5    know if it was you or it was not you; is that

6    correct?

7              MR. HOFFMAN:  Objection.

8              THE WITNESS:  I couldn't tell you.  You

9    would have to ask Jim.

10   BY MR. WINTER:

11       Q.   Have you spoken to Jim about this lawsuit

12   at all?

13       A.   I don't remember.

14       Q.   When's the last time you spoke to him?

15       A.   We all joke around on Facebook, on the

16   different groups we got.  But outside of that,

17   actually spoken to him?  Maybe a year.  Maybe a

18   handful of months.

19              I really can't recall.

20       Q.   Did you ever inform him that you were

21   going to identify him by name by interrogatory

22   response or other documents sent to you in this

23   lawsuit?

24       A.   I don't know.

25       Q.   These text messages on PX24, these were

1    sent to a number associated with your business; is

2    that correct?

3         A.    That is correct.

4         Q.    And these are business records that are

5    kept in the ordinary course of business; is that

6    correct?

7         A.    These are text messages, yes.

8         Q.    And they are business records kept in the

9    ordinary course of business; is that correct?

10        A.    Sure.  They can be classified as that.

11        Q.    And you use the number associated with

12    these texts to communicate with both customers and

13    referral sources; is that correct?

14        A.    Yep.  That would be correct.

15        Q.    So the phone number associated with these

16    texts is used in the ordinary course of business; is

17    that correct?

18        A.    Yes.

19              (Plaintiff's Exhibit Number 25 was marked

20    for identification, as of this date.)

21    BY MR. WINTER:

22        Q.    You see PX25 in front of you there?

23        A.    Yep.

24        Q.    Do you see the words "Black Widow Termite

25    and Pest Control Corp.," and then my client's logo

1   below that?

2         Do you see that?

3    A.   Yes.

4    Q.   And below "Black Widow," there's the words

5   "Termite and Pest Control Corp." in black.  And

6   then, "She always gets her prey," in red in smaller

7   font compared to the words "Black Widow."

8         Is that correct?

9    A.   Yes.

10    Q.   Do you believe those smaller words would

11   be the words that are shown on the text with Jim

12   Horton as PX24?

13    A.   Looks similar.

14    Q.   And then next down is "Black Widow Pest

15   and Wildlife Specialists" underlined in bold in

16   text.

17         Do you see that?

18    A.   I do.

19    Q.   And that's your company; is that correct?

20    A.   That is correct.

21    Q.   And below that is your logo, shown on

22   PX16; is that correct?

23    A.   That's correct.

24    Q.   Both use red; is that correct?

25    A.   Yes, that is correct.

```
 1              They also both use black.
 2        Q.   Do they both use white?
 3        A.   It looks like mine is negative space and
 4   theirs is a highlight.
 5        Q.   Do you see on your spider that there
 6   are -- I will call them white accents on at least
 7   the legs of the spider?
 8        A.   Sure.  As negative space.
 9        Q.   Do you see on my client's logo on the top
10   the -- we'll call it around the eye of the spider,
11   is white?
12              Do you see that?
13        A.   Yeah.  What's -- go ahead.
14        Q.   No, finish your answer.
15        A.   My answer is yes.
16        Q.   Both spiders' designs have red on the
17   spider design; is that correct?
18        A.   In very different ways.
19        Q.   But they both have red on the spider
20   design; is that correct?
21        A.   Yes.
22        Q.   And the words "Black Widow" in both marks
23   are the largest words by font size in both
24   examples -- in both logos; is that correct?
25        A.   Yes.
```

1      Q.    You have an example on your website where

2    the spider design logo is off to the left of the

3    words "Black Widow"; is that correct?

4      A.    It's disconnected from the design.

5      Q.    Okay.  But on your website, your spider

6    design is shown to the left of the "Black Widow"

7    words; is that correct?

8      A.    Yes.

9      Q.    A lot of similarities, right?

10           MR. HOFFMAN:  Objection.

11           THE WITNESS:  None.

12   BY MR. WINTER:

13     Q.    No similarities?

14     A.    No.

15     Q.    Nothing similar about those two logos?

16           Not a single thing is similar about those

17   two logos; is that correct?

18           MR. HOFFMAN:  Objection.

19           THE WITNESS:  They both have spiders.

20   BY MR. WINTER:

21     Q.    Okay.  What else is similar?

22     A.    I'm not sure.

23           They're not very similar at all.

24     Q.    What else is similar though?

25     A.    They're clearly different marks.

1          Q.    I see.

2                They both include the same words, "Black

3     Widow;" is that correct?

4          A.    Yes.

5          Q.    That's another similarity; is that

6     correct?

7          A.    Yes.

8          Q.    You already said they both include a

9     spider design; is that correct?

10         A.    Different designs.

11         Q.    They both include a spider design; is that

12     correct?

13         A.    They both include different spider

14     designs.

15         Q.    They both include a spider design, is that

16     correct, "yes" or "no"?

17         A.    Yes.

18         Q.    And in one variant of your logo, the

19     spider design is to the left of the words "Black

20     Widow;" is that correct?

21         A.    Are you referring to the website?

22         Q.    Yeah.

23         A.    It's the only time I've seen it like that.

24         Q.    They both use the word "pest;" is that

25     correct?

1      A.    "Pest" is in both of the names, yes.

2      Q.    So that's another similarity; is that

3    correct?

4      A.    Yes.

5      Q.    So we've identified more than two

6    similarities; is that correct?

7      A.    I don't know.

8      Q.    Do you not remember your testimony that

9    you just gave, identifying similarities?

10     A.    I remember my testimony.

11     Q.    Okay.

12           You identified "Black Widow" as being

13    words that are in both; is that correct?

14     A.    Yes.

15     Q.    Similarity Number 1, right?

16           Do you agree?

17     A.    Yes.

18     Q.    Okay.  You see me holding up finger one,

19    right?

20           I'm holding up finger one?

21     A.    Are you teaching me how to count?

22     Q.    I'm going to count for you because you're

23    not counting on the record, so I'm going to count

24    for you.  All right?

25           MR. HOFFMAN:  Your little finger is

1    slightly up too, so it's a little bit ambiguous.

2    BY MR. WINTER:

3        Q.    We'll count pens.

4              Here's one pen.

5              Do you agree?

6        A.    It looks like one pen, yes.

7        Q.    One pen for one similarity?

8        A.    Sure.

9        Q.    All right.

10             Now we're going to identify a second

11   similarity:  They both have spiders; is that

12   correct?

13       A.    Yes.

14       Q.    Third pen.

15             They both have red in the logo; is that

16   correct?

17       A.    Let me think about it for a moment.

18             Yeah, they both have red.

19       Q.    Both have black, correct?

20       A.    You will have to give me a minute.

21             Yeah, they both have black.

22       Q.    They both have the word "pest," correct?

23             I'm timing you.

24             MR. HOFFMAN:  I'm sorry?  Why are you

25   timing the witness at this point?

```
1   BY MR. WINTER:
2        Q.    Timing you.
3              How quickly can you identify the word
4   "pest" in those logos --
5              MR. HOFFMAN:  Why -- why -- why are you
6   shove -- shoving him --
7   BY MR. WINTER:
8        Q.    How quickly can you identify the word --
9              MR. HOFFMAN:  I'm sorry.  Why are you --
10  BY MR. WINTER:
11       Q.    How quickly can --
12             MR. HOFFMAN:  Why are you --
13             MR. WINTER:  Because he's being evasive.
14             MR. HOFFMAN:  Excuse me.  Why are you --
15             (Simultaneous speakers.)
16  BY MR. WINTER:
17       Q.    How quickly can you identify --
18             MR. HOFFMAN:  Attorney Winter, why are you
19  standing up and --
20  BY MR. WINTER:
21       Q.    How quickly --
22             MR. HOFFMAN:  -- getting visibly --
23  BY MR. WINTER:
24       Q.    How quickly --
25             MR. HOFFMAN:  -- and audibly upset?
```

```
 1              MR. WINTER:  Stop.
 2              MR. HOFFMAN:  No.  I'm not stopping --
 3    BY MR. WINTER:
 4        Q.   I'm going to time you now.  I would
 5    like --
 6              MR. HOFFMAN:  No.
 7              My witness will not be demeaned this way.
 8              I understand that you're upset.  I
 9    understand that.  If you want to take a two-minute
10    break --
11              MR. WINTER:  I don't need a break.
12              MR. HOFFMAN:  -- please do so.
13              MR. WINTER:  I don't need a break.
14              MR. HOFFMAN:  So if you don't need a break
15    then treat my client appropriately.
16              MR. WINTER:  Okay --
17              MR. HOFFMAN:  He does not need to be
18    shoved with an iPhone in his face.  And he does not
19    need to have you raised up from your seat and raise
20    your voice audibly.
21              This is a deposition.  It is not a bar
22    fight.
23              MR. WINTER:  Are you done?
24              MR. HOFFMAN:  I am now done.  And I hope
25    that you will act appropriately going forward.
```

1          MR. WINTER:  Are you done?

2          MR. HOFFMAN:  I just said I am now done.

3          MR. WINTER:  Thank you.

4          MR. HOFFMAN:  And I hope that you will act

5     appropriately going forward.

6     BY MR. WINTER:

7          **Q.   I'd like to ask you, the question is --**

8     **and I'm going to time you -- how quickly can you**

9     **identify the word "pest" in both logos?**

10          MR. HOFFMAN:  You're going to time my

11     client?

12          THE WITNESS:  I don't feel comfortable

13     answering, being timed.

14          I also don't feel comfortable with your

15     demeanor or the way you stood up.

16          MR. HOFFMAN:  We're going to take a break.

17          We're off the record.  Thank you.

18          Mr. Winter, that was inappropriate.

19          MR. WINTER:  We're not -- we're not taking

20     a break until we have finished this line of

21     questioning.

22     BY MR. WINTER:

23          **Q.   Does "pest" appear in both logos, "yes" or**

24     **"no"?**

25          MR. HOFFMAN:  Are you going to stop the

1   use of timing my client right in his face?

2           MR. WINTER:  I need the answer on the

3   record.

4           MR. HOFFMAN:  Are you going to stop doing

5   that?

6           MR. WINTER:  If he could --

7           MR. HOFFMAN:  It's a "yes" or "no."

8           MR. WINTER:  Look, Ari -- Ari --

9   (Simultaneous speakers.)

10          MR. WINTER:  Ari -- Ari -- I will agree to

11  stop doing it provided -- provided --

12          MR. HOFFMAN:  Then we will agree to

13  continue the deposition.

14          MR. WINTER:  Hold on.  Hold on.  Hold on.

15          This is ridiculous.

16          How long does it take to identify the

17  color red in both logos?

18          MR. HOFFMAN:  He was --

19          MR. WINTER:  He took about 3 -- about 60

20  seconds to do so.

21          MR. HOFFMAN:  No.  No, he was not.

22          THE WITNESS:  That's timed, no?

23          Was that timed?

24          We could identify how long it took, so --

25          MR. WINTER:  It is.

```
 1              THE WITNESS:  Perfect.
 2              MR. WINTER:  Let's take a break.
 3              THE WITNESS:  I thought we weren't taking
 4   one.
 5              MR. WINTER:  You want to answer the
 6   question?
 7              MR. HOFFMAN:  We're ready to go forward.
 8              THE WITNESS:  We're ready to go forward --
 9              MR. WINTER:  All right.  Let's do it.
10              MR. HOFFMAN:  As long as you're not timing
11   my client in his face, we're ready to go forward.
12              And as long as --
13              MR. WINTER:  Does -- does --
14              MR. HOFFMAN:  -- voices --
15              MR. WINTER:  Okay.
16              MR. HOFFMAN:  -- are kept at a moderate
17   tone --
18              MR. WINTER:  We're done.
19              MR. HOFFMAN:  -- we don't need to go
20   forward.
21              MR. WINTER:  Hey.  We're done.
22   BY MR. WINTER:
23       Q.  Does "pest" appear in both logos, "yes" or
24   "no"?
25       A.  Before answering the question, I would
```

1    like to state on the record that if --

2        Q.    No, Mr. Black.  Your counsel has stated on

3    the record the objection already.

4             It is your job to answer the questions.

5    It is your counsel's job to object.

6             I have asked a question.  I'd just like to

7    know, does the word "pest" appear in both logos,

8    "yes" or "no"?

9        A.    I've been compliant the whole time.

10            Yes.

11       Q.    That's a fifth similarity; is that

12   correct?

13       A.    Yes.

14       Q.    So there are five similarities you can

15   identify in this logo -- in between the two logos on

16   PX25; is that correct?

17       A.    Yes.

18            MR. WINTER:  We can take a break now.

19            MR. HOFFMAN:  Thank you.

20            THE WITNESS:  Thank you.

21         (Off the record.)

22

23

24

25

1                    (Plaintiff's Exhibit Number 26 was marked

2    for identification, as of this date.)

3    BY MR. WINTER:

4         Q.    I will hand you several documents.

5               The first is 26.  That's BLACK_000132

6    through 135.

7         A.    Thank you.

8         Q.    Will you just confirm that those numbers

9    are accurate.

10        A.    000132, yes.

11        Q.    And the last one is 135, correct?

12        A.    Yes.

13        Q.    Okay.  I'm just going to read them all on

14   the record right now.

15               (Plaintiff's Exhibit Number 27 was marked

16   for identification, as of this date.)

17   BY MR. WINTER:

18        Q.    Number 27 is 000112.  Do you agree?

19        A.    000112, yes.

20               (Plaintiff's Exhibit Number 28 was marked

21   for identification, as of this date.)

22   BY MR. WINTER:

23        Q.    28 is also marked -- is -- is marked

24   000122.  Do you agree?

25        A.    Right.

1                Do I get copies of these?

2        Q.   I will give them to you at -- once I ask

3    questions.

