# Exhibit J

```
 1                    IN THE UNITED STATES

 2                   DISTRICT COURT FOR THE

 3                   DISTRICT OF CONNECTICUT

 4

 5     * * * * * * * * * * * * * * *
       BLACK WIDOW TERMITE & PEST,    *
 6     CONTROL CORP.,                  *
               Plaintiff,             *
 7                                     *   Civil Action No.:
       V.                              *   3:23-cv-01246
 8                                     *
       BLACK WIDOW PEST SPECIALIST     *
 9     LLC,                            *
               Defendant.             *
10     * * * * * * * * * * * * * * *
                                          April 23, 2025
11                                        10:13 a.m.

12

13

14                         _ _ _

15     VIDEO-RECORDED 30(b)(6) DEPOSITION OF BLACK WIDOW PEST
                     SPECIALIST, LLC - BLAKE BLACK
16                         _ _ _

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2        FOR THE PLAINTIFF:

 3                   FARBER, LLC
                     BY:   JONATHAN A. WINTER, ESQUIRE
 4                         SAMANTHA GEROLD, ESQUIRE
                           4 Corporate Drive, Suite 287
 5                         Shelton, Connecticut 06484
                           Phone: (203) 285-8356
 6                         Email:  j.winter@farberllc.com
                                   samantha.gerold@farberllc.com
 7

 8        FOR THE DEFENDANT:

 9                   COHEN AND WOLF, PC
                     BY:   ARI J. HOFFMAN, ESQUIRE
10                         EMILIO ESTRELLA TERON, ESQUIRE
                           1115 Broad Street
11                         Bridgeport, Connecticut 06604
                           Phone: (203) 337-4194
12                         Email:  ahoffman@cohenandwolf.com

13

14        ALSO PRESENT:

15                   ALEJANDRO GOMEZ - VIDEOGRAPHER

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2
                                                    PAGE
3
    30(b)(6) BLACK WIDOW PEST SPECIALIST, LLC
4   BLAKE BLACK

5

6           Examination by Mr. Winter              7

7

8

9   EXHIBITS:

10

11  PLAINTIFF'S EXHIBITS

12  NUMBER                 DESCRIPTION            PAGE

13  Exhibit 53             Notice of 30(b)(6) Deposition
                           of Black Widow Pest
14                         Specialist, LLC          7

15  Exhibit 54             Exhibit A to 30(b)(6)    7

16  Exhibit 55             Exhibit C to 30(b)(6)    7

17  Exhibit 56             Defendant's Responses to
                           First RFA (1-53)         7
18

19  Exhibit 57             Confusion Evidence -
                           First Production,
20                         12/1/2023                7

21  Exhibit 58             Confusion Evidence
                           Produced 2/13/2025       7
22

23  Exhibit 59             Confusion Evidence
                           Produced 3/26/2025       7
24

25

Page 4

```
 1   PLAINTIFF'S EXHIBITS

 2   NUMBER                 DESCRIPTION                  PAGE

 3   Exhibit 60             Confusion Evidence
                            Produced 4/14/2025            7
 4

 5   Exhibit 61             Confusion Evidence
                            Produced 4/23/2025            7
 6

 7   Exhibit 62             BlackWidowCT.com
                            Website                      72
 8

 9   Exhibit 63             Telephonic Conference
                            Transcript - Motion
10                          for Prejudgment Remedy       93

11   Exhibit 64             Customer List               108

12   Exhibit 65             Customer List -
                            Highlighted                 108
13

14   Exhibit 66             List of Callers             108

15   Exhibit 67             Utah Registration           119

16   Exhibit 68             Colorado Registration       119

17   Exhibit 69             Indiana Registration        119

18   Exhibit 70             Revenue Report 2024         143

19   Exhibit 71             26(f) Report                144

20   Exhibit 72             Text String                 144

21

22

23

24

25
```

```
 1              Video-recorded 30(b)(6) Deposition of Black

 2  Widow Pest Specialist LLC, taken on behalf of the

 3  Plaintiff herein, for the purpose of discovery and for

 4  use as evidence in this cause, pending in the United

 5  States District Court, District of Connecticut, pursuant

 6  to Notice, before Qiana M. Burgess, Registered

 7  Professional Reporter and a Notary Public within and for

 8  the State of Connecticut, held at the offices of Farber,

 9  LLC, 1234 Summer Street, Suite 400, Stamford,

10  Connecticut, on the 23rd day of April, 2025, at

11  10:13 a.m., at which time Counsel appeared as

12  hereinbefore set forth. . .

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    S T I P U L A T I O N S

2

3              IT IS HEREBY STIPULATED AND AGREED TO by and
      among counsel for the respective parties hereto that all
4      technicalities as to the proof of the official character
      of the authority before whom the deposition is to be
5      taken are waived.

6              IT IS FURTHER STIPULATED AND AGREED TO by and
      among counsel for the respective parties hereto that any
7      objections to the sufficiency of the Notice are waived.

8              IT IS FURTHER STIPULATED AND AGREED TO by and
      among counsel for the respective parties hereto that all
9      objections, except as to form, are reserved to the time
      of trial.

10

11             IT IS FURTHER STIPULATED AND AGREED TO by and
      among counsel for the respective parties hereto that all
12     objections to the oath/affirmation being administered are
      waived.

13

              IT IS FURTHER STIPULATED AND AGREED TO by and
14     among counsel for the respective parties hereto that the
      reading and the signing of the deposition by the deponent
15     is reserved.

16

17

18

19

20

21

22

23

24

25

1          (Plaintiff's Exhibits 53 through 61 were

2    premarked for identification.)

3          THE VIDEOGRAPHER:  This is the beginning of

4    Media Number 1 in the deposition of Blake Black in the

5    matter of Black Widow Termite & Pest Specialist, LLC,

6    et al. versus Black Widow Pest, et al., Case Number

7    323-cv-01246.  Today's date is April 23, 2025.  The time

8    on the monitor is 10:13 a.m..

9          My name is Alejandro Gomez; I am the

10   videographer.  The court reporter today is Qiana Burgess.

11   We are here with Huseby Global Litigation.  Counsel,

12   please introduce yourself, after which the court reporter

13   will swear in the witness.

14         MR. WINTER:  Jonathan Winter.  Also with me is

15   Samantha Gerold for Black Widow Termite & Pest Control

16   Corp., the plaintiff.

17         MR. HOFFMAN:  Good morning.  Ari Hoffman and

18   with me is Emilio Estrella on behalf of the defendant.

19         THE COURT REPORTER:  Mr. Black, would you please

20   raise your right hand.

21         THE DEPONENT:  Sure.

22         THE COURT REPORTER:  Do you solemnly swear or

23   affirm that the testimony you are about to give will be

24   the truth, the whole truth, and nothing but the truth, so

25   help you God?

1          THE DEPONENT:  I do.

2          THE COURT REPORTER:  Would you please state your

3   full name and address for the record.

4          THE DEPONENT:  I would.  My name is Blake Joseph

5   Black, 108 Curtiss Street, Naugatuck, Connecticut 06770.

6          THE COURT REPORTER:  Thank you.

7          THE DEPONENT:  You're welcome.

8          THE COURT REPORTER:  Counsel, usual

9   stipulations?

10          MR. WINTER:  Yeah.  Are you going to read and

11   sign?

12          MR. HOFFMAN:  Yeah.  Connecticut Practice.  And,

13   yes, reading and signing.

14          THE COURT REPORTER:  Thank you.  All set,

15   Attorney Winter.

16   EXAMINATION

17   BY MR. WINTER:

18      Q.   Okay.  Mr. Black, nice to see you today.

19      A.   Good morning.

20      Q.   As you know, I represent Black Widow Termite &

21   Pest Control, the plaintiff.  And I understand you're

22   represented by counsel today; is that correct?

23      A.   That is correct, yes.

24      Q.   So as you'll probably remember from the last

25   time we did this, during this deposition I'll ask

1    questions.  Unless your attorney instructs you not to

2    answer, you should answer those questions.  Do you

3    understand that?

4         A.   Yes.

5         Q.   And then he may, from time to time, make

6    objections.  Even if there's an objection, you still have

7    to answer the question.  Do you understand that?

8         A.   Yes.

9         Q.   And then in terms of speaking order, because the

10   court reporter has to type everything down, we'll try

11   to -- I'll speak first, I'll let Mr. Hoffman make any

12   objections he has, and then you'll speak.  We'll try not

13   to speak over each other.  Do you understand?

14        A.   Yes.

15        Q.   Is there any reason you cannot testify

16   truthfully today?

17        A.   No.

18        Q.   Did you talk to anybody about this deposition

19   prior to coming here?

20        A.   Yes.

21        Q.   Who was that?

22        A.   My counsel.

23        Q.   Would that be Mr. Hoffman and Mr. Estrella?

24        A.   Correct.

25        Q.   Anybody else?

1    A.    Other counsel that is not representing with me

2    today.

3    Q.    **Who is that?**

4    A.    Paul Greeley.

5    Q.    **When was that conversation?**

6    A.    Last week.

7    Q.    **How long was it?**

8    A.    Maybe a half hour.

9    Q.    **Did it take place in person or via phone?**

10    A.    Phone call.

11    Q.    **Did you review any documents during that**

12    **meeting?**

13    A.    Not with him, no.

14    Q.    **Did you review any documents in advance of that**

15    **meeting or in advance of this deposition?**

16    A.    Yes.

17    Q.    **What documents did you review?**

18    A.    Anything that was pertinent to this meeting.  I

19    can't remember the headers of them, the names.  The

20    exhibits and whatever else that was pertinent to this.

21    And the request for admission, I believe, was one of the

22    names, if I'm not mistaken.

23    Q.    **Okay.  Are there any documents -- well, I'll**

24    **hand you -- this has been marked as 53.**

25    A.    Thank you.

```
 1            MR. WINTER:  I have a copy for you, Ari.

 2            MR. HOFFMAN:  Thank you.

 3   BY MR. WINTER:

 4       Q.   This is the 30(b)(6) notice.  Do you see that?

 5       A.   Yes.

 6       Q.   Is this one of the documents that you reviewed

 7   prior to this deposition?

 8       A.   Yes.

 9       Q.   And for this deposition, if you look starting on

10   page 3 through the end, there's a number of topics which

11   are numbered 1 through 22.  Do you see that?

12       A.   Yep.

13       Q.   And then do you see two document requests

14   numbered 125 and 126?  The second to last page for the

15   document requests.

16       A.   Yes.

17       Q.   Did you bring any documents responsive to either

18   of those requests with you today?

19       A.   No.

20       Q.   With regards to 126, did you search for any

21   documents relative to that request?

22       A.   There were none.

23       Q.   There were no documents responsive to number

24   126; is that your testimony?

25       A.   Yes.
```

1      Q.    Okay.  And so getting back to the topics,

2    there's topics, numbers 1 through 22.  And if I

3    understand correctly, you have been designated as a

4    corporate deponent for each one of those topics; is that

5    correct?

6      A.    Yes.

7      Q.    If you look at the first page of this -- this

8    document here, there's a -- I guess we'll call it a

9    pleading heading.  It says, "United States District Court

10   For District of Connecticut."  It has the names of the

11   parties and the case number.  Do you see that?

12     A.    Yeah.

13     Q.    So other than documents that had that heading or

14   a similar heading, are there specific documents that

15   you've looked at in order to prepare for any of the

16   topics?

17     A.    I don't think so.

18     Q.    Did you look at any of your internal records to

19   prepare for this deposition?

20     A.    Can you please be specific?  Just clarify for

21   me, if you don't mind.

22     Q.    So do you know -- do you have internal business

23   records of your company, documents that you keep?

24     A.    Yes.

25     Q.    Did you look at any of those documents in

1    preparation for this deposition?

2        A.    Yes.

3        Q.    What -- which ones did you look at?

4        A.    One specific one I could think of off the top of

5    my head was relating to confusion.

6        Q.    Related to confusion.  What was -- what was that

7    document?  Can you describe it?

8        A.    The account of someone with the last name Burr.

9        Q.    So I'm going to go a little bit out of order in

10   our numbers we're marking.  I'm going to hand you what's

11   been premarked as Exhibit 57.  So I'll ask you to look

12   through to the last page.  Is that the document that you

13   were referring to?

14       A.    That's the customer's name that I'm referring

15   to, yes.

16       Q.    So if I understood correctly, we were talking

17   about business records that you looked at to prepare for

18   this deposition.  You said you looked at one for --

19   related to Ms. Burr.  Is that -- did I understand that

20   correctly?

21       A.    I looked at her account, yes.

22       Q.    I see.  What specifically on her account did you

23   look at?

24       A.    The name and the timeline of when it was

25   serviced.

1      Q.   Why were you looking at the name and timeline

2  that it was serviced?

3      A.   I was confused, because when we spoke about it

4  originally, it was somebody else that was contacting the

5  other people in New York, the people you're representing,

6  regarding the confusion.  It wasn't the customer that

7  hired us for the job, to my recollection.  It was her

8  daughter or whomever it was.

9      Q.   Bridget Burr, does that name ring a bell to you?

10     A.   It doesn't.

11     Q.   Are you aware that Bridget Burr was deposed in

12  this matter?

13     A.   I knew that somebody else with the last name

14  Burr was deposed.  I didn't recall the name.

15     Q.   Have you looked at either the transcript or the

16  video recording of that deposition?

17     A.   No, I have not.

18     Q.   If you go to the first page of this, of Exhibit

19  Number 57, if you see the date of the email is Friday,

20  December 1, 2023.  It's from me to Samantha and Hugh

21  Pfabe.  Do you see that?

22     A.   Yes.

23     Q.   And at the time, Hugh Pfabe was your attorney in

24  this matter; is that correct?

25     A.   Yes.

1     Q.    After December 1, 2023, did you take any steps

2  to change your branding?

3     A.    No.

4     Q.    Why not?

5     A.    Because I believed that I had the right to use

6  the name and the brand.

7     Q.    Did seeing evidence of confusion have any impact

8  on your opinion?

9     A.    It wasn't the person that we received any money

10  from, nor the customer that we did the work for that had

11  confusion.  So no.

12     Q.    So you don't think this shows that an ordinary

13  customer could be confused; is that correct?

14     A.    Correct.

15     Q.    And that's because she's not your actual

16  customer; is that right?

17     A.    Correct.

18     Q.    Are you aware that she was at -- she testified

19  that she was at the address 7 Greenknoll Drive,

20  Brookfield, Connecticut, twice when your service vans

21  were there?

22     A.    I was not.  And at the time, our trucks weren't

23  lettered either.

24     Q.    Are you aware she testified that your

25  technicians were wearing a shirt with your logo on it?

1      A.   I wasn't.

2      **Q.   Are you aware that she testified that she Google**

3   **searched for Black Widow Pest, and as a result called my**

4   **client?**

5      A.   No, but it makes sense.  We don't really do any

6   marketing or anything to have a presence on Google, so...

7      **Q.   Are you aware that my client has a trademark**

8   **registration for Black Widow Pest?**

9      A.   I am.

10     **Q.   Do you think customers in the pest control**

11  **industry are careful about who they select as -- to do**

12  **the work?**

13     A.   I believe they are.

14     **Q.   What's the basis for that belief?**

15     A.   Well, I'd like to believe all of our customers

16  are intelligent and they're careful and cautious

17  individuals.  I don't believe they're people that just

18  hire to hire.

19     **Q.   You've never spoken specifically to a customer**

20  **who -- strike that.**

21         **You never -- did you ever speak to Richelle Burr**

22  **about this email or this instance here?**

23     A.   I don't believe so, no.

24     **Q.   Have you spoken directly about any -- to any**

25  **customers about whether they were confused by the Black**

1    Widow name?

2       A.    No.

3       Q.    So you've had no direct conversations with

4    customers whether they -- there has been actual

5    confusion; is that correct?

6       A.    I don't think so, no.

7       Q.    You don't think so, or you have not had

8    conversations?

9       A.    That I could best recall, no.

10      Q.    So sitting here, you can't remember any; is that

11   correct?

12      A.    Correct.

13      Q.    All right.  So if you turn to the 30(b)(6)

14   document in front of you that's Exhibit Number 53 --

15      A.    Which page?

16            MR. WINTER:  What topic is it?

17   BY MR. WINTER:

18      Q.    Topic Number 15.  Can you read Topic

19   Number 15 just to yourself.

20      A.    Sure.  Give me just one moment.

21      Q.    Have you read topic 15?

22      A.    I have.

23      Q.    What, specifically, did you do to prepare to

24   testify on topic 15?

25      A.    I went through the account of the last name

1  Burr, because I knew it was somebody's name I didn't

2  recognize.  And we didn't have that name specifically in

3  our system, so it wasn't our customer.

4      Q.   You didn't look at any deposition transcript or

5  video recording of Bridget Burr; is that correct?

6      A.   Correct.

7      Q.   Even though that's specifically identified in

8  topic 15; is that correct?

9      A.   Correct.

10     Q.   Is there any reason you thought that it was not

11 necessary for you to review the deposition or video

12 recording in preparation for -- to testify?

13     A.   Could you clarify, please?

14     Q.   You understand you have an obligation to prepare

15 to testify as a corporate deponent in this matter?

16     A.   Yes.

17     Q.   And you are designated for topic 15; is that

18 correct?

19     A.   Yes.

20     Q.   In connection with that preparation, the

21 topic -- excuse me -- the topic specifically says --

22 references the deposition of Bridget Burr and any video

23 recording thereof.  Do you see that?

24     A.   Yes.

25     Q.   Given your obligation to prepare for this topic,

1    specifically 15, and given the fact that it specifically

2    references the deposition of Bridget Burr and any video

3    recording thereof, why did you not feel it was your

4    obligation to review those documents or video recording

5    in order to prepare for this deposition?

6        A.   I don't know.

7        Q.   In terms of the first part of that paragraph, it

8    says, "The factual basis for defendant's denial of

9    Request to Admit No. 33 which states: 'Admit that factor

10   (8) "sophistication of [consumers]" as described in

11   Polaroid,'" case sited there, "weighs in favor of

12   plaintiff."  Do you see that there?

13       A.   Yes.

14       Q.   And I understand that you have denied that

15   request to admit; is that correct?

16       A.   What does that mean, I denied the request to

17   admit?

18       Q.   I'll hand you the request to admit that's been

19   marked as 56.  You can turn to Request to Admit Number

20   30- -- Request to Admit Number 33.

21            Do you see number 33 in front of you there?

22       A.   Yep.

23       Q.   Have you read it?

24       A.   Yes.

25       Q.   So on page 5 is the text of "Admit that factor

1    (8)."  It goes on, and then the next page has a response,

2    "Deny, subject to Plaintiff completing its document

3    production."  Do you see that?

4        A.   Yes.

5        Q.   Do you still deny that request to admit today?

6        A.   Meaning what?

7        Q.   So in this request, number 33, my client has

8    asked you to admit that the sophistication of the

9    consumers weighs in favor of my client.  Do you

10   understand that?

11       A.   Yeah, I understand that.

12       Q.   And in response to that, you denied that?

13       A.   Correct.

14       Q.   Why?

15       A.   She wasn't our customer.  I never received any

16   money from this person.  She was not the person who hired

17   us to do that job.  She's not my customer.

18       Q.   I'm talking about consumers in general, not just

19   Ms. Burr.  This is sophistication of the consumers in

20   general.  You've denied it as to all customers --

21   consumers in general.

22       A.   I still agree.

23       Q.   Why?

24       A.   She wasn't looking to hire somebody and calling

25   them.  It was somebody's daughter that called somebody

1   else.  That wasn't the person that hired us.

2       Q.   I see.  So the only basis for your denial is

3   the -- the Richelle Burr account that you reviewed; is

4   that correct?

5           MR. HOFFMAN:  I'm going to object.

6           THE DEPONENT:  No.

7   BY MR. WINTER:

8       Q.   What's the other basis?

9       A.   What's the other basis for what?

10      Q.   Why you denied Request Number 33.

11      A.   All of our customers are sophisticated

12  customers.  People looking to hire somebody should do

13  their due diligence, and I believe they do.

14      Q.   You have no actual evidence that they actually

15  do their due diligence; is that correct?

16      A.   How would I provide that?

17      Q.   I'm just asking you if you have any evidence of

18  it.  Do you have any evidence of those customers doing

19  their due diligence, yes or no?

20      A.   I don't know.

21      Q.   Okay.  Would you agree that the average customer

22  choosing a pest control company is typically not an

23  expert in the field of pest control?

24      A.   Yes.

25      Q.   Would you agree that they typically rely on

1   branding or name recognition, online impressions, things

2   like that in terms of how they make their decision on who

3   to call?