4                (Plaintiff's Exhibit Number 29 was marked

5    for identification, as of this date.)

6    BY MR. WINTER:

7        Q.   And 00108 is Exhibit 29; is that correct?

8        A.   000108, yes.

9        Q.   And then I will get to the next one later.

10               So I'm going to hand you -- we'll look at

11   them in order:  26, 27, 28 and 29.

12               If you could look at Exhibit 26.

13       A.   Yeah.

14       Q.   Tell me what's on the first page.

15       A.   It looks like a logo from one of our

16   shirts.

17       Q.   Second page?

18       A.   Another logo of one of our shirts.

19       Q.   Third page?

20       A.   Also our shirts.

21       Q.   And on that one, there's a yellow shirt --

22   this is on BLACK-000134, where the spider logo is

23   mostly in black.

24               Do you see that?

25       A.   It's entirely in black, yes.

1      Q.    There's some -- I guess there's some

2    yellow see-through on it; is that correct?

3      A.    Yes.

4            It's negative space.  So it's all black.

5      Q.    The next page, that's 000135.  What do you

6    see there?

7      A.    Also looks like shirts.

8      Q.    With your logo; is that correct?

9      A.    Yep.

10      Q.    So this is -- shows several variants of

11    your shirts; is that correct?

12            PX26?

13      A.    Yes.

14      Q.    And are these shirts worn by your

15    technicians in the field?

16      A.    Yes.

17      Q.    When you attend marking events or business

18    development events, do you wear a shirt including

19    your logo?

20      A.    Yes.

21      Q.    Why?

22      A.    To identify ourself.

23      Q.    And so those shirts always include the

24    words "Black Widow" on them; is that correct?

25      A.    Yes.

1        Q.    Let's look at 27.  It says

2    ARM-BLACK-000112.

3              What do you see there?

4        A.    That is a truck with our logo.

5        Q.    Is that a truck that is owned by your

6    business?

7        A.    Yes.  It's our truck.

8        Q.    But title -- if I looked at the

9    Connecticut car title, it would be in the name of

10   your business?

11       A.    It should be.

12       Q.    Do you use any vehicles where you

13   personally own -- own them for your business?

14             MR. HOFFMAN:  Objection.

15             THE WITNESS:  I'm not sure.

16   BY MR. WINTER:

17       Q.    Do you own all the vehicles that you use

18   for your business outright?

19       A.    No.

20       Q.    You have loans on some of those vehicles?

21       A.    Yeah.

22       Q.    How many vehicles do you have -- "you"

23   meaning the business?

24       A.    I think five, maybe.

25       Q.    Do all --

1     A.   Six, maybe.  Maybe five.

2          I don't know.

3     **Q.   So those five or six vehicles, are they**

4     **all -- the main color of the vehicle, from any one**

5     **of the colors, black, red, and white?**

6     A.   Yes.

7     **Q.   So there's no other color than black, red,**

8     **and white as the color of the vehicle; is that**

9     **correct?**

10    A.   Yes.

11    **Q.   And each one of them includes the logo**

12    **that's on PX16; is that correct?**

13    A.   Yes.

14    **Q.   You see the right photo in that --**

15    **right -- right in there, it shows "Black Widow" on**

16    **the back?**

17    A.   This is as it was still being designed.

18    So the representation might be a little bit

19    slightened [sic] because they overlapped the black

20    widow with "Black Widow."

21         But it is written in white and red, which

22    is the proper way for it to be.  And that's how it's

23    lettered on that truck.

24    **Q.   In a white truck, it would be -- the word**

25    **"black" would be in black color; is that correct?**

1      A.   Yeah.

2      Q.   On a red truck, the word "black" would be

3  in the color black; is that correct?

4      A.   Correct.

5      Q.   Do you have any brand standards or a

6  document specifying different uses of your logo,

7  anything like that?

8      A.   I don't understand the question.  What do

9  you mean?

10      Q.   Do you have any document that specifies

11  different variations of the logo and how they're

12  used, right?

13           You've seen some where the spider and the

14  circle are all black.  And, you know, there's

15  negative space.  For example, the yellow shirt.

16  That's one example.

17           There's another example where the word --

18  here, "black" is in white.  And there's another

19  example where the word "black" is in black.

20           Is that correct?  Those are all correct

21  examples of your logo?

22      A.   Yes.

23      Q.   Is there any document, like one document

24  that specifies the different time where you would

25  use one variation or the other, such as brand

1    guidelines?

2        A.   I don't know.

3        Q.   All your trucks include the words "Black

4    Widow" and the spider design; is that correct?

5        A.   Yes.

6        Q.   Why do you put your company -- company

7    brand on your trucks?

8        A.   To identify yourselves.

9        Q.   To who?

10       A.   Peoples' whose driveway we're in.

11       Q.   Is it also useful for identifying yourself

12   to, for example, neighbors or other potential

13   customers?

14       A.   I don't know.

15       Q.   Have you ever received a call, to your

16   knowledge, of someone saying, I saw your truck and

17   called?

18       A.   I did have one person once.  But it was

19   only after they already saw us on Facebook.

20   Somebody referred us.  And they saw a yard sign that

21   same day in their neighbor's yard, so...

22       Q.   Got it.

23            So such a yard sign would include the logo

24   on PX16; is that correct?

25       A.   Yeah.

1      Q.    And those yard signs, why do you use them?

2      A.    To show our happy customers off.

3      Q.    In the hopes of getting more happy

4    customers; is that correct?

5      A.    If that's a by-product, sure.

6      Q.    From -- so you -- so what other sort of

7    print materials do you have that include your logo?

8          We've identified yard signs?

9      A.    Uh-huh.

10     Q.    We've identified shirts and we've

11   identified trifold flyers so far in this deposition,

12   I believe.

13     A.    Uh-huh.

14     Q.    Is there anything else that you can tell

15   me that you used as printed materials including your

16   logo that are distributed to customers?

17     A.    Sure.

18          Door-hangers for "Sorry we missed you," if

19   the customer was not home at the time of service.

20   Or a -- a "Thank you" door hanger, letting the

21   customer know that we were there for service and we

22   performed a service that they have already hired us

23   to do, if it's one that could be performed without

24   them being home.

25          Business cards.  We have business cards.

1            Oh, Christmas cards.  We do Christmas

2    cards every year.

3        Q.    Anything else?

4        A.    We have post signs -- that I mentioned for

5    the other business in the past, so I'll mention them

6    again here -- that says our name on it.  It doesn't

7    have our logo but it has our name.  It is after you

8    make an application requirement, we put those on.

9        Q.    Little yellow ones?

10       A.    Little yellow ones.  Exactly.

11       Q.    Anything else?

12       A.    Banners.  I have a couple small banners.

13       Q.    Where do you use the banners?

14       A.    Well, if you were to go to an event, be a

15   good place to put a banner out.

16            Also table covers.  I did a table cover

17   recently for the events as well.  Looks great.

18            As far as print material:  Hoodies.  We

19   get hoodies.  It looks the same as the T-shirts.

20            Insulated vests.  Hats.  The winter

21   beanies and, like, the long caps.

22            We mentioned the cups but I have a couple

23   of the gallon jugs.  The guys, they love those.

24            Printed material.

25            Stickers.  Some small stickers.  All of

1   our bait station stickers, obviously.

2            (Reporter clarification.)

3            THE WITNESS:  Our bait.  Bait station

4   stickers.  So rodenticide-type stickers.

5            There might be more.

6   BY MR. WINTER:

7        Q.   Okay.  So --

8        A.   The guys have business cards too.

9        Q.   Do you have a business card with you

10  today?

11       A.   I don't.

12       Q.   Okay.

13            So just to refresh what I at least wrote

14  down, the record will say whatever you said, but

15  door hangers, thank you cards, business cards,

16  Christmas cards, the little yellow post signs that

17  you put up after treatment --

18       A.   Uh-huh.

19       Q.   -- banners that you use at, for example,

20  trade shows.

21       A.   Uh-huh.

22       Q.   Table covers.  Hoodies.  Vests.  Hats.

23            Cups.  Like the coffee cup that you have

24  in front of you.  Gallon jugs --

25       A.   These are ice shakers.

1      Q.   I guess.

2           Okay.  So the cup is an ice shaker that

3   you have in front of you.

4           The gallon jugs.  Stickers.  Baits -- and

5   then baits stations.

6      A.   Bait station stickers.

7           So a sticker goes on top of the bait

8   station telling the customer what types of

9   rodenticide you applied -- or -- applied, rather.

10  Excuse me.

11     Q.   Does the bait station sticker contain your

12  logo as appeared on PX16?

13     A.   No.  Just our name.

14     Q.   When you say just your name, it says just

15  "Black Widow" --

16     A.   "Pest Specialists," and then our phone

17  number, in case of emergency.

18     Q.   So bait stations would be -- what? --

19  placed around a customer's either home or property

20  to trap whatever it is that you're trying to trap?

21     A.   Bait stations aren't intended to trap.

22  They're intended to allow the rodent to feed and go

23  elsewhere, to control the population.

24     Q.   Got it.

25     A.   You can put traps inside, but we just

1  don't.

2      Q.   So those -- are those bait stations like

3  roughly 1 or 2-foot kind of plastic boxes that are

4  black?  Is that kind of what they are?

5           What -- can you describe them?

6      A.   Some.  Some of them look like that, yeah.

7      Q.   So then on that bait station, you put a

8  sticker that identification you guys, Black Widow

9  Pest Specialists, and your phone number, correct?

10     A.   Yes.

11     Q.   Do you have those stickers custom printed?

12     A.   Yes.

13     Q.   From a vendor?

14     A.   Yes.

15     Q.   Who is that vendor?

16     A.   Prospect Printing.

17     Q.   And do you keep records of your invoices

18  and expenses with Prospect Printing?

19     A.   I don't keep records of them.

20     Q.   You don't keep records of those expenses?

21     A.   No.

22     Q.   So you buy the bait station stickers for

23  the business but you don't keep records of those --

24  those expenses?

25     A.   I don't keep the receipts, if that's what

1  you're referring to.  It's on the statement I give

2  to my accountant.

3      Q.    What statement?

4      A.    The credit card statement.

5      Q.    I see.

6            So that would be on a -- would that be on

7  a business card?

8      A.    Correct.

9      Q.    The card is in the name of your LLC; is

10 that correct?

11     A.    That would be correct.

12     Q.    So you would -- so Prospect Printing would

13 basically just charge your credit card beyond the

14 statement as an expense and you would give that to

15 your accountant; is that correct?

16     A.    That is correct.

17     Q.    Is that how you pay for every one of those

18 printed items, with that credit card on your -- in

19 your business?

20     A.    I believe so.

21           Sometimes I pay with a check, depending on

22 the vendor.  Some people have a different preferred

23 method of payment.  Sometimes we save the 3 percent

24 fee by paying with a check, you know.

25     Q.    Who signs the checks?

1      A.   I sign the checks.

2      Q.   **Can anybody else sign the checks?**

3      A.   No.

4      Q.   **Are you the only one who is authorized to**
5      **pay anybody for anything in your business?**

6      A.   No, I'm not.

7      Q.   **Does Prospect Printing print everything on**
8      **that list that we -- that we just referred to, or do**
9      **they only print some of it?**

10     A.   No.  They print some of it.

11     Q.   **Tell me what some of the other vendors are**
12     **that you use.**

13     A.   If you could read through your list, I
14     could itemize it for you or tell you which ones.

15     Q.   **All right.  So door hangers?**

16     A.   Door hangers, I believe, I did online.

17          I want to say it was -- oh, God.  It's
18     like one of the big people who print things.  Not
19     the -- VistaPrint, maybe.

20     Q.   **So like a -- so like a VistaPrint company?**

21     A.   Like a print shop, yeah.

22     Q.   **Online --**

23     A.   Yeah.  I designed the door hangers online,
24     so those were at VistaPrint, I believe.

25     Q.   **Got it.**

1              **Thank you cards?**

2      A.   I didn't say thank you cards.  We don't --

3  or "Thank you for your service."  The door hangers.

4  I'm sorry.

5      **Q.   Yeah.**

6      A.   I was -- confusion.

7           Same thing, VistaPrint for those.

8      **Q.   Business cards?**

9      A.   That's Prospect Printing.

10     **Q.   Christmas cards?**

11     A.   That I do online.  I think it was Canva, I

12  believe.  But it might have been VistaPrint this

13  year.

14     **Q.   And do you -- do you actually print those**

15  **Christmas cards and mail them to your customers or**

16  **do you distribute them via e-mail?**

17     A.   So they're printed, delivered to us, and

18  we handwrite them and send them to our customers.

19  It's a really nice touch.

20     **Q.   The yellow post signs, those are kind of a**

21  **standard pest control industry sign; is that right?**

22     A.   Yes, but we get them customized.  I can't

23  remember the name of the vendor, but I can get it

24  for you if you need it.

25     **Q.   Are they customized with your logo as**

1    shown on PX16?

2        A.   No.  I stated that it's just our name

3    that's on our part.

4        **Q.   Okay.  Banners for trade shows, where are**

5    **those printed?**

6        A.   I think Prospect Printing did those.

7        **Q.   Table covers?**

8        A.   I think they did those too.  I'm pretty

9    sure.

10       **Q.   So banners and table covers you think**

11   **Prospect Printing; is that correct?**

12       A.   Yeah.  I believe so.

13       **Q.   Hoodies.  Where do you think those are**

14   **from?**

15       A.   I was getting them done by Grand Concepts

16   in Seymour, but we switched and -- who does them

17   now? -- the guy's name is Jamie.  I can't remember

18   the company's name.