4        A.   I'm not sure how they rely on who to call.

5        Q.   So you have no evidence of how customers choose

6   who to call; is that correct?

7        A.   I don't know.

8        Q.   You don't know if you have evidence?  Or there

9   is -- you don't have evidence, which one is it?

10            MR. HOFFMAN:  I'm going to object.

11            THE DEPONENT:  I don't have any evidence.

12   BY MR. WINTER:

13        Q.   And, again, topic 15 requires you to be prepared

14   as a corporate deponent to explain why your company

15   denied Request to Admit Number 33 related to the

16   sophistication of consumers; is that correct?

17        A.   Yes.

18        Q.   And you prepared for that topic; correct?

19        A.   Yes.

20        Q.   Yet you have no evidence that you can point to,

21   is that correct, other than Ms. Burr?

22            MR. HOFFMAN:  Object -- objection.

23            THE DEPONENT:  Can you restate that question?

24            MR. WINTER:  You can read it back.

25            THE COURT REPORTER:  "Q   Yet you have no

1  evidence that you can point to, is that correct, other

2  than Ms. Burr?"

3          MR. HOFFMAN:  I maintain my objection.

4          THE DEPONENT:  Evidence of what, exactly, you

5  said?  I'm sorry.

6  BY MR. WINTER:

7      **Q.   Related to whether customers are careful in**

8  **terms of how they identify a pest control company to**

9  **call.**

10     A.   Yeah, I don't know.

11     **Q.   You don't know what, if you have evidence or**

12 **there isn't -- you don't have evidence?**

13     A.   I don't have evidence.

14     **Q.   Would you agree that pest control services are**

15 **typically not a luxury purchase?**

16     A.   Not necessarily.

17     **Q.   Why do you say that?**

18     A.   Because there's so many different facets of pest

19 control services.  You could do wildlife proofing, which

20 is a luxury service for sure.  You could do preventative

21 maintenance, which is also something I would consider to

22 be a luxury service.  You could do corrective pest

23 control, which most people don't do.  So I would deem it

24 a luxury service, potentially, but it could go either

25 way.

1     Q.    Why do you consider it a luxury service?

2     A.    A luxury is something that's not a necessity.

3     Q.    Are keeping bats out of one's house a necessity?

4     A.    It depends.

5     Q.    Why does it depend?

6     A.    I spoke with somebody the other day who's had

7 bats for 25 years.  They don't deem it a necessity.  They

8 weren't even bothered by the bats, full transparency.

9     Q.    Bats carry rabies, to your knowledge?

10    A.    Less than 1 percent.

11    Q.    How many other customers have you come across

12 asking for a bat service or inquiring about a bat service

13 who decide that having bats in their house is fine?

14    A.    More than you would think.  Everybody has

15 something that they're more bothered about than others.

16    Q.    Do you think it's fair to say that customers may

17 contact you based on doing a quick online search or

18 seeing a name they recognize rather than doing in-depth

19 comparisons?

20    A.    No, because we have no Google presence.  That's

21 not how our customers find us.

22    Q.    How do they find you?

23    A.    Referrals, other companies, other operators,

24 Facebook pages.  Things like that.

25    Q.    And then when those referrals come from someone,

1  usually they are -- this potential customer is given your

2  name; is that correct?

3      A.   My name sometimes, or sometimes the company's

4  name.  A lot of people still ask for me.

5      Q.   Would you agree that if two companies have

6  similar names or branding, that a customer in immediate

7  need of pest control might not notice the difference or

8  might assume they're affiliated?

9          MR. HOFFMAN:  Objection.

10          THE DEPONENT:  No.

11  BY MR. WINTER:

12      Q.   Do you think Ms. Burr maybe assumed because the

13  names were similar that the two companies were

14  affiliated?

15          MR. HOFFMAN:  Objection.

16          THE DEPONENT:  I'm not sure what she thought.

17  She wasn't our customer.

18  BY MR. WINTER:

19      Q.   Her mom was, though; correct?

20      A.   Was her mom the one that called you?

21      Q.   Is Richelle Burr your customer?

22      A.   Yes.

23      Q.   To your knowledge, is Richelle Burr Bridget

24  Burr's mother?

25      A.   I would assume, but I don't know.

1    Q.   Okay.  I'm going to give you -- just so I don't

2  get too out of order here, I'm going to give you

3  Exhibit A to the 30(b)(6) deposition, which is marked 54.

4  I'm not going to ask you any questions about it right

5  now.  I'll ask you some questions later.

6    A.   Would you like me to review it now or after?

7    Q.   Well, if you want to look at it now and confirm

8  that it's Exhibit A to the 30(b)(6) deposition, that's

9  fine.

10    A.   I see Exhibit A, yep.

11    Q.   Do you agree that that document, Exhibit 54, was

12  Exhibit A to the 30(b)(6) deposition notice?

13    A.   Yes.

14    Q.   I'm handing you 55, which is Exhibit C.  Do you

15  agree that Exhibit C is in front of you --

16    A.   Yep.

17    Q.   -- is also exhibit C to the 30(b)(6) deposition?

18    A.   Yes.

19    Q.   Okay.  Just put those to the side for now.  So

20  if you could take the 30(b)(6) deposition again and turn

21  to --

22    A.   Is that marked 53?

23    Q.   53 -- yeah, Exhibit 53, topic number 13.  It's

24  at the bottom of one of the pages.

25    A.   Yep.

1    Q.   You have 13 in front of you?

2    A.   I do.

3    Q.   Can you read it just to yourself.

4    A.   Yep.  I just did.

5    Q.   You have?  Okay.

6    A.   Mm-hmm.

7    Q.   And then you see it -- in the first line of that

8  topic, it references Request to Admit Number 31.  Do you

9  see that?

10    A.   Mm-hmm.

11    Q.   So if you can --

12       THE COURT REPORTER:  Yes?

13       THE DEPONENT:  Yes, I'm sorry.  My fault.  I'll

14  be more specific.

15       THE COURT REPORTER:  Thank you.

16  BY MR. WINTER:

17    Q.   So if you could pull number 56 -- Document 56,

18  Exhibit 56, have them side by side.  That's the Request

19  to Admit right there.

20    A.   Yep.

21    Q.   Turn to 31.  Just have both the topic in front

22  of you and the Request to Admit Response Number 31 in

23  front of you side by side.  You're looking at both those

24  documents right now?

25    A.   I am.

1       Q.   Can you read Request to Admit Number 31 to

2   yourself along with the response?  Tell me when you've

3   done that.

4       A.   Yes.

5       Q.   Now, you understand looking at topic 13 that you

6   are obligated to prepare to be -- to answer questions

7   about the reasons for denial of Request Number 31.  Do

8   you understand that?

9       A.   Yes.

10      Q.   What did you do to prepare for that Topic Number

11  13?

12      A.   I spoke with my attorneys about it.

13      Q.   Is that it?

14      A.   Yes.  We reviewed documents in preparation to

15  this.

16      Q.   What documents did you review?

17      A.   I can't remember the names of them, but I

18  believe documents that are in front of me.

19      Q.   Did you review any emails to prepare for Topic

20  Number 13?

21      A.   I don't think so.

22           MR. WINTER:  The earlier exhibits.  The text

23  message.  You have a copy for them?

24           MS. GEROLD:  Yeah.  They should be behind it.

25  BY MR. WINTER:

1    Q.    I'm handing you a document -- take the sticky

2    off -- 23 that's been previously marked at your earlier

3    deposition.  Do you see that?

4    A.    Yeah.

5    Q.    Did you review this document to prepare for

6    Topic Number 13?

7    A.    Yes.

8    Q.    Why did you think this document was relevant to

9    your preparation for Topic Number 13?

10    A.    Because of the date in question.

11    Q.    Why is that?

12    A.    I wanted to be sure I knew the date of it.

13    Q.    What is the date of it?

14    A.    It was November of 2023.  I believe it was the

15    13th, but it could have been between the 9th and the

16    13th.  I can give you the actual date if you'd like me

17    to, but that's to the best of my memory.

18    Q.    And after receiving this text message string or

19    being involved -- excuse me, strike that.

20          After having this missed call and text message

21    exchange, you did not change your branding; is that

22    correct?

23    A.    Correct.

24    Q.    Did you review any other documents in connection

25    with your preparation for Topic Number 13?

1    A.   I don't remember.

2    Q.   **When -- when did you prepare for Topic Number**

3    **13?**

4    A.   I prepared for the entire deposition over the

5    course of the last couple of weeks as time would allow.

6    Q.   **Was that preparation done on your own looking**

7    **through documents, or how was it -- how did you do that**

8    **preparation?**

9    A.   Primarily with legal counsel, but there was some

10    done alone.

11    Q.   **So other than this document in front of you that**

12    **was previously marked as Plaintiff's Exhibit 23, you**

13    **can't specifically identify any other document that you**

14    **looked at to prepare other than the record of Ms. Burr's**

15    **account?**

16            MR. HOFFMAN:  Objection.

17            THE DEPONENT:  Correct.

18    BY MR. WINTER:

19    Q.   **Do you think this indicates that a potential**

20    **customer of my client called you in mistake?**

21    A.   I'm not sure.

22    Q.   **You have no evidence one way or the other that**

23    **this is or is not the customer -- that potential customer**

24    **becoming confused?**

25    A.   I don't know.

1      Q.   Do you have any idea what "NYC Black Widow

2   office" refers to on that text message?

3      A.   No.

4      Q.   No possible idea who the Black Widow NYC office

5   could be; correct?

6           MR. HOFFMAN:  Objection.

7           THE DEPONENT:  I don't know.

8   BY MR. WINTER:

9      Q.   But you did receive this call in November of

10   2023 with someone referencing an NYC Black Widow office;

11   is that correct?

12     A.   I didn't specifically.  But we did, yes.

13     Q.   So your company received a call for someone who

14   was apparently looking for the NYC Black Widow office in

15   November of 2023; is that correct?

16     A.   Yes.

17     Q.   Your company does not have a NYC or New York

18   City Black Widow office; is that correct?

19     A.   Correct.

20     Q.   You don't have any office -- your company does

21   not have any office in New York; is that correct?

22     A.   Correct.

23     Q.   You are not aware of any other company called

24   Black Widow in New York other than my client; is that

25   correct?

 1      A.    Correct.

 2      Q.    And I'll be a little bit more specific.  You're

 3    not aware of any other pest control company in New York

 4    called Black Widow; is that correct?

 5      A.    Correct.

 6      Q.    The only one in New York that you know of is my

 7    client; correct?

 8      A.    Correct.

 9      Q.    Yet you don't know what "NYC Black Widow office"

10    refers to in Plaintiff's Exhibit Number 23; is that

11    correct?

12      A.    I mean, I guess.

13      Q.    You guess it's correct?

14            THE DEPONENT:  Could you re-read the question to

15    me, please?

16            MR. WINTER:  Go ahead.  Please read it back.

17            THE COURT REPORTER:  "Q   Yet you don't know

18    what "NYC Black Widow office" refers to in Plaintiff's

19    Exhibit Number 23; is that correct?"

20            THE DEPONENT:  I can make an assumption, but at

21    the time I didn't know what it referred to.

22    BY MR. WINTER:

23      Q.    Do you know when this lawsuit was filed?

24      A.    A couple of months prior to that text message.

25      Q.    So prior to that text message you were aware of

1    my client, who was a New York company that used "Black

2    Widow," and it was also a termite -- a pest control

3    company.  So you were aware of them; correct?

4        A.   Correct.

5        Q.   When you said, "at the time, I didn't know what

6    it referred to," what did you mean?

7        A.   I don't know.

8        Q.   I'm going to ask the court reporter to read back

9    a portion of your testimony; then I'll ask a question.

10            MR. WINTER:  So go up to his last answer.

11   Before that one.  It was on line 20.

12            THE COURT REPORTER:  There is no line 20 -- oh,

13   okay.  Question -- "I can make an assumption, but at the

14   time I didn't know what it referred to."

15   BY MR. WINTER:

16       Q.   What did you mean by that?

17       A.   I don't know.

18       Q.   Well, you said it; correct?

19       A.   Yeah.

20       Q.   Do you not know what you mean when you were

21   saying it?

22       A.   I don't know.  I'm doing my best to answer all

23   these questions here for you.

24       Q.   So in November of 2023, which was a few months

25   after the lawsuit was filed, where you certainly knew who

1    my client was, you received a text message that said

2    "Sorry.  Wrong office.  Wanted NYC Black Widow office,"

3    and you don't know who that refers to; is that correct?

4        A.    I'm assuming it refers to Black Widow in NYC.

5        Q.    And the only Black Widow in NYC is my client

6    that you know of; is that correct?

7            MR. HOFFMAN:  Objection.

8            THE DEPONENT:  Correct.

9    BY MR. WINTER:

10       Q.    After receiving this text message in November of

11   2023, what steps, if any, did you take to change your

12   branding to either remove "Black Widow" or remove a

13   spider design?

14       A.    None, because I believed I had rights to use the

15   name and logo.

16       Q.    However, this does appear to be someone who was

17   confused and call you -- called you looking for my

18   client; is that correct?

19       A.    Yes.

20       Q.    A few months later, my client produced to your

21   attorney, Hugh Pfabe, Exhibit Number 57 where the name

22   Richelle Burr and a phone number and address was given,

23   called looking for Black Pest Specialist, called looking

24   for you; is that correct?

25       A.    Yes.

1      Q.    So then after December 2023, you did not take

2  any steps to remove "Black Widow" or the spider design

3  from your logo; is that correct?

4      A.    Correct.

5      Q.    Despite evidence served on your attorneys

6  showing that at least someone called my client looking

7  for you; is that correct?

8      A.    Correct.

9      Q.    And Exhibit Number 58.

10      A.    Thank you.

11      Q.    Do you see that in front of you?  It is an email

12  to Ari Hoffman and Wilson Carroll from Samantha Gerold

13  referencing production of P001227 to 1228.  And then on

14  the next page of that email -- of that exhibit is P001227

15  and 1228.  Do you see that?

16      A.    Yes.

17      Q.    Who's Tony Criscuolo?

18      A.    I don't know.

19      Q.    Has he ever referred you clients?

20      A.    I'm not sure.  I don't recognize the name.

21      Q.    Do you service Easton and Redding, Connecticut?

22      A.    Yes.

23      Q.    Do you have several clients in both towns,

24  Easton and Redding?

25      A.    Yes.

1      Q.   Do you have several clients in Westport,

2  Connecticut?

3      A.   Yes.

4      Q.   Do you see the email on P001227 references Tony

5  Criscuolo of Criscuolo Design & Build, gives his address

6  and a phone number.  The text says, "Called about two

7  previous clients he referred to us, which he referred to

8  as Easton and Redding referrals and wanted to speak about

9  another client he is referring in Westport.  He then

10  questioned why we have an NY number, which is when he

11  realized he was calling the wrong company."

12          The next page says, (as read) "He did say if he

13  had any NY work he would potentially work with us."

14      Q.   You have no evidence one way or the other --

15  excuse me.  Based on this email in front of you, do you

16  believe Mr. Criscuolo was confused?

17          MR. HOFFMAN:  Objection.

18          THE DEPONENT:  I'm not sure.  I also don't know

19  who he is.

20  BY MR. WINTER:

21      Q.   You have no evidence one way or the other

22  whether Mr. Criscuolo was confused or not; is that

23  correct?

24      A.   Correct.

25      Q.   However, it is an email sent to my client about

1   someone referring to my client in Easton and Redding,

2   Connecticut, apparently, and he was -- questioned why

3   there was a New York number.  Do you believe that that

4   has anything to do with whether or not there is evidence

5   of actual confusion in this case?

6       A.   I don't know.

7       Q.   So you have no evidence one way or the other to

8   refute or confirm that this is evidence of actual

9   confusion in front of you; is that correct?

10          THE DEPONENT:  Can you re-read that, please?

11          THE COURT REPORTER:  "Q   So you have no

12  evidence one way or the other to refute or confirm that

13  this is evidence of actual confusion in front of you; is

14  that correct?"

15          THE DEPONENT:  I don't believe so, no.

16  BY MR. WINTER:

17      Q.   So you have no evidence one way or the other to

18  confirm or deny whether Document -- Exhibit Number 58 is

19  evidence of confusion or not?

20      A.   I don't know.

21      Q.   Well, did you prepare for Topic Number 13?

22      A.   Yes.

23      Q.   Did you ask your attorneys to provide you any

24  documents to prepare for Topic Number 13?

25          MR. HOFFMAN:  Objection.  Goes to privilege --

1           MR. WINTER:  Just a yes or no.

2           THE DEPONENT:  That information --

3           MR. HOFFMAN:  Those are privileged

4    communications.

5           THE DEPONENT:  -- was privileged.

6    BY MR. WINTER:

7       Q.    When's the first time that you received this

8    document, Number 1227 to 1228?

9       A.    This one here?

10      Q.    The second -- the pages 2 and 3 of it, the

11   ones -- if you look at the bottom left corner, see

12   P001227 and the next page is 1228, bottom left?

13      A.    Yeah.

14      Q.    So those two pages, when's the first time you

15   received that document?

16      A.    I don't know.

17      Q.    Would you have received it on or around February

18   2025?

19      A.    It says on the document 2/12/2024.  It says, Hi,

20   Scott, on 2/12/2024."

21      Q.    If you look at the email, the first page, it

22   says, "February 13, 2025," and you look at the second

23   page where it says -- under "From:  Nicholas Scida,

24   nick@blackwidowpest," it says the date, February 12,

25   2025.  Do you see that?

1    A.   I do.  But right below it, it says, "On

2  2/12/2024 at 3:55 p.m. the below potential client called

3  us."  I don't  -- I'm just confirming.

4    Q.   Okay.  But do you see the date -- under --

5  there's a forwarded message, then there's a from line,

6  and then there's a date line that says February 12, 2025.

7  Do you see that?

8    A.   Yes.

9    Q.   And then on the first page, you see an email

10  where Samantha Gerold of my office provided that document

11  to your attorneys; is that correct?

12    A.   Yes.

13    Q.   So then your company would have received this

14  document in February 2025; is that correct?

15    A.   I'm not sure.

16    Q.   Okay.  After February 13, 2025, what steps, if

17  any, did you take to remove "Black Widow" from your

18  branding or remove the spider design in your logo from

19  your branding?

20    A.   None.

21    Q.   Let's look at 59 -- oh.  Actually, before we

22  turn -- turn away from that, you have no evidence one way

23  or the other to refute the contention that Exhibit 58

24  references evidence of actual confusion in this matter;

25  is that correct?

1      A.    Correct.

2      **Q.    Fifty-nine.**

3      A.    Thank you.

4      **Q.    So I'll ask you to look at the top of the first**

5  **page with me.  You see an email dated March 26, 2025,**

6  **from Samantha Gerold to Ari Hoffman, and then cc'd is**

7  **myself, Wilson Carroll, and Emilio Estrella.  Do you see**

8  **that?**

9      A.    Yes.

10      **Q.    And do you agree that that document -- that**

11  **email is evidence that the Document P001229 through 1230**

12  **was provided to your attorneys on March 26, 2025?**

13      A.    Wait.  Could you repeat those numbers again?

14  I'm sorry.  Am I supposed to look -- that was the first

15  page; right?

16      **Q.    Yep.**

17      A.    Sorry.  I was looking at the wrong page.  Go

18  ahead.

19      **Q.    Do you agree that P001229 to 1230 was provided**

20  **to your company on March 26th of 2025?**

21          MR. HOFFMAN:  Objection.

22          THE DEPONENT:  It was provided to my counsel,

23  yes.

24  BY MR. WINTER:

25      **Q.    And then if you look at the -- this is a 50- --**

1    number 59 is a four-page document.  On the second page,

2    do you see on the bottom left P001229, and then the next

3    one P001230?

4         A.   The --

5         Q.   Bottom left.  Bottom left.

6         A.   There's no -- nothing on the bottom left of this

7    one.  Are you talking about --

8         Q.   The next page.

9         A.   Oh.  I thought you said second page.  I'm sorry

10   about that.  Okay.  Sorry.  Repeat the number one more

11   time so I can confirm.

12        Q.   So -- so you're now looking at -- within Exhibit

13   59, you are looking at P001229, and then you turn to the

14   next page and you see P001230; is that correct?

15        A.   Yes.

16        Q.   So at the bottom of P001229, do you see an email

17   from nick@blackwidowpest to paul@blackwidowpest on March

18   26th of 2025?  "I received the following call," and

19   that's on P001229.  Do you see that?

20        A.   You asked, did I see that?  What were you asking

21   did I see?  I'm sorry.