19            Jamie.

20       **Q.   First -- 1st Phorm?**

21       A.   Jamie Perez -- no, that's not the hoodies.

22            They did the polos for us.

23       **Q.   So -- so for -- let's just -- all the**

24   **apparel, is that all done locally?**

25       A.   Not all of it.

1          Q.    **What is not done locally?**

2          A.    1st Phorm did the polos.

3          Q.    **Okay.**

4          A.    That's what I was saying.  It's a company

5     I'm heavily involved with.

6          Q.    **Heavily involved with how?**

7          A.    Well, I use all their supplements.  I'm a

8     Legionnaire for their program.

9                I'm also involved with Arete Syndicate,

10    which is a program through Ed Mylett and Andy

11    Frisella.

12               You should check that out.  It's good.

13               (Reporter clarification.)

14               THE WITNESS:  Arete, A-R-E-T-E, Sydicate.

15    Ed Mylett and Andy Frisella.

16               Incredible program.  Highly recommend it.

17               MR. WINTER:  Spell it.

18               THE WITNESS:  It's F-R-I-S-E-L-L-A.

19    And -- no problem -- and Ed Mylett, M-Y-L-E-T-T-E

20    [sic].  They put out some great stuff.

21    BY MR. WINTER:

22         Q.    **So that's like a fitness and supplement**

23    **company?**

24         A.    Yeah.  Correct.

25               So they have a program internally, through

1    their -- their people there, so -- that's where I

2    get those.

3         Q.   Are you heavily involved -- you don't

4    own -- do you -- do you own any portion of that

5    business?

6         A.   No.

7         Q.   You just think it's a good company and

8    they have good products that you like or things like

9    that, right?

10        A.   Exceptional products.

11             Great core values.  Great people.

12             I'm telling you, you should check them

13   out.

14        Q.   Maybe I will.  I've got it written on the

15   record who they are, so I'll go find it.

16        A.   I will send you my code.

17        Q.   You'll have to send it through counsel.

18             THE WITNESS:  Do you guys mind if I send

19   it to counsel?

20             MR. WINTER:  No, I'm totally kidding.

21   BY MR. WINTER:

22        Q.   Your website, do you have any tracking

23   metrics like where visitors come from and things

24   like that?

25        A.   If we do, I'm not aware of them, so...

1       Q.   How about social media, do you review the

2  metrics on your social media accounts?

3       A.   I'm not a metrics guy.

4       Q.   Do you at least know the number of likes

5  when certain things go viral directionally; is that

6  correct?

7       A.   I only know the one because it was over

8  2 million.  I don't -- I don't know exact on them.

9       Q.   Are there any others that stood out, other

10  than the one that went over 2 million?

11       A.   If I went through them, I'm sure I can

12  find some that were standouts.  But nothing coming

13  to the top of my head.

14       Q.   Any others that are in excess of 1 million

15  likes or views?

16       A.   Maybe.  I haven't checked in a while so I

17  don't know.

18       Q.   How often do you post on social media for

19  your business?

20       A.   I was doing it often for a while, but -- I

21  try to at least weekly or biweekly now.

22       Q.   So in front of you, I believe, is PX28.

23  Do you see that?

24       A.   I do.

25       Q.   Is that an example of an advertisement?

1        A.    Yeah, I guess.

2        **Q.    Do you know where that would be**

3    **distributed?**

4        A.    That was for a local community page they

5    asked us to -- to be in, in Waterbury, which is the

6    bordering town to Naugatuck.

7              The Jewish community magazine featured us.

8        **Q.    29.   Exhibit 29, 20108.**

9              **Do you see that in front of you?**

10        A.    Yes.

11        **Q.    On the bottom there's some type that says,**

12    **"Figure 6 ad for Seymour High School booster page."**

13              **Is that correct?**

14        A.    Yeah.   That's what it says, correct.

15        **Q.    You went to Seymour High School; is that**

16    **correct?**

17        A.    Yes.   I did, yes.

18        **Q.    And the booster page, is that for some**

19    **sports related thing?**

20        A.    I literally don't even remember this, to

21    be honest with you, so maybe.

22        **Q.    And you see there it mentions -- it shows**

23    **two numbers under your logo -- right? -- the 828 and**

24    **the 651 number?**

25        A.    Yeah.   Those are the two numbers

1    associated with our business.

2            So it looks like somebody put the number

3    in and put the second number below it.

4            MR. HOFFMAN:  Holding a bat.

5            THE WITNESS:  I'm sorry?

6            MR. HOFFMAN:  Holding a bat.

7            THE WITNESS:  Oh.  Yeah.  That's a bat.

8            MR. HOFFMAN:  God bless you.

9    BY MR. WINTER:

10        Q.    I will tell you an hilarious story off the

11   record about bats.

12        A.    Please.

13        Q.    For the high school booster page, did you

14   sponsor -- were you, like, sponsoring this ad or

15   something, or you just don't even know?

16        A.    I don't even know, to be honest.  I don't

17   remember.

18            Are you going to share the story or are

19   you going to wait?

20        Q.    We'll wait till we're off the record.  Let

21   me get through this.

22            (Plaintiff's Exhibit Number 29 was marked

23   for identification, as of this date.)

24   BY MR. WINTER:

25        Q.    So right there is document BLACK_00131 on

1    the first page.

2         A.    Yeah.

3         Q.    And then if you look at the next pages, on

4    the bottom left, there's a mailchi.mp link for each

5    of them.  So I'd ask you just to kind of thumb

6    through these market -- these examples at the end

7    and then I will ask you some questions about them.

8         A.    What's this one?  Is this a print mistake?

9         Q.    I don't know.  Just --

10        A.    I really hope we didn't send this to

11   somebody.

12        Q.    I just printed them out.

13        A.    That's okay.  Mistakes happen.  Hope he

14   stays happy.

15             (Witness reviews document.)

16           (Discussion off the record.)

17   BY MR. WINTER:

18        Q.    All right.  So have you now looked through

19   PX30?

20        A.    I have, yes.

21        Q.    First page lists a number of mailchi.mp

22   links.

23             Do you see that?

24        A.    Yes.

25        Q.    And those are -- would you call those

1   e-mail marketing blasts?

2       A.   To our customers, yes.

3       Q.   **How often do you send out these marketing**

4   **blasts?**

5       A.   To my knowledge we only did one.  Maybe

6   two.  It was a project that Merina was doing and

7   adopting.

8            So the only one I recognize here was -- I

9   think I remember seeing this one.

10           But I definitely remember this one.  I

11  liked this a lot.

12      Q.   **Okay.**

13      A.   I don't even remember seeing the rest of

14  these, to be honest.  I don't know if they ever went

15  out.

16      Q.   **So let's -- let's look at the first one,**

17  **that you identified as seeing this one.**

18      A.   Yeah.  I think I remember seeing this one.

19      Q.   **So if you look at the bottom left corner,**

20  **there's a link --**

21      A.   Uh-huh.

22      Q.   **Mailchi.mp, dash -- or, excuse me, slash,**

23  **eceba0050b08, slash, you-can-win-250.**

24           **Do you see that?**

25      A.   Yes.

Page 228

1          Q.   So it's a two-page printout at least here;

2     is that accurate?

3          A.   Seems to be, yes.

4          Q.   So on there, there's a photo of you

5     holding or -- well, someone holding a bat with a

6     Black Widow Pest Specialist logo on some piece of

7     clothing; is that correct?

8          A.   That's a hoodie sweat shirt.

9          Q.   Sweat shirt?

10         A.   Yes.

11              Same one as in PX29.  It's the same group

12     of photos.

13         Q.   Got it.

14              And then the other one you notice that you

15     said you liked?

16         A.   Yes.

17         Q.   Is it the "spring special" one?

18         A.   Yes.  Yeah.

19              I remember seeing that one for sure, with

20     the mosquito stuff.

21         Q.   So that's the -- let's see.  I will read

22     the mailchi.mp link from the bottom left:

23              Mailchi.mp/9bf40dc3f5ef/spring-special.

24              Do you see that?

25         A.   Yes.

1      Q.    So those two that you identified those are

2   marketing communications that you've generated in

3   the ordinary course of your business; is that

4   correct?

5      A.    I did not, but somebody did, yes.

6      Q.    Well, that your company generated in the

7   ordinary course of business, correct?

8      A.    That's correct.

9            Would I be able to excuse myself?  I have

10  something stuck in my eye and it's driving me nuts.

11           MR. WINTER:  Yes.

12         (Off the record.)

13           (Plaintiff's Exhibit Number 12, previously

14  marked.)

15  BY MR. WINTER:

16     Q.    I'm going to hand you PX12, which was

17  previously marked.

18           Turn to a page containing a request for

19  production Number 12.

20           Just read that to yourself.

21     A.    (Witness reviews document).

22           Uh-huh.  Got it.

23     Q.    And now you produced everything responsive

24  to that request; is that correct?

25     A.    I believe so.

1          Q.    And everything responsive to that request,

2    when I say that, it includes PX31, which I am going

3    to hand you now.

4                And PX32, which I am going to hand you

5    now.

6                (Plaintiff's Exhibit Number 31 was marked

7    for identification, as of this date.)

8                (Plaintiff's Exhibit Number 32 was marked

9    for identification, as of this date.)

10   BY MR. WINTER:

11         Q.    So those two documents, PX31 and PX32, is

12   everything responsive to requests for production

13   Number 12 through June of 2024; is that correct?

14         A.    Yes.

15         Q.    You have no other documents; is that

16   correct?

17         A.    I have no other documents for Number 12.

18                Bear with me one moment, please.

19                (Witness reviews document.)

20                I believe that's accurate.

21         Q.    Okay.  So let's look at -- we will work

22   backwards from PX31.

23                I will ask you to look at the last page,

24   which is marked ARM-BLACK-000098.

25                Do you see that?

1      A.    Give me one moment.

2            (Witness reviews document.)

3            Yes.

4      Q.    **And that shows on the bottom 2021, and**

5  **then all the way to the right, it shows 9,635; is**

6  **that correct?**

7      A.    Yes.

8      Q.    **So $9,635 was your total revenue in 2021;**

9  **is that correct?**

10     A.    I don't know if that's accurate.  I'm not

11 positive if that's accurate or not.

12     Q.    **Well, this is a business record that you**

13 **produced in response to request for production**

14 **Number 12; is that correct?**

15           **This is just for 2021.**

16     A.    Right.  I understand that.  I want to

17 answer your question properly.  So please bear with

18 me one moment.  I apologize.

19           (Witness reviews document.)

20           I guess it's accurate but I'm not a

21 hundred percent sure.

22     Q.    **Are your business records accurate?**

23     A.    Yes.  But I'm just not sure if this number

24 is 100 percent.  I want to make sure that if it's

25 not, that I provide the correct one.  I believe it

1    to be correct the way the record states.  But I want

2    to double-check and make sure.

3         **Q.    Okay.**

4         A.    That's all I'm saying.  I want to make

5    sure that I provide the proper records to

6    everything.

7              MR. WINTER:  Can we get a confirmation in

8    writing one way or the other fairly quickly on this?

9              MR. HOFFMAN:  Yeah.

10             THE WITNESS:  I will make sure you have

11   that as well.

12   REQ

13   BY MR. WINTER:

14        **Q.    Then next page working backwards is --**

15   **ending in 97.**

16             **Do you see that?**

17        A.    Working backwards -- this one is

18   definitely accurate, yes.

19        **Q.    That's 2022 revenue, correct?**

20        A.    Correct.  Yes.

21        **Q.    So $158,268.39; is that correct?**

22        A.    Correct.

23        **Q.    And next one back is 2023, $532,180.60; is**

24   **that correct?**

25        A.    Yes.  I believe that's correct.

1     Q.    So that's on ARM-BLACK 000096, correct?

2     A.    Yes.

3     Q.    And then going to 2024, this goes

4     through -- do you agree with me that this goes

5     through --

6     A.    March.

7     Q.    -- March?

8           Well, actually, instead -- instead of

9     that, let's not look at PX31.  Let's turn to PX32.

10    A.    Yeah.

11    Q.    Because this shows on PX32 a revenue

12    report through June of 2024 --

13    A.    Right.

14    Q.    With year to date total sales of

15    436,000 -- 436,378.56.

16          Do you see that?

17    A.    Yes, I do.

18    Q.    So that 436,000 and change was, as of

19    June 2024, your annual revenue; is that correct?

20    A.    Correct.

21    Q.    Do you agree that you're on track to have

22    gross revenue of roughly a million dollars this

23    year?

24    A.    Yes.

25    Q.    Do you think it will be more?

1    A.    Maybe.  I don't know.

2    Q.    **How about for the month of July, do you**

3    **know what your revenue was?**

4    A.    I do.

5    Q.    **What was it?**

6    A.    Just shy of 140,000 in July.  And 150 in

7    August.

8    Q.    **Of total revenue?**

9    A.    Correct.

10    Q.    **We are now most of the way through**

11    **September.  Is it trending to be around the same**

12    **amount, 140, $150,000?**

13    A.    No.  September usually tapers a little

14    bit.

15          Maybe 110, 120.  I don't know.  We'll see

16    how the month plays out.

17    Q.    **So September you would expect to be over**

18    **$100,000; is that correct?**

19    A.    Maybe.

20    Q.    **Yeah.**

21          **October, do you have any exception what**

22    **that might be?**

23    A.    It's tough to tell.  Usually October,

24    November, and December are very bad months.

25    Q.    **So those might be less than $75,000,**

1    something like that?

2         A.    Yeah.

3         Q.    And then it ramps up pretty quickly

4    starting in February, March, April, May; is that

5    accurate?

6         A.    Like, February starts to come up a little,

7    March a little bit.  April, as you see, it starts to

8    lift up.

9         Q.    Why is that?

10        A.    It's a seasonal business.  It's way

11   more -- there's way more pests to control, way more

12   wildlife, way more exclusions, better weather.  So

13   there's more things to control.