22        Q.   Do you see an email from nick@blackwidowpest

23   sent March 26th --

24        A.   Yep.

25        Q.   -- to paul@blackwidowpest and Scott Charney --

1      A.    Okay.  I see it now, yeah.

2      Q.    -- with a subject line saying, "I received the

3    following call," and that's on P001229; is that correct?

4      A.    Mm-hmm.

5      Q.    If you go on to the next page, it references

6    Herica Campos and an address.  Do you see that?

7      A.    Yes.

8      Q.    Do you know who Herica Campos is?

9      A.    Doesn't sound familiar.

10      Q.    Could Herica Campos be one of your customers?

11      A.    I'm not sure.

12      Q.    Do you see it says, (as read) "Called asking for

13    service for her mother's house but wanted to clarify

14    which company she was calling.  She claimed she was

15    calling Black Widow Termite & Pest Control, Corp.  I then

16    clarified and repeated our company name, and she said,

17    yes, that's the one.  I informed her that we had no

18    client or account with this supplied information.  She

19    said she will investigate it and call back if she needs

20    further assistance."  Do you see that?

21      A.    Yes.

22      Q.    Now, if she's in Connecticut, you're not aware

23    of any other active company using "Black Widow" other

24    than either your company or my client's company in

25    Connecticut; is that correct?

1          MR. HOFFMAN:  Objection.

2          THE DEPONENT:  No.

3    BY MR. WINTER:

4      Q.    Why is that incorrect?

5      A.    Repeat that, please.

6      Q.    Are you aware of any other company in

7    Connecticut using "Black Widow" for pest control other

8    than your company or my client?

9      A.    I said no.

10     Q.    Okay.  So this person could only be -- if she's

11   referring to pest control service at her mother's house

12   in Connecticut, she could only be calling for either your

13   company or my client; is that correct?

14     A.    Yes.

15     Q.    Do you have any evidence one way or the other

16   whether this person was confused or not?

17     A.    No.

18     Q.    Do you think this shows that she was potentially

19   confused?

20     A.    I don't know.

21     Q.    Why don't you know?

22     A.    I'm not sure if she's a client.

23     Q.    If she is a client, would that change your view?

24     A.    No.

25     Q.    Why not?

1    A.    I don't know.

2    **Q.    So you don't know why this is -- why you believe**

3  **this is not evidence of confusion?**

4    A.    No.

5    **Q.    You just think it's not evidence of confusion;**

6  **is that correct?**

7    A.    Yeah.

8    **Q.    Why?**

9    A.    I just stated, I don't know.

10    **Q.    But if it turns out that this person or her**

11  **mother was a customer, would that indicate to you that**

12  **this is evidence of actual confusion?**

13          MR. HOFFMAN:  Objection.

14          THE DEPONENT:  I don't know.

15  BY MR. WINTER:

16    **Q.    After March 26th of 2025, what steps, if any,**

17  **did you take to stop using "Black Widow" or the spider**

18  **design in your logo?**

19    A.    Due to the advice of --

20          MR. HOFFMAN:  I'm -- I'm going to caution the

21  witness not to disclose any attorney-client privileged

22  communications.

23          THE DEPONENT:  Okay.  I've looked into options.

24  BY MR. WINTER:

25    **Q.    Options to change your name?**

1      A.   Options for other names.

2      Q.   And you, in fact, filed a trademark for one of

3   them; is that correct?

4      A.   Yes.

5      Q.   And is that one of those options that you were

6   looking into?

7      A.   Yes.

8      Q.   It's called PEXT Specialist; is that correct?

9      A.   That's one of them, yes.

10      Q.   But you didn't actually change your name; is

11   that correct?

12      A.   Yes.

13      Q.   So you're -- so after March 26 of 2025, your

14   company name and your branding continues to be "Black

15   Widow" with the spider design; is that correct?

16      A.   Yes.

17      Q.   I'll give you Exhibit Number 60.

18      A.   Thank you.

19      Q.   Do you see this is an email -- email from

20   April 14, 2025.  On the first page is producing P001231

21   to 1232.

22           And then if you go to the last two pages of this

23   exhibit, you see at the bottom left P001231 to P001232;

24   is that correct?

25      A.   Yes.

1      Q.   So you agree that this document was provided to

2   your attorneys on April 14, 2025; is that correct?

3      A.   Yes.

4      Q.   You did not review this document in order to

5   prepare for Topic Number 13; is that correct?

6      A.   I don't believe so, no.

7      Q.   If you look at the last two pages of this

8   Exhibit Number 60, specifically P001231 and 1232, the

9   email subject line is "Call confusing us with Black Widow

10  Pest Specialist."  Do you see that?

11     A.   Where was that?  I'm sorry.  I'm looking for it

12  now.

13     Q.   P001231 on the bottom left.  Do you see that?

14     A.   Oh, yep.  Okay.

15     Q.   Okay.  Do you see the subject line in the email

16  string?

17     A.   Got it.

18     Q.   Can you read that to me?

19     A.   It says, "CT call confusing us with Black Widow

20  Pest Specialist."

21     Q.   Is your company Black Widow Pest Specialist?

22     A.   It is.

23     Q.   Go to the second page, that's P001232 -- sorry,

24  the second page of that at the end of the document.

25     A.   So the last last page?

1      Q.    The last page.  Yeah, sorry.

2      A.    Understood.

3      Q.    So we're at Exhibit 60, page P001232, the last

4    page of that document.  Do you see that?

5      A.    Yes.

6      Q.    Can you read that to me out loud?

7      A.    Which part?

8      Q.    Start at, "Hi, Scott."  Read it out loud.

9      A.    "Hi, Scott.  The two following calls came in

10   confusing us with Black Widow Pest Specialist."

11     Q.    Keep going.

12     A.    (As read) "Nicole (Nikki) Brown from FAD, 311

13   Washington Ave., West Haven.  She has a quarterly service

14   contract and wanted to bump" up -- "bump it up to earlier

15   to Monday.  The ants are very bad."

16     Q.    Okay.  Stop right there.

17     A.    Yep.

18     Q.    Do you know who Nicole or Nikki Brown is?

19     A.    Not sure.

20     Q.    Do you know what FAD is?

21     A.    No.

22     Q.    Do you know -- do you service locations in West

23   Haven, Connecticut?

24     A.    Yes.

25     Q.    Do you service any location at Washington Avenue

1    in West Haven, Connecticut?

2        A.    I'm not sure.  Our Google listing was recently

3    down for a period of time too, so you couldn't even find

4    us on Google.  They've been removing businesses all over

5    the place, so it's possible that could have been part of

6    it.  One of my guys that lives in New Haven couldn't find

7    us, so -- New Haven is right on the border of West Haven.

8        **Q.    So you think this person couldn't find you and**

9    **therefore called my client?**

10           MR. HOFFMAN:  Objection.

11           THE DEPONENT:  I'm not sure.

12   BY MR. WINTER:

13       **Q.    You have no evidence one way or the other**

14   **whether this person Nicole Nikki Brown from FAD was**

15   **confused or not; is that correct?**

16       A.    Correct.

17       **Q.    Then go down and start reading the 4/11/2025 one**

18   **out loud for me.**

19       A.    (As read) "Charles Engle," I don't know, "22

20   Conclave Circle, Newtown.  Recent treatment for carpenter

21   ants, still seeing a lot of activity" --

22           THE COURT REPORTER:  I'm sorry.  Recent

23   treatment for carpenter ants --

24           THE DEPONENT:  Oh, I'm sorry.  I'll slow down a

25   bit.  My fault.  "Recent treatment for carpenter ants.

1  Still seeing activity and wanted to see about next step"

2  -- excuse me -- "treatment steps."

3  BY MR. WINTER:

4  **Q.    Do you know who Charles Engle is?**

5  A.    No.

6  **Q.    Is he a customer of yours?**

7  A.    I'm not sure.  I don't take the calls.

8  **Q.    But this is not a call that you would have**

9  **taken, correct, because it's an email from my client; is**

10  **that right?**

11  A.    Yeah.

12  **Q.    You have no evidence one way or the other**

13  **whether Charles Engle was confused by your name and my**

14  **client's name both including "Black Widow."  Is that**

15  **correct?**

16  A.    Can you rephrase that one more time?  I'm sorry.

17  **Q.    You have no evidence one way or the other**

18  **whether Charles Engle was confused by my client and your**

19  **company both having a trademark including "Black Widow."**

20  **Is that correct?**

21  A.    Wait.  I think the question changed.  I'm sorry.

22  I didn't understand that.

23      THE DEPONENT:  Would you mind reading it back?

24      MR. WINTER:  We'll strike this.

25  BY MR. WINTER:

1      Q.   You have no evidence one way or the other

2   whether Charles Engle was actually confused when he

3   called my client; is that correct?

4      A.   Correct.

5      Q.   So it would be pure speculation for you to opine

6   on whether there was evidence -- whether Charles Engle

7   was confused; is that correct?

8      A.   Correct.

9      Q.   And it would be pure speculation for you to

10   opine on whether Nikki Brown was confused or not; is that

11   correct?

12      A.   Correct.

13      Q.   And after April 20- -- April 14, 2025, and to

14   this day, you are still using "Black Widow" and the

15   spider design for your logo; is that correct?

16      A.   Yes.

17      Q.   And you have not taken steps to actually change

18   the branding or logo on your company materials; is that

19   correct?

20      A.   Yes.

21      Q.   Okay.  I'll give you Exhibit 61.  So this

22   document was, as you can see, sent to me this morning at

23   9:16 a.m.  So this is both for marking at the deposition

24   and for production.

25           MR. WINTER:  We'll give you guys a -- we'll

1    email you guys a copy.

2    BY MR. WINTER:

3        Q.    Can you read the subject line, please, Blake?

4        A.    Subject line at the top says, "Forward:  CT Call

5    confusing us with Black Widow Pest Specialist."

6        Q.    If you go down to the bottom of the first page,

7    which is marked P001233, do you see that Letizia's Pizza

8    and David Cook?

9        A.    Yes.

10       Q.    Do you know who Letizia's Pizza or David Cook

11   are?

12       A.    No.

13       Q.    Are they your customer?

14       A.    I don't know.

15       Q.    Going to the next page, 1234, it says, "Reason

16   for the call."  Can you read that, please?

17       A.    It says, (As read) "Called about service during

18   lunch rush hour.  Service was not fully completed.

19   Called us looking for Black Widow Pest Specialist to

20   discuss service."

21       Q.    The reference to Black Widow Pest Specialist, to

22   the best of your knowledge, refers to your company; is

23   that correct?

24       A.    Yes.

25       Q.    It could not refer to anybody else; is that

1    correct?

2        A.    Correct.

3        Q.    Next one down also on page 1234 -- P001234, date

4    is 4/15/2025; time of call, 10:53 a.m.  It's a phone

5    number, Laura Ledan, has an address in Southbury.  Do you

6    see that?

7        A.    Yes.

8        Q.    Who is Laura Ledan?

9        A.    No idea.

10        Q.    Reason for the call, can you read that?

11        A.    (As read)  "Called to schedule follow-up service

12    for ants and wasps.  Last service was for mice.

13    Follow-up service covered under Gold Plan."

14            THE COURT REPORTER:  What plan?  I'm sorry.

15            THE DEPONENT:  Gold plan.

16            THE COURT REPORTER:  Gold plan.  Thank you.

17    BY MR. WINTER:

18        Q.    Does your company offer a gold plan?

19        A.    Yes.

20        Q.    What is it?

21        A.    Quarterly service to include general pests and

22    tick and mosquito.

23        Q.    Roughly, what do you charge for that quarterly

24    service?

25        A.    It depends on the size of the home and the size

1    of the property for tick and mosquito.

2    **Q.    For a 3,000-square-foot one-acre lot, what would**

3    **the cost be?**

4    A.    Roughly, 1- -- 120 a month.

5    **Q.    But this is a quarterly service plan.  Is the**

6    **quarterly service plan billed -- that is billed monthly?**

7    A.    Correct.

8    **Q.    So you would go bill three times a year but bill**

9    **once a month; is that correct?**

10   A.    Incorrect.  Quarterly would be four times a

11   year.  Four quarters.

12   **Q.    Sorry.  How much did you say it was a month,**

13   **$125 a month; is that right?**

14   A.    About.  Rough numbers.

15   **Q.    In terms of residential customers, can you give**

16   **me a general range of kind of what the minimum would be**

17   **for the gold plan on a monthly basis to what the maximum**

18   **is on a monthly basis for a single-family residence?  In**

19   **terms of your business, specifically.**

20   A.    Minimum could be -- for the gold plan,

21   specifically?

22   **Q.    Yes.**

23   A.    Maybe a hundred.  Maximum maybe 150, somewhere

24   in that range.

25   **Q.    When did you introduce the gold plan?**

1    A.   I -- I really don't know.  If I had to give an

2  idea, maybe a year, a year and a half ago, maybe,

3  somewhere in that ballpark.  Within the last two years.

4    **Q.   Okay.  Looking down to the next 4/14/2025, time**

5  **of call 2:59 p.m., Michelle Rau, an address in Oxford.**

6  **Do you see that?**

7    A.   I do.

8    **Q.   And it says, "Reason for the call:  Called back**

9  **to reschedule pest control service."  Do you see that?**

10   A.   Yes.

11   **Q.   Do you service Oxford -- Oxford, Connecticut?**

12   A.   Yes.

13   **Q.   Do you know who Michelle Rau is?**

14   A.   No.

15   **Q.   Do you know if Michelle Rau is your customer?**

16   A.   No.  Sounds familiar.

17   **Q.   Why does it sound familiar?**

18   A.   I'm not sure, but it does sound familiar.

19   **Q.   So now you have -- let me get -- just get some**

20 **exhibits in order.**

21   A.   Yeah.  I'd like to do that as well.

22   **Q.   So get --**

23   A.   What would you like me to keep in front of me?

24   **Q.   I'll just get -- take a stack, put 23 down in**

25 **front of you.  I'm just going to get them in order.  So**

1    Exhibit 23, which is this one.

2        A.   Understood.  Give me one moment.  23.

3        Q.   **Put that down there.**

4        A.   Yeah.

5        Q.   **Then take 57.**

6             MR. HOFFMAN:  There's also a 56, I believe.

7             THE DEPONENT:  I see 57 here.

8    BY MR. WINTER:

9        Q.   **Okay.  Yeah.  So 56 and then 57 -- just do 56,**

10   **57, 58, 59.  You know what I mean?**

11       A.   Put them back in order?

12       Q.   **Yep.**

13       A.   58, 59.  Do you want me to keep going?  60, 61?

14       Q.   **Stop at 61, yeah.**

15       A.   Stop at 61?

16       Q.   **Yeah.**

17       A.   Okay.  So do you want me to put 61 in the pile

18   or do you want me to keep 61?

19       Q.   **Put it in the pile?**

20       A.   Understood.

21       Q.   **I'm just going to look at this pile real quick.**

22   **Sorry?**

23       A.   No problem.  Do you want me to keep these other

24   ones in front of me?

25       Q.   **Yeah, just keep them there.**

1    A.   Okay.  I'm going to organize them here too so we

2    can at least find them.

3         MR. HOFFMAN:  Yeah.  Just so that I can organize

4    them as well, can we just go through the exhibit numbers?

5         MR. WINTER:  Yeah, I will.

6         MR. HOFFMAN:  All right.

7    BY MR. WINTER:

8    **Q.   All right.  So what I have in the pile is going**

9    **to be 23 -- Exhibit 23.  I'm going to have Exhibit Number**

10   **56 turned to the response to request 31.  I'm going to**

11   **have 57, 58, 59, 60, and 61.  All right?**

12        MR. HOFFMAN:  Okay.  There were additional

13   exhibits marked.  As I understand it, its 53, 54, 55 --

14        MR. WINTER:  Yeah.  I'm not going into those

15   right now.

16        MR. HOFFMAN:  That's fine.  I just wanted to

17   make sure that I was -- I had them.  We're going to --

18        MR. WINTER:  I will -- I will do a little bit

19   better organizing these.  So I'm going to do -- in

20   Exhibit Number 57, I'm going to turn to the last page,

21   which is P001.  Put that in the pile.  In 58, I'm going

22   to turn to P1227 to 1228.  Put that as the first page in

23   the pile.  1229 to 1230 will be showing in 59.  60 is

24   going to show 1231 to 1232 as the first page.  And then

25   1233 will be showing for Exhibit 61.

1   BY MR. WINTER:

2        Q.   All right.  So -- so if you can just go through

3   these just real quick with me.  What I'm going to confirm

4   is that you're looking at those numbers.

5        A.   Okay.

6        Q.   -- right in the stack.

7        A.   Sure.

8        Q.   So the first document in front -- in that stack

9   is going to be Exhibit 23.

10       A.   Yep.

11       Q.   The next document in that stack is going to be

12   P001 of Exhibit 57.

13       A.   This is 56, the next one in the stack --

14       Q.   Sorry.

15       A.   -- that you gave me, so --

16       Q.   Sorry.

17       A.   Do you want me to turn back?

18       Q.   56, you're looking at Request to Admit Number 31

19   and the response; is that right?

20       A.   Yes.

21       Q.   Okay.  Turn -- turn that over.  Now the next one

22   is 57.  You're looking at P001?

23       A.   Yes.

24       Q.   58, you're looking at P001227?

25       A.   In 58, you said; right?

```
 1    Q.    Yep.

 2    A.    Yep.

 3    Q.    59, you're looking at 1229 to 1230?

 4    A.    Say that one more time.

 5    Q.    1229, P001229?

 6    A.    Yep.

 7    Q.    Yep.

 8    A.    Okay.

 9    Q.    And then 60, you're looking at P001231 to 1232;

10    is that correct?

11    A.    Yeah.

12    Q.    And then 61, you're looking at P001233; is that

13    correct?

14    A.    Yes.

15    Q.    Okay.  So let's do this.  Take the Request to

16    Admit document, which is the second document in your

17    stack, put it to your left so it's visible.  Just to your

18    left right there, so you've got the stack of -- yeah.

19    Okay.  So you see in front of you, you've denied that

20    there is any evidence of -- the factor of evidence of

21    actual confusion weighs in favor of plaintiff; is that

22    correct?

23    A.    For which number?

24    Q.    Number 31.

25    A.    Yes.
```

1    Q.    And you denied that; is that correct?

2    A.    Yes.

3    Q.    And you still deny that; is that correct?

4    A.    Yes.

5    Q.    And it's no longer subject to plaintiff

6    completing its document production; is that correct?

7    A.    Yes.

8            THE DEPONENT:  Before we go into a line of

9    questioning, would I be able to go to the bathroom quick?

10           MR. WINTER:  Of course.

11           THE DEPONENT:  Because there's no pending

12    question --

13           MR. WINTER:  Of course.

14           THE DEPONENT:  -- I just wanted to make sure

15    that was acceptable.

16           MR. WINTER:  Yep.

17           THE VIDEOGRAPHER:  Okay.  We are going off the

18    record.  The time is 11:34.

19           (The proceedings went off the record at

20    11:34 a.m.)

21           (The proceedings went back on the record at

22    11:55 a.m.)

23           THE VIDEOGRAPHER:  We are going back on the

24    record.  The time is 11:55.

25           THE DEPONENT:  I just wanted to give you a heads

1  up before we get started.  My stomach has been bothering

2  me a little bit.  I should be fine, I should have no

3  issues.  I anticipated and packed a cleaner lunch in

4  anticipation of this, but I just wanted --

5           MR. WINTER:  Okay.

6           THE DEPONENT:  -- to give you a heads up in case

7  I'm uneasy and do have to take a break.  Just wanted to

8  let you know that.

9           MR. WINTER:  Okay.  Just -- any time you need to

10  take a break just tell me --

11          THE DEPONENT:  No worries.  I appreciate it.

12          MR. WINTER:  -- I'll keep going unless you stop

13  me.

14          THE DEPONENT:  I'm good to go.

15          MR. WINTER:  So just -- if you want to take a

16  break, just let me know.

17          THE DEPONENT:  Not a problem.  I appreciate it.

18  BY MR. WINTER:

19      **Q.  So -- okay.  So in front of you is Exhibits 23**

20  **and 56 through 61.  Do you agree with me?**

21      A.  I think those are the ones we went through.  I

22  have 57, 58 -- oh, 56.  Oh -- 56, yes.  And then through

23  what number?  I'm sorry.

24      **Q.  Through 61.**

25      A.  Yep, I have them.

1      Q.   Okay.  So, again, in front of you are

2   Exhibits 23 and 56 through 61; is that correct?

3      A.   Yes.

4      Q.   And number 56 is responses to the Request to

5   Admit is turned to Request Number 31 where your company

6   has denied that the factor of evidence of actual

7   confusion weighs in favor of plaintiff; is that correct?