14             So we're working on trying to find a

15   consistent balance of that.

16        Q.    Are most of your customers -- well, are

17   some of your customers on a subscription billing

18   model?

19        A.    Some of them.  We're doing more of that

20   this year.

21        Q.    Is that something you would say you try to

22   push, you try to get subscription revenue?

23        A.    I wouldn't say we push it.  If it's right

24   for the client.  Everybody's different.  All their

25   needs are different.

1      Q.    And subscription revenue -- what's just
2  one example of the type of service that would be,
3  for example, a subscription-based model.

4      A.    Our quarterly, quarterly pest control
5  service.  Termites could be done on a subscription
6  model.

7            We're starting to look into some other
8  options.  But those are really the ones for right
9  now.

10           Other commercial service, you know, if we
11 do like a commercial service, frequently.  Maybe.

12     Q.    What would a commercial service example
13 be?

14     A.    It could be a -- like a weekly, biweekly,
15 bimonthly.  All depends on the need of the customer.
16 The frequency of service, you know.

17           But commercial is hard to get to pay
18 subscription, you know, but everybody is different.
19 Everyone's needs are different, so...

20     Q.    Do you have any commercial customers now?

21     A.    Yeah, we have commercial customers.

22     Q.    Can you tell me which ones you know about?

23     A.    Well, we have restaurants.  A couple
24 bigger buildings.  But what specifically would you
25 like to know?

1      Q.    Bigger buildings, what are the examples of

2  bigger buildings?

3      A.    The one I gave earlier is a good example.

4  One like Basement Systems.

5      Q.    Basement Systems is a bigger building?

6      A.    Yes.  They're a service-based business, so

7  they have a big building.  Like a big facility that

8  houses their employees' trucks and material and

9  things like that.

10     Q.    I see.

11           So you do pest control for their

12  commercial establishment; is that correct?

13     A.    Yeah.

14     Q.    So like what types of things?  Like

15  mosquitoes, termites, mice?

16     A.    No, just general pests.

17     Q.    When you -- when you say "general pests,"

18  what do you mean?

19     A.    Small ants, carpenter ants if they've got

20  them.  Mice, rats, roaches.  So -- things like that.

21     Q.    So we talked about Success Village and the

22  Basement company.

23     A.    Uh-huh.

24     Q.    What are other examples of bigger

25  buildings that you work for?

1        A.    Not off the top of my head.

2              So the Basement Systems one, the reason

3    I'm referencing that is because I was just there not

4    long ago.  I just did an initial start for them

5    because they were having a problem.

6              But it's, like, when I say a bigger

7    account or a bigger building, it's like a large

8    facility.  I don't mean that it's a big

9    revenue-producing account.  It's just a

10   time-consuming account, if that makes sense.

11       Q.    Do time-consuming accounts -- do you

12   generally charge a little bit more for, the more

13   time-consuming it is?

14       A.    Sure.  But they're not big money makers.

15       Q.    What would you say is your big money

16   maker?

17       A.    It's hard to say.

18             Maybe exclusion.  I think that would be a

19   fair assessment.

20       Q.    And do exclusion jobs tend to be at

21   residential homes, or at commercial establishments,

22   or it just varies?

23       A.    Varies.  Varies.

24       Q.    How about -- you mentioned restaurants?

25       A.    Uh-huh.

1          Q.    Generally what sort of services do you do

2    for restaurants?

3          A.    Really anything.  Could be pest control.

4    They could have wildlife getting in somewhere.  We

5    may have to trap, might have to seal it up after,

6    exclude it.  All depends.

7                Every customer is different.  That's why I

8    said it's hard to answer these properly.  Do you

9    know what I mean?

10         Q.    So these restaurants, are they national

11   chains, local restaurants, or a combination?  What

12   is it?

13         A.    Local restaurants.  We don't have any big

14   chains.  Not that I know of, at least.

15         Q.    And generally what counties of Connecticut

16   would you say you're most active in?

17         A.    Fairfield, Litchfield County.  But we do

18   some New Haven County.  Starting to push more out

19   that way.

20         Q.    And then looking back at these revenue

21   numbers -- PX31, PX32 -- every one of these

22   customers pays Black Widow Pest Specialists; is that

23   correct?

24         A.    Yes.

25         Q.    Would you agree that most of these

1    customers at some point would have seen the Black

2    Widow Pest Specialist logo shown in PX16?

3        A.    Yes.

4        Q.    And so earlier we mentioned some example

5    estimates, things like that, as PX21.

6              Earlier we talked about PX21, the

7    estimate.  Most of these customers on -- within

8    their -- account for the revenue on these two

9    reports, PX30 and PX32, would you agree that they

10   would have received an estimate like the one shown

11   on 21 or along that form?

12       A.    Could you repeat that, please.

13             You said anybody who received an estimate?

14       Q.    So the customers that would have accounted

15   for the revenue in PX31 and PX32, would you agree

16   with me that most of them would have received or

17   would have been sent an estimate or some other

18   document similar to what is shown on 21 including

19   your logo?

20       A.    Depending on the service, yeah.

21       Q.    Would you say it's over 90 percent of them

22   that would have received a document like that?

23       A.    It's hard to put a number on it.  I don't

24   know, to be honest.  I'm not sure.

25       Q.    When customers refer to your business do

1    they refer to it as Black Widow?

2        A.    They refer to it as Black Widow Pest

3    Specialists.

4        Q.    You know that from them calling you and

5    saying they're looking for Black Widow Pest

6    Specialists?

7        A.    Calling us, tagging us, or it's "Blake

8    from Black Widow."  It's usually pretty specific.

9        Q.    So all this revenue is associated with

10   your Black Widow trademark; is that correct?

11           MR. HOFFMAN:  Objection.

12   BY MR. WINTER:

13       Q.    You can answer.

14       A.    Would you re-ask that question?  Is it

15   associated with Black Widow trademark?  Is that what

16   you said?

17           MR. WINTER:  Can you read back the

18   question.

19        (The Record was read back.)

20           THE WITNESS:  No.

21   BY MR. WINTER:

22       Q.    Why do you say no?

23       A.    Why do I say no?

24           It's associated with Black Widow Pest

25   Specialists, LLC.

1          Q.    Which uses your logo consistently on all

2     of its marketing materials, correct?

3          A.    Yes.

4          Q.    Each one of these customers would have

5     seen the logo on PX16; is that correct?

6          A.    Yes.

7          Q.    And they would have paid a company where

8     the first two words of that company's name are

9     "Black Widow"; is that correct?

10         A.    Yes.

11         Q.    And some of them necessarily would have

12    been referred through seeing, say, your signs or

13    your trucks or your other marketing materials that

14    contain your logo, PX16; is that correct?

15              MR. HOFFMAN:  Objection.

16              THE WITNESS:  I don't know.  Maybe.  I'm

17    not sure.

18    BY MR. WINTER:

19         Q.    Well, you do receive -- you asked the

20    question or put it in your system, how do they hear

21    from you, right?

22              MR. HOFFMAN:  Objection.

23              THE WITNESS:  We don't put it in our

24    system.

25

1    BY MR. WINTER:

2        **Q.    When the customer answers a question, how**

3    **did they hear of your company, I thought you**

4    **mentioned that you put it in the -- your CRM system?**

5        A.    Only if it's a referral.  There's little

6    tabs for a referral.

7        **Q.    And the referral would be from?**

8        A.    One of our sister companies I had

9    mentioned earlier.

10       **Q.    Sister company -- well, you're not**

11   **actually related to those companies.  You just have**

12   **a working relationship with them, correct?**

13       A.    Yes.  I misspoke.  I apologize.

14             A working relationship or a friendship

15   with another company, or a vendor who refers us.

16       **Q.    Do you track advertising spending?**

17       A.    We don't really advertise.  Would you be

18   able to define advertising for me?

19       **Q.    Well, you said -- I mean, do you consider**

20   **buying an ad in a magazine advertising?**

21       A.    Yeah.  That would be advertising.

22       **Q.    Do you consider door stickers -- door**

23   **hangers and stickers to be advertising?**

24       A.    I never categorized that.  Those are

25   people who are already customers of ours, so I don't

1  consider that to be advertising.

2          It all depends on the definition of

3  advertising, really.

4      **Q.   Well, I mean -- so do you ever provide**

5  **your accountant with advertising expenses to prepare**

6  **your taxes for your business?**

7      A.   Well, I give her the statement that states

8  what we spent on whatever.  And the reason that we

9  hired Fraxn is to better -- better categorize

10  everything.  So at this time I don't have an

11  accurate number for you.

12     **Q.   Is Fraxn able to print out a report that**

13  **would show that information?**

14     A.   I'm not sure.

15          (Plaintiff's Number 33 was marked for

16  identification, as of this date.)

17  BY MR. WINTER:

18     **Q.   This document did not come from Fraxn; is**

19  **that correct?**

20     A.   I'm not sure where this document came

21  from.  I don't think it came from Fraxn.

22     **Q.   PX33, is that correct?  That's what you're**

23  **referring to?**

24     A.   Yes.

25     **Q.   Did you generate that document?**

```
 1        A.    I don't remember.
 2        Q.    This lists your total advertising expenses
 3   of $14,377.38; is that correct?
 4        A.    It is.
 5        Q.    You have no other advertising expenses
 6   after -- excuse me -- before the date that this
 7   document was produced; is that correct?
 8        A.    I don't know.
 9              Did you say before this was produced or
10   after this was produced?
11        Q.    As of the date that this was produced,
12   this represents your total advertising expenses of
13   $14,377.38; is that correct?
14        A.    I think so.  But I wouldn't consider
15   caution labels like advertising.  That's -- that's a
16   compliance thing for our bait stations, you know?
17   I'm just not certain.
18        Q.    So what on here do you not consider to be
19   advertising expenses?
20              We'll just start at the -- "What's Doing
21   in Waterbury" ad.  Do you consider that to be a
22   advertising expense?
23        A.    Yes.
24        Q.    What about the dog bundle?
25        A.    I don't understand categorizing very well.
```

Page 246

```
 1   But it's my assumption, based off of what I know --
 2   again, speculation here -- I don't think that would
 3   be.
 4            It's like a business card, digital
 5   business card.  So I don't know if that would be
 6   considered advertising.
 7        Q.   So it's a digital business card, the dog
 8   kennel?
 9        A.   Yes.
10        Q.   Okay.  Then we have three entries for
11   caution labels.  You just said those are not
12   advertising expenses; that's correct?
13        A.   Yeah.
14        Q.   2023 website, do you consider that to be
15   an advertising expense?
16        A.   Yes.
17        Q.   500 stickers and 2,000 door hangers; do
18   you consider that to be an advertising expense?
19        A.   I guess.
20            Yeah.  I guess mean, I guess the rest are
21   accurate.  It's just really the caution labels that
22   I would say, really, don't make much sense to
23   consider as advertising.
24        Q.   Okay.
25            So of everything listed on PX23, you're
```

1    telling me the four instances of caution labels --

2    total of 5,000 caution labels -- are not advertising

3    expenses, correct?

4         A.   Yeah.  I think, I mean -- it could go

5    either way, I'm sure.

6              Again, I don't know what's classified as

7    in advertising, but...

8              MR. HOFFMAN:  When you're done with this

9    line of questioning, can we just take a break.

10             MR. WINTER:  Sure.

11   BY MR. WINTER:

12        Q.   This document was generated for the

13   purposes of this lawsuit, correct?

14        A.   Yes.

15        Q.   It's not a document that you keep in the

16   ordinary course of business; is that correct?

17        A.   I'm not sure.

18             MR. HOFFMAN:  I just need to make a quick

19   phone call.  I'm sorry.

20             MR. WINTER:  I'll just -- one question.

21             MR. HOFFMAN:  Okay.

22   BY MR. WINTER:

23        Q.   Do you remember earlier we went through a

24   whole list of printed materials.  You said some were

25   VistaPrint, some were the other printing company.

1    We went through a whole list of things.

2         A.    Uh-huh.

3         Q.    Do you have photos or copies or records of

4    what those look like?

5         A.    Like what looked like?

6         Q.    Like the yard signs, the hoodies, the cups

7    the whole list of -- we went through a list of maybe

8    10 or 15 printed items.

9              Do you have photographs of those or do you

10   have physical examples of those?

11        A.    I mean, yeah, I could -- I could get them.

12   They're all fairly recently done, so...

13        Q.    So you either have a physical T-shirt or

14   cup or whatever, or a photo of those?  You have

15   those in your business record; is that correct?

16        A.    If not, I can produce them.

17             MR. WINTER:   Okay.  We can take a break.

18        (Off the record.)

19             (Plaintiff's Exhibit Number 34 was marked

20   for identification, as of this date.)

21   BY MR. WINTER:

22        Q.    Giving you a document marked PX34.  Below

23   the case caption it reads, "Defendant's responses

24   and objections to plaintiff's first set of

25   interrogatories, Number 1 through 24."

1            Do you see that?

2       A.   Yes.

3       Q.   And now please turn to the -- page 15.

4  Second to last page.

5            Is that verification statement accurate?

6       A.   Absolutely.

7       Q.   And that's your signature there on page 15

8  of PX34; is that correct?

9       A.   Well, a typed signature, but, yes.

10      Q.   But you consider that to be your signature

11 for purposes of this document; is that correct?

12      A.   Yes.

13      Q.   Just as equivalent if you took out a pen

14 right now and wrote on this; is that correct?

15      A.   Yes.

16      Q.   So the answers in here are accurate,

17 correct?

18      A.   Absolutely.  To the best of my ability.

19      Q.   Page 2.

20           I will just ask you to read interrogatory

21 Number 2 to yourself.

22      A.   The thing or the response?

23      Q.   Interrogatory Number 2.  Under heading

24 interrogatory Number 2, that three, four-line

25 paragraph.