8      A.   Yes.

9      Q.   Exhibit 23 is also in front of you.  And this

10  was a text message you received in November of 2023;

11  correct?

12     A.   Yes.

13     Q.   Someone calling for the NYC Black Widow office;

14  correct?

15     A.   Yes.

16     Q.   And you are aware of no other pest control

17  company using "Black Widow" in New York; is that correct?

18     A.   Yes.

19     Q.   So you have no knowledge of any other company

20  that this could be referring to other than my client; is

21  that correct?

22     A.   Yes.

23     Q.   After this date, you made no efforts to change

24  your name from "Black Widow" to something else or to

25  remove the spider design from your logo; is that correct?

1       A.   Yes.

2       Q.   Now, we're looking at number 57.  It's been

3  turned to P001; is that correct?

4       A.   Yes.

5       Q.   You have no evidence one way or the other to

6  confirm or deny whether this individual who called my

7  client was confused or not; is that correct?

8       A.   Yes.

9       Q.   To the extent my client contends this is

10  evidence that somebody was confused, called them

11  believing they were calling your company, you have no

12  evidence to refute that contention; is that correct?

13      A.   Well, my version of confusion is if one person

14  can service that person.  So I'm not licensed for New

15  York, and to my knowledge, your client isn't licensed in

16  Connecticut.  So I don't think there could be confusion.

17      Q.   Were you aware that my client is actually

18  licensed in Connecticut now?

19      A.   No.

20      Q.   Does that change your opinion?

21      A.   No.

22      Q.   Why?

23      A.   It doesn't.

24      Q.   Why does it not change your opinion?  You did

25  mention that my client -- you believed my client was not

1   licensed in Connecticut.  That was one of the reasons why

2   this was not evidence of actual confusion.  So based on

3   my representation my client is registered -- is

4   registered -- has a pest control license in Connecticut,

5   does that change your opinion?

6       A.   It does not change my opinion.  Can they operate

7   in Connecticut?

8            MR. ESTRELLA:  Sorry, apologies.

9            MR. WINTER:  I'm the one asking the questions.

10  BY MR. WINTER:

11      Q.   You have not spoken to anyone, either Richelle

12  or Bridget Burr, whether they were confused when they

13  called my client; is that correct?

14      A.   Correct.

15      Q.   Looking at 58 now, and we have turned to 1227 to

16  1228; is that correct?

17      A.   Yes.

18      Q.   You did not change your branding to remove

19  "Black Widow" or the spider design after February 13,

20  2025; is that correct?

21      A.   Correct.

22      Q.   And you have no evidence one way or the other

23  whether this individual calling my client was confused;

24  is that correct?

25      A.   Correct.

1      Q.   If he was confused, would that indicate to you

2   that you should change your name and logo?

3           MR. HOFFMAN:  Objection.

4           THE DEPONENT:  I don't understand the question.

5   BY MR. WINTER:

6      Q.   If one -- if some of these people were actually

7   confused, do you think that is a reason that you should

8   change your logo?

9           MR. HOFFMAN:  Objection.

10          THE DEPONENT:  No.

11  BY MR. WINTER:

12     Q.   Why not?

13     A.   I've operated, and still operate, under the

14  impression that I have the right to use this name in

15  Connecticut.

16     Q.   Even if someone is actually confused between

17  your client -- your company and my client; is that

18  correct?

19          MR. HOFFMAN:  Objection.

20          THE DEPONENT:  I don't understand.

21  BY MR. WINTER:

22     Q.   If someone is confused between my client and

23  your company, do you believe that you still have the

24  right to continue using the Black Widow name and the

25  spider design?

1          MR. HOFFMAN:  I'm just going to maintain my

2    objection.

3          THE DEPONENT:  I don't know.  I think I still

4    have the right to use it.

5    BY MR. WINTER:

6        Q.    Even if it's causing actual confusion; correct?

7          MR. HOFFMAN:  Objection.

8          THE DEPONENT:  Correct.

9    BY MR. WINTER:

10       Q.    Turn to 59.  And we're open to 1229 to 1230.  Do

11   you see those?

12       A.    1229 and what?

13       Q.    And the next page is 1230; is that correct?

14       A.    Yes.

15       Q.    Okay.  After March 26, 2025, you did not take

16   steps to stop use of the Black Widow name; is that

17   correct?

18       A.    March 26 -- state that one more time.  I'm

19   sorry.  You're asking if I had taken steps?

20       Q.    I'll -- I'll rephrase.

21       A.    Thank you.

22       Q.    After March 26, 2025, you continued to use

23   "Black Widow" as your brand for your company under pest

24   control services; is that correct?

25       A.    Yes.

1      Q.   And you continued to use "Black Widow" with the

2   spider design after March 26, 2025; is that correct?

3      A.   Correct.

4      Q.   And even if this individual, Herica Campos, was

5   confused, and believes -- was confused between my client

6   and your company, you still believe you have the right to

7   continue Black -- using "Black Widow" --

8           MR. HOFFMAN:  Objection.

9           MR. WINTER:  -- is that correct?

10          MR. HOFFMAN:  Objection.

11          THE DEPONENT:  So you're asking if I still

12   believe I have the rights to use "Black Widow" in

13   Connecticut?

14   BY MR. WINTER:

15      Q.   Even if confusion is being caused; is that

16   correct?

17          MR. HOFFMAN:  And objection.

18          THE DEPONENT:  Again, I stated I don't believe

19   there is confusion.  So I still believe I have rights to

20   use the name.

21   BY MR. WINTER:

22      Q.   I see.  But if you're wrong about that and there

23   is actual confusion, then you do not have the rights to

24   use that name; is that correct?

25          MR. HOFFMAN:  Objection.  Objection.

1                THE DEPONENT:  I'm not sure.

2    BY MR. WINTER:

3        Q.    **Do you agree that continuing to use the brand**

4    **that causes marketplace confusion could be seen as**

5    **intentionally benefiting from that confusion?**

6                MR. HOFFMAN:  Objection.

7                THE DEPONENT:  No.

8    BY MR. WINTER:

9        Q.    **So intentionally using a brand that causes**

10   **marketplace confusion is not intentionally benefiting**

11   **from that confusion; is that correct?**

12               MR. HOFFMAN:  Objection.

13               THE DEPONENT:  I -- I don't understand.  I'm

14   sorry.

15   BY MR. WINTER:

16       Q.    **If you brought a pair of shoes, put the Nike**

17   **logo on them, sold them as Nikes, do you think you're**

18   **allowed to do that?**

19               MR. HOFFMAN:  Objection.

20               THE DEPONENT:  I'm not sure.

21   BY MR. WINTER:

22       Q.    **You don't know?**

23               MR. HOFFMAN:  Objection.

24   BY MR. WINTER:

25       Q.    **Even if they're not Nike shoes, you just made up**

1  a Nike logo and slapped them on there, you think you're

2  allowed to sell that, or you don't know?

3          MR. HOFFMAN:  Objection.

4          THE DEPONENT:  I don't know.

5  BY MR. WINTER:

6      Q.   Do you think you're entitled to continue using a

7  brand that causes marketplace confusion?

8          MR. HOFFMAN:  Objection.

9          THE DEPONENT:  I don't know.

10  BY MR. WINTER:

11     Q.   Why don't you know?

12          MR. HOFFMAN:  Objection.

13          THE DEPONENT:  I've operated and continue to

14  operate out of good faith.

15  BY MR. WINTER:

16     Q.   But you did receive a text message in November

17  of 2023 from someone who was looking for the Black Widow

18  NYC office, and you are not aware of any other company

19  called Black Widow who does pest control services in New

20  York; is that correct?

21          MR. HOFFMAN:  Objection.

22          THE DEPONENT:  Correct.

23  BY MR. WINTER:

24     Q.   So despite that instance of someone calling my

25  client -- or calling you looking for someone who could

1    only be my client, you still think there's no evidence of

2    confusion; is that correct?

3       A.   Correct.

4       Q.   Why do you think that person was not confused?

5       A.   As I stated what I thought confusion was -- I

6    already answered that.

7       Q.   Why do you think that person in Exhibit 23 was

8    not confused?

9       A.   Exhibit 23, meaning?  Oh, the text message.

10   Because they couldn't service Connecticut, and I couldn't

11   service New York.

12      Q.   So if my client can now service Connecticut and

13   there is evidence of actual confusion, does that change

14   your view of what's required for evidence of actual

15   confusion?

16           MR. HOFFMAN:  Objection.

17           THE DEPONENT:  I don't know.

18   BY MR. WINTER:

19      Q.   Well, you are the corporate deponent for topic

20   13, which is the factual basis for defendant's denial of

21   Request to Admit Number 31, which states, "Admit that

22   factor (5) evidence of actual confusion weights in favor

23   of plaintiff."  Is that correct?

24      A.   Thirteen of this one here?  On which exhibit?

25      Q.   The 30(b)(6).  This is Exhibit Number 53.

1      A.    I'm looking at 56.  And you're asking what

2   number?  I'm sorry.

3      **Q.    Number 13.**

4            MR. HOFFMAN:  Sorry.  Is there a pending

5   question?

6            MR. WINTER:  Yeah.

7   BY MR. WINTER:

8      **Q.    You're the corporate deponent for number 13;**

9   **correct?**

10     A.    Yes.

11     **Q.    You prepared for that; correct?**

12     A.    I'm reading the whole -- yes.

13     **Q.    So other than your contention that my client was**

14  **not licensed in Connecticut, what other evidence refuting**

15  **contention of actual confusion do you have?**

16     A.    Meaning what?

17     **Q.    Whatever other evidence refuting actual**

18  **confusion do you have other than your contention that my**

19  **client is not licensed in Connecticut?**

20     A.    I'm not sure.

21     **Q.    Yet you prepared for topic 13; is that correct?**

22     A.    Yeah.

23     **Q.    So you can't --**

24     A.    I prepared to the best of my ability.

25     **Q.    Okay.  Have you ever -- have you taken any steps**

1    to try to inhibit or reduce the possibility of confusion?

2        A.    I don't know.

3        Q.    In the requests to admit that were in front of

4    you, Number 38 -- that was number -- so Document Number

5    56, looking at Request Number 32.

6            THE DEPONENT:  Sorry, I didn't mean to drop

7    yours.  Which was it, 42?

8    BY MR. WINTER:

9        Q.    Number 32 in the requests to admit.  So Exhibit

10    56 --

11        A.    Okay.

12        Q.    -- Request Number 32.  Do you see that?

13        A.    Yes.

14        Q.    Okay.  And then also look at Topic Number 14 on

15    Exhibit 53.  Just let me know after you've read topic 14.

16        A.    Yeah, just give me one moment.  I read slow.

17    Okay.  I should be good.  I just had to re-read that one

18    part.

19        Q.    You've now read topic 14 on Exhibit 53; is that

20    correct?

21        A.    Yes.

22        Q.    So I'll ask you again, have you made any

23    corrective action or taken any action to reduce the

24    likelihood of confusion during the course of this case?

25            MR. HOFFMAN:  Objection, asked and answered.

1         THE DEPONENT:  No.

2   BY MR. WINTER:

3       Q.   **Have you done anything that could be seen to**

4   **increase the likelihood of confusion in this case?**

5       A.   No.

6            MR. WINTER:  Can we mark this 62.

7            (Plaintiff's Exhibit 62 was marked for

8   identification.)

9   BY MR. WINTER:

10      Q.   **You have in front of you --**

11      A.   Thank you.

12      Q.   **-- a document marked as Exhibit 62; is that**

13  **correct?**

14      A.   Yeah.

15      Q.   **What is that?**

16      A.   That would be our website.

17      Q.   **Is that your most recent version of the website?**

18      A.   It is.

19      Q.   **I'll ask you again, have you ever made any**

20  **changes to your website that could be seen as increasing**

21  **the likelihood of confusion in this case?**

22      A.   No, not to my knowledge.

23      Q.   **Do you remember what your website looked like**

24  **last time we had a deposition?**

25      A.   Yes.  You brought to my attention that there was

1  a spider in the wrong area that was inconsistent with our

2  branding.

3      **Q.   Did you remove the spider from your website**

4  **after that deposition?**

5      A.   I did, because it was inconsistent with our

6  branding.  You brought it to my attention.  The spider

7  belongs on the top of the logo the way that it's supposed

8  to sit.

9      **Q.   But in your current website as shown in**

10  **Exhibit 62, there is no spider design next to Black**

11  **Widow; is that correct?**

12      A.   Yeah.  My girlfriend and I did it ourselves, and

13  we couldn't figure out for the life of us how to put it

14  back in the right spot.  So we just took it off, cropped

15  it.

16      **Q.   I see.  Do you have any web developers that have**

17  **ever worked for you before?**

18      A.   Yeah.

19      **Q.   Did you contact a web developer to help -- to**

20  **ask for help to include the spider design above "Black**

21  **Widow" to be consistent with the rest of your branding?**

22      A.   No, just my girlfriend and I.

23      **Q.   I see.  Exhibit 35 -- so keep both of those in**

24  **front of you.**

25      A.   Sure.

1    Q.    -- 35 and 60-, what is it, -2; is that right?

2    35 and 62 in front of you?

3    A.    Yep, 35 and 62.

4    Q.    The change to your website to remove the spider

5    design from the left of Black Widow occurred after the

6    registration date of the trademark shown on Exhibit 35;

7    is that correct?

8    A.    I believe so, yes.  Yep.  I found it.  Sorry

9    about that.

10    Q.    Then -- so keep all three in front of you --

11    A.    Sure.

12    Q.    -- you've got Exhibit 35, Exhibit 20, and

13    Exhibit 62.  So Exhibit 20 is a copy of what your website

14    used to look like on the first page; is that correct?

15    A.    Yes.

16    Q.    And then after the registration date on

17    Exhibit 35, you changed your website to remove the spider

18    design; is that correct?

19    A.    I did.

20    Q.    Do you think that makes you closer to my

21    client's Black Widow trademark registration?

22    A.    No.

23    Q.    Why not?

24    A.    Its the same name that we've been using.  We

25    didn't change anything except removing the spider.

1    Q.    Do you think the spider distinguishes your

2  company from my client?

3    A.    Maybe where it's located and the type of spider.

4  The way the spider is depicted, potentially.  There's

5  many companies that use spiders.

6    Q.    So removal of the spider -- so the spider is

7  something that could potentially distinguish your company

8  from my client; is that correct?

9    A.    Not really.  Because a spider is

10  non-descriptive.  Lots of companies use spiders.

11    Q.    I see.  But you're aware of no other company

12  that uses the words "Black Widow" and a spider design; is

13  that correct?

14    A.    Incorrect.  There's other companies that use

15  "Black Widow" with spiders.

16    Q.    For termite and pest control services?

17    A.    Yes.

18    Q.    Which ones are they?

19    A.    There's, I think, like, seven total around the

20  country.  I'm not sure if all of them do, but I know that

21  there is several of them that do.  Indiana, Colorado.

22  Several.

23    Q.    And you know for a fact that they do?

24    A.    Yeah.

25    Q.    What's that based on?

1          A.    A quick Google search.

2          Q.    You've never talked to anybody that's affiliated

3     with any of those companies; is that correct?

4          A.    Correct.

5          Q.    You've never seen any internal documents from

6     those companies; is that correct?

7          A.    No.

8          Q.    You've never --

9          A.    That's correct, I haven't.

10         Q.    You've never seen any corporate records from any

11    of those companies; is that correct?

12         A.    Correct.

13         Q.    You have no idea when any of those companies

14    first came into business; is that correct?

15         A.    Well, that's not correct.  No.

16         Q.    Which ones do you know -- which ones do you know

17    when they came into business?

18         A.    There's one of them that I clicked on that said

19    they were in business since 1997.

20         Q.    I see.  But you have no personal knowledge of

21    whether they actually were in business since 1997; is

22    that correct?

23         A.    Correct.

24         Q.    You've never talked to that company or any

25    individual associated with it; correct?

1      A.    Correct.

2      Q.    **You mentioned a company in Colorado earlier; is**

3    **that -- is that right?**

4      A.    I think.  I'm not positive, but I know there's

5    several of them around.

6      Q.    **And did you find out about this company in**

7    **Colorado from a Google search?**

8      A.    Yeah.

9      Q.    **And you have no personal knowledge of the date**

10   **they started operations; is that correct?**

11     A.    Correct.

12     Q.    **You don't know the geographic scope of their**

13   **service area; is that correct?**

14     A.    Correct.

15     Q.    **You have no idea how much revenue they generate**

16   **under "Black Widow." Is that correct?**

17     A.    Correct.

18     Q.    **You don't know if the company in Colorado has**

19   **"Black Widow" with a spider design; is that correct?**

20     A.    Incorrect.

21     Q.    **They -- the company in Colorado specifically**

22   **does?**

23     A.    I'm pretty sure that one does.  I could be

24   wrong, but I'm pretty confident, to the best of my

25   knowledge, that is one of them that did.

1      Q.   Do you know if they offer services across state

2   lines?

3      A.   I do not.

4      Q.   I think you mentioned someone in Indiana; is

5   that correct?

6      A.   I think somewhere out there, yeah.

7      Q.   Did you find out about this company from Google

8   or somewhere else?

9      A.   I think it was Google.  I don't know where else

10   I would have found out about them.

11      Q.   Have you been in contact with this company in

12   any way?

13      A.   No.

14      Q.   Do you know the date they started offering pest

15   control services?

16      A.   No idea.

17      Q.   Do you know the geographic scope of their

18   service area?

19      A.   Nope.

20      Q.   Do you know if they generate revenue under their

21   Black Widow company name?

22      A.   I think.  I don't know.

23      Q.   That's just an assumption; is that correct?

24      A.   Correct.

25      Q.   You have no actual knowledge of whether they

1  generate revenue under "Black Widow."  Is that correct?

2      A.   Correct.

3      Q.   You have no knowledge whether they've

4  consistently used "Black Widow" for any period of time;

5  is that correct?

6      A.   Correct.

7      Q.   You don't know if there was a delay between

8  their date of incorporation and their provision of pest

9  control services; is that correct?

10     A.   Correct.

11     Q.   Did you mention a company in Utah?

12     A.   I don't remember where the other ones were.

13  There was a bunch of them.  I'm not familiar with the

14  exact locations, because it wasn't relevant.

15          THE COURT REPORTER:  Because it wasn't

16  exactly --

17          THE DEPONENT:  It wasn't exactly relevant.

18          THE COURT REPORTER:  Thank you.

19          THE DEPONENT:  My apologies.

20  BY MR. WINTER:

21     Q.   Why wasn't it relevant?

22     A.   Because I don't know who they are.

23     Q.   You have no -- you have not spoken to any of

24  these companies; is that correct?

25     A.   Correct.

1    Q.   You don't know the geographic scope of any of

2    these companies; is that correct?

3    A.   Correct.

4    Q.   You have not been in contact with any of these

5    companies; is that correct?

6    A.   Correct.

7    Q.   You have no personal knowledge whether any of

8    these companies generate revenue under "Black Widow."  Is

9    that correct?

10    A.   Correct.

11    Q.   You have no knowledge whether there was a delay

12    between their date of incorporation and their provision

13    of pest control services; is that correct?

14    A.   Correct.

15    Q.   Do you have Exhibit 35 in front of you still?

16    A.   Mm-hmm.  Yes.  Sorry.

17    Q.   And Exhibit 62 in front of you still?

18    A.   Yes.

19    Q.   Do you see there's a line on the trademark

20    registration, Exhibit 35, "Principal Register."  Then in

21    bold font then to the left -- excuse me -- to the right

22    of it, "First use in commerce," right, it says that.

23    Then it has, "The mark consists of."  Do you see that?

24    A.   Yep.

25    Q.   Can you read that "The mark consists of"

1    paragraph or section out loud.

2        A.    "The mark consists of standard characters

3    without claim to any particular font style, size, or

4    color."

5        Q.    What's your understanding of what that statement

6    means?

7        A.    I'm not a trademark attorney, so I don't know.

8        Q.    Do you understand that regardless of the font

9    style, size, or color, that it includes a claim to the

10   words "black" and "widow" together for pest control

11   services?

12       A.    I do read that, yes.

13       Q.    Does your website use "Black Widow" for pest

14   control -- to offer pest control services?

15       A.    Yes.

16       Q.    And so after this registration in Exhibit 35

17   issued, you removed the spider design to the -- that was

18   to the left of the words "Black Widow" from your website;

19   is that correct?

20       A.    You're saying timeline-wise; right?

21       Q.    Yep.

22       A.    That is correct.

23       Q.    Do you think that was done in good faith?

24       A.    Absolutely.

25       Q.    Why?

1    A.   Because you brought it to my attention.  I

2  wasn't aware that it was to the left of the name, so I

3  changed it.  And I took the spider off, because it wasn't

4  consistent with our branding.