1          A.    Thank you.

**2          Q.    Yeah.**

3          A.    (Witness reviews document).

4                Yep.

**5          Q.    And in the response there's -- one, two,**

**6     three, four, five -- sixth line, you start**

**7     identifying individuals.**

**8                Do you intend to call Robert Scribner as a**

**9     witness to testify on behave of your company?**

10                MR. HOFFMAN:   Objection.

11                THE WITNESS:   I don't know.

12     BY MR. WINTER:

**13         Q.    What information does he have specific to**

**14     your company?**

15         A.    Could you clarify for me what do you mean.

**16         Q.    He doesn't work for your company; is that**

**17     correct?**

18         A.    He does not.

**19         Q.    He's never worked for your company; is**

**20     that correct?**

21         A.    That is correct.

**22         Q.    He doesn't have access to your company**

**23     e-mail inbox; is that correct?**

24         A.    That's correct.

**25         Q.    He doesn't have access to any of your**

1    company internal business records; is that correct?

2         A.    That's correct.

3         Q.    What information -- have you spoken to him

4    prior to identifying him on this document?

5         A.    Have I spoken to him?  What do you mean?

6    About this lawsuit specifically?

7         Q.    Yes.

8         A.    Maybe.

9         Q.    What was that discussion about?

10         A.    I don't remember.

11         Q.    Do you know his address?

12         A.    No.

13         Q.    Do you know his company's address?

14         A.    No.

15         Q.    Do you know his company's name?

16         A.    I do.

17         Q.    What's his company's name?

18         A.    Scribner Pest and Wildlife Control.

19         Q.    Where are they based?

20         A.    Danbury.

21         Q.    They don't use "black widow" as part of

22    their brand name at all, do they?

23         A.    No.

24         Q.    This references common-law related facts.

25    "Robert Scribner has information based on common-law

1    related facts."

2                    What does he have information on?

3        A.    (Witness reviews document).

4                    I don't remember.

5        Q.    You don't know what those common-law

6    related facts refer to -- refer to in this answer?

7        A.    I don't remember.

8        Q.    It also says, "Information regarding and

9    relevant to prepare industry marketplace."

10                   What does that refer to?

11       A.    Can you be more specific?

12       Q.    Well, you wrote it in your response and

13   you swear under penalty of perjury that that's

14   correct.  So what does it refer to?

15       A.    It refers to the industry and the

16   marketplace there as such.

17                   Is there anything specific you'd like me

18   to answer?

19       Q.    Yeah.  The -- what's the subject matter of

20   Robert Scribner's personal knowledge of that -- of

21   those facts?

22       A.    Industry experience.

23       Q.    What do you mean by "industry experience"?

24       A.    Meaning he's been in the industry for a

25   long time.

1    Q.    **To your knowledge, how long?**

2    A.    I know -- maybe 18 years?

3    Q.    **So you think more than 15 years, at least?**

4    A.    18 is more than 15.

5    Q.    **Yeah.**

6    A.    Yeah.

7    Q.    **It also references consumer awareness.,**

8    **what does that refer to?**

9    A.    The awareness of customers in our

10   industry.

11   Q.    **Right.**

12         **But what -- can you elaborate on what that**

13   **is, the awareness of them.**

14         **What type of awareness?**

15   A.    In terms of what?

16   Q.    **In terms of who they are, where they are,**

17   **what they need done.  What sort of information does**

18   **Robert Scribner have that is specific to this**

19   **lawsuit?**

20         THE WITNESS:  Would you mind repeating

21   that for me one more time.

22       (The Record was read back.)

23         THE WITNESS:  Well, better helping us find

24   our customers.

25

1   BY MR. WINTER:

2       Q.    He was knowledge that helps your business

3   find customers?

4       A.    Yeah.

5       Q.    Okay.  Have you made any written

6   allegations in this lawsuit?

7       A.    Can you be more specific.

8       Q.    Yeah.  Sure.

9             Let's look at PX18.  Let me find that one.

10            So I've given you PX18 and I have it

11  turned to page 14.

12            Do you agree with me?

13      A.    I do agree.

14      Q.    Does he have personal knowledge of what's

15  in the allegation in paragraph 6?

16      A.    (Witness reviews document).

17            Maybe.  I can't remember.

18      Q.    So you haven't identified that in the

19  response to interrogatory 2, have you?

20      A.    What did he say?

21      Q.    You haven't identified Robert Scribner as

22  having knowledge of the allegation in paragraph 6 in

23  interrogatory 2; is that correct?

24      A.    I don't know.  Maybe go through it.

25            Would you remind me what page?

1          Q.    Number 2, page 2.

2                Do you see that paragraph on Robert

3    Scribner?

4          A.    The paragraph on Robert Scribner?

5          Q.    Yeah.

6          A.    One more time.

7          Q.    So let me step back here to explain to you

8    what I'm trying to get at.

9          A.    Yeah.  I'm just trying to answer the

10   proper --

11         Q.    ,"Identify the persons who are likely to

12   have personal knowledge of any fact alleged by

13   defendant in this proceeding."

14               So what I'm getting at is you have made

15   allegations in this proceeding, which is the written

16   document, the answer, which is PX18, which is to

17   your left there.

18               So what I'm saying is those are

19   allegations that you, your company has alleged in

20   this proceeding, or any fact used to support any

21   allegation in this proceeding.

22               So I'm trying to understand which

23   allegations in PX18 Robert Scribner has personal

24   knowledge or facts of.

25               So I'm asking:  Does Robert Scribner have

1    any personal knowledge of any fact that would be

2    used in this proceeding to support the allegation in

3    paragraph 6?

4              MR. HOFFMAN:  I will object.  Just calls

5    for legal conclusions.

6              THE WITNESS:  I just don't understand.

7    It's -- it's based upon Number 6.

8    BY MR. WINTER:

9         Q.   Right.

10             So interrogatory Number 2 asks which

11   individuals have personal knowledge of a fact

12   related to this proceeding in the pleadings.

13             Do you understand that?

14        A.   Somewhat, yes.

15        Q.   Okay.  And so you've made allegations in

16   this proceeding.

17             Do you understand that?

18        A.   Yes.

19        Q.   Do you agree with me that PX18 includes

20   those allegations, starting on -- at the

21   counterclaim, page 13, continuing to 14, and so on?

22             MR. HOFFMAN:  Objection.

23   BY MR. WINTER:

24        Q.   You're making allegations --

25             MR. HOFFMAN:  There are also allegations

1    in the special defenses or affirmative defenses as

2    well.

3    BY MR. WINTER:

4        Q.    So there's numbered paragraphs with

5    allegations -- do you agree with me -- on that in

6    your answer?

7        A.    Yes.

8        Q.    And when I say your answer, I'm referring

9    to PX18 starting at page 15.

10             Do you agree with me?

11             Just starting at 13.  We'll talk about

12   where it ends later.

13       A.    What page does it end on?

14       Q.    We're just talking about where it starts.

15   The allegations start on page 13.

16             Do you agree with me?

17       A.    Yes.

18       Q.    Okay.  So we'll find where they end.

19             So on page 19, Number 36, those are the

20   end of the allegations; is that correct?

21             MR. HOFFMAN:  Objection.  Calls for legal

22   conclusion.

23             If you know, you can answer.

24             THE WITNESS:  I don't know.

25

1    BY MR. WINTER:

2        Q.    Okay.  Now, does Robert Scribner have

3    knowledge of the allegations in paragraph 6?

4        A.    I believe so.

5        Q.    Does he have personal knowledge?

6        A.    Meaning?

7        Q.    Well, he wasn't employed by your company

8    in 2021; is that correct?

9        A.    No, he was not.

10        Q.    Does he have knowledge of the allegations

11    in paragraph 7, Robert Scribner, personal knowledge?

12        A.    When you say "personal," what do you mean?

13            I'm just trying to understand so I can

14    answer it thoroughly for you.

15        Q.    Well, let's look at it this way:  You have

16    no personal knowledge of any business dealings of my

17    client; is that correct?

18        A.    Again, what do you mean by "personal

19    knowledge"?

20        Q.    You've never been employed by my client;

21    is that correct?

22        A.    Correct.

23        Q.    So you've never -- you can't verify that

24    any document of my client is a true or accurate

25    document; is that correct?

1    A.   I don't know.  I would assume.  I don't
2    know.
3        Q.   Will you --
4        A.   I'm just asking for clarification because
5    I don't understand what you're saying, you know.
6    Not to be rude or argumentative.
7        Q.   No, I get it.
8        A.   I just want to understand the question.
9    That's all.
10       Q.   What knowledge does Robert Scribner have
11   of the allegations in paragraph 7?
12       A.   I'm not sure.
13       Q.   Did you speak to Robert Scribner to
14   determine if he has any knowledge of any of the
15   allegations in this lawsuit?
16       A.   Yes.
17       Q.   You spoke to him to determine that he was
18   knowledge of the allegations in this lawsuit?
19       A.   I believe so, yes.
20       Q.   Which allegations does he have personal
21   knowledge of, based on your conversations with him?
22       A.   (Witness reviews document).
23            I don't know.
24       Q.   So you don't know what allegation Jim
25   Horton has knowledge of -- or -- excuse me -- Robert

1    **Scribner has knowledge of?**

2              MR. HOFFMAN:  Is that the question, or is

3    the question of whether he has -- whether the client

4    knows whether Mr. Scribner has knowledge of any

5    facts in connection with the allegations in the

6    counterclaim, or whether he's, in fact, spoken with

7    Mr. Scribner concerning any facts concerning the

8    counterclaim?

9              Or are we talking about a specific

10   paragraph in the counterclaim?

11             I'm confused.

12             MR. WINTER:  So your client identified

13   Robert Scribner under oath in a interrogatory as

14   someone with knowledge --

15             MR. HOFFMAN:  Of -- of a fact alleged by

16   defendant in the pleadings of this proceeding, were

17   any fact to be used to support any allegation of

18   defendant in this proceeding.

19             MR. WINTER:  Correct.

20             MR. HOFFMAN:  Right.

21             MR. WINTER:  So I'm having you read the

22   counterclaims between the allegations.

23             MR. HOFFMAN:  Okay.  There are other

24   allegations in the pleadings and other facts that

25   potentially support some of these allegation.

1          MR. WINTER:  Okay.  Fine.  But I'm asking

2     specifically about the counterclaims.

3          MR. HOFFMAN:  Okay.  Okay.  You can

4     proceed.

5     BY MR. WINTER:

6     Q.   I will tell you, topic 48 is defendant's

7     responses to plaintiff's interrogatories, including

8     the factual bases thereof, which you are the

9     identified deponent for your company on, correct?

10    A.   Yes.

11    Q.   49, the factual basis for defendant's

12    counterclaim, count 1.

13         You're the identified deponent for your

14    company on that topic; is that correct?

15    A.   Yes.

16    Q.   Paragraph number -- excuse me, topic

17    Number 50:  Factual basis for defendant's

18    counterclaim, comma, count 2.

19         You're the identified deponent for your

20    company on that topic; is that correct?

21    A.   Yes.

22    Q.   You understand that we are looking at the

23    allegations of the counterclaims.  I just had you

24    look at those, PX18; is that correct?

25    A.   Yes.

1      Q.    Okay.

2      A.    Just takes me a little while to go through

3   these things.

4      **Q.    What did you do in preparation for this**

5   **deposition, to be prepared to testify on topics 48,**

6   **49, and 50?**

7            MR. HOFFMAN:  This is just so that I'm

8   clear:  This is separate and apart from

9   Mr. Scribner; is that right?

10            MR. WINTER:  It's relevant to it, because

11   it's in the interrogatories in topic 48.

12   BY MR. WINTER:

13      **Q.    What did you do in preparation for this**

14   **deposition, be prepared to testify on topics 48, 49,**

15   **and 50.**

16      A.    So is the question what did I do to

17   prepare?

18      **Q.    Yes.**

19      A.    Everything that I could.

20      **Q.    What did that include?**

21      A.    Several things.

22      **Q.    Please list them.**

23            MR. HOFFMAN:  I just want to object,

24   because this has been asked and answered repeatedly

25   throughout the last eight hours.

```
 1              THE WITNESS:  I thought I answered this.

 2              MR. HOFFMAN:  We can -- we can proceed.

 3     BY MR. WINTER:

 4         Q.   I didn't ask it specifically as to this

 5     topic.

 6              So please answer the question.

 7              MR. HOFFMAN:  I'm sorry.  What was the

 8     question.

 9              Can you read the question again?

10          (The Record was read back.)

11              MR. WINTER:  So I will restate it, and

12     your objection, Ari, that you already made will be

13     noted.

14     BY MR. WINTER:

15         Q.   What did you do in preparation for this

16     deposition to be prepared to testify on topics 48,

17     49, and 50, which are right in front of you?

18         A.   Would you mind explaining this to me.

19         Q.   You understand that you're a corporate

20     deponent for your company at this deposition; is

21     that correct?

22         A.   Yes.

23         Q.   You understand you have an obligation to

24     prepare; is that correct?

25         A.   Yes.
```

1      Q.    Okay.  And then you have an obligation to

2   prepare for specific topics that listed in that

3   deposition notice.

4              Do you understand that?

5      A.    Yes.

6      Q.    And those topics include 48, 49, and 50;

7   is that correct?

8              They're right in front of you, 48, 49 --

9      A.    I'm well aware of that.  They are.  But

10  there's a lot here, and I did the best that I could.

11  And I'm still continuing to give you best that I

12  can.

13     Q.    48, 49, and 50, those are specific topics,

14  correct?

15     A.    They are.

16     Q.    What did you do to prepare to answer

17  questions related to those topics?