5    **Q.   I see.  But it's more consistent with my**

6  **client's trademark registration; is that correct?**

7    A.   I don't think so, no.

8    **Q.   Why not?**

9    A.   It's the same consistent brand that we use

10  across the board.  The only exception is the spider is

11  not on there now.

12    **Q.   I see.  But by removing the spider, you've**

13  **become closer to being just the words "Black Widow" on**

14  **your website and offering pest control services; is that**

15  **correct?**

16    A.   I don't believe so, no.

17    **Q.   So you don't think that by removal of the spider**

18  **design you've come closer to my client's Black Widow**

19  **trademark registration?**

20        MR. HOFFMAN:  Objection.

21        THE DEPONENT:  No.

22  BY MR. WINTER:

23    **Q.   Why not?**

24    A.   I just answered that.

25    **Q.   You explained why it's consistent with your**

1  branding, not why you believe it's not closer to my

2  client.  So my question is, when you removed the spider

3  from your website and it just includes "Black Widow" in

4  block letters, why is that farther away from my client's

5  trademark registration for Black Widow?

6      A.   I don't know.

7      Q.   Is it closer to my client's registration for

8  Black Widow?

9      A.   I don't know.

10     Q.   So you don't know whether taking a website that

11  includes a spider and then the words "Black Widow" and

12  changing it to remove the spider to be just block letters

13  "Black Widow," you don't know if that is closer to my

14  client's trademark or not; is that correct?

15     A.   You're saying it --

16          THE DEPONENT:  Can you re-read that?  I'm sorry.

17          THE COURT REPORTER:  "Q   So you don't know

18  whether taking a website that includes a spider and then

19  the words "Black Widow" and changing it to remove the

20  spider to be just block letters "Black Widow," you don't

21  know if that is closer to my client's trademark or not;

22  is that correct?"

23          MR. HOFFMAN:  Objection.

24          THE DEPONENT:  I don't think it's closer, no.

25  BY MR. WINTER:

1    Q.    Why?

2    A.    I don't know.  It's not closer.  It doesn't

3  change the letters that's on there.  It's still the same

4  word.

5    Q.    Doesn't it place more emphasis on just the words

6  "Black Widow" because there's no other spider design to

7  distinguish it?

8    A.    I don't believe so.

9    Q.    Is it inconsistent with your branding to use

10  just the words "Black Widow" without a spider design?

11    A.    No, not necessarily.

12    Q.    Why is that?

13    A.    Because we have it, in some cases like on the

14  back of the truck, "Black Widow" and the spider is offset

15  in a different area.  Sometimes it's the most convenient

16  way to put it.

17    Q.    It's the most convenient way to put it

18  completely without any spider design?

19    A.    Yeah.  Again, the reason we did that was to make

20  it more consistent with our branding.

21    Q.    Would it be more consistent with your branding

22  to use the spider design than to not use it at all?

23    A.    Of course.

24    Q.    So why didn't you use the spider design?

25    A.    I couldn't figure it out.  I'm not a website

1  designer; neither is my girlfriend.

2      Q.    But you have a website designer you used

3  previously who would -- who you did not call; is that

4  correct?

5      A.    That's correct.

6      Q.    Do you know when you made the change?

7      A.    I can't recall the exact date.  I'm not sure.

8      Q.    Topic Number 14.

9      A.    Of which number?

10     Q.    Of Exhibit Number 53.

11     A.    And you're looking for what number, I'm sorry,

12  14?

13     Q.    Fourteen.

14     A.    Yep.

15     Q.    You see that that topic references any revisions

16  to defendant's website or marketing materials to remove

17  any logo component or spider design from any logo

18  appearing or previously appearing on defendant's website

19  or other marketing materials and the dates of any changes

20  made to defendant's website or other marketing materials

21  to remove or otherwise de-emphasize/remove defendant's

22  spider design.

23         Do you see that?

24     A.    Yes.

25     Q.    You prepared for this topic; correct?

1      A.   To the best of my ability, yes.

2      **Q.   You did not look into figuring out when the**

3   **date -- the date was that the change was made to remove**

4   **the spider design from your website as reflected on**

5   **Exhibit 62; is that correct?**

6      A.   Your question is whether or not I looked into

7   the date, you're saying?

8      **Q.   Correct.**

9      A.   I can't recall.  I prepared for this to the best

10  of my ability.

11     **Q.   You would have done this change shortly after**

12  **our last deposition; is that correct?**

13     A.   After it was brought to my attention, correct.

14     **Q.   It was brought to your attention at our last**

15  **deposition; is that correct?**

16     A.   Correct.

17     **Q.   And if you'll look at Plaintiff's Exhibit 20,**

18  **the yellow sticker, it shows 9/24/24.  Do you see it down**

19  **there?**

20     A.   Yes.

21     **Q.   So it would have been sometime after September**

22  **24, 2024, that you made the change to the website; is**

23  **that correct?**

24     A.   That is my assumption, yes.

25     **Q.   Would have been -- would it have been in October**

1  of 2024?

2      A.   I'm not sure.

3      Q.   It wouldn't have been in January 2025; is that

4  correct?

5      A.   I'm not sure.  I know that it was after this

6  date.

7      Q.   I'll ask that -- this has been very specifically

8  identified a topic that you guys tell me what the date

9  is.

10          MR. WINTER:  He's supposed to be prepared to

11  testify.  And, apparently, he didn't look through any

12  materials to figure out the date of the website change.

13          THE DEPONENT:  I prepared to the best of my

14  ability.

15          MR. WINTER:  Are you going to give me that or

16  no?

17          MR. HOFFMAN:  Am I going to give you what?

18          MR. WINTER:  A specific date that the website

19  changed.

20          MR. HOFFMAN:  We -- we are going to consult with

21  our client, and then we will touch base with you.

22          MR. WINTER:  Okay.

23  BY MR. WINTER:

24      Q.   Let's look at Exhibit 53, topic 9, and then also

25  put in front of you Exhibit 56, number 27.  Do you have

1  **those two documents in front of you?**

2      A.    Yes.  If you give me a moment to review them.

3          MR. HOFFMAN:  What exhibits are we looking at?

4          MR. WINTER:  53 and 56.  We're looking at

5  topic 9 on the 30(b)(6), and that is Exhibit 53.  And we

6  are looking at Request Number 27 and its denial on

7  Exhibit Number 56.

8  BY MR. WINTER:

9      **Q.    Is that accurate, Mr. Black?**

10     A.    I'm going to ask you to repeat the question in a

11 moment when I'm done reading it, if you don't mind.  I

12 just want to read through it one more time, if you don't

13 mind.

14     **Q.    Sure.**

15     A.    Appreciate it.

16         MR. HOFFMAN:  While he's reading, is there a way

17 that we can make the temperature in here a little cooler?

18 It's really hot.

19         MR. WINTER:  I don't know, unfortunately.  I --

20 its -- the air-conditioning is on.

21         THE DEPONENT:  It's kind of nice.  Like a sauna.

22         MR. WINTER:  The witness is comfortable, so --

23         MR. HOFFMAN:  Yeah, it's --

24         THE DEPONENT:  No, its too hot, don't get me

25 wrong.  But it's not that bad --

1           MR. HOFFMAN:  If he likes a sauna --

2           THE DEPONENT:  -- it just feels like a sauna.

3           MR. WINTER:  If the witness is comfortable, I

4    don't know, Ari.

5           MR. HOFFMAN:  I'm not comfortable, but okay.

6           THE DEPONENT:  Everybody mentioned that it was

7    hot.

8           MR. WINTER:  I'm sorry, I don't know how to do

9    anything other than open the door.

10          MR. HOFFMAN:  Maybe at some point we can open

11   the door --

12          MR. WINTER:  Yeah, we can try -- well, we'll

13   take a break shortly after this for lunch, and we'll

14   leave it open.

15          THE DEPONENT:  Sure.

16          MR. HOFFMAN:  Okay.

17          MR. WINTER:  We should have done that off the

18   record.  Sorry.

19          THE DEPONENT:  She's typing, in parentheses, "it

20   is hot."

21          THE COURT REPORTER:  Yes, she is.

22          THE DEPONENT:  And the other one was 27?

23   BY MR. WINTER:

24       **Q.   So we're looking at topic 9 on Number 53 --**

25       A.   Yeah.

1      Q.   -- and request 27 as response.  Do you have

2   those two documents in front of you?

3      A.   Yeah, give me one moment.  Okay.  Yep.

4      Q.   Okay.  Do you have those two in front of you;

5   correct?

6      A.   Mm-hmm.  Correct.  Sorry.

7      Q.   Okay.  So I'm going to give you -- this was

8   marked at the last deposition.

9      A.   Yep.

10      Q.   And in case you want to look at -- Exhibit C is

11   in front of you.  It's our registrations right here.

12   It's -- that is Exhibit Number 55 in case you want to

13   look at it.

14           So looking at number 27, it says, "Admit that

15   Black Widow and spider design logo is similar to

16   defendant's Black Widow and spider design logo found in

17   Exhibit C."  Do you see that?

18      A.   Yes.

19      Q.   And then you're looking at Exhibit 25.  The top

20   one is my client's logo; do you agree?

21      A.   Twenty-five is this one here?

22      Q.   Yep.

23      A.   Yes.

24      Q.   And the bottom one is your logo; is that

25   correct?

1     A.    Yes.

2     **Q.    And you denied that those two are similar; is**

3  **that correct?**

4     A.    Yes.

5     **Q.    Why?**

6     A.    Because they're easy to distinguish between the

7  two of them.

8     **Q.    How so?**

9     A.    They're different logos.

10     **Q.    How are they different?**

11     A.    Different words; different phone number;

12  different brand; the spider's positioning; the color of

13  the words in question, meaning the two headline words;

14  the way it's oriented.  The hourglass on the spider

15  that's way more facing -- it actually looks like a tick,

16  kind of.  The light on the head.  The pronounced fangs

17  versus mine, unpronounced fangs.

18     **Q.    Is that it?**

19     A.    Well, there's several.

20     **Q.    Is that it?**

21     A.    There's a circle in mine to also add to the

22  branding.  For the logo, there's a term under yours,

23  there's a phone number under mine.  Yours states "termite

24  and pest."  Mine states "pest specialist."  So --

25  different name, different everything.

1      Q.    Is that it that's different?

2      A.    They're different brands, yeah.

3      Q.    They both include "Black Widow," though;

4  correct?

5      A.    Yes.

6      Q.    And you see your trademark multiple times a day;

7  is that correct?

8      A.    I what?

9      Q.    You see your brand multiple times a day; is that

10  correct?

11     A.    Was the question trademark or brand?

12     Q.    Your brand -- on Exhibit 25, your brand is shown

13  there on the bottom; is that correct?

14     A.    Yes, I see my brand multiple times a day.  And,

15  yes, that is my brand.

16     Q.    You have no evidence of any customer -- you have

17  not -- excuse me, strike that.

18           You have not spoken to any customers whether

19  they can distinguish between these two brands; is that

20  correct?

21     A.    No, not to my knowledge.

22     Q.    Are you aware the judge in this case had

23  indicated that the two brands are con- -- are similar?

24           MR. HOFFMAN:  Objection.

25           THE DEPONENT:  What is your question?

1    BY MR. WINTER:

2        Q.    Are you aware that the judge has said, "I do

3    think the defendant's mark and logo considered alongside

4    those marks, and I'm now talking about those three

5    registrations, the '084, '108, and the '109

6    registrations.  Alongside those marks, I think it's

7    fairly reasonable to expect that the plaintiff can

8    prevail on its claim that there is a likelihood of

9    confusion."  Are you aware of that?

10            MR. HOFFMAN:  Objection.

11            THE DEPONENT:  I've read that, yes.

12    BY MR. WINTER:

13        Q.    You've read that transcript from the judge?

14        A.    Yes.

15            MR. HOFFMAN:  Objection.

16    BY MR. WINTER:

17        Q.    You have read that transcript; correct?

18        A.    Certain parts.

19            MR. WINTER:  Can you mark this, please?

20            THE COURT REPORTER:  This will be 63, I think.

21    Right?

22            MR. WINTER:  Yep.

23            (Plaintiff's Exhibit 63 was marked for

24    identification.)

25    BY MR. WINTER:

1       Q.    Okay.  I have Exhibit 63.  It's a transcript

2   from a hearing dated March 20, 2025.  And I'd like you to

3   look at what would be page 12.  And then I'll also ask

4   that you have Exhibit C, which is Exhibit -- marked as

5   55.  Put that in front of you.

6       A.    Mm-hmm.  I've got it.  What page?

7       Q.    So I'll just take it and I'll turn it to the

8   right page.  So I've turned to the page on Exhibit C that

9   has Registration Number 4624109 on it.  Do you see that

10  page?

11      A.    Yes.

12      Q.    The registration date is October 21, 2014; is

13  that correct?

14      A.    Yes.

15      Q.    Your company was founded in what year?

16      A.    2021.

17      Q.    So this is, what, seven years roughly -- six or

18  seven years before your company was founded, this

19  trademark was registered; is that correct?

20      A.    Yes.

21      Q.    See the last three digits of the registration

22  number are 109?

23      A.    Yes.

24      Q.    Okay.  Now, looking at page 12 of that

25  transcript, do you see line numbers on the left?  Go down

1    to line 13.  Do you see that?

2         A.    Yes.

3         Q.    Can you read that paragraph out loud to me?

4         A.    "I do think that the defendant's mark and logo

5    considered alongside those marks, and I'm talking now

6    about those three registrations, the '084, the '108, and

7    the '109 registrations, alongside those marks I think

8    it's fairly reasonable to expect that the plaintiff can

9    prevail on its claim that there is likelihood of

10   confusion.  Indeed, it appears to me that they are

11   confusingly similar."

12        Q.    Do you understand that the judge said that?

13        A.    Yes.

14        Q.    When did you first see this transcript?

15        A.    I can't recall.

16        Q.    Was it a week ago, two weeks ago, a month ago?

17   How long ago?

18        A.    I don't remember.

19        Q.    Well, sometime between today and March 20th; is

20   that correct?

21        A.    I think that would be accurate, yes.

22        Q.    Was it in April, the first time you saw this

23   document?

24        A.    I don't remember.

25        Q.    But this, today, sitting here, is not the first

1    time you've seen this document; correct?

2        A.    I've seen parts of it, yes.

3        Q.    Have you seen this part of it?

4        A.    Yes.

5        Q.    Prior to this deposition; is that correct?

6        A.    Yes.

7        Q.    Do you think the judge is wrong?

8        A.    I don't know.

9        Q.    Do you think the -- so you agree with me the

10   judge said that he thinks it's likely that my client is

11   going to prevail in this -- to show likelihood of

12   confusion; is that correct?

13       A.    Can you break down that question for me, please?

14   You're asking if your client would prevail?

15       Q.    The judge has said it's fairly reasonable to

16   expect the plaintiff can prevail on its claim that there

17   is a likelihood of confusion.  Do you agree?

18       A.    I agree that's what he stated, yes.

19       Q.    Yet after -- having seen this before this

20   deposition, you have not changed your logo to remove

21   "Black Widow."  Is that correct?

22       A.    Yes, because I don't believe they're similar.

23       Q.    So you believe the judge is wrong?

24       A.    I'm not making any assumption about the judge.

25   I'm just telling you my belief, which is that the logo is

1    not similar.

2         Q.   Do you think it's unreasonable to expect that

3    plaintiff can prevail on its claim that there's a

4    likelihood of confusion?

5              MR. HOFFMAN:  Objection.

6              THE DEPONENT:  I don't know.

7    BY MR. WINTER:

8         Q.   Can you turn to page 15.  Starting at line 4,

9    "The marks are."  Can you read -- start reading there?

10   Out loud, please.

11        A.   "The marks are confusingly similar.  The

12   plaintiff does have priority.  It appears to me that

13   based on what I know right now, it would make sense

14   for -- have the defendant to find a way forward that

15   doesn't require the defendant to continue to be enmeshed

16   in expensive litigation over the use of" the mark --

17        Q.   Stop there.

18        A.   -- "this mark," rather.

19        Q.   So you understand the judge said that; correct?

20        A.   I understand that would be the judge's words,

21   yes.

22        Q.   And the judge said the marks are confusingly

23   similar; is that correct?

24        A.   The judge did say that, yes.

25        Q.   And after that statement was made, you have not

1  changed your brand to remove "Black Widow."  Is that

2  correct?

3      A.   Yes.

4      Q.   And you have not changed your brand or marketing

5  to remove the spider design; is that correct?

6      A.   Yes.

7      Q.   The judge says, "The plaintiff does have

8  priority."  Do you see that?

9      A.   I do.

10     Q.   You have no evidence otherwise; is that correct?

11     A.   I only have evidence that's what the judge said.

12     Q.   Do you think after a judge tells you that the

13  marks are confusingly similar, it's in good faith for you

14  to continue using that mark that the judge has said is

15  confusingly similar?

16          MR. HOFFMAN:  Objection.

17          THE DEPONENT:  Your question is -- break that

18  down for me, please.  I'm sorry.  Do you think that it's

19  in good faith to use the marks after the judge said that

20  it's confusingly similar?

21  BY MR. WINTER:

22     Q.   That's exactly my question.

23     A.   The judge gave his opinion.  I'm still using the

24  mark, because I haven't been told otherwise.  I'm still

25  using it in good faith, yes.

1    Q.   So -- so until a judge tells you that the marks

2    are confusingly similar, you don't think you should

3    change -- change your trademark; is that correct?

4            MR. HOFFMAN:  Objection.  Objection.

5            THE DEPONENT:  You asked about my trademark.

6    BY MR. WINTER:

7    Q.   Your branding.

8    A.   Did you mean name -- okay.  I'm not sure.

9    Q.   So the judge has said the marks are confusingly

10   similar; correct?

11   A.   That's what it says here, correct.

12   Q.   And after the judge said that, you did not

13   change your branding at all; is that correct?

14   A.   Yes.

15   Q.   And you think that's done in good faith; is that

16   correct?

17   A.   Yes.

18   Q.   Despite a judge telling you that they are

19   confusingly similar and the plaintiff does have priority;

20   is that correct?

21           MR. HOFFMAN:  Objection, asked and answered.

22           THE DEPONENT:  I answered this.

23   BY MR. WINTER:

24   Q.   Are you refusing to answer my question?

25   A.   I am not refusing to answer your question.  I

1    already answered it, and the answer is yes.

2        **Q.   So I need to make a clear record.  Despite the**

3    **judge telling you that the marks are confusingly similar**

4    **and the plaintiff does have priority, you think you're**

5    **continuing to use your brand in good faith; is that**

6    **correct?**

7        A.   Yes.

8        **Q.   Why?**

9        A.   Because that's my opinion.

10       **Q.   Why is that your opinion?**

11       A.   Because I'm operating out of good faith.

12       **Q.   What evidence supports that position?**

13       A.   Is your -- can you rephrase the question,

14   please?

15       **Q.   What evidence supports your position that after**

16   **being told by the judge the marks are confusingly similar**

17   **that you are continuing to operate in good faith, despite**

18   **not changing your branding?**

19       A.   They're different marks.

20       **Q.   So the judge is wrong?**

21           MR. HOFFMAN:  Objection.

22           THE DEPONENT:  I'm not sure if the judge is

23   right or wrong.

24   BY MR. WINTER:

25       **Q.   So after the judge says the marks are**

1  confusingly similar, it is your position that you're

2  continuing to operate in good faith despite not changing

3  your branding.  That's correct; right?

4            MR. HOFFMAN:  Objection, asked and answered.

5  He's asked and answered this.  You can -- you can answer

6  again, but it would be helpful to ask questions which

7  have not been asked --

8            MR. WINTER:  Ari, you can stop the speaking

9  objection.  Answer the question, please.

10            THE DEPONENT:  I already did.

11            MR. HOFFMAN:   You -- you can -- you can answer

12  this.

13            THE DEPONENT:  Yes.

14            MR. WINTER:  Okay.

15            MR. HOFFMAN:  And my objection --

16            MR. WINTER:  Why --

17            MR. HOFFMAN:  -- remains.

18  BY MR. WINTER:

19      Q.   What evidence supports your position that you're

20  continuing to operate in good faith despite the statement

21  from the judge that the marks are confusingly similar?

22            MR. HOFFMAN:  And objection, asked and answered.

23            THE DEPONENT:  They're different marks.

24  BY MR. WINTER:

25      Q.   So the reason you think you're operating in good

1  **faith is because the judge is wrong; is that correct?**

2          MR. HOFFMAN:  Objection, asked and answered.

3          THE DEPONENT:  I answered this already, more

4  than once.  Do I have to keep answering it?