18     A.    I don't remember.

19     Q.    Did you do anything to prepare to answer

20  questions related to those topics?

21     A.    I don't remember.

22     Q.    You don't remember if you prepared for the

23  deposition --

24              MR. HOFFMAN:  Objection.

25

1  BY MR. WINTER:

2      **Q.    -- related to those topics?**

3      A.    I remember just answering that question,

4  telling you I did prepare for the deposition.

5      **Q.    What did you do specifically related to**

6  **topics 48, 49, and 50?**

7      A.    I don't remember.

8      **Q.    You can't identify one specific thing that**

9  **you did to answer questions related to topics 48,**

10  **49, and 50?**

11          MR. HOFFMAN:   And I would caution the

12  witness not to disclose any attorney-client

13  privileged communications that may have occurred.

14          THE WITNESS:   I don't remember.

15  BY MR. WINTER:

16      **Q.    Did you prepare for those topics, 48, 49,**

17  **and 50?**

18          MR. HOFFMAN:   And, again, my caution is

19  the same.

20          THE WITNESS:   I already answered that.

21  BY MR. WINTER:

22      **Q.    Your answer is you don't know?**

23      A.    My answer is I don't remember.

24      **Q.    So you can't, sitting here, identify any**

25  **specific thing you did to prepare for topic 48; is**

1  that correct?

2      A.   I thought I already answered that.

3      Q.   Did you read defendant's responses to

4  plaintiff's interrogatories in preparation for the

5  deposition?

6      A.   I don't remember.

7      Q.   Did you read defendants counterclaim

8  count 1 in preparation for the deposition?

9      A.   I don't remember.

10     Q.   Did you read defendant counterclaim

11 count 2 in preparation for the deposition?

12     A.   I don't remember.

13     Q.   When is the last -- have you ever read

14 defendant's counterclaim count 1?

15     A.   Yes.

16     Q.   When did you read that?

17     A.   I don't remember.

18     Q.   Was it around the time it was filed?

19     A.   That might have been the first time, but

20 I've read it since then.

21     Q.   So the counterclaims -- the document is to

22 your left there -- it shows on the top -- so this is

23 PX13, filed 10/2/23.

24          Do you agree with me?

25     A.   No.  I disagree.  It's 10/20/23.

1      Q.    10/20/23?

2      A.    Yes.

3      Q.    **Would you have reviewed a draft of that**

4   **document prior to it being filed?**

5      A.    Yes.

6      Q.    **Did you have any input on the contents of**

7   **that document?**

8            MR. HOFFMAN:  Objection.  Privileged.

9            THE WITNESS:  That's privileged

10   information.

11           MR. WINTER:  The facts he put into a

12   document that is public?

13           MR. HOFFMAN:  Restate the question.

14   BY MR. WINTER:

15      Q.    **Did you have any input on facts alleged in**

16   **that document in the counterclaim in front of you?**

17           MR. HOFFMAN:  That's fine.

18           You can answer.

19           THE WITNESS:  Yes.

20   BY MR. WINTER:

21      Q.    **What input did you have?**

22      A.    Can you be specific?

23      Q.    **Sure.  There's a number of paragraphs.**

24   **Why don't we go through them all.**

25           Paragraph Number 1 on page 13, right under

1    the heading "Counterclaim."

2            Do you see that in front of you?

3        A.   Yes.

4        Q.   Did you have input on the facts alleged in

5    paragraph 1?

6        A.   Give me a moment to read it.

7            (Witness reviews document).

8            Yes.

9        Q.   What input did you have?

10       A.   Am I allowed to say that?

11           MR. HOFFMAN:  No.

12           Objection as to privilege.

13           MR. WINTER:  Input in terms of facts that

14   are alleged in a counterclaim?

15           THE WITNESS:  Communications with counsel

16   in connection with the preparation of a pleading.  I

17   believe that's privileged.  And I would direct him

18   not to answer that.

19       INST

20   BY MR. WINTER:

21       Q.   Let's turn to page 14, Number 6.

22           Black widow spiders are not commonly

23   requested to be removed by pest specialists in

24   Connecticut; is that correct?

25           MR. HOFFMAN:  I'm sorry.  Which paragraph

1    are we on?

2              MR. WINTER:  Six.

3              THE WITNESS:  Correct.

4    BY MR. WINTER:

5        Q.    In fact, you've never had a job you can

6    identify that is specific to a black widow spider;

7    is that correct?

8        A.    Correct.

9        Q.    They're not actually in Connecticut, black

10   widow spiders; is that correct?

11       A.    I thought we already went through this.

12       Q.    Correct?

13       A.    It was last time.  It is this time too.

14       Q.    Okay.

15       A.    Right on.

16       Q.    The allegations in paragraph 7 -- excuse

17   me.

18             Paragraph 10, it references that you

19   instead focus resources on reputation-building in

20   the state of Connecticut.

21             It's on page 15 at the bottom.

22             Do you see that?

23       A.    Which number are you referring to?

24       Q.    All the way at the bottom, paragraph 10.

25             MR. HOFFMAN:  10.

1                THE WITNESS:  Yeah.  I see.

2    BY MR. WINTER:

3         Q.   You -- you have never registered your

4    business -- excuse me.  Strike that.

5              Your business has never registered any

6    trademarks; is that correct?

7         A.   Correct.

8         Q.   And instead of registering trademarks,

9    your business focuses on reputation-building in the

10   state of Connecticut; is that correct?

11        A.   Correct.

12        Q.   Why?  Why have you not registered any

13   trademarks?

14        A.   I don't know.

15        Q.   Never thought to do it.

16        A.   I don't know.

17        Q.   Turn next to page 16, paragraph 11.

18             You talked earlier that you -- the

19   attorney who formed your LLC, you said you believe

20   did a search; is that correct?

21        A.   That I -- just for clarification, you said

22   "believe" did a search.

23        Q.   You believed that they did some form of

24   searching; is that correct?

25        A.   Searching in the form of what?

1          Q.    Did they do any searching, to your

2    knowledge?

3          A.    Searching for what?

4          Q.    Trademarks.

5          A.    I have no idea.

6          Q.    How was the no-risk assessment delivered

7    to you?

8          A.    Meaning what?

9          Q.    Well, this is your allegation.  In 11, it

10   says, "This trademark search came back with an

11   assessment of no risk, and counterclaim plaintiff

12   entered into business under Black Widow Pest

13   Specialists in good faith."

14              Do you see that?

15         A.    I do.

16         Q.    How was the assessment of no risk

17   delivered to you?  Was it by phone call, e-mail,

18   text message?  Was it by pigeon?

19         A.    On horseback, actually.

20         Q.    Okay.

21         A.    It was --

22         Q.    Seriously, how was it delivered.

23         A.    It was delivered via phone call.

24         Q.    And --

25         A.    But I believe they did a search.

Page 272

1          Q.    Was it a trademark search, to your

2     knowledge?

3          A.    I have no idea.

4          Q.    So when you say this trademark search came

5     back with an assessment, you have no idea whether or

6     not they performed a trademark search; is that

7     accurate?

8          A.    Not necessarily.  It was my belief that

9     they did a search on anything that would affect my

10    business.  So I believe they were doing a trademark

11    search.

12         Q.    To your knowledge, are they trademark

13    attorneys?

14         A.    I'm not sure.

15         Q.    Did you ever instruct them to perform a

16    trademark search?

17         A.    Not --

18              MR. HOFFMAN:  Objection.  Objection.

19              THE WITNESS:  -- necessarily but at the

20    time I didn't know --

21              MR. HOFFMAN:  Objection.  Privileged.

22    BY MR. WINTER:

23         Q.    So this alleges that counterclaim

24    plaintiff had a trademark search performed by an

25    attorney.

1          That -- those words are in paragraph 11;

2     is that correct?

3          A.    That was my belief, correct.

4          Q.    And are you certain that that statement is

5     accurate?

6          A.    Under oath, yes.

7          Q.    Did that attorney perform a trademark

8     search?

9                You're certain of that?

10         A.    Again, at the time of filing, that was my

11    understanding.   Absolutely.

12         Q.    What's your understanding now?

13         A.    I don't know.

14         Q.    So at the time of the filing, you believed

15    that this statement that counterclaim plaintiff has

16    a trademark search performed by an attorney on

17    October 20th, 2023, you believed that statement to

18    be accurate.

19                Is that accurate -- correct?

20         A.    Are you asking if I believed it to be

21    correct on the date of filing, 10/23?

22         Q.    Yes.

23         A.    Yeah.   I still believe that's true.   I

24    would hope they would do it.

25         Q.    You hope or you know?   Two different

1    **things.**

2         A.   It is my belief that they did that.

3         **Q.   Have you asked them for any records of**

4    **that search?**

5              MR. HOFFMAN:  Objection as to privilege.

6              I'm going to direct the client not to

7    answer.

8    (Instruction not to answer)

9    BY MR. WINTER:

10        **Q.   Has anyone collected documents in**

11   **connection with a privilege log of those privileged**

12   **communications related to the trademark search?**

13             MR. HOFFMAN:  Are you asking the client

14   that?

15   BY MR. WINTER:

16        **Q.   Has any search been -- has any request**

17   **been made to those attorneys for documents in their**

18   **possession related to the trademark search?**

19        A.   I'm not sure.

20             MR. HOFFMAN:  Would we be able to take a

21   quick break.

22             MR. WINTER:  Sure.

23          (Off the record.)

24   BY MR. WINTER:

25        **Q.   I will show your request for production,**

1    PX12, request for production Number 7.

2              Read that to yourself.

3         A.    (Witness reviews document).

4              Yeah.

5         Q.    Was the attorney who performed the search

6    contacted in relation to gathering documents

7    responsive to request for production Number 7?

8              I'm not asking for the contents.  Just

9    whether he was contacted.

10        A.    The attorney that filed the -- you're

11   saying my LLC?

12        Q.    Yeah.

13        A.    I don't know.  I think.  I'm not sure.

14        Q.    Did you contact that attorney?

15        A.    Regarding what?

16        Q.    Request for production Number 7.

17        A.    I didn't personally contact.

18        Q.    Did you direct -- was anybody else

19   directed to contact that attorney to gather

20   documents responsive for request for production

21   Number 7?

22        A.    I didn't direct anybody.  I'm not sure if

23   anybody did.

24        Q.    And you don't know if any search results,

25   like search data, were produced or -- excuse me.

1          You don't know if any search results were

2    obtained in connection with the search that that

3    attorney performed; is that correct?

4         A.   I don't understand what you mean.  Any --

5    any searches, like -- any searches they did?

6         Q.   Right.

7              So when -- so when they did a search, was

8    any data, search data, as in references returned,

9    provided to you?

10        A.   Not that I recall.  I'm not sure.

11        Q.   Do you know if any such search data was

12   ever generated?

13        A.   I don't know.

14        Q.   I'm not asking for the contents of the

15   communication.

16             But has anybody asked for those documents?

17        A.   I don't think so.  I don't know.

18        Q.   I think you have an obligation to ask that

19   attorney.  So I ask that it be done and we get this

20   pretty quickly.

21   REQ

22             MR. WINTER:  Mark 35.

23             (Plaintiff's Exhibit Number 35 was marked

24   for identification, as of this date.)

25

1  BY MR. WINTER:

2       **Q.   Do you see that document in front of you?**

3       A.   Yes.

4       **Q.   Do you recall the first time you saw this**

5  **document?**

6       A.   Do I recall the first time I saw this

7  document?  Yes.  I don't have a date, but I know it

8  was when it was delivered to me with a cease and

9  desist.

10      **Q.   I see.**

11           **But that cease and desist was delivered**

12  **in 2023; isn't that correct?**

13      A.   It is.

14      **Q.   Do you see on the left there, it says**

15  **registration number, and then below, it says**

16  **"Registered August 6, 2024."**

17      A.   Which part are you pointing out?  I'm

18  sorry.

19      **Q.   Left side, bold font, there's a,**

20  **"Registered August 6, 2024."**

21           **Do you see that?**

22      A.   Are you talking about this here -- oh, I'm

23  looking --

24      **Q.   Left side.  Left side, bold font.**

25      A.   I'm sorry.  I apologize.

1          "Registered" -- yeah.

**2      Q.   August 6 of 2024.**

3      A.   Uh-huh.

**4      Q.   Does that change your answer as to when**

**5  you think you may have first seen this document?**

6      A.   I'm sorry.  I'm mistaken for -- I'm

7  mistaking it for the other document.  It was my

8  fault.

9          (Witness reviews document).

10          So you're asking me if the first time was

11  now?

**12      Q.   So do you want to change your answer --**

13      A.   Yes, I would like to change my answer.  I

14  apologize.  I misspoke, because I was thinking it

15  was the other document.

16          When did I see this?  I don't remember.

17  It was recent.

**18      Q.   Was it on or around August 6th of 2024?**

19      A.   I know it would have been after August 6

20  of 2024.  I don't know the exact date.

**21      Q.   Would you have seen this before**

**22  August 20th, 2024?**

23      A.   I'm not sure.

**24      Q.   You've seen this before this deposition;**

**25  is that correct?**

1        A.    Yes.

2        Q.    Did you review this document in

3    preparation for this deposition?

4        A.    Yes.

5        Q.    And you said you did that preparation

6    before the last deposition that we conducted; is

7    that correct -- I mean, the last scheduling of this

8    deposition; is that correct?

9        A.    Yeah.

10       Q.    So that was originally around August 20th;

11   is that correct?

12       A.    I think that sounds right.

13       Q.    So you probably would have seen this

14   somewhere between August 6th and August 20th, then;

15   is that correct?

16       A.    I think so.

17       Q.    Of 2024, correct?

18       A.    Correct.

19       Q.    And I'd like you to look through the first

20   page.  Tell me if you can find the word

21   "disclaimer."