5  BY MR. WINTER:

6      **Q.  Do you remember the instructions, that unless**

7  **you were instructed not to answer, you have to answer the**

8  **question.  Mr. Hoffman has not instructed you not to**

9  **answer.  You must, therefore, answer the question.**

10         MR. WINTER:  Ms. Reporter, can you please repeat

11  it.

12         THE COURT REPORTER:  "Q  So the reason you

13  think you're operating in good faith is because the judge

14  is wrong; is that correct?"

15         THE DEPONENT:  Again, I stated I don't know if

16  the judge is right or wrong.  I agreed on what he said in

17  reading that, but I believe they are different marks.

18  That is my belief.

19  BY MR. WINTER:

20      **Q.  What did you agree about on what he said?**

21      A.   You asked me, do you believe this is what he

22  said, or do you agree with what he said, or do you agree

23  that this is what he said specifically.  That was what I

24  agreed to, that this was what he said, what I read.  And

25  you confirmed and asked me if that was what he said, and

1  I agreed, yes, that is what he said on the record that

2  was written here that I read out loud.  That was what I

3  agreed upon.

4      **Q.   Okay.  Is he right?**

5          MR. HOFFMAN:  Objection.

6          THE DEPONENT:  I just answered that multiple

7  times.  I don't know if he's right or wrong.

8  BY MR. WINTER:

9      **Q.   If he turns out to be right, then you're**

10 **operating in bad faith; is that correct?**

11         MR. HOFFMAN:  Objection.

12         THE DEPONENT:  I'm not sure.

13 BY MR. WINTER:

14     **Q.   So the only evidence of your good faith in**

15 **continuing to use your branding after the judge stated**

16 **the marks are confusingly similar is you don't know**

17 **whether the judge is right or not?**

18         MR. HOFFMAN:  Objection.  Mischaracterizing his

19 testimony.

20         THE DEPONENT:  I have near 2,000 customers.  A

21 few examples doesn't constitute confusion.  I don't

22 believe that people are confused, no.

23 BY MR. WINTER:

24     **Q.   Have you spoken to any of those customers**

25 **specifically about whether the two marks are confusingly**

1    similar?

2        A.    No, not to my recollection.

3        Q.    So your evidence is based on your belief; is

4    that correct?

5        A.    I've already stated that.

6        Q.    What other evidence do you have that you're

7    operating in good faith despite the judge having stated

8    the marks are confusingly similar?

9        A.    I don't know.

10        Q.    Turn to topic 14 in Exhibit 53, the 30(b)(6).

11    You prepared to answer all questions for this topic; is

12    that correct?

13            MR. HOFFMAN:  Objection.

14            THE DEPONENT:  Yes.

15    BY MR. WINTER:

16        Q.    And just now you were unable to identify any

17    other facts that support your asserted good faith other

18    than what you've already stated on the record; is that

19    correct?

20        A.    You asked me number 15 to read; correct?

21        Q.    Fourteen.

22        A.    Oh, I'm sorry.  I read the wrong one.  I

23    apologize.  I should have asked that first.  And your

24    question one more time, please.

25        Q.    So other than the items of evidence you've

1    identified that support your position that you can --

2    excuse me, strike that.

3              Other than the items you've identified already

4    in this deposition that you contend support your

5    continued good faith in using the mark, you are not able

6    to identify any other evidence; is that correct?

7    A.    I don't know.

8    Q.    Well, can you -- why don't you give me the other

9    evidence of good faith that you have.

10   A.    I don't know.

11   Q.    You don't know of any other evidence of good

12   faith other than what you've told me today?

13   A.    They're different brands.

14   Q.    Other than what you've told me today, you're not

15   aware of any other evidence of good faith; is that

16   correct?

17   A.    So you're asking if I have any other evidence of

18   good faith in operating my business?

19   Q.    With your brand.

20   A.    Well, I have, you know, the rights of being in

21   Connecticut.  I started in Connecticut first.

22   Q.    The judge did say plaintiff does have priority,

23   though, in the deposition -- in the transcript; right?

24   A.    Can you show me where?  And then I'll confirm

25   what he said based off --

1      Q.   Yeah, page 15, line 5, "Plaintiff does have

2   priority."

3      A.   I agree that's what he says in this statement,

4   yes.

5      Q.   So other than your assertion that you were first

6   to use it in Connecticut and anything else that you've

7   described today, what other evidence of good faith in

8   continuing to use your brand do you have?

9      A.   I don't know.

10     Q.   Okay.  And you prepared for topic 14; is that

11  correct?

12     A.   I did prepare for this deposition.

13     Q.   You're designated for topic 14; is that correct?

14     A.   Yes.

15     Q.   And you don't know any other evidence of good

16  faith other than what you've told me today; is that

17  correct?

18     A.   I did the best job I could to prepare for this

19  deposition.

20     Q.   And sitting here today, you cannot identify any

21  other evidence of good faith; is that correct?

22     A.   I don't know.

23     Q.   Okay.  Identify other evidence of good faith,

24  please.

25     A.   I can't think of any --

1      Q.   Okay.

2      A.   -- in this moment.

3      Q.   **Yet you were obligated to prepare to answer**

4  **questions for topic 14.  You understand that; correct?**

5           MR. HOFFMAN:  Objection.  I think that's

6  probably the third or the fourth time you've asked that

7  question.

8           THE DEPONENT:  And I've answered.

9           MR. WINTER:  He can just say, "I have no other

10 evidence of good faith," and be done with it.

11          MR. HOFFMAN:  No -- but he has said that this is

12 what he can recall.

13          MR. WINTER:  Okay.

14          THE DEPONENT:  I'm doing the best job I can here

15 for you.

16          MR. WINTER:  Okay.

17          THE DEPONENT:  I'm trying to be cooperative.

18          MR. WINTER:  That's fine.  What time is it?

19          MR. ESTRELLA:  1:00.

20          MR. WINTER:  Its 1:00.  Do you guys want to take

21 a lunch break and let the room cool off a little?

22          MR. ESTRELLA:  I won't complain.

23          MR. HOFFMAN:  That's fine.

24          MR. WINTER:  Off the record.

25          THE VIDEOGRAPHER:  Okay.  We are going off the

1  record.  The time is 1 o'clock.

2          (The proceedings went off the record at

3  1:00 p.m.)

4          (The proceedings went back on the record at

5  2:04 p.m.)

6          (Plaintiff's Exhibits 64 through 66 were marked

7  for identification.)

8          THE VIDEOGRAPHER:  We are going back on the

9  record.  The time is 2:04.

10 BY MR. WINTER:

11     Q.   Okay.  So I have two exhibits here which are 64

12 and 65.  They are your customer lists.  If you can look

13 at those.  They're identical other than there are some

14 highlights on 65.

15          Do you see that, 64 and 65 are your customer

16 lists, but there are some highlights on 65?

17     A.   Yep.

18     Q.   Okay.  So I have --

19          MR. WINTER:  Oh.  Here, let me give these to

20 you, Ari.  Sorry.

21          MR. HOFFMAN:  Thank you.  64 and 65 --

22          MR. WINTER:  64 is the top one, 65 is the bottom

23 one.

24          MR. HOFFMAN:  Thank you.

25 BY MR. WINTER:

1    Q.    Now, earlier we had gone through those exhibits

2    of the text messages and emails for my client that was

3    Exhibits 23, 57, 58 through -- 57 -- excuse me -- 23 and

4    57 through 61.  Do you remember that?

5    A.    Yeah.  But if you wouldn't mind just telling me

6    again so I can go --

7    Q.    They're under -- under those two exhibits,

8    they're all in a pile right there.

9    A.    Yeah.  Got it.

10    Q.    So those are those exhibits I was referring

11    to --

12    A.    23 -- and what were the other ones?

13    Q.    57 through 61.

14    A.    57, 58 -- yep -- 59 and 60.  Oh, 61 is there

15    too.  I'm sorry, my fault.  Yep.

16    Q.    Okay.  So -- all right.  So you see on -- with

17    your exhibits 64 and 65, I have some tabs there so those

18    blue stickies?

19    A.    Yes.

20    Q.    So turn to that -- the first blue sticky?

21    A.    Of which one, 64 or 65?

22    Q.    Both of them, it's going to be the same -- it

23    should be the same page.  So can you read the name on the

24    top for both of them?

25    A.    Once I get to it.  Well, this one that's

1  highlighted, the one that's highlighted in yellow is

2  Charles Engle.

3      Q.   Okay.  And does -- is the page that has the

4  highlight otherwise -- other than the highlights

5  identical to the other page that has also Charles Engle

6  on it?

7      A.   From what I can see, yes.

8      Q.   Okay.  And so Charles Engle is one of your

9  customers; is that correct?

10     A.   I assume so, yes.

11     Q.   You have no reason to believe that customer list

12  is inaccurate in any way; is that correct?

13     A.   I have no reason to believe that.

14     Q.   Okay.  So then -- so then Charles Engle is your

15  customer; correct?

16     A.   I believe so, yes.

17     Q.   Go to the next highlight sticky on both of them.

18  Can you read me the name of the customer?

19     A.   You want me on both of them; right?

20     Q.   Yeah.  Just want to -- well, the highlight --

21  the yellow highlight one, read the yellow highlight name.

22     A.   That was FAD Mechanical.

23     Q.   Okay.  And the non-highlighted page is otherwise

24  identical other than the highlights; is that correct?

25     A.   It looks like it, correct.

1    Q.   FAD Mechanical is your client; correct?

2    A.   It looks like it.

3    Q.   Okay.  And then do the same thing for the next

4 page, the highlighted -- yellow highlighted name.

5    A.   Herica Campos.

6    Q.   Yep.  And then just verify on the

7 non-highlighted page that that's accurate.

8    A.   Yep.

9    Q.   Okay.  Go to the next page, please.  It's --

10 read me the name that you find there in yellow highlight.

11    A.   Michelle Rau.

12    Q.   Michelle R-a-u is the last name; right?

13    A.   Yep.

14    Q.   Okay.  And that's -- also matches the

15 non-highlighted version in front of you; correct?

16    A.   Yes.

17    Q.   So Michelle Rau or Roo (phonetic), however you

18 pronounce it, is your customer; correct?

19    A.   I would assume so, yes.

20    Q.   And then go to the next page with the tab on it.

21 Tell me the name.

22    A.   Rachel Burr.

23    Q.   So Rachel Burr is your customer; is that

24 correct?

25    A.   Yes.

1      Q.   Okay.  I'm going to hand you Exhibit 66.  Those

2   are all the names that we just read off:  Charles Engle,

3   FAD Mechanical, Herica Capos, Michelle Rau, and Rachel

4   Burr; correct?

5      A.   Yes.

6      Q.   Those are all your customers; is that correct?

7      A.   It seems like it.

8      Q.   Do you have any reason to doubt those people are

9   your customers?

10     A.   No.

11     Q.   Okay.  So we already went over the Rachel Burr

12  phone number was -- that someone that -- that her

13  daughter called my client; correct?

14     A.   Say it one more time.  Sorry, I was looking at

15  something.  You said --

16     Q.   Your customer Rachel Burr's daughter called my

17  client looking for pest control services; is that

18  correct?

19     A.   Yes.  As I agreed, Rachel was our client, her

20  daughter was not.

21     Q.   Right.  Earlier we were looking at Exhibit

22  Number 59.  So that was -- I'll help you there.  So why

23  don't you just have 66 in front of you and then

24  Exhibit 59 in front of you.

25     A.   I have 59 here.

1      Q.    Okay.  So just the last page of 59 is bottom

2    left P001230, that says Herica Campos; correct?

3      A.    Yes.

4      Q.    So it's your understanding that Herica Campos,

5    who is your customer, called my client; is that right?

6      A.    Yes.

7      Q.    All right.  Let's go to 60.  We're going to go

8    to the last page of that one.  Let me know when you have

9    it.

10     A.    Yeah, this should be it here.

11     Q.    Do you see Nicole Nikki Brown from FAD 311

12   Washington Ave., West Haven --

13     A.    Mm-hmm.

14     Q.    -- that matches your customer FAD Mechanical;

15   correct?

16     A.    Yep.

17     Q.    So it's your understanding that FAD Mechanical

18   called my client looking for you; is that correct?

19     A.    I assume.

20     Q.    You have no reason to believe otherwise; is that

21   correct?

22     A.    Correct.

23     Q.    You have no evidence to show otherwise; is that

24   correct?

25     A.    Yeah.

1    Q.    And then the next one down on that same page,

2    Charles Engle.

3    A.    Mm-hmm.

4    Q.    Do you see that is also on Exhibit 66?

5    A.    Yes.

6    Q.    Charles Engle is your customer?

7    A.    It seems like it.

8    Q.    Therefore, Charles Engle called my client

9    looking for you; is that correct?

10    A.    Yep.

11    Q.    Okay.  Do you still believe those individuals on

12    Exhibit 66 were not confused?

13    A.    I'm not sure if they were or were not confused.

14    Q.    You have no evidence one way or the other; is

15    that correct?

16    A.    Correct.

17    Q.    In fact, the only evidence in front -- is what's

18    in front of you in those exhibits that I just showed you;

19    is that correct?

20    A.    Evidence of confusion for these customers

21    specifically, you're saying?

22    Q.    Yes.  That you've seen.

23    A.    Yeah, this is the only evidence.

24    Q.    That you have seen; is that correct?

25    A.    That I've seen.

1      Q.    Okay.  You can put those away.

2      A.    How do you want me to organize this here?

3  Because I've got a pile all over the place.

4      Q.    Yeah, we'll -- just --

5      A.    I just want to stay organized so I don't have to

6  take ten minutes to dig through just to find one of them,

7  you know what I mean?

8      Q.    Yeah.  Just -- why don't you just stack them

9  up --

10      A.    Sure.

11      Q.    -- so those customer lists and the document I

12  just gave you, you can kind of put those aside -- or put

13  those here.

14      A.    Sure.

15      Q.    This one --

16      A.    Do you want me to try to at least reorder this a

17  little bit so we can maybe -- it's up to you.

18      Q.    Okay.  In front of you -- I'm going to hand you

19  Plaintiff's Exhibit 34, which was previously marked.  I

20  have it turned to page 11, which if you look at page

21  10 -- well, actually I'll turn to page 10.  So I'm going

22  to turn to page 10.  It's Exhibit 34.

23      A.    Give me just one second.  I just want to at

24  least have some sort of -- we're all over the place.  I

25  guess it doesn't matter.  Okay.  Let's turn to page 10.

1    Q.    Yep.  Do you see Interrogatory 19 there?

2    A.    I'm looking at it.  Hold on.

3    Q.    At the bottom.

4    A.    Mm-hmm.  Hold on one second.

5          MR. WINTER:  It's the same --

6          MR. HOFFMAN:  It's fine.  I just wanted to make

7    sure.

8          THE DEPONENT:  Okay.  Sorry.  It just takes me a

9    little while to read.

10   BY MR. WINTER:

11   Q.    Have you now read Interrogatory 19 --

12   A.    Yes, I have.

13   Q.    -- and its response?

14   A.    Yes.

15   Q.    And if you can please turn to the second to last

16   page, which is page 15.  Just -- I'll just have you look

17   at it real quick and then we'll turn back to 19.  So

18   that's a verification signed by you that this document is

19   accurate; is that correct?

20   A.    Yes.

21   Q.    Looking at the response to number 19 on page 11

22   of Exhibit 34 now --

23   A.    You said Exhibit -- oh, sorry.  I was thinking

24   page 34.

25   Q.    Yeah.  So page 11, Exhibit 34, the response to

1    Interrogatory 19.  You have that in front of you;

2    correct?

3         A.   Yes.

4         Q.   Okay.  Do you see most of the way down, "Subject

5    to these objections," do you see that list there?

6         A.   Yeah.

7         Q.   So that's a company in Utah, Indiana, and

8    Colorado that we spoke about --

9         A.   Mm-hmm.

10        Q.   -- previously; is that correct?

11        A.   Spoke about previously -- meaning, like, earlier

12   when we were talking -- yes.

13        Q.   Yes.  Earlier today.

14        A.   Yeah.

15        Q.   And then Black Widow Pest Management of

16   Connecticut, you didn't reference.  However, to your

17   knowledge, that company is out of business; is that

18   correct?

19        A.   Yes.

20        Q.   Do you know the date that any of these companies

21   other than -- excuse me.  Strike that.

22             The company in Utah, Black Widow Pest Control,

23   Inc., in Utah, do you know when they were formed?

24        A.   No.

25        Q.   Do you know if they have continuously been using

1   "Black Widow" for pest control services --

2       A.   No.

3       Q.   -- for any period of time?

4       A.   No.

5       Q.   You have no knowledge?

6       A.   No.

7       Q.   For Black Widow Pest Control, Inc., in Indiana,

8   you have no knowledge of when they first came into

9   business; is that correct?

10      A.   Correct.

11      Q.   And you have no knowledge of whether they've

12  continuously used the term "Black Widow" since that --

13  since whenever it is that they came into business; is

14  that correct?

15      A.   Correct.

16      Q.   And Black Widow Exterminators, Inc., in

17  Colorado, again, you do not know when they were formed;

18  is that correct?

19      A.   Correct.

20      Q.   And you do not have any evidence of whether they

21  have continuously used the term "Black Widow" to -- for

22  pest control services --

23      A.   Correct.

24      Q.   -- for any period of time?  We stepped over each

25  other --

1      A.   Oh, I apologize.  Yeah.

2      Q.   **Is the answer correct?**

3      A.   I should have waited for you to be finished.  I

4  apologize.

5      Q.   **It's okay.**

6      A.   Yes, the answer is correct.

7      Q.   **Okay, great.**

8      A.   My apologies.

9      Q.   **So let's get three exhibits.**

10          (Plaintiff's Exhibits 67 through 69 were marked

11  for identification.)

12  BY MR. WINTER:

13      Q.   **So handing you number 67.**

14      A.   Thank you.

15      Q.   **At the top, do you see this is a Utah business**

16  **registration?  At the top in small font.**

17      A.   What did you say?  I'm sorry.  Top --

18      Q.   **At the top in small font, do you see it says,**

19  **"Utah Business Registration"?**

20      A.   Yep.

21      Q.   **Do you see "Black Widow Pest Control, Inc."?**

22      A.   Mm-hmm, yes.

23      Q.   **And then if you go down to "Formation Effective**

24  **Date:  06/05/2014."  Do you see that?**

25      A.   Yes.

1    Q.   Do you see "Formation Date" above that,

2  4/16/2013; is that correct?

3    A.   Yes.

4    Q.   You have no knowledge or evidence whether or not

5  this company was in business or doing any pest control

6  services between April 16, 2013, and June 5, 2014,

7  correct?

8    A.   Correct.

9    Q.   You have no knowledge whether in any year since

10  June 5, 2014, this company has offered pest control

11  services to any customers; is that correct?

12    A.   Correct.

13    Q.   All right.  Exhibit 68.  Do you see this

14  Number 68 is Articles of Incorporation for Black Widow

15  Exterminators, Inc.?  It has a stamp, Secretary of State,

16  in 2002.  And above that another stamp that says,

17  "Colorado Secretary of State."  Do you see that?

18    A.   Where is that?  I'm sorry, you're saying -- over

19  there, yes.

20    Q.   You have no knowledge if this company offered

21  pest control services in any year from 2002 to the

22  present; is that correct?

23    A.   Yes.

24    Q.   You have no knowledge if they have continuously

25  offered pest control services in any year since 2002; is

1    that correct?

2        A.    Correct.

3        Q.    You have no knowledge of whether they're

4    currently operating or providing pest control services;

5    is that correct?

6        A.    Correct.

7        Q.    So you have no knowledge of whether this company

8    is a senior mark holder to plaintiff; is that correct?

9        A.    I don't know anything about senior mark holders.

10       Q.    Do you have any knowledge -- you have no

11   knowledge one way or the other whether this company

12   started using "Black Widow" for pest control services

13   before my client; is that correct?

14       A.    Correct.

15       Q.    You have no evidence to support any claim that

16   this company in Colorado, Black Widow Exterminators,

17   Inc., offered pest control services in any state in the

18   country prior to my client; is that correct?

19       A.    Correct.

20       Q.    69.  Do you see this Black Widow Pest Control,

21   Inc., out of Indianapolis on Exhibit 69?

22       A.    Yes.

23       Q.    Do you see the creation date of August 1, 2017,

24   there?

25       A.    Yes.

1      **Q.   Do you recall earlier when we were looking at**

2   **trademark registrations of my client and it included some**

3   **dates in 2014?**

4      A.   I don't remember the dates.  Do you mind if I

5   look back?