22       A.    If I can find the word "disclaimer."

23             (Witness reviews document.)

24             Where are you referring to?

25       Q.    Anywhere on the first page, find the word

```
 1    "disclaimer."

 2         A.   No.

 3         Q.   It's not there, correct?

 4         A.   I don't see that word there.

 5         Q.   You see "Black Widow" in big, bold font;

 6    is that correct?

 7         A.   Yes.

 8         Q.   And then -- so you use "Black Widow" to

 9    promote your pest control business in commercial

10    buildings; is that correct?

11         A.   Yes.

12         Q.   And you use it in Connecticut; is that

13    correct?

14         A.   Yes.

15         Q.   And you use "Black Widow" to promote your

16    pest control business for residential homes in

17    Connecticut; is that correct?

18         A.   Yes.

19         Q.   And you use "Black Widow" for termite and

20    pest control services other than agriculture,

21    aquaculture, horticulture, and forestry in

22    Connecticut; is that correct?

23         A.   Yes.

24         Q.   Do you see count 1 and then a bold title,

25    two lines below that, in front of you on PX18?
```

1       A.   I'm not sure where you're referring to.

2            PX18 -- what number are you looking for?

3       **Q.   Right below count 1 on page 17, those two**

4  **bolded lines.  Do you see that in front of you?**

5       A.   Sure.

6       **Q.   It says, "Action seeking declaratory**

7  **judgment that US trademark application, serial**

8  **Number 98124482 is incapable of registration."**

9            **Do you see that?**

10      A.   I do.

11      **Q.   Do you believe that application is**

12  **incapable of registration?**

13      A.   I think it was improperly registered.

14      **Q.   Why?**

15      A.   "Black widow" is a common term.

16      **Q.   In what manner?  How is it common?**

17      A.   It's a pest commonly controlled by

18  technicians in our industry.

19      **Q.   But not in Connecticut at all, correct?**

20      A.   Nor in New York.

21      **Q.   So it's not a common pest in Connecticut**

22  **or New York, correct?**

23      A.   Correct.

24           It's also the name of a spider.

25      **Q.   Do you see on PX35 -- I will just point it**

1    out to you -- the last -- serial Number 98124482.

2            Do you see that?

3        A.   Yes.

4        Q.   That's on PX35, correct?

5        A.   Yes.

6        Q.   That's the same number that is found in

7    those bolded terms on page 17 of PX18; is that

8    correct?

9        A.   I'm looking.  Let's see.

10           Yes.

11       Q.   And so serial Number 98124482 did, in

12   fact, register; is that correct?

13       A.   I'm not sure.  It looks like it might

14   have.

15       Q.   You didn't start your business until --

16   well, scratch that.

17           When did you start your business?

18       A.   In or around September 7, 2021.

19       Q.   Is "black widow" a descriptive term?

20           MR. HOFFMAN:  Objection calls for legal

21   conclusion.

22           THE WITNESS:  In terms of what?

23   BY MR. WINTER:

24       Q.   Is it -- do you believe it to be

25   descriptive of anything in the industry?

1         MR. HOFFMAN:  Same objection.

2         THE WITNESS:  What do you mean,

3    "descriptive of anything in the industry"?  I've

4    already stated it's a spider.

5    BY MR. WINTER:

6         Q.   **So is it descriptive of a spider?**

7         A.   It would be, yes.

8         Q.   **So that's the only thing it's descriptive**

9    **of?**

10        A.   It's also descriptive of my last name and

11   something that's meaningful to me.

12        Q.   **Your last name is not Black Widow; is that**

13   **correct?**

14        A.   The second part of that statement.  Yes.

15   My name is Black.  My last name is Black.

16        Q.   **All right, but Black Widow is not your**

17   **last name, correct?**

18        A.   Correct.  I've already answered that.

19        Q.   **Do you believe that my client infringes**

20   **your rights in "Black Widow" in Connecticut?**

21        MR. HOFFMAN:  Objection.

22        THE WITNESS:  Do I believe that he

23   infringes my rights in Connecticut?

24   BY MR. WINTER:

25        Q.   **Yes.**

```
 1        A.    In terms of what?
 2        Q.    Trademark rights.
 3        A.    What do you mean?
 4        Q.    Do you own trademark rights in
 5   Connecticut?
 6        A.    I believe I own rights in Connecticut.
 7        Q.    What rights do you believe you own in
 8   Connecticut?
 9        A.    I'm not familiar with the term.  But I
10   started operating there first.
11        Q.    So do you believe you developed common-law
12   rights in the word "Black Widow" in Connecticut?
13              MR. HOFFMAN:  Objection.
14              THE WITNESS:  I don't know.
15   BY MR. WINTER:
16        Q.    PX18, number 34.  Do you see that in front
17   of you?
18        A.    Yes.
19        Q.    Is that accurate?
20        A.    Give me just a moment.
21              (Witness reviews document).
22              Could you explain that to me?
23        Q.    It's your allegation.
24        A.    You have to forgive me I only have a high
25   school education.  So if you don't mind just
```

1 explaining to me, I'd really appreciate it.

2      Q.   You alleged -- well, let's look at 31

3 instead.

4           Do you see 31 at the top?

5      A.   I do.

6      Q.   "Counterclaim defendant," that refers to

7 my client, correct?

8      A.   Yes, I believe so.

9      Q.   And then it says, "Has infringed on

10 counterclaim plaintiff."

11           Counterclaim plaintiff is your company; is

12 that correct?

13      A.   I think so, yes.

14      Q.   And then it says, "Common-law trademark

15 rights," correct?

16      A.   It says that, yes.

17      Q.   Right.

18           So the allegation in 31 is that my client

19 has infringed your company's common-law trademark

20 rights; is that correct?

21      A.   I believe so, yes.

22      Q.   Why do you believe my client has infringed

23 your common-law trademark rights?

24           MR. HOFFMAN:  Objection.

25           You can answer.

1              Objection.

2              THE WITNESS:  Unfair competition.

3    BY MR. WINTER:

4         Q.    What do you mean by that?

5         A.    They claim they got all these calls for

6    business from us.

7         Q.    I see.

8               So you have rights in Connecticut that

9    those calls should have been directed to you instead

10   of my client; is that correct?

11        A.    I think so.

12        Q.    I see.

13              So those customers called my client, being

14   confused, looking for you; is that correct?

15              MR. HOFFMAN:  Objection.

16              THE WITNESS:  I'm not sure why they called

17   him.

18   BY MR. WINTER:

19        Q.    Why does -- do customers calling my client

20   support your claim for trademark infringement?

21              MR. HOFFMAN:  Objection.

22              THE WITNESS:  I'm not sure.

23   BY MR. WINTER:

24        Q.    Other than calls received by people

25   apparently looking for your business, what other

1    facts are you aware of that support finding that my

2    client has infringed your common-law trademark

3    rights?

4              MR. HOFFMAN:  Same objection.

5              THE WITNESS:  I choose not to answer.

6              MR. HOFFMAN:  You can answer if you know.

7              THE WITNESS:  The claim that they're doing

8    walkthroughs in Connecticut.

9    BY MR. WINTER:

10        Q.   So my client is not allowed to use its

11   "Black Widow" trademark in Connecticut?

12             Is that your position?

13        A.   They weren't trademarked at the time of

14   the walkthrough.

15        Q.   My client was not -- so it's your position

16   that my client does not have the rights to use

17   "Black Widow" in Connecticut; is that right?

18        A.   I don't know.

19        Q.   Well, is that what -- is that an action

20   that is an infringing action on behalf of my client?

21        A.   I'm not sure.  I'm not a lawyer.

22        Q.   What activity of my client do you believe

23   violates your rights in "Black Widow," your

24   business' rights?

25        A.   I don't know.

1      Q.    You can't identify one activity of my

2   client that violates your business' rights in the

3   words "Black Widow" for pest control; is that

4   correct?

5            MR. HOFFMAN:  Objection.

6            THE WITNESS:  Could you be more

7   descriptive?

8   BY MR. WINTER:

9      Q.    So my client performing a walkthrough in

10  Connecticut, that violates your rights in "Black

11  Widow" for pest control; is that correct?

12     A.    I don't know.

13     Q.    What action of my client violates your

14  rights in "Black Widow" for pest control?

15           MR. HOFFMAN:  Objection.

16  BY MR. WINTER:

17     Q.    You can answer.

18           There's a question pending.

19     A.    I don't know.

20     Q.    Sitting here today, you're not able to

21  identify any action of my client that violates your

22  business' rights in "Black Widow" for pest control;

23  is that correct?

24           MR. HOFFMAN:  Objection.

25           Are you speaking with respect to count 1

```
 1   or count 2 of the counterclaim?

 2   BY MR. WINTER:

 3        Q.   Sitting here today, you are not able to

 4   identify any action of my client that violates your

 5   business' rights for "Black Widow" for pest control

 6   as alleged in count 2 of the counterclaims; is that

 7   correct?

 8        A.   This is it.

 9             MR. HOFFMAN:  Uh-huh.

10             THE WITNESS:  So what are you asking me

11   exactly?

12             MR. WINTER:  Read back to him, please.

13        (The Record was read back.)

14             THE WITNESS:  (Witness reviews document).

15             To answer your question, yes.  I believe

16   they violated everything in count 2.

17   BY MR. WINTER:

18        Q.   So what specific action are you sitting

19   here today able to identify then?

20        A.   Well, for a start, they've profited from

21   our good name.

22        Q.   Explain that to me.

23        A.   Our reputation.

24        Q.   So my client is taking advantage of your

25   business reputation; is that correct?
```

```
 1      A.    Absolutely.
 2      Q.    What else?
 3      A.    Everything in count 2.
 4      Q.    What else?  Specifically.  Tell me.
 5      A.    Receiving calls.
 6      Q.    Calls specifically that were meant for
 7   your business?
 8            Is that what you're referring to?
 9      A.    That's correct.  That's what it said in
10   the filing.
11            (Clarification requested by the Court
12   Reporter.)
13            THE WITNESS:  That's what it said in the
14   filing.  They've gained business from our confusion.
15   Then unjustly enriched.
16   BY MR. WINTER:
17      Q.    How were they unjustly enriched?
18            MR. HOFFMAN:  Objection.
19            THE WITNESS:  They benefited from our good
20   name and reputation.
21   BY MR. WINTER:
22      Q.    So it's your position that you're free to
23   use "Black Widow" without violating my client's
24   rights.  However, my client is not free to use
25   "Black Widow" in Connecticut without violating your
```

1    rights; is that correct?

2            MR. HOFFMAN:  Objection.

3    BY MR. WINTER:

4        Q.    An objection means you still have to

5    answer the question.

6        A.    I know.  I'm thinking.

7        Q.    Okay.

8        A.    Would you mind repeating the question.

9          (The Record was read back.)

10           THE WITNESS:  I don't travel into New

11    York.  I only operate in Connecticut.

12    BY MR. WINTER:

13        Q.    I see.

14            But you have received calls that were

15    supposed to be directed to my client; is that

16    correct?

17        A.    Yes.

18        Q.    And that was the example of that two-page

19    text message where you had the auto response; is

20    that correct?

21        A.    Yes.

22        Q.    That is -- and in that answer you were

23    referring to PX23, which is in front of you right

24    now; is that correct?

25        A.    Yes.

1          Q.    I will play you some more of the "Pest

2    Control Millionaire" podcast, starting at 35:24.

3                Do you see that?

4          A.    I sure do.

5                (Video playing.)

6    BY MR. WINTER:

7          Q.    So I'm starting from 35:10 now.

8                Do you see that?

9          A.    Yep.

10               (Video playing.)

11   BY MR. WINTER:

12         Q.    I stopped at 35:41.

13               Do you agree?

14         A.    Yes.

15         Q.    "Interesting situation" were your words;

16   is that correct?

17         A.    Yes.

18         Q.    Were you referring to this lawsuit?

19         A.    Maybe.  I can't remember.

20         Q.    Well, you did say it was an ongoing legal

21   matter; is that correct?

22         A.    That is correct.

23         Q.    Do you have any other ongoing legal

24   matters, other than the current one?

25         A.    No.

1      Q.    So what else could it have referred to?

2      A.    I don't know.

3      Q.    So you can't identify anything other than

4  the lawsuit that the term "interesting situation"

5  could have referred to; is that correct?

6      A.    Yes.

7      Q.    You said, "There's no infringement

8  happening" in that video clip; is that correct?

9      A.    That is correct.

10     Q.    Why?

11     A.    Because there isn't.

12     Q.    Why?

13     A.    Why what?

14     Q.    Why is there no infringement happening?

15          MR. HOFFMAN:  Objection.  Calls for legal

16  conclusion.

17          THE WITNESS:  Because there isn't.

18  BY MR. WINTER:

19     Q.    Okay.  But what facts support the finding

20  that there's no infringement happening, as you

21  stated in the "Pest Control Millionaire" podcast,

22  "There is no infringement happening"?

23          MR. HOFFMAN:  Same objection.

24  BY MR. WINTER:

25     Q.    You made that statement without any

1    understanding of what facts support that statement;

2    is that correct?

3         A.    No.

4         Q.    So you do have an understanding of the

5    facts that support that statement; is that correct?

6         A.    I don't know.

7         Q.    Do you have an understanding of any facts

8    that support this statement of, "There is no

9    infringement happening"?

10              MR. HOFFMAN:  Objection.

11              THE WITNESS:  Could you rephrase that?

12    BY MR. WINTER:

13        Q.    What don't you understand about it?

14        A.    The question.

15        Q.    What specifically do you not understand

16    about the question?

17        A.    I don't understand the question.

18        Q.    Do you have an understanding of any facts

19    that support the statement in the "Pest Control

20    Millionaire" podcast that there's no infringement

21    happening?