6      **Q.   Yeah, that would be Exhibit C.**

7      A.   Mm-hmm.

8           MS. GEROLD:  It's 55.

9           MR. WINTER:  Yeah, Exhibit 55.

10  BY MR. WINTER:

11     **Q.   So why don't you tell me on the that first page,**

12  **read the registration number.  Can you do that for me?**

13     A.   4,582,084.  August 5, 2014.

14     **Q.   Okay.  So that is prior to the company in**

15  **Indianapolis; is that correct?**

16     A.   From the dates in front of me, yes.

17     **Q.   Okay.  Can you go to the next registration on**

18  **Exhibit C, which is also Exhibit 55.**

19     A.   This one here?

20     **Q.   Yep.  Can you read the registration number and**

21  **then the date as well?**

22     A.   Sure.  It is 4,624,108.  October 21, 2014.

23     **Q.   So, again, prior to the company in Indianapolis;**

24  **is that correct?**

25     A.   From the dates in front of me, yes.

1    Q.   And then I think there's maybe one more; is that

2    correct or --

3    A.   Yes.

4    Q.   Can you read the registration number and the

5    date for that one as well?

6    A.   Sure.  4,624,109.  October 21, 2014.

7    Q.   Again, prior to the company in Indianapolis,

8    Indiana; correct?

9    A.   Correct.

10    Q.   In those interrogatories, which is Exhibit 34 --

11    let's see if we can get those in front of you.

12    A.   It's kind of --

13    Q.   Maybe --

14    A.   What am I looking for?

15    Q.   Exhibit 34.  If you give them to me, I'll sort

16    through them.

17    A.   Here you go.  You're better off.  You'd probably

18    find it much faster.

19    Q.   Here we go, 34.  And I will turn to -- all

20    right.  You have Interrogatory 18 in front of you?

21    A.   Yes.

22    Q.   That interrogatory identifies Jim Horton, Merina

23    Sabatucci, Michael Camilini, Robert Scribner, Russell

24    Sieb, and Drew Cowley; correct?

25    A.   Yep.

1      Q.   None of those individuals, to your knowledge,

2   have any involvement or relation to any of the companies

3   identified by you in Interrogatory Number 19; is that

4   correct?

5      A.   Correct.

6      Q.   Interrogatory 19, is that answer complete and

7   accurate in terms of the third parties' trademarks that

8   you will rely on in connection with this proceeding?

9           THE DEPONENT:  Can you read that question one

10   more time?  I'm sorry.  Would you mind?  I'm sorry.

11           THE COURT REPORTER:  "Q   Interrogatory 19, is

12   that answer complete and accurate in terms of the

13   third-parties' trademarks that you will rely on in

14   connection with this proceeding?"

15           THE DEPONENT:  I believe so.  To the best of my

16   knowledge, yes.

17   BY MR. WINTER:

18      Q.   Is it your position that those third parties

19   that you've identified or any third parties weaken my

20   client's trademark?

21           MR. HOFFMAN:  Objection.

22           THE DEPONENT:  I don't know trademark law.  But

23   from what I do know, I think it would.

24   BY MR. WINTER:

25      Q.   I'm giving you Exhibit 53, and I've turned to

1   Topic Number 10.  Would you please just read that to

2   yourself and let me know when you have read it.

3       A.   Okay.

4       Q.   Now I'm handing you Exhibit 56 and the Requests

5   for Admission Number 28, which you have denied.  Is that

6   accurate, that you have denied Request to Admit

7   Number 28?

8       A.   Yes.

9       Q.   Why?

10      A.   Again, I'm not a trademark expert, but to my

11   knowledge, I would deny it.

12      Q.   What's the factual basis for your denial?

13      A.   I'm not a lawyer.  I only know what I know.

14      Q.   What facts are you aware of that supports your

15   denial of Request to Admit Number 28?

16      A.   Based off the fact they started sooner.

17      Q.   That makes my client's mark weak?

18      A.   Are you asking me what makes your client's mark

19   weak?

20      Q.   Well, so -- yes.  Is that your -- is it your

21   contention that my client's trademark is weak?

22      A.   Yes.

23      Q.   Why?

24      A.   Well, several reasons.  It's a common term in

25   the industry.  It's an insect that is commonly controlled

1 by pest and wildlife professionals in the industry.  My

2 only understanding of trademark is that it has to be

3 something specific that is not relevant to the industry.

4 And because it's a common term and an insect, I don't

5 think it's strong.

6     **Q.   Is your trademark strong?**

7     MR. HOFFMAN:  Objection.

8     THE DEPONENT:  I don't have a trademark.

9 BY MR. WINTER:

10     **Q.   You don't own a trademark?**

11     A.   No.

12     **Q.   You know you've alleged that my client infringes**

13 **your trademark in this lawsuit; is that correct?**

14     A.   My rights.

15     **Q.   So you don't own a trademark; is that correct?**

16     MR. HOFFMAN:  Objection.

17     THE DEPONENT:  I have applied for two.

18 BY MR. WINTER:

19     **Q.   You don't own a trademark for "Black Widow."  Is**

20 **that correct?**

21     A.   That's correct.

22     **Q.   You don't own any -- you do not own any**

23 **trademark rights for "Black Widow."  Is that correct?**

24     MR. HOFFMAN:  Objection.

25     THE DEPONENT:  I don't think so.

1    BY MR. WINTER:

2        Q.    **Yet you have alleged that my client infringes**

3    **your rights to "Black Widow."  Is that correct?**

4        A.    Yes.

5        Q.    **What are those rights?**

6        A.    The rights that I started first in Connecticut.

7    I have a base of -- well, I have rights in Connecticut.

8        Q.    **Trademark rights in Connecticut?**

9        A.    I don't know.

10       Q.    **Well, you've alleged that my client infringes**

11   **your trademark.  So do you not know if you have trademark**

12   **rights?**

13       A.    You just asked two different things.  I'm

14   confused, because you asked if I -- if they infringed my

15   rights or my trademark rights.

16       Q.    **What's the difference in your mind?**

17       A.    I'm asking you if you wouldn't mind just

18   defining the question so that I could answer properly.

19       Q.    **Does my client infringe your trademark rights?**

20       A.    I don't know.

21       Q.    **Okay.  Black widow spiders, they are not a**

22   **common pest in Connecticut; is that correct?**

23       A.    Not common in this part of the country,

24   Connecticut or New York.

25       Q.    **They're generally a southern pest; is that**

1  **correct?**

2      A.   I believe so.

3      **Q.   You, in fact, have done zero revenue for pest**

4  **control for black widow spiders; is that correct?**

5          MR. HOFFMAN:  Objection, asked and answered.

6          THE DEPONENT:  I think we went over that the

7  last deposition.  Do you still want me to answer?

8  BY MR. WINTER:

9      **Q.   Mm-hmm.**

10     A.   Correct.

11     **Q.   Okay.  You have never had a customer call you**

12 **looking to control a black widow spider presence or**

13 **infestation in their home or location; is that correct?**

14     A.   Only if they were confused and trying to figure

15 out a different spider.  Just because, again, we don't

16 get them in Connecticut or New York.  They're not

17 prevalent in this part of the country.

18     **Q.   So, then, the word "Black Widow" is not**

19 **descriptive of any services that you provide; is that**

20 **correct?**

21         MR. HOFFMAN:  Objection.

22         THE DEPONENT:  Myself or anyone else on this

23 side of the country, correct.

24 BY MR. WINTER:

25     **Q.   Okay.  So I'm asking just for you.  The word**

1    "Black Widow" is not descriptive of any services that

2    your company provides; is that correct?

3            MR. HOFFMAN:  Objection.

4            THE DEPONENT:  Correct.

5    BY MR. WINTER:

6        Q.   Other than your assertion that the black widow

7    is a common pest, what's the other factual basis for your

8    denial of Request to Admit Number 28?

9        A.   I don't understand.

10           THE DEPONENT:  Could you rephrase it, please?

11   Or re-read it, rather.  I'm sorry.  I misspoke.

12           THE COURT REPORTER:  "Q   Other than your

13   assertion that the black widow is a common pest, what's

14   the other factual basis for your denial of Request to

15   Admit Number 28?"

16           THE DEPONENT:  Could you rephrase that for me,

17   Mr. Winter?  Just because I'm confused what you mean by

18   that.  I'm just not understanding fully.

19   BY MR. WINTER:

20       Q.   So in Request to Admit Number 28 --

21       A.   Yep.

22       Q.   -- I have asked you to admit that the strength

23   of my client's trademark weighs in favor of my client in

24   this dispute.  Do you understand that?

25       A.   So you're asking if it weighs in favor of --

1    Q.   No, no.  Sorry.  I'm -- so I'm only asking if

2    you understand what I'm asking you to admit, not whether

3    you agree with it or not.  I'm -- I am -- in this Request

4    to Admit Number 8 -- 28 --

5    A.   Mm-hmm.

6    Q.   -- I've said to your company, I want you to

7    admit that the strength of plaintiff's mark in this

8    dispute weighs in favor of plaintiff.  Do you understand

9    that I have asked you to admit that?

10   A.   Okay.  So you're asking me if I -- I understand

11   you're asking me to admit that it weighs in favor of

12   plaintiff.  Understood.

13   Q.   Okay.

14   A.   Thank you.

15   Q.   And so then you have denied that?

16   A.   Correct.

17   Q.   And it is -- is it your contention that it is

18   neutral or it weighs against plaintiff?

19   A.   I think it's neutral.  I don't think that it

20   weighs in favor of either of us.  I think in Connecticut

21   it weighs in favor of me.  New York, no.

22   Q.   Okay.  And so is the reason you denied it

23   because you believe that this factor is neutral?

24            MR. HOFFMAN:  Objection.

25            THE DEPONENT:  No.  The reason I denied it is

1  because I didn't believe it weighed in favor of anybody.

2  BY MR. WINTER:

3      Q.   Right.  So then it's neutral.  If it doesn't

4  weigh in favor of anybody, isn't it neutral?

5      A.   It could be described that way.

6      Q.   Is that not an accurate way to describe it?  How

7  else would you describe it?

8      A.   I guess.

9      Q.   So you -- so you believe that the strength of

10  plaintiff's mark is a neutral factor in this dispute?

11         MR. HOFFMAN:  Objection.

12         THE DEPONENT:  Say it one more time.

13  BY MR. WINTER:

14      Q.   You believe that the strength of plaintiff's

15  mark is a neutral factor in this dispute; is that

16  correct?

17      A.   Yeah.

18         MR. HOFFMAN:  Same objection.

19  BY MR. WINTER:

20      Q.   And what are the facts that lead you to the

21  conclusion that this is a neutral factor, and, therefore,

22  for you are entitled to deny it?  Deny the request, that

23  is.

24         MR. HOFFMAN:  Objection.

25         THE DEPONENT:  Would you mind re-reading it?

1    I'm sorry.  My stomach is killing me.

2              MR. WINTER:  Do you want to take a break?

3              THE DEPONENT:  That's okay.  If it starts

4    getting worse, I will take a break.  But I appreciate you

5    asking.  Thank you.

6              THE COURT REPORTER:  "Q   And what are the facts

7    that lead you to the conclusion that this is a neutral

8    factor, and, therefore, for you are entitled to deny it?

9    Deny the request, that is."

10             THE DEPONENT:  I don't know.

11   BY MR. WINTER:

12       **Q.   And topic number 10 is the topic specifically**

13   **about factual basis for the denial.  And you prepared for**

14   **that topic; is that correct?  This is topic number 10 in**

15   **Exhibit 53.**

16             THE DEPONENT:  Would you mind re-reading it one

17   more time?

18             THE COURT REPORTER:  "Q   And what are the facts

19   that lead you to the conclusion that this is a neutral

20   factor, and, therefore, for you are entitled to deny it?

21   Deny the request, that is."

22             And the question after that is, "And Topic

23   Number 10 is the topic specifically about factual basis

24   for the denial.  And you prepared for that topic; is that

25   correct?  This is Topic Number 10 in Exhibit 53."

1           That's the pending question.

2           THE DEPONENT:  I did prepare for this as best as

3    I could.  Would we be able to take a break after I answer

4    this question, just to get my stomach right for a moment?

5           MR. WINTER:  Sure.

6           THE DEPONENT:  I apologize.  I'm having a little

7    bit of a tough time here, so I'm having a little trouble

8    focusing so I just need a moment.  So my answer is that I

9    did prepare as best I could.

10          MR. WINTER:  Okay.

11          THE DEPONENT:  Mind if I step out for a moment?

12          MR. WINTER:  Go ahead.

13          THE DEPONENT:  Appreciate it.  I'll be right

14   back

15          THE VIDEOGRAPHER:  Okay.  We are going off the

16   record.  The time is 2:45.

17          (The proceedings went off the record at

18   2:45 p.m.)

19          (The proceedings went back on the record at

20   2:57 p.m.)

21          THE VIDEOGRAPHER:  We are going back on the

22   record.  The time is 2:57.

23   BY MR. WINTER:

24   **Q.   Okay.  Mr. Black, in front of you I have put**

25   **Exhibit 53 turned to the page that has topic 5 on it.**

1    I've given you Exhibit 56 turned to page 4 that shows

2    Request Number 21.  And then in front of you up there is

3    Exhibit A, Exhibit 54.  Do you see those three documents?

4         A.   I see 54, I have 53.  And you said -- what was

5    the other one?

6         Q.   56.

7         A.   It might be in that pile.

8         Q.   It's turned to number 21 right in front of you.

9         A.   Oh, okay.  My apologies.  Yes, I see it.

10        Q.   Okay.  So would you read numbers 5, 6, 7, and 8

11   topics, those topics on Number 53.  And just tell me when

12   you've read them.

13        A.   And you said through 8?

14        Q.   Yes.

15        A.   Okay.  All right.  I read those.

16        Q.   Okay.  And so those topics reference Requests to

17   Admit Number 21, 22, and 23, which -- all of which you

18   have denied; is that accurate?

19        A.   21, 22, and 23.  Agree.

20        Q.   And you are prepared to testify as to those

21   topics, 5, 6, 7, and 8; correct?

22        A.   Correct.

23        Q.   And, specifically, you're also prepared to

24   discuss to what extent any statements in the Pest Daily

25   interview are correct or incorrect in whole or in part;

1    is that correct?

2        A.   Correct.

3        Q.   Okay.  So let's look at Exhibit A there.  If you

4    look at the --

5        A.   Exhibit A being -- yes.

6        Q.   Exhibit A being also marked as Exhibit 54.  If

7    you go down to the bottom right, you'll see 4 of 7.  Can

8    you turn to that page?

9        A.   Got it.

10       Q.   Can you read the "Vet your lawyer" paragraph?

11       A.   Okay.

12       Q.   You read the "Vet your lawyer" paragraph?

13       A.   I have.

14       Q.   What about that is not accurate?

15       A.   The whole thing is accurate.

16       Q.   So all the quotes in there, the parts in between

17   quotation marks, are things that you actually said?

18       A.   Yes.

19       Q.   And the whole paragraph and the characterization

20   of when getting your LLC, that is all accurate; is that

21   right?

22       A.   Meaning?

23       Q.   So is it accurate that you didn't do enough due

24   diligence and "the attorney ended up screwing up my LLC

25   pretty badly"?  Is that accurate?

1    A.    I'd like to explain.  The attorney had filed my
2    address wrong, my phone number wrong, my email wrong.  So
3    I didn't even get any notification that, you know, I was
4    supposed to renew with the State of Connecticut.  So,
5    yeah, they messed it up pretty badly.
6    **Q.    And they created a trademark issue that's been a**
7    **very expensive headache; is that right?**
8    A.    Yes.
9    **Q.    So the attorney ended up creating a trademark**
10   **issue; is that correct -- correct?**
11   A.    I'm not sure if that's correct, but I did make
12   the best decisions at the time with the information that
13   I had.
14   **Q.    Did you say, "If I had gone to a better lawyer**
15   **and spent just a little more money or I'd done a little**
16   **bit more research on my end, all of this could have"**
17   **been -- "could have easily been avoided"?  Is that an**
18   **accurate quote?**
19   A.    Yeah.
20   **Q.    And was this -- was that referring to trademark**
21   **issues?**
22   A.    Well, it refers to a few different things.  The
23   fact is they filed everything improperly.  So had I gone
24   to a trademark-specific lawyer, somebody who does IP, I
25   probably would have been in a different position.

1    Q.   What -- what would that different position have

2  been?

3    A.   Not sure.

4    Q.   Would you have chosen a different name?

5    A.   Not sure.  I made the best decisions that I

6  could at the time with the information I had in front of

7  me.

8    Q.   And that quote at the end, that you said is

9  accurate, "all of this," that includes a trademark issue;

10  correct?

11    A.   It includes several things.

12    Q.   But it includes a trademark issue; is that

13  correct?

14    A.   Potentially.

15    Q.   Well, when you said "all of this" in that quote,

16  what were you referring to?

17    A.   I just stated there were several things.

18    Q.   One of them being trademark; is that correct?

19    A.   Potentially.

20    Q.   What do you mean by "potentially"?

21    A.   That was potentially one of the things that

22  could have been avoided had it been handled differently.

23    Q.   Right.  So "all of this" -- the words "all of

24  this" referred to those several issues that you've

25  discussed, one of which is a trademark issue; correct?

1      A.    Yes.

2      Q.    Okay.  If you look at Request to Admit

3    Number 23.  It looks like it's to your left there.  Read

4    that to yourself, both the request and the response.

5      A.    Okay.

6      Q.    Why did you deny that?

7      A.    So, again, the way that I formed the name of my

8    company was based off my last name, based off a word that

9    I liked, for my mother who was in a widows' group, like

10   we'd already gone through.  So I formed that name because

11   I liked it.  I'm not sure if it could have been avoided

12   or not.  Again, I went to a lawyer, the best information

13   I had at the time which is why I did that.

14     Q.    Okay.  But this -- this request says is -- I, or

15   my client, is asking you to admit that on his Pest Daily

16   interview, Blake Black said that had he gone to a better

17   lawyer and spent a little more money or done a little bit

18   more research on his end, all of the trademark issues

19   could have easily been avoided.

20           It says, "See Exhibit A," which is also in front

21   of you.  And then your response is "Deny."

22     A.    Correct.  I wasn't referring to just trademark

23   issues.  I was referring to multiple different things,

24   one of which being the fact that the State of Connecticut

25   requires you to file paperwork every year that claims as

1    a business you renew your licensing and whatnot.  I -- I

2    almost got myself in a position because I didn't get the

3    notice because it was filed improperly.  So had I gone to

4    a better lawyer, several things could have been avoided.

5        **Q.   I see.  But one of them -- again, you've denied**

6    **this whole thing.  But the reference to trademark issues**

7    **could have easily been avoided is one of the issues that**

8    **could have easily been avoided; correct?**

9        A.   I'm not sure if trademark issues could have been

10    avoided or not.

11        **Q.   I'm not asking you that.  I'm asking if you said**

12    **it.  If you meant by "all of this" -- all of this could**

13    **have been easily avoided, in your Pest Daily interview,**

14    **when you said that, all of this, those words, referring**

15    **to several issues, one of which was trademark issues.**

16    **And you said that; correct?**

17            MR. HOFFMAN:  Objection.

18            THE DEPONENT:  There were several issues that

19    could have been avoided.

20    BY MR. WINTER:

21        **Q.   One of them being trademark issues; correct?**

22        A.   I'm not sure.

23        **Q.   Did you just testify earlier that trademark --**

24    **that "all of this" referred to several issues, one of**

25    **which is trademark issues?**

1     A.   I believe so, yes.

2     **Q.   So then this request to admit is, in part, true,**

3   **and, in part, you're denying; is that correct?**

4     A.   I don't know.

5     **Q.   What part of this request to admit is wrong?  Is**

6   **it the brackets of "the trademark issues"?**

7     A.   The what?

8     **Q.   See how the words "the trademark issues" are in**

9   **brackets on Request Number 23?**

10    A.   Yeah.

11    **Q.   Is that the part that is not accurate?**

12    A.   Well, that word supplements "this."  The word as

13  "this" here.  So it's phrasing as though I'm just talking

14  about trademark issues.

15    **Q.   Right.  So you were talking about trademark**

16  **issues and other issues when you said "all of this."**

17  **Correct?**

18    A.   I was talking about several different things.

19    **Q.   One of which is trademark; correct?**

20    A.   I -- I still believe -- I don't know.

21    **Q.   I'm trying to understand why you denied Request**

22  **to Admit Number 13 -- 23.  If I understand correctly, the**

23  **reason you're denying Request to Admit Number 23 is**

24  **because that request replaces the words "all of this"**

25  **with -- excuse me -- it replaces the word "this" with**

1  "trademark issues."  And you're saying -- you have

2  testified that "this" refers to several issues, including

3  trademark issues.  Did I misstate that?  Is that not

4  accurate?