22              MR. HOFFMAN:  Objection.

23              THE WITNESS:  Would you mind reiterating

24    that one more time, please.

25              (The Record was read back.)

1                    THE WITNESS:  Do I have any facts?  I

2   don't know.

3   BY MR. WINTER:

4       Q.    You don't know if you have any facts that

5   support that statement that you made on the "Pest

6   Control Millionaire" podcast?

7       A.    Yeah.

8            MR. HOFFMAN:  Objection.

9   BY MR. WINTER:

10      Q.    So sitting here today, you're not able to

11  identify any facts you're aware of that support your

12  statement in the "Pest Control Millionaire" podcast

13  that there's no infringement happening; is that

14  correct?

15           MR. HOFFMAN:  Objection.  That's a

16  mischaracterization of the testimony that he's given

17  over the last eight hours.

18  BY MR. WINTER:

19      Q.    Are you able to identify facts or not?

20      A.    I don't know.

21      Q.    You don't know if you're able to identify

22  facts to support a finding that there's no

23  infringement?

24           There's a question pending.

25           Are you able to identify facts to support

1    the statement on the "Pest Control Millionaire"

2    podcast that there's no infringement happening?

3              MR. HOFFMAN:  Objection.

4              You can answer.

5              THE WITNESS:  I would need my counsel's

6    help.

7    BY MR. WINTER:

8        Q.   So without help from your attorney, you're

9    not able to identify any facts to support your

10   belief in the "Pest Control Millionaire" podcast

11   that there's no infringement happening; is that

12   correct?

13             MR. HOFFMAN:  Objection.  I'm going to

14   restate that that's a mischaracterization of the

15   testimony that he has given during today's

16   deposition.

17   BY MR. WINTER:

18       Q.   Do you need help from your attorney to

19   identify facts or not?

20       A.   I don't know.

21       Q.   You don't know if you need help.

22            Did you say "I don't know"?

23       A.   Yes.

24       Q.   Are you able to identify any facts to

25   support your belief that there's no infringement

1    **happening?**

2              MR. HOFFMAN:  This is -- I'm going to

3    object.  At this point I think that this is

4    getting --

5              MR. WINTER:  So are we going to stipulate

6    that he does not know of any facts to support the

7    finding of infringement?

8              MR. HOFFMAN:  No.  We're not.  Because

9    actually he's given various facts throughout the

10   deposition as to why he believes there is

11   non-infringement.

12   BY MR. WINTER:

13       **Q.   Do you agree with this statement of your**

14   **attorney, that you have given facts throughout the**

15   **deposition as to why you believe there's no**

16   **infringement?**

17              MR. HOFFMAN:  Please finish.

18              Why don't you answer the pending question.

19              Why don't you restate the question.

20          (The Record was read back.)

21              THE WITNESS:  Yes.

22   BY MR. WINTER:

23       **Q.   What are they?  What are those facts that**

24   **you've given?**

25              MR. HOFFMAN:  I'm going to object.

1    Because I'm going to say this has been asked and

2    answered throughout the deposition.

3    BY MR. WINTER:

4         **Q.    You can still answer.**

5         A.    I don't know.

6         **Q.    Okay.**

7              **In what way have you been damaged by my**

8    **client's infringement of your trademark rights in**

9    **"Black Widow"?**

10        A.    My good reputation.

11        **Q.    So no monetary damage; is that correct?**

12        A.    Incorrect.  I wasn't finished.

13        **Q.    Okay.**

14        A.    There's been several other ways.

15        **Q.    Okay.  What are those other ways?**

16        A.    Loss of work.  Loss of good will.  Loss --

17    of monetary damages, which we got already.

18        **Q.    Is that it?**

19        A.    Maybe.

20        **Q.    Can you identify anything else today?**

21        A.    I can't remember anything else.

22        **Q.    You are the corporate deponent for your**

23    **company on topic 50, the factual basis for**

24    **defendant's counterclaim, count 2.**

25        A.    Which page is this on, please?

1          Q.   PX11, Number 50.

2          A.   And where is counterclaim 2?

3          Q.   Counterclaim 2 is your claim for

4    infringement, common-law trademark infringement

5    against my client.

6               Do you see that heading, "Common-law

7    trademark infringement, unfair competition, and

8    deceptive trade practices under Connecticut common

9    law," count 2 in PX18.

10              You're the designated corporate deponent

11   on count 2; is that correct?

12         A.   Yes.

13         Q.   And you prepared for this deposition; is

14   that correct?

15         A.   Yes.

16         Q.   And you prepared for all the topics in the

17   deposition; is that correct?

18         A.   Yes.

19         Q.   So necessarily you must have then

20   prepared -- been prepared for answering questions

21   related to topic Number 50; is that correct?

22         A.   Yes.

23         Q.   So then you listed damages suffered by

24   your company as damage to your good reputation, loss

25   of work, loss of good will, and loss of damages.

1          **Is that correct?**

2      A.   Among others, yeah.

3      **Q.   What are the others?**

4      A.   Everything in claim 2.

5      **Q.   Other than good reputation, loss of work,**

6  **loss of goodwill, and loss of damages, what**

7  **specifically is another way that you've been damaged**

8  **by my client's actions?**

9      A.   I don't know.

10     **Q.   Okay.  Are you done with your answer?**

11     A.   Am I done with my answer?

12     **Q.   Was "I don't know" the end of your answer?**

13     A.   I can't recall.

14     **Q.   Ten seconds ago, you can't recall?**

15     A.   No.  I can recall that it was the end of

16  my answer.  I can't recall what other things.

17     **Q.   Okay.  So I didn't interrupt your answer,**

18  **is that --**

19     A.   Not that time, correct.

20     **Q.   Good reputation.**

21          **How has your good reputation been damaged?**

22          **Are you still thinking or are you waiting**

23  **for me to ask a question?**

24          **All right.  I withdraw my question.  I**

25  **gave this notice to be audiovisual or stenographic**

1    means.  I am setting up my phone and I'm going to

2    record this.

3              MR. HOFFMAN:  I believe it's time to call

4    it --

5              MR. WINTER:  Object however you want to.

6              MR. CARROLL:  So it's been seven hours as

7    of 6:28.  So the deposition time is concluded.

8              MR. HOFFMAN:  Thank you so much.

9              MR. WINTER:  It's a running time.

10             MR. HOFFMAN:  Running time?  I'm not sure

11   what that means.

12             MR. WINTER:  It's running time.

13   Deposition breaks don't count.

14             MR. CARROLL:  I have excluded breaks.  I

15   actually have a breakdown here by the minute, if you

16   would like.

17             MR. WINTER:  We only took 30 minutes of

18   breaks?

19             MR. CARROLL:  So we got here at 10:00, so

20   that's eight and a half hours, minus an hour and a

21   half, seven hours, which is the deposition timing

22   limit.  So we've taken about an hour in breaks in

23   addition to lunch.  I have it down by the minute.

24             MR. WINTER:  So if you're going to

25   refuse --

```
 1                THE WITNESS:  Would you please turn that
 2   off?
 3                MR. WINTER:  It's not recording.
 4                THE WITNESS:  Will you please take it
 5   away, then.  You don't have my permission.
 6                Thanks.
 7                MR. WINTER:  If you're going to refuse to
 8   let him answer my questions, we're going to have a
 9   motion for another deposition.  Because he was
10   obviously unprepared to answer any of the questions.
11   He sat there for minutes and minutes on end staring
12   at me, without any ability to prepare for count 2,
13   to answer questions about damage, anything like
14   that.
15                THE WITNESS:  I've prepared with counsel.
16                MR. WINTER:  I'm talking to your attorney,
17   not you.
18                THE WITNESS:  Okay.
19                MR. WINTER:  So in light -- are we still
20   on the record?
21                THE COURT REPORTER:  Uh-huh.
22                MR. WINTER:  So are you still -- in light
23   of that, you're going to refuse to let him answer
24   any more questions?
25                THE WITNESS:  I'm answering everything to
```

1  the best of my knowledge.

2          MR. WINTER:  I'm asking -- talking to your

3  attorney.

4          MR. HOFFMAN:  Yeah.  Thank you so much.

5          So for the last five minutes, Attorney

6  Winter took his computer and propped up his cell

7  phone and started to -- he began to --

8          MR. WINTER:  Before you state that, you

9  can look at this.  This is the last thing I did.  I

10  did not take any video.

11          MR. HOFFMAN:  Okay.  So he did not

12  actually record any video.

13          He expressed his intention and his setting

14  up to begin recording my client's deposition at

15  6:30 p.m. this evening, and this deposition

16  commenced at 10:00 a.m.

17          At this point I think everyone in this

18  room, but most importantly my client, is exhausted.

19          What we have done is we have calculated

20  the amount of time that the deposition has been

21  ongoing.  We have removed time for breaks, and we

22  have calculated that to be seven hours.

23          That, coupled with the fact that now

24  Attorney Winter is -- and this is the -- well,

25  Attorney Winter has gotten visibly upset and is now

1  wanting to video record this deposition at --

2  beginning at 6:30 p.m., we are of the position that

3  at this point this deposition is over, based upon

4  the fact that it has run for seven hours.

5          Thank you.

6          MR. WINTER:  So to be clear, if I take the

7  camera down, you're still going to leave the room

8  and end the deposition.

9          Is that your position?

10          MR. HOFFMAN:  That was never presented to

11  us.

12          MR. WINTER:  So I will take the camera

13  down and he will answer the questions about damages?

14          MR. HOFFMAN:  How much longer do you have?

15  I don't want to be --

16          MR. WINTER:  I mean, he's got to move it

17  along.  Right?  This is entirely controlled by his

18  delay in answering these questions which he should

19  have prepared for.

20          MR. HOFFMAN:  I'm going to have to

21  respectfully disagree.

22          MR. WINTER:  Okay.

23          MR. HOFFMAN:  These questions have -- I'm

24  not going to -- I'm not going to go into your

25  questions.  But all I can say is that I'm highly

1    confident that the length of this deposition is not

2    a result of my client's answers.

3                    MR. WINTER:  Okay.  So how about -- we've

4    got the four topics:  Good reputation, loss of work,

5    loss of goodwill, and loss of damages.

6                    I will inquire as to specifically what

7    actions were those, and that's the limit of my

8    questioning, and I will end the deposition.

9                    MR. HOFFMAN:  How many more minutes do you

10   have?

11                   MR. WINTER:  It depends on how long he

12   takes to answer the questions.

13                   MR. HOFFMAN:  That could very easily turn

14   into another half an hour.

15                   MR. WINTER:  How about five minutes?

16                   MR. HOFFMAN:  It is 6:30.  No.

17                   MR. WINTER:  Ten minutes?

18                   MR. HOFFMAN:  No.

19                   MR. WINTER:  Five minutes?

20                   MR. HOFFMAN:  If you want to take another

21   two minutes to end the deposition and -- so that we

22   don't -- it's not --

23                   MR. WINTER:  Yeah.  We're filing a motion.

24                   Filing a motion.

25                   Before we end, I have two notices,

1    subpoena that I am going to be serving on -- one on

2    the Burlington Chamber of Commerce and delivery for

3    service.  And on Rachael Burr of Brookfield,

4    Connecticut.  Also hand delivery for service.

5              Off the record.

6         (At 6:35 p.m., the record was concluded.)

7         (The Witness reserved the right to read and

8    sign.)

9                    * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2

3    STATE OF CONNECTICUT  )
                          ) ss.
4    COUNTY OF FAIRFIELD  )

5

6        I, MERCEDES MARNEY-SHELDON, a court reporter within

7    the state of Connecticut, and a notary public in and for

8    the State of Connecticut, do hereby certify:

9        That BLAKE JOSEPH BLACK, the witness whose

10   deposition is hereinbefore set forth, was duly sworn by

11   me, and that such deposition is a true record of the

12   testimony given by the witness.

13       I further certify that I am not employed by nor

14   related to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto set my hand this

18   27th day of September, 2024.

19

20

21   _____
     Mercedes Marney-Sheldon - Shorthand Reporter
22   Notary Public - State of Connecticut
     Account Number:   167303
23   Date Appointed:   08/07/2019
     Expiration Date:  08/31/2024

24

25

```
1                    J U R A T

2

3    STATE OF CONNECTICUT          )
                                   ) ss.
4    COUNTY OF _____ )

5

6

7             I, BLAKE JOSEPH BLACK, the witness herein,

8    having read the foregoing testimony of the pages of this

9    deposition, do hereby certify it to be a true and correct

10   transcript, subject to corrections, if any, shown on the

11   attached page(s).

12

13

14                    _____

15                    BLAKE JOSEPH BLACK

16

17

18

19   Subscribed and sworn to before me this

20
     _____ day of _____, 2024.
21

22

23   _____

24   Notary Public

25
```

1                          ERRATA SHEET

2     CASE: BLACK WIDOW TERMITE & PEST CONTROL vs. BLACK
      WIDOW PEST SPECIALIST, LLC
3
      WITNESS:  BLAKE JOSEPH BLACK
4
      DEPOSITION DATE: September 24, 2024
5
      PAGE  LINE
6
      _____|_____| CHANGE: _____
7
                     REASON: _____
8
      _____|_____| CHANGE: _____
9
                     REASON: _____
10
      _____|_____| CHANGE: _____
11
                     REASON: _____
12
      _____|_____| CHANGE: _____
13
                     REASON: _____
14
      _____|_____| CHANGE: _____
15
                     REASON: _____
16
      _____|_____| CHANGE: _____
17
                     REASON: _____
18
      _____|_____| CHANGE: _____
19
                     REASON: _____
20
      _____|_____| CHANGE: _____
21
                     REASON: _____
22
      _____|_____| CHANGE: _____
23
                     REASON: _____
24
      _____|_____| CHANGE: _____
25
                     REASON: _____















































































































