5      A.  I'm not sure.

6      Q.  Well, we've already established that the words

7  "all of this" in that Pest Daily quote that you've said

8  is accurate refers to, among other things, trademark

9  issues.  Do you agree?

10     A.  I don't know.

11     Q.  What does "all of this" refer to, then?

12     A.  I don't know.

13     Q.  Does it refer to the attorney not putting the

14  correct contact information in the LLC?

15     A.  Partially, yes.

16     Q.  Does it partially refer to trademark issues?

17     A.  I don't know.

18     Q.  Looking back at Exhibit A in that paragraph

19  we've been talking about, you said earlier that this

20  paragraph is accurate; is that right?  The "Vet your

21  lawyer" paragraph.

22     A.  Yes.

23     Q.  So when it says, "he didn't do enough" -- so --

24  "he did the right thing by going to a lawyer.  However,

25  he didn't do enough due diligence."  Who is "he"?

1      A.    It would be referring to me.

2      Q.    **"The attorney ended up screwing up my LLC pretty**

3 **badly and creating a trademark issue."  Is that accurate?**

4      A.    What I should have said was created an expensive

5 situation.

6      Q.    **Okay.  But that's not what you did say.  You**

7 **said that it was -- it created a trademark issue.**

8      A.    Yeah.  But I still don't have a trademark issue.

9      Q.    **I'm not asking what you have or not.  I'm asking**

10 **what you said.  Okay?  You were on an interview, and**

11 **you've said this paragraph is accurate.  You said and --**

12 **"However, he didn't do enough due diligence," refers to**

13 **you, "and the attorney ended up screwing up my LLC pretty**

14 **badly and creating a trademark issue."**

15          **That is an accurate summary of your interview**

16 **with the Pest Daily; is that correct?**

17      A.    It is correct.  That's accurate to what I

18 said --

19      Q.    **Okay.**

20      A.    -- but it's not accurate to what I meant.

21      Q.    **Do you often say things you don't mean?**

22      A.    No.

23      Q.    **Okay.  So just in this instance?**

24          MR. HOFFMAN:  Objection.

25          THE DEPONENT:  I don't know.

1          MR. WINTER:  Okay.  Mark this as 70?

2          THE COURT REPORTER:  70?

3          MR. WINTER:  70.  Is that right?  Revenue --

4    2024 Revenue Report.

5          (Plaintiff's Exhibit 70 was marked for

6    identification.)

7    BY MR. WINTER:

8       **Q.   Handing you a document marked Exhibit 70.  Is**

9    **this an accurate report of your revenue for your company**

10   **in 2024?**

11      A.   Yes, to the best of my knowledge.

12      **Q.   Do you have any reason to believe it's not**

13   **accurate?**

14      A.   Nope.

15      **Q.   Do you have a rough idea what your revenue has**

16   **been in January, February, and March of this year?**

17      A.   I'm -- I'm not positive.  I would be purely

18   speculating.

19      **Q.   Is it more than $50,000 for each one of the**

20   **months?**

21      A.   Yeah.

22      **Q.   Is it more than $60,000 for each one of the**

23   **months?**

24      A.   I don't know.  I think.

25      **Q.   How about for March, do you know how much March**

1  **has been, roughly?  Is it more than $60,000**

2      A.    I don't know.  I haven't looked at it.

3      **Q.    Okay.**

4      A.    -- to be honest.  I don't want to give you an

5  inaccurate description of what they are.

6      **Q.    Okay.  That's fine.**

7          MR. WINTER:  I'll just go look at this and then

8  figure out if -- so we're just going to take a break real

9  quick, take a look and see if we have anything else we

10  want to ask.  And then we'll reconvene.

11          THE DEPONENT:  Okay.  Perfect.

12          THE VIDEOGRAPHER:  We are going off the record.

13  The time is 3:19.

14          (The proceedings went off the record at

15  3:19 p.m.)

16          (The proceedings went back on the record at

17  3:23 p.m.)

18          (Plaintiff's Exhibits 71 and 72 were marked for

19  identification.)

20          THE VIDEOGRAPHER:  We are going back on the

21  record.  The time is 3:23.

22  BY MR. WINTER:

23      **Q.    Okay.  I am handing you a document that is**

24  **marked Exhibit 70- -- 71, which is a 26(f) report.  And**

25  **I'm turning to statement of undisputed facts, page 4.**

1      A.   Thank you.

2      Q.   Sorry.  Page 5.  Sorry.  Top one on page 5.  Can

3  you read that statement -- that bullet point on the top

4  of page 5, "The goods and services."  Just read it to

5  yourself.

6      A.   Okay.

7      Q.   That's accurate; is that right?

8      A.   No, I don't think it is.

9      Q.   Are you aware that this is a stipulation signed

10  by your attorney, Hugh Pfabe?  If you look at page 11, on

11  December 4, 2023.

12      A.   Eleven -- yep.  I see that.

13      Q.   And do you see at the top it has Case 3:23 and

14  the header up there?

15      A.   Mm-hmm.

16      Q.   You have to say yes.

17      A.   Yes.  Sorry.

18      Q.   Did your attorney not have authorization to

19  stipulate to this fact?

20      A.   When you say "stipulate to this fact," what do

21  you mean?

22      Q.   So this is a statement of undisputed facts, if

23  you look at page 4.

24      A.   Mm-hmm.

25      Q.   It says at -- right under the heading, Statement

1  of Undisputed Facts, "Counsel certify that they have made

2  a good faith attempt to determine whether there are any

3  material facts that are not in dispute.  The following

4  material facts are undisputed."  Did I read that

5  correctly?

6      A.   It looks like you read that correctly, yes.

7      Q.   Okay.  And then it goes through several bullet

8  points on page 4 and continues on to page 5.  Do you see

9  that?

10      A.   Yes.

11      Q.   And then it says on page 5, "The goods and

12  services offered by both Plaintiff and Defendant under

13  the term 'Black Widow' appear to be in many cases

14  identical but at least substantially similar."

15          Do you see that?

16      A.   Appear in many cases identical, but at least

17  substantially similar.  I see it, but I'm just not

18  understanding.  So there are certain services that I'm

19  sure cross over, but we both offer different services, at

20  least to my understanding.  At least slightly.

21      Q.   But they are at least substantially similar; is

22  that correct?

23      A.   I don't know if "substantially" is the word that

24  I would use, but there definitely could be similar

25  services offered.

1      Q.    Okay.  But this is a statement of undisputed

2    facts that your attorney signed; is that right?

3      A.    I believe it to be right, yes.

4      Q.    And he would not have signed that unless he had

5    authorization from you to sign that that fact is

6    undisputed and correct; is that right?

7      A.    I would assume so.  And, again, just to state,

8    we make the best decisions we can at the time with the

9    information we have.  As time goes on and we get more

10    information about the other company and also about what

11    we do, I now think that they're at least similar, but I

12    wouldn't agree that they're substantially similar, no.

13      Q.    What's the distinction in your mind?

14      A.    What do you mean when you say, "what's the

15    distinction"?

16      Q.    You would agree that they're similar but not

17    necessarily substantially similar?  Is that what you

18    said?

19      A.    Yes.  I did just say that.

20      Q.    What's the distinction between those two

21    phrases?

22      A.    So there are similar services that are provided,

23    I'm sure, because both companies do pest control.  Right?

24      Q.    Correct -- okay.

25      A.    Okay.  So we also work like contractors and do

1  wildlife proofing, corrective metal work, wildlife

2  trapping, wildlife proofing, specialize in bats, do a

3  bunch of different types of work that I don't know the

4  other company to do.  So I wouldn't think at this point

5  that we're substantially similar.  I might think that

6  maybe we offer similar services in some regards.

7      Q.   Okay.  You understand that this was a -- this

8  was a statement of material facts to this lawsuit that

9  are undisputed as of the date this was filed on

10  December 4, 2023?  Do you understand that?

11     A.   Yes.  And at the time with the information that

12  I had, we believed them to be more similar than I believe

13  at this point we might be.

14     Q.   And what evidence do you have that has changed

15  your position as to that fact?

16     A.   What evidence do I have?

17     Q.   Yes.

18     A.   Well, they refer wildlife work to other people

19  in the industry in New York.

20     Q.   Okay.  Does that mean that my client does not do

21  wildlife work?

22     A.   I'm not sure.

23     Q.   So you have no evidence -- strike that.

24          You haven't spoken to my client about what the

25  scope of his services are; is that correct?

1      A.   Correct.

2      Q.   **You, in fact, have not done a deposition of my**

3   **client to determine what the scope of his services are;**

4   **is that correct?**

5      A.   Correct.

6      Q.   **You have not looked at any documents of my**

7   **client for you to be able to determine what the scope of**

8   **his services are; is that correct?**

9      A.   Correct.

10     Q.   **So what's the basis for your now belief that**

11  **this statement on page 5 of this 26(f) report marked**

12  **Exhibit 71 is now not accurate?**

13     A.   I never stated it wasn't accurate.  I stated

14  that it's less accurate.  So it's not substantially

15  similar, but we might have similar services we provide.

16     Q.   **How would you rephrase this paragraph to make it**

17  **accurate?**

18     A.   I wouldn't.  I would rely on my counsel to do

19  that.

20     Q.   **Okay.  So do you agree that the goods and**

21  **services offered by both plaintiff and defendant under**

22  **the term "Black Widow" appear to be similar?**

23     A.   Somewhat, yes.

24     Q.   **And in some cases the services offered are**

25  **identical; correct?**

1    A.    I'm not sure how they provide services, so it

2  would be hard for me to say identical.  Identical is a

3  mirror image of something else.  So to my understanding

4  of the word identical, I would say no.

5    **Q.    Rat abatement is rat abatement; correct?**

6    A.    Incorrect.  There's several different ways to do

7  rat abatement.  You could use a machine called Burrow RX,

8  which is burning cedar oil and emitting a fume that goes

9  throughout burrows and kills them that way.  There's

10 trapping, which is several different facets of trapping.

11 there's rodenticides.  There's rodenticide dust.  There's

12 all sorts of different ways to control rats.

13   **Q.    But --**

14   A.    But they're all different services.  Exclusion.

15 You could use repellants.  So I don't know how they do

16 it.  I'm really not certain.

17   **Q.    But from a customer's perspective, the rats are**

18 **either there or they're gone; correct?**

19        MR. HOFFMAN:  Objection.

20        THE DEPONENT:  I -- I don't understand the

21 question.  Your question is from a customer's

22 perspective, meaning their perception of how the work got

23 proceed -- or was done?

24 BY MR. WINTER:

25   **Q.    Right.  So the customer's perception -- let's --**

1    I'll give you this scenario.

2         A.    Mm-hmm.

3         Q.    The customer calls you, they have rats in their

4    house, they want them gone.  You show up, do something,

5    and they're gone; right?  Is that the customer's

6    perception of what the services are?  Or is the

7    customer's perception of the services the specific manner

8    in which the rats were controlled?

9         A.    I don't know that there's an accurate way for me

10   to answer that, only because there's customers that are

11   looking for more humane options, more permanent solutions

12   like exclusion and rodent proofing, versus just

13   controlling of the pests.  Rats are a neophobic; they're

14   extremely challenging to kill.  So there's several

15   different ways to do it.  So that's why I'm stating I'm

16   not certain.  I can't give you a definitive answer on

17   that.

18        Q.    Okay.  Exhibit 72.  Just take a look at it and

19   let me know when you're ready.

20        A.    Ready.

21        Q.    Who's Josh?

22        A.    He is somebody who has been helping us with some

23   marketing and branding.

24        Q.    What's his full name?

25        A.    Josh Philippas -- Philippos (phonetic).  I can

1    get you the proper spelling, if you'd like.

2       Q.   Okay.  When you get your transcript, you can

3    make the typo correction.

4       A.   No problem.

5       Q.   Was he the original designer of your logo?

6       A.   No.  No.  Tyler Wood was.  As we mentioned

7    formerly, it was somebody who was just kind of helping

8    me.  He was selling hot tubs at the time, believe it or

9    not.  He had access to software that allowed him to make

10   logos, so --

11      Q.   Got it.  And at the time did he -- was this, on

12   the first page, this, I guess, brand scheme or

13   whatever you want -- actually, what would you call

14   this -- this spread of "Black Widow" in colors, what

15   would you call that?

16      A.   I don't know what I would call it.

17      Q.   He calls it a brand package.  Is that an

18   accurate description of that?

19      A.   Maybe.

20      Q.   Okay.  This brand package includes the logo with

21   the spider design both on the left and at the top; is

22   that correct?

23      A.   I'm seeing that now, yes.

24      Q.   So it was part of your brand package when you

25   deleted the spider from your website; is that correct?

1    A.    I'm not certain of whether or not it was part of

2    the brand package when I deleted it.  As stated

3    previously, you know, we've never used it anywhere else

4    that way.  I don't even remember seeing it that way, full

5    transparency.  The first time that I can recall seeing it

6    ever was on the website.  And that's why I took it down,

7    because it was very inconsistent with how we do our

8    brand.  It's just not -- this is how we've done it for

9    everything.

10          And I needed whatever version that is of it.  I

11   don't know if it's a PNG or PDF -- whatever it was that

12   we needed so that we could put it in different areas and

13   different spots.  I wanted to make sure I had a copy of

14   it, because I couldn't locate the old one.

15   **Q.    I see.  But the revised version of the website,**

16   **that version of the logo doesn't include the spider; is**

17   **that correct?**

18   A.    Right, because my girlfriend and I took the

19   spider off of it.

20   **Q.    Right.  But at the time, the version of the logo**

21   **without the spider is not -- was not in your brand**

22   **package; is that correct?**

23   A.    Right.  Because it wasn't done by him.  And this

24   just proves what I was telling you.  I didn't have him do

25   it.  It was my girlfriend and I who just cropped the

1    spider.  We couldn't figure out how to put it back on

2    there.  And I don't know nothing about websites; neither

3    does she.  We were just trying to save some money, but

4    clearly -- it's silly.

5        Q.    What's silly?

6        A.    Trying to save money instead of just doing it

7    the right way and having a professional do it.  Because I

8    couldn't figure out how to put it back the right way.

9        Q.    **What would the right way have been?**

10       A.    The way that it's always depicted with the

11   spider above our logo that's consistent with all of our

12   branding.

13       **Q.    I see.  So then if you look at the second**

14   **page -- oh, if you look -- sorry, the text -- sort of the**

15   **text from the second to the third -- first to the second**

16   **page, "I really wanted to add wildlife to our name and**

17   **logo.  So it would be Black Widow Pest & Wildlife**

18   **Specialists."  Do you see that?**

19       A.    Yes, I do.

20       **Q.    So then he changed it to pest and wildlife**

21   **specialist as the -- as I guess the smaller font in**

22   **there; is that right?**

23       A.    Mm-hmm.  That is correct.

24       **Q.    And this was done February 20- -- so this was**

25   **February 26 of 2024.  Is that correct?**

1    A.   That's correct.  The reason we added wildlife is

2  because we wanted to distinguish ourself as more of a

3  wildlife company and more than just pest control so the

4  that people understood we also do a lot of wildlife work.

5    Q.   Okay.  Are you aware that Merina Sabatucci was

6  deposed in this case?

7    A.   I did hear that, yes.

8    Q.   Have you read her transcript?

9    A.   No, I have not.

10    Q.   Do you recall our last deposition I asked you

11  why she was fired or terminated?

12    A.   Yes.

13    Q.   Do you recall what you said?

14    A.   Well, there was several reasons.

15    Q.   What were they?

16    A.   Well, she was very argumentative, attitude

17  problem, insubordinate in some regards.  It was tough,

18  because she was actually really good at her position in a

19  lot of ways, and I actually did like her as a person.

20  But I just think that wrong place, wrong time, you know.

21    Q.   Are you aware that she has alleged that she was

22  fired because your girlfriend didn't like her?

23    A.   No.  My girlfriend tried to convince me to keep

24  her.  If it was up to Amy, she would have still been

25  there.

1    **Q.    Okay.  Is your wife -- I mean, excuse me -- is**
2  **your girlfriend involved in daily operations of your**
3  **business?**

4    A.    She's not.

5    **Q.    Does she own any interest in the company?**

6    A.    Nope.

7    **Q.    Still a 100 percent single-member LLC owned by**
8  **you?**

9    A.    A hundred percent.

10   **Q.    Okay.**

11        MR. WINTER:  Nothing further.

12        MR. HOFFMAN:  Thank you.  Nothing on my end.

13        THE VIDEOGRAPHER:  Okay.  That's it?  Okay.

14  This is the end of the video deposition of Blake Black.

15  The time is 3:41 p.m.

16        THE COURT REPORTER:  Okay.  Can counsel just

17  tell me how they would like their transcript, please.

18        MR. WINTER:  Like, ten days or something --

19        THE COURT REPORTER:  I meant format.  Sorry.

20        MR. WINTER:  Oh.

21        THE DEPONENT:  Like a half hour should be

22  enough.

23        MR. WINTER:  I want it tomorrow.

24        MR hOFFMAN:  Six and a half days.

25        MR. WINTER:  Just the -- the full-width one.

1  Just, like, the full page, however.

2          MR. HOFFMAN:  I'll just have it emailed, e-tran.

3          MR. WINTER:  Email is fine too, yeah.

4          THE COURT REPORTER:  Thank you.

5          (The proceedings went off the record at

6  3:42 p.m.)

7          (The proceedings went back on the record at

8  3:44 p.m.)

9          MR. WINTER:  So the stipulation is that on

10  Exhibit 64 and 65, there were certain pages that had

11  sticky notes on them.  For completeness of the record,

12  Ari and I have both initialed those pages that had

13  stickies on them.  We are now removing those stickies so

14  they can be scanned.  So stipulated?

15          MR. HOFFMAN:  So stipulated.  Thank you.

16          MR. WINTER:  All right.

17          THE COURT REPORTER:  Thank you.

18          MR. WINTER:  Thank you so much.

19          (The proceedings went off the record, and the

20  deposition was concluded at 3:45 p.m.)

21

22

23

24

25

```
 1              C E R T I F I C A T I O N .

 2

 3        I, Qiana M. Burgess, Registered Professional

 4   Reporter, and a Notary Public within and for the State of

 5   Connecticut, do hereby certify:

 6        That the foregoing proceedings were taken before me

 7   at the time and place therein set forth, at which time

 8   the witness, 30(b)(6) Black Widow Pest Specialist, LLC -

 9   Blake Black, was put under oath by me;

10        That the testimony of the witness, the questions

11   propounded, and all objections and statements made at the

12   time of the examination were recorded stenographically by

13   me and were thereafter transcribed.

14        I further certify that I am not related to the

15   parties hereto or their counsel, and that I am not in any

16   way interested in the events of said cause.

17        Dated at Woodbridge, Connecticut, this 7th day of

18   May, 2025.

19

20                    Qiana M. Burgess, RPR

21                    Notary Public

22

23

24   My Commission Expires:

25   March 31, 2029
```

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3

4

5

6                    _____
                     BLAKE BLACK

7

8

9

10              BLAKE BLACK appeared before me at

11   _____, Connecticut, this _____ day of

12   _____, 2025 made oath and acknowledged this

13   deposition to be a true and accurate transcription of his

14   testimony.

15

16

17

18

19
     My Commission Expires:
20

21

22
                              _____
23                            NOTARY PUBLIC

24

25

1          ERRATA SHEET:   Please note any error(s) and/or

2     correction(s) thereof on this sheet.  The rules require a

3     reason for any change or correction.  It may be general

4     such as, "to correct stenographic error," or "to clarify

5     the record," or "to conform with the facts."

6     This must be accomplished within thirty (30) days from

7     date on Errata sheet.  The ORIGINAL NOTARIZED CERTIFICATE

8     OF DEPONENT and ERRATA SHEET along with a COPY should be

9     sent to the attorney who took DIRECT EXAMINATION.  All

10    other counsel of record should be sent a copy, along with

11    a copy to our office for our records.

12    CASE:     BLACK WIDOW TERMITE & PEST CONTROL, CORP. VS.

13    BLACK WIDOW PEST SPECIALIST LLC - 30(b)(6) DEPOSITION OF

14    BLACK WIDOW PEST SPECIALIST, LLC - BLAKE BLACK TAKEN ON

15    APRIL 23, 2025.

16

17

18

19

20

21

22

23

24

25

Page 161

| 1 | PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|------|------|------------|-------------------|

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 162

| | PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |



















































































