# Exhibit S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____
                               )
BLACK WIDOW TERMITE &          )
PEST CONTROL CORP.,            )
                               )
            Plaintiff,         )
                               )
  – vs –                       )
                               )
                               )
BLACK WIDOW PEST SPECIALIST, LLC,  )
                               )
            Defendant.         )
_____)


        In accordance with the Connecticut Practice Book,
the deposition of MICHAEL CAMILINI, was taken at the law
offices of Farber, LLC, 1234 Summer Street, Stamford,
Connecticut, before Mercedes Marney, RPR, CT–LSR #530,
and a notary public in and for the State of Connecticut,
on Tuesday, September 24, 2024, at 10:00 a.m.

```
 1               A P P E A R A N C E S:

 2

 3    ATTORNEYS REPRESENTING THE PLAINTIFF:

 4    FARBER, LLC

 5         4 Corporate Drive, Suite 287

 6         Shelton, Connecticut 06484

 7         203.286.5140

 8    BY:  JONATHAN A. WINTER, ESQUIRE

 9         j.winter@farberllc.com

10    BY:  SAMANTHA GEROLD, ESQUIRE

11         samantha.gerold@farberllc.com

12

13

14    ATTORNEYS REPRESENTING THE DEFENDANT AND THE WITNESS:

15    COHEN & WOLF, PC

16         1115 Broad Street

17         Bridgeport, Connecticut 06604

18         203.337.4122

19    BY:  WILSON T. CARROLL, ESQUIRE

20         wcarroll@cohenandwolf.com

21    BY:  ARI J. HOFFMAN, ESQUIRE

22         ahoffman@cohenandwolf.com

23

24

25
```

```
 1   -------------------- I N D E X --------------------

 2   TESTIMONY OF:  MICHAEL CAMILINI

 3   EXAMINATION                                    PAGE

 4      Direct examination by Mr. Winter              7

 5

 6   ------------- INFORMATION REQUEST -----------------

 7   INSTRUCTION TO WITNESS:        (None)

 8   REQUEST FOR PRODUCTION:        (None)

 9   INFORMATION TO BE FURNISHED:   (None)

10   STIPULATIONS:                  (None)

11   MOTIONS:                       (None)

12   MARKED FOR RULING:             (None)

13

14   ----------------- E X H I B I T S -----------------

15   MARKED FOR IDENTIFICATION                      PAGE

16   Plaintiff's Exhibit 36                            9

17   Notice of deposition

18   Plaintiff's Exhibit 21                           20

19   PREVIOUSLY MARKED EXHIBIT:
     Example of a form estimate or agreement
20   provided to customers

21   Plaintiff's Exhibit 16                           27

22   PREVIOUSLY MARKED EXHIBIT:
     A document displaying the Black Widow Pest
23   Specialists, LLC, logo

24

25
```

```
 1    ----------------- INDEX CONTINUED -----------------

 2    ----------------- E X H I B I T S -----------------

 3    MARKED FOR IDENTIFICATION                     PAGE

 4    Plaintiff's Exhibit 20                          28

 5    PREVIOUSLY MARKED EXHIBIT:
      A photograph
 6
      Plaintiff's Exhibit 27                          43
 7
      PREVIOUSLY MARKED EXHIBIT:
 8    Photograph of a Black Widow Pest Specialists
      company truck
 9
      Plaintiff's Exhibit 25                          51
10
      PREVIOUSLY MARKED EXHIBIT:
11    A document containing the Black Widow Pest
      Specialists logo that appears on Plaintiff's
12    Exhibit 16

13    Plaintiff's Exhibit 24                          58

14    PREVIOUSLY MARKED EXHIBIT:
      Text messages, with photographs
15
      Plaintiff's Exhibit 34                          76
16
      PREVIOUSLY MARKED EXHIBIT:
17    Defendant's interrogatories

18

19

20

21

22

23

24

25
```

1                S T I P U L A T I O N S

2

3        It is stipulated by counsel for the parties

4    that all objections are reserved until the time of

5    trial, except those objections as are directed to

6    the form of the question.

7

8        It is stipulated and agreed between counsel

     for the parties that the proof of the authority of

9
     the notary before whom this deposition is taken is

10
     waived.

11

12       It is further stipulated that any defects

13   in the notice are waived.

14

15       It is further stipulated that the reading and

     signing of the deposition transcript by the witness

16
     may be signed before any notary public.

17

18
                        * * * * * * *
19

20

21

22

23

24

25

1           Mr. Camilini, I need to swear you in.

2    Would you raise your right hand.

3           Do you solemnly swear the testimony you're

4    about to give will be the truth, the whole truth,

5    and nothing but the truth, so help you God?

6           THE WITNESS:  I do.

7           THE COURT REPORTER:  You can put your hand

8    down.

9           For the record, I need to ask you your

10   name and address.

11          THE WITNESS:  Michael Camilini, 375 Walnut

12   Hill Road in Thomaston.

13          THE COURT REPORTER:  Usual stips?

14          MR. WINTER:  Sure.

15          MR. CARROLL:  Yeah.  And we'll read and

16   sign.

17                    -   -   -

18          M I C H A E L   C A M I L I N I

19   called as a witness, having been first duly sworn by

20    a notary public of the State of Connecticut, was

21          examined and testifies as follows:

22   ///

23   ///

24   ///

25   ///

```
 1                    -   -   -
 2            M I C H A E L   C A M I L I N I,
 3    called as a witness, having been duly sworn in by
 4    the court reporter, a notary public commissioned by
 5    the State of Connecticut, is examined and testifies
 6                    as follows:
 7                    -   -   -
 8                 DIRECT EXAMINATION
 9                    -   -   -
10    BY MR. WINTER:
11         Q.   Good morning, Mr. Camilini.  Thanks for
12    coming today.
13              I represent Black Widow Termite & Pest
14    Control Corp., the plaintiff in this lawsuit.
15              Are you represented by counsel today?
16         A.   Yes.
17         Q.   Is that Wilson Carroll?
18         A.   Yes.
19         Q.   So I'll just go over kind of the process
20    what's going to happen.
21              You know, I'll ask you some questions, the
22    court reporter will type down what I say.  And then
23    I'll ask you to -- then you'll answer the questions
24    and she'll type down what you say.
25              Do you understand that?
```

1      A.   Yes.

2      Q.   And so when you answer, you need to give

3  verbal answers because she can't take down head nods

4  and things like that.

5      A.   Right.

6      Q.   And then, so it's easier for her, we'll

7  try to -- I'll try to end my question, then you'll

8  answer, I'll let you finish your answer, so that

9  we're not talking over each other.  It makes it

10 easier for her.

11     A.   Gotcha.

12     Q.   From time to time your attorney may

13 object.  Unless he instructs you not to answer after

14 the objection, please don't answer the question.

15          Do you understand that?

16     A.   Yep.

17     Q.   If you ever need a break, just let me

18 know, we can take one.  We'll just ask that if

19 there's a pending question, that you answer that

20 question, and then we can take a break?

21     A.   Okay.

22     Q.   Is there any reason that you cannot

23 testify truthfully today?

24     A.   No.

25     Q.   Okay.  And then one other thing is, I will

1  hand you some documents from time to time.  They'll

2  be marked with exhibit numbers, things like that.

3  So you're welcome to look through the documents, and

4  then I'll have some questions for you about either

5  the documents or just other things.

6          Do you understand that?

7      A.  Yes.

8          (Plaintiff's Exhibit 36 was marked for

9      identification as of this date.)

10  BY MR. WINTER:

11      Q.  So in front of you is a document.

12          Do see that it's been marked Exhibit 36 on

13  the bottom?

14      A.  Yeah.

15      Q.  And in the first paragraph, third line, do

16  you see your name there?

17      A.  I do.

18      Q.  So do you understand that you're here for

19  your deposition in the lawsuit, Black Widow

20  Termite & Pest Control Corp. versus Black Widow Pest

21  Specialists?

22      A.  I do.

23      Q.  And you are currently employed by

24  Black Widow Pest Specialists, LLC; is that correct?

25      A.  I am.

```
 1          Q.    When did you receive this document, PX 36?

 2          A.    Today.

 3          Q.    Had you seen it before today?

 4          A.    Uh-uh.

 5          Q.    Just say "no" because she can't get

 6    "uh-uhs"?

 7          A.    No.

 8          Q.    Okay.

 9                Did you do anything to prepare for this

10    deposition?

11          A.    Other than speaking with my lawyer, no.

12          Q.    When did you speak with your lawyer?

13          A.    Today.

14          Q.    For how long?

15          A.    About an hour.

16          Q.    Was that in person or by phone?

17          A.    In person.

18          Q.    At this office in the conference room next

19    to me?  Is that --

20          A.    Uh-huh -- yes.

21          Q.    Were you shown any documents?

22          A.    Other than my notice of deposition, no.

23          Q.    Did you review any documents prior to this

24    deposition --

25          A.    No.
```

1        Q.    -- to prepare?

2        A.    No.

3        Q.    Did you speak with anybody, other than

4    your attorney, regarding this deposition?

5        A.    No.

6        Q.    Did you speak with Blake Black concerning

7    this deposition?

8        A.    No.

9        Q.    How did you learn that you were going to

10    come here and have a deposition?

11        A.    Well, I mean, obviously I was told that

12    I was going to have a deposition.  But anything

13    regarding the case, we kept it completely quiet

14    until it was over with.  We didn't even speak

15    personally.

16        Q.    Got it.

17              So, basically, you were told, here's the

18    day of your deposition, show up here, and that's

19    basically it?

20        A.    Correct.

21        Q.    All right.

22              Are you originally from Connecticut?

23        A.    I am.

24        Q.    Where did you grow up?

25        A.    Ansonia.

1          Q.    And you now live in Thomaston; is that

2     correct?

3          A.    Uh-huh -- yes.

4          Q.    "Yes"?

5          A.    Sorry.

6          Q.    How long have you worked for Black Widow

7     Pest Specialists?

8          A.    About a year and a half now, a little over

9     a year.  I can't recall what my actual hire date

10    was.

11         Q.    And at any point during your employment,

12    have you previously discussed this lawsuit with

13    Blake Black or anybody else?

14         A.    No.

15         Q.    Were you aware of this lawsuit?

16         A.    Just that he was going to court.  Nothing

17    specific.

18         Q.    Got it.

19               Prior to your employment with Black Widow

20    Pest Specialists roughly a year and a half ago,

21    where were you employed?

22         A.    Catseye.

23         Q.    What is Catseye?

24         A.    Another pest control company.

25         Q.    How long were you employed at Catseye?

1          A.    Two years.

2          Q.    **And prior to Catseye were you employed?**

3          A.    Yes.

4                I was actually doing landscaping before

5    that.

6          Q.    **Was Catseye your first employment in the**

7    **pest control industry?**

8          A.    It was.

9          Q.    **In terms of prior to the -- so how long --**

10   **what was the name of the landscaping company?**

11         A.    Hennessey Landscaping, LLC.  It was just

12   one of my buddies' businesses.

13         Q.    **And how long were you employed there?**

14         A.    Probably less than a year.

15         Q.    **And in terms of your level of education,**

16   **where -- what's the highest degree or level of**

17   **education you have obtained?**

18         A.    In general?

19         Q.    **Yeah.**

20         A.    High school.

21         Q.    **Did you do any formal education after**

22   **high school?**

23         A.    No.

24         Q.    **So then would you agree that it's mostly**

25   **on-the-job training that you've obtained in the pest**

1    control industry?

2        A.    No.   I mean, I've gone through plenty of

3    courses and certifications.   I'm sure a lot of it is

4    hands-on, especially with exclusion.   A lot of is

5    hands-on work, and it's something that you learn by

6    doing it.

7            But, yeah, I'm sure you're familiar with

8    the industry by now.   You know, you need to go

9    through a fair share of courses and licensing and

10   whatnot.

11       **Q.   So when did you complete those courses and**

12   **licensing?**

13       A.    My NWCO license I completed while I was at

14   Catseye.   It's required before doing any form of

15   wildlife exclusion.

16           My operator license I acquired maybe

17   two months after working for Blake, because I never

18   did pass it at Catseye.

19       **Q.   To your knowledge, is anybody else at**

20   **Black Widow Pest Specialists certified as an**

21   **operator?**

22       A.    A pest operator?

23       **Q.   Yeah.**

24       A.    Yes.

25       **Q.   Who would that be?**

1       A.    Jay.  Nate.  Brandon.  I think that's it.

2             (Reporter clarification.)

3       **Q.    Jay, Nate, and Brandon, you said?**

4       A.    Uh-huh.

5       **Q.    Are those all technicians employed by**

6       **Black Widow Pest Specialists, LLC?**

7       A.    They are.

8       **Q.    Would you also consider yourself to be a**

9       **technician?**

10      A.    I would.

11      **Q.    To your knowledge, does Blake Black have**

12      **an operator license?**

13      A.    I -- yeah, he has a supervisor.

14      **Q.    What's the difference between supervisor**

15      **and operator?**

16      A.    So, the supervisory, you have to go

17      through like extensive studying and tests.  I've

18      never seen what the course actually entails, but

19      I've heard it's a pretty hard test.  But in order

20      for you to have operator's work underneath you, you

21      have to be a licensed supervisor.

22      **Q.    And what sort of things do you learn in**

23      **the course of, let's talk about the operator**

24      **license?  What's kind of examples of things you**

25      **learn?**

1        A.    What pesticides to use, where, why not.

2              How to treat, where to treat.

3              What to be aware of, especially if you're

4    spraying insecticides; wind drift, you know,

5    neighboring yards.

6              Pretty much everything.

7        Q.    **And then the new -- was it N-E-W-C-O?**

8        A.    NWCO (nuisance wildlife control operator).

9        Q.    **And you said you obtained that while you**

10   **were working at --**

11       A.    Catseye.

12       Q.    **Catseye?**

13       A.    Uh-huh.  And then you renew it.

14       Q.    **How often do you renew it?**

15       A.    Every two years.  And every year you have

16   to submit a NWCO report for --

17              (Reporter clarification.)

18              (The record was read back.)

19              THE WITNESS:  You have to submit a NWCO

20   report.  N-W-C-O.

21   BY MR. WINTER:

22       Q.    **So talk about the operator license.**

23              **Was there formal coursework in terms of**

24   **either in a classroom or an online classroom**

25   **setting?**

1      A.   It's all online.  For your operator's
2   license it's online course.
3      **Q.   And then the NWCO one, is that the same?**
4      A.   In-person course.  You actually have to
5   take an in-person course, and then take the test
6   online.
7      **Q.   Where are -- well, let's talk about the**
8   **NWCO course.  Where is that course offered?**
9      A.   Multiple locations.
10          I actually took mine at Cabela's, by
11   Hartford, the actual town that's in.
12      **Q.   And then the operator license, you said**
13   **that was online?**
14      A.   Uh-huh.  I think it's through the DEEP
15   website, or something like that.
16      **Q.   D-E-E-P?**
17      A.   Yeah.  They usually -- when you apply for
18   it, they send you links.  And you just go through
19   the links in your e-mail.
20      **Q.   So DEEP would be the state --**
21      A.   Department of Environmental.
22          (Reporter interruption.)
23      **Q.   So the DEEP would be the state of**
24   **Connecticut's environmental regulators; is that**
25   **correct?**

 1      A.   Correct.

 2      Q.   So I think you said you did not have pest

 3   control experience before working with Black Widow

 4   Pest & Wild -- excuse me -- Black Widow Pest

 5   Specialists, but you had wildlife experience.  Is

 6   that accurate?

 7      A.   Yes, it is.

 8      Q.   Does Catseye, to your knowledge, do pest

 9   control?

10      A.   They do.

11      Q.   And so I see you're wearing a shirt today

12   that includes a logo.

13           Is that your -- the company's logo for

14   Black Widow Pest Specialists, LLC?

15      A.   It is.

16      Q.   Do you ordinarily wear shirts like that or

17   contain that logo to every job you go to?

18      A.   We do.

19      Q.   Is that a company policy?

20      A.   It is.

21      Q.   Do you have any understanding or idea why

22   that is company policy?

23           MR. CARROLL:  Objection.

24           THE WITNESS:  I would assume it's just

25   uniform, as any in other company.

1    BY MR. WINTER:

2        **Q.   So would you agree with me that that**

3    **company logo is generally always visible to**

4    **customers that you go and service their houses?**

5        A.   Sure.

6        **Q.   Does part of your work as a technician**

7    **involve doing any sales functions?**

8        A.   Yes.

9        **Q.   Could you elaborate on that, please.**

10       A.   I do like new inspections and quarterly

11   sales, and stuff like that.

12            I deal with a lot of the new customers and

13   new starts, stuff like that.

14            And I don't do any customer service.  But

15   I do -- I will talk with customers, you know, after

16   if they have questions.

17       **Q.   So new inspections; what do you mean by a**

18   **"new inspection"?**

19       A.   As in a new customer that would reach out

20   for service.  Someone that we don't already service.

21       **Q.   And so you would go to their location, you**

22   **would walk around or inspect it, and see what**

23   **services you could provide to them, or that they may**

24   **need?  Is that --**

25       A.   Correct.  So -- that's it.

1      Q.   And then after that inspection, would you

2   work up, say, an estimate?

3      A.   Yes.

4           (Plaintiff's Exhibit 21 was previously

5   marked.)

6   BY MR. WINTER:

7      Q.   I'm handing you PX 21 which was marked

8   yesterday.

9           So after you do a new inspection, is this

10  an example of something that you would generate and

11  give to the customer?

12     A.   It is.

13     Q.   And do you personally generate these types

14  of documents?

15     A.   So we have pre-write-ups, and then you add

16  into it anything specific, you know, to the home.

17     Q.   So there's, basically, a form estimate or

18  agreement that you would have, that you would then

19  customize to whatever the inspection showed you.  Is

20  that accurate?

21     A.   Yes.

22     Q.   And do all of those estimates include the

23  same logo that is on your shirt?

24     A.   Yes.

25     Q.   Do you have any knowledge of why that

1    would be on the estimate?

2         A.    Recognition, I would assume.

3         Q.    What do you mean by "recognition"?

4         A.    I mean, obviously, our name is on it.  But

5    seeing our company logo, knows exactly what -- shows

6    exactly were it's coming from.  A lot of times

7    people will just skim past something.

8         Q.    Got it.

9              So you want to make sure the customer

10   knows they're purchasing services from a company

11   called Black Widow; is that right?

12        A.    Sure.

13        Q.    So after you mentioned new inspections,

14   I believe you mentioned quarterly sales?

15        A.    Uh-huh -- yes.

16        Q.    Does quarterly sales involve a similar

17   estimate or agreement of some type?

18        A.    Yes.

19              Whenever we're setting up a quarterly,

20   anytime that any rodenticide or any kind of

21   pesticide is placed, there has to be a signed

22   agreement.

23        Q.    And so what's the -- what's an example of

24   the types of services that would be involved in a

25   quarterly sales?

1       A.   Rodent baiting.  Foundation treatments.

2  Depending on the level of quarterly, tick,

3  mosquitoes, termite baiting.  Pretty much all your

4  typical pest service.  And baiting -- gel baiting.

5       **Q.   And so in the situation where you're --**

6  **for doing a quarterly sales function, would you,**

7  **like a new inspection, go to visit the customer's**

8  **location?**

9       A.   Yes.

10          So typically they'll call for an issue.

11  And you go, thoroughly, look the house through, top

12  to bottom.

13      **Q.   And then from that you would generate a**

14  **document, such as the estimate in front of you, that**

15  **would summarize what the proposal is to do?**

16      A.   Correct.

17      **Q.   Can you turn to last page of PX 21.**

18          **Is that an example of something that looks**

19  **like quarterly sales?**

20      A.   Yes.

21          This -- this one is an estimate, though.

22  This is one that's sent for someone that's

23  undecided.  This is what they'll receive before

24  signing.

25      **Q.   I got it.**

1              **And then --**

2       A.    This is not an invoice.  This is a

3    generated estimate.

4       **Q.    Got it.**

5              **And then after the generated estimate,**

6    **what type of document would be generated for them to**

7    **agree to --**

8       A.    They need to sign -- sorry.

9              They need to sign it.

10      **Q.    They need to sign the last -- that**

11   **document that's in front of you, or a different**

12   **document gets created?**

13      A.    So the -- when they get sent an estimate

14   via e-mail, they'll be able to click and open the

15   link, and it will generate it to an invoice.  They

16   can sign the invoice, leave a deposit.  And then --

17      **Q.    Got it.**

18      A.    -- it turns it into a signed document for

19   their contract.

20      **Q.    Understood.**

21            **And when you click through the link, you**

22   **said an invoice is generated?**

23      A.    Uh-huh -- yes.

24            Sorry.  I'm new to this.

25      **Q.    No worries.  We'll -- so -- okay.**

1              So an invoice is generated.

2              Does the invoice also include the

3    Black Widow logo that is on your shirt and on the

4    first page of the exhibit in front of you?

5         A.    I think so.

6         Q.    Have you seen those invoices before?

7         A.    I see them on my end, but I've never seen

8    them through the customer e-mail.  So I --

9         Q.    Got it.

10             Are the invoices different than what's on

11   the first page of PX 21?

12        A.    No.

13             No, other than, this one -- this one isn't

14   one that we started.  So it's an actual generated

15   invoice, and job that was set up, will have material

16   added to it.

17        Q.    When you say "material added to it," what

18   does that mean --

19        A.    Anything you use; rodenticides, baits,

20   insecticides.

21        Q.    And when you say "quarterly sales," are

22   you then visiting that customer location once per

23   quarter or does it vary?

24        A.    Depends on the severity of the problem.

25             If it's just a minor rodent issue, we'll

1    probably go back every quarter.

2          If it's a bad rodent issue, and we're

3    setting it up initially, we'll probably go back a

4    couple times within the first two months to make

5    sure that we stay on top of it.

6    **Q.   And then after you go back several times**

7    **for the first two months, would you then hopefully**

8    **switch to a more quarterly --**

9    A.   Correct.

10   **Q.   I think you said earlier that you don't do**

11   **customer service, but you talk to customers,**

12   **I guess, on the jobsite.  Is that accurate?**

13   A.   So I don't answer any -- like, you know,

14   I don't answer new incoming calls.  You know, like

15   the phones are ringing, I'll deal with new

16   customers.

17         But I only -- I'll only return calls to

18   like customers that have questions.  If we're going

19   to be doing a big job, and they want more info on

20   it, you know, deeper information on the work that

21   we're going to be doing, I'll return calls to those

22   customers, just to give them a rundown.

23   **Q.   When you return those calls to the**

24   **customer, how do you identify yourself?**

25   A.   Mike from Black Widow Pest.

1        Q.    And do you always identify yourself as

2    Mike from Black Widow Pest?

3        A.    Yeah.   Mike from Black Widow Pest

4    Specialists.

5        Q.    And is that because there's a company

6    policy to refer to your personal name, and then the

7    name of the company right after that, when you talk

8    to customers?

9        A.    No.   I just think it's good for them to

10   know who they're answering the phone to.   I could

11   just be Mike from anywhere.

12       Q.    So it's important to make the connection

13   between the company Black Widow, and so they know

14   who they're buying from; is that correct?

15       A.    Sure.

16       Q.    So when you said you don't do customer

17   service, is that -- what you mean by that is, that

18   you don't answer kind of the initial call from the

19   customer?

20       A.    Correct, correct.

21       Q.    Okay.

22             And then other than the examples you just

23   mentioned, where you're calling a customer,

24   identifying yourself as Mike from Black Widow Pest,

25   and answering any questions they may have about

1  service that will be performed, do you have other

2  interfaces with customers?

3      A.   Other than face-to-face, no.

4      Q.   And those face-to-face interactions, are

5  you always wearing a shirt or some form of apparel

6  that shows the Black Widow logo on it?

7      A.   I am.

8           (Plaintiff's Exhibit 16 was previously

9  marked.)

10 BY MR. WINTER:

11      Q.   When I refer to the "Black Widow logo,"

12 just for the record, that refers to what's shown on

13 PX 16; is that correct?

14      A.   Correct.

15      Q.   And that's what you're referring -- we're

16 referring to throughout this deposition so far?

17      A.   Correct.

18      Q.   And so when I say the "Black Widow logo"

19 from here on out, you understand that I'll be

20 referring to what's on PX 16?

21      A.   I do.

22      Q.   Okay.

23           So looking at the logo, it includes the

24 words "Black Widow" in a bold font of the largest

25 size of any other font.  And then below it it says,

1    "Pest Specialists," and then below that a phone

2    number, both in smaller fonts below "Black Widow."

3    And then the logo also includes a drawing of a

4    spider.

5            Is that an accurate description of the

6    logo?

7        A.  I would say so.

8        Q.  Would you agree with me that the color

9    scheme is black and red in that logo?

10       A.  It is.

11       Q.  The company logo shown on PX 16, it

12   doesn't include colors other than black and red and

13   white.  Is that accurate?

14       A.  It is.

15       Q.  Have you ever looked at your company's

16   website before?

17       A.  I have.

18           (Plaintiff's Exhibit 20 was previously

19   marked.)

20   BY MR. WINTER:

21       Q.  I'm handing you PX 20.

22           Is that an accurate depiction of your

23   company's website?

24       A.  Yeah.  One section of it, yeah.

25       Q.  And at the top left of that photo, do you

1    see a different variant of the logo on PX 16?

2        A.    In this top left right here?

3        **Q.    Yeah.**

4        A.    I mean, I guess you could say it's a

5    different variant; just shrunken down.

6        **Q.    And the spider drawing is to the left of**

7    **the words "Black Widow"; is that correct?**

8        A.    Correct.

9        **Q.    Are you aware of any other variations of**

10   **the logo?**

11       A.    No.

12       **Q.    Have you ever tried to access that website**

13   **from a state outside of Connecticut?**

14       A.    Nope.

15       **Q.    Are you aware of any restrictions that**

16   **would prevent somebody from accessing that website**

17   **outside of the state of Connecticut?**

18       A.    Nope.

19       **Q.    To your understanding, does -- does the**

20   **company work for -- market to the general public?**

21            MR. CARROLL:  Objection.

22            THE WITNESS:  I don't know.

23   BY MR. WINTER:

24       **Q.    Do you service the general public?**

25       A.    Yes.

1      Q.   Does your company also service commercial

2   establishments?

3      A.   We do.

4      Q.   When I say "commercial establishments,"

5   can there be -- would you consider a large

6   residential complex a commercial establishment?

7      A.   Yes.

8      Q.   And then would you consider another

9   example of commercial establishment like a business

10   or a warehouse, something like that?

11      A.   Yes.

12      Q.   Are there any other commercial

13   establishments that wouldn't fall into those

14   two categories?

15      A.   Restaurants.

16      Q.   Does -- have you serviced restaurants

17   before in connection with working with Black Widow

18   Pest Specialists, LLC?

19      A.   Only to fill in.  One of our -- one of our

20   other guys does most of the commercial pests.  So

21   only on days where he doesn't come in or his route

22   got changed.

23      Q.   Who is that other person who does

24   commercial --

25      A.   (Indiscernible.)

```
 1            (Reporter clarification.)

 2              THE WITNESS:  Jay.

 3   BY MR. WINTER:

 4        Q.    Is there anybody else that does commercial

 5   pest?

 6        A.    Brandon.

 7        Q.    Anybody else?

 8        A.    Blake.

 9        Q.    Anybody else?

10        A.    (Witness shakes head.)

11        Q.    You have to say "no"?

12        A.    No.

13        Q.    Sorry.

14              Have you ever been to the Success Village

15   before?

16        A.    I have.

17        Q.    Do you go -- do you personally go there

18   frequently?

19        A.    Not frequently.

20        Q.    How often would you say in the last

21   year -- or, in the last -- since January have you

22   been there?

23        A.    Twice.

24        Q.    To your knowledge, do other technicians at

25   your company go there frequently?
```

1      A.    They do.

2      Q.    How frequently would you say?

3      A.    Sometimes weekly, sometimes biweekly.

4      Q.    Is -- would you consider Success Village

5  to be a large customer of Black Widow Pest

6  Specialists, LLC?

7      A.    No.

8      Q.    Why do you say that?

9      A.    They definitely have a lot work, but not

10 consistent.  It tapers.

11     Q.    Who would you consider to be an example

12 of a large customer of Black Widow Pest

13 Specialists, LLC?

14     A.    More property managers than Success

15 specifically.

16     Q.    What -- when you say "property managers,"

17 what types of properties do those property managers

18 manage, to your knowledge?

19     A.    Like rentals, duplexes.

20     Q.    And so are those property managers

21 engaging your company for quarterly sales or other

22 situations?

23     A.    Sure, some of them.

24     Q.    So both?

25     A.    Yeah.

1      Q.    Do you -- do you spend a lot time going

2    and working for prop -- working on properties that

3    those property managers call you-all to work for?

4      A.    Depends.  Some of the property managers

5    want just your typical pest service.  Some we do

6    full exclusion for.

7            If we -- if these property managers are a

8    typical pest customer, and they have wildlife

9    issues, then they become an exclusion customer while

10   they're a customer as well.

11     Q.    When you say a "typical pest customer,"

12   what specifically in terms of the services do you

13   mean by that?

14     A.    Like your small rodent baiting, interior

15   insect baiting, one-time services.  Stuff like that.

16     Q.    And so is a typical pest customer, to your

17   knowledge, on a quarterly sales or subscription

18   model?

19     A.    Not always.

20     Q.    So it would vary, depending on what the

21   needs are of the customer?

22     A.    Correct.

23     Q.    You mentioned earlier, when we were

24   talking about customer service and when you're

25   calling customers back, how does -- how does it get

1  to be that you are the one to call that customer

2  back?

3       A.   I guess I'm the most knowledgeable in most

4  exclusion, which is mostly, like, the customers have

5  questions about -- a lot -- you know, a lot of

6  customers will have questions about their, you know,

7  rodent baiting or rodenticides or chemicals,

8  whatever.

9            But for the most part, all the callbacks

10  that I have to do are requiring like large repairs;

11  how we're going to do it, what we're going to do,

12  what we're going to use, et cetera.

13       Q.   What's an example of a recent large repair

14  that you've done.

15       A.   Like a bat exclusion.

16       Q.   Can you explain to me what types of things

17  are involved in a bat exclusion?

18       A.   So when you do a bat exclusion, you have

19  to close up every little small nook or cranny on the

20  house, and it varies per house, obviously.  Some

21  have stone on the front, some are vinyl, some are

22  wood.  Some have a metal roof.

23            So installing stuff in those roof

24  intersections or closing off those stone faces, you

25  know, like I said, every house varies.

1        Q.    In terms of routing or where to go on a

2   daily basis, how do you -- how do you know where to

3   go?

4        A.    I look at my schedule.

5        Q.    How is that schedule generated?

6        A.    Through the office.

7        Q.    Who provides you that schedule?

8        A.    Our office girl.

9        Q.    Who is that?

10       A.    Kara [ph.].

11       Q.    Do you know how the schedule is generated?

12       A.    Through incoming calls.  And then we have

13  a software that we can put all of the stops on, and

14  it will show us efficient routing.  And then we can

15  kind of move it around to make it make sense for the

16  techs.

17       Q.    And what is that software?

18       A.    GorillaDesk.

19       Q.    Other than route and accessing the

20  GorillaDesk software for your daily routes, what

21  other interface do you have with the GorillaDesk

22  software?

23       A.    Other than generating estimates and stuff

24  for customers, I don't.

25       Q.    And when you say "generating estimates,"

1    you're referring to something like what -- PX 21,

2    which is in front of you?

3         A.   Yes.

4         Q.   Now, you have -- in connection with going

5    along these routes and performing the services, do

6    you have any materials that you use?

7         A.   Like building materials?

8         Q.   Just --

9         A.   In general?

10        Depends on what kind of job you're talking

11   about.

12        Q.   Where do you get those materials from?

13        A.   Any local distributor.

14        Q.   And when you start your route during the

15   day, do you start it from Thomaston and go directly

16   to a customer, or do you go to a central location to

17   pick things up?

18        A.   So we have a central location.  Typically,

19   once a week, we'll stock the trucks.  After that, we

20   go directly to jobs from our houses.

21        Q.   And the central location, what is that?

22        A.   That would be 108 Curtiss --

23        Q.   And that's --

24        A.   -- in Naugatuck.

25        Q.   And that's Blake's personal residence; is

1    that right?

2        A.    It is, it is.

3        Q.    Is there a warehouse or storage or some

4    sort of facility there?

5        A.    Yeah.  We have a detached-lock back

6    storage shed, marked and labeled.

7        Q.    And then you mentioned a truck.

8              Are you provided with a company truck?

9        A.    I am.

10        Q.    Does that company truck contain or show

11    the logo shown on PX 16?

12        A.    It does.

13        Q.    Do you believe that helps your company

14    brand become visible to customers?

15        A.    I believe it helps any company.

16        Q.    Why do you say that?

17        A.    Recognition.

18        Q.    Why is the recognition important?

19        A.    So they know who they're looking at, or

20    who they're hiring, or who's pulling in their

21    driveway.

22        Q.    In your typical day, how many locations do

23    you tend to go to?

24        A.    Any from two to fifteen.  As many I can

25    squeeze in.

1          Q.    And so if you're talking about the higher

2    end of fifteen, do you tend to be doing, I guess,

3    what you called the "typical pest customer" work?

4          A.    Yeah.  It could be just a quick pest

5    service, like a residential pest service.  Or

6    usually it's -- for me, it's all like new

7    inspections.

8          Q.    And so when you -- when you say -- so if

9    you go out and try to do multiple new inspections in

10   one day, those are all for new customers that you

11   have not yet -- they have not yet hired the company;

12   is that correct?

13         A.    Correct.

14         Q.    So that's your sales function that we

15   talked about earlier?

16         A.    Correct.

17         Q.    Have you ever serviced any locations

18   outside of Connecticut?

19         A.    No.

20         Q.    Are there any standard service fees or

21   pricing guidelines that you use in the sales

22   process?

23         A.    We charge an inspection fee.

24               Other than that, we have, you know, our

25   baseline pricing per services.  But that's really

1  the only out-of-the-ordinary one, I guess.

2      **Q.    Inspection fee of, how much is that?**

3      A.    150 bucks.

4      **Q.    And then you mentioned the baseline**

5  **pricing.**

6          **Is that in the form of a written document**

7  **of some kind?  How's that communicated to you?**

8      A.    Again, per job.  It depends on the size of

9  the house, how much material you're using.  That's

10  all the specifics that go into an estimate.

11      **Q.    How do you -- how would you gen -- or,**

12  **create, after your inspection, using the baseline**

13  **pricing, the -- an estimate such as the one on PX 21**

14  **in front of you?**

15      A.    As in how do I come up with a price?

16      **Q.    Yes.**

17      A.    Again, material size of the house, square

18  footage.  How bad the issue is.  Where in the house;

19  is it easy to access?  Do you have to get on the

20  roof at all?  Do you have go in a crawlspace?

21          There's a lot of factors into it.

22      **Q.    When you're -- so what sort of information**

23  **is in the baseline?  Is there a baseline pricing**

24  **document?**

25      A.    So we have like your baseline estimate

1    for, say, our bottom-line quarterly.  And it will

2    have your -- it will have an average price on it.

3              But very rarely is a house based off of

4    just our bottom-line base, you know, quarterly

5    price.

6         **Q.    And so it would be adjusted up, depending**

7    **on the complexity of the job?**

8         A.    Correct.

9         **Q.    And, potentially, adjusted down if it's**

10   **really simple?**

11        A.    Correct.

12        **Q.    Other than the inspection fee, is there**

13   **any other, I guess, flat or standard type of service**

14   **fee that you -- that your company uses?**

15        A.    Not that I can remember.

16        **Q.    Are you involved in collecting checks or**

17   **payments from any customers?**

18        A.    Sure.  Some pay cash, some pay check.

19        **Q.    When they pay cash, how does, to your**

20   **knowledge, that get given to the company?**

21        A.    It all gets -- we all bring it right back

22   to the office.  You know, we collect -- we have a

23   nice filing system for all the guys.  And everything

24   everybody collects, they bring back to our location

25   on Mondays.

1       Q.    Then do you collect -- do you ever collect

2    checks from customers?

3       A.    Sure.

4       Q.    Are those checks made out to Black Widow

5    Pest Specialists, LLC?

6       A.    They are.

7       Q.    Then you said every Monday you come back

8    and you give it to...?

9       A.    Yeah, usually Blake and Kara are in the

10   office.  We have a whole filing system for

11   everything.

12      Q.    What is that filing system, to describe

13   it?

14      A.    How they deposit it, I don't know.

15            But we have, you know, an actual -- we

16   have all -- a whole binder set up, everything for,

17   like, material sign-out, any payments, and any

18   documents that need to be, you know, pushed through,

19   time-off requests, and stuff like that.

20      Q.    In connection with your job, would you say

21   you speak to Blake regularly, or --

22      A.    Yes.

23      Q.    -- multiple times a day?

24      A.    Sometimes.

25            Sometimes I don't talk to him for

1    two days.

**2        Q.   And at, I think you said, 108 Curtiss**

**3    Street, does Kara work there?**

4        A.   She does sometimes.  She works from home

5    other times.

**6        Q.   Going back to the sales function, how is**

**7    it that you get -- strike that.**

**8            Do you ever get referrals for your**

**9    business -- for the business?  Do other people ever**

**10   get -- refer friends to the -- that they know, that**

**11   you've worked on their homes?**

12       A.   Sure.  Just current --

13           MR. CARROLL:  Objection.

14           Just give me a little time.

15           THE WITNESS:  Just current customers, you

16   know.

17   BY MR. WINTER:

**18       Q.   So current customers may sometimes refer a**

**19   friend to the business?**

20       A.   Sure.

**21       Q.   And would you have knowledge of those**

**22   referrals?**

23       A.   Only if I'm the one dealing with the

24   customer and they tell me, Hey, my cousin's house

25   has this problem.  Do you think check it out, too?

1          Other than that, no.

2      Q.   At which point, if you get that referral,

3  how is it input and tracked into the system?

4      A.   If I were to get a referral in person like

5  that, I would ask for their contact information, and

6  reach out to them to schedule an appointment, or

7  send it to Kara and have her reach out to schedule

8  it.

9      Q.   And so then once it's scheduled by Kara,

10 you would then go and do a new inspection, prepare

11 the estimate, all those things that we talked about?

12     A.   Correct.

13          (Plaintiff's Exhibit 27 was previously

14 marked.)

15 BY MR. WINTER:

16     Q.   I will hand you PX 27.

17          Is that an accurate depiction of a truck

18 that your employer uses?

19     A.   It is.

20     Q.   Is that your truck?

21     A.   I'm actually using it right now, but

22 that's not the one that I use every day.

23          We had a truck go down this week, so

24 I picked up this one and shuffled around.

25     Q.   Is there any standards or guidelines that

1  you're aware of for how those trucks are lettered or

2  decorated with the logo?

3       A.   No standard.

4            We actually just picked a new lettering

5  company and let them kind of design it, and we just

6  matched all the trucks.

7       Q.   And with the new letter company and the

8  design they generated, have you seen that design?

9       A.   Not before it's applied, no.

10           I drop the trucks off, but I have nothing

11 to do with it on the back end.

12      Q.   And then when was -- when that new design

13 was applied, does it include the logo found on PX 16

14 in front of you?

15      A.   Yes.

16      Q.   Do all the trucks include the logo on

17 PX -- that are found on PX 16?

18      A.   They do.

19      Q.   Do you see the back of that truck, on the

20 tailgate it says just "Black Widow"?  Do you see

21 that?

22      A.   I do.

23      Q.   Do all the trucks include that on the

24 tailgate?

25      A.   I don't think so.  Not in that design.

1          Q.    Do others of the trucks include

2    "Black Widow"?

3          A.    Yeah, yeah.

4          Q.    And that would be on the tailgate without

5    the spider design next to it; is that correct?

6          A.    Correct.

7                I can't even remember if my truck has that

8    or not.  I would have to look at it.

9          Q.    Okay.

10               Do all of the truck letterings include a

11   phone number associated with the business?

12         A.    They do.

13         Q.    Have you ever heard customers say that

14   they saw the van driving around and called?

15         A.    Maybe once or twice.

16         Q.    Do you ever -- when you are doing your

17   sales function, ever learn about how customers were

18   referred to you or how they came to you?

19         A.    I do.

20         Q.    What are some examples of that?

21         A.    Word of mouth.

22         Q.    When you say "word of mouth," what do you

23   mean?

24         A.    Word-of-mouth referrals.

25         Q.    So they would -- so word-of-mouth referral

1    would be that someone identified Black Widow Pest

2    Specialists, and recommended that customer call

3    Black Widow Pest Specialists?

4        A.   Or current customers referring us to new

5    ones.

6        Q.   To your knowledge, have any of those

7    referrals referred to anything other than the

8    company name?

9        A.   No.

10       Q.   Are you familiar with, other than the

11   Catseye one, other pest control companies in

12   Connecticut?

13       A.   Sure, yeah.

14       Q.   If you were to list, based on your

15   experience in the industry, the three biggest, what

16   would they be?

17       A.   Orkin, Terminix, Catseye, Fox

18   (indiscernible).

19            (Reporter clarification.)

20            THE WITNESS:  Fox Pest Control.

21   BY MR. WINTER:

22       Q.   In terms of Orkin, when you said they're

23   one of the largest pest controls in Connecticut --

24   pest control companies in Connecticut, what would

25   you say is their size relative to your current

1  company?

2       A.  Oh, I have no idea.

3       Q.  **In an order of magnitude, what do you**

4  **think?**

5       A.  Couldn't tell you.

6       Q.  **Would that be the same answer for Terminix**

7  **and Fox?**

8       A.  Yeah.

9       Q.  **Then, Catseye, do you know how large they**

10 **are in Connecticut?**

11      A.  Customer base, I don't know.  But they

12 service more than just Connecticut.  They do

13 New York and Massachusetts and Rhode Island.

14      Q.  **Do they -- does Catseye, to your**

15 **knowledge, have a single location in Connecticut or**

16 **multiple locations in Connecticut?**

17      A.  When I worked there they only had a

18 Cromwell location.  But they were talking about

19 opening a new one down in Fairfield County.  I don't

20 know if they ever did that or not.

21      Q.  **Do you have any idea of how many trucks**

22 **Catseye had on the road, in general?**

23      A.  All of them?

24      Q.  **Yeah.**

25      A.  Just for Connecticut, probably anywhere

1    from, like, 14 to 20, 15 to 20.

2        Q.    And your company, how many trucks are on

3    the road at any given point?

4        A.    Four to five.

5        Q.    So Catseye is, roughly, three to four to

6    five -- three to five times the size in terms of the

7    number of trucks as compared to your company?

8        A.    I mean, if you're going off of just the

9    amount of employees they have, I don't think that

10   would be accurate.  I would probably go off their

11   customer base versus how many employees they have.

12       Q.    Well -- so based on their customer base,

13   how large --

14       A.    That, I couldn't tell you.

15       Q.    Do you have any knowledge of the size of

16   your company's customer base?

17       A.    Uh-uh.

18       Q.    You have to --

19       A.    No.

20       Q.    You're getting a lot better.

21          (Reporter interruption.)

22       Q.    Do you consider your company to be one of

23   the larger pest control companies in Connecticut?

24       A.    No.

25       Q.    When I say "larger pest control

1    companies," what would you qualify that as?  What is

2    a larger pest control company?

3         A.    One of these on the list.

4         Q.    So what -- what characteristics of those

5    companies make them one of the larger?

6         A.    I guess the amount of employees, amount of

7    customers.  The amount that they put into

8    advertising, marketing.  I mean, all of it.

9         (Off the record.)

10   BY MR. WINTER:

11        Q.    Are you aware of the amount of advertising

12   that your company does?

13        A.    No.

14        Q.    Do you -- are there any companies that you

15   would consider to be your company's main competitors

16   in Connecticut?

17        A.    No.  I don't think we have any

18   competition.

19              Any of the larger companies are kind of in

20   their own bracket.

21        Q.    What do you mean by that?

22        A.    They're so large, and they have the money

23   to do all of their advertising and set billboards

24   and et cetera, et cetera.  So it just puts them in a

25   different size bracket I would say.

1      Q.   From a pricing perspective, does that make

2    you-all less expensive?

3      A.   No.

4      Q.   When you say you don't have any

5    competition, what do you mean by that?

6      A.   I would say that anybody -- any other

7    company that we were, quote/unquote, competing with

8    is pretty much at the same level as us.

9      Q.   When you say same "levels of us," would

10   you consider -- would that be small? medium? large?

11   How would you describe the level?

12     A.   Small -- sorry.

13          Small.

14     Q.   So you would agree that your current

15   company is a small pest and wildlife control

16   company?

17     A.   Yes.

18     Q.   Would there be a medium category that you

19   would consider to exist?

20     A.   Sure.

21     Q.   What would be the characteristics of a

22   medium-size pest and wildlife control company?

23     A.   Probably a company in between, you know,

24   8 to 10 employees with a larger customer base.

25     Q.   Do you know of any examples of such

1  companies in Connecticut?

2       A.   Not off the top of my head.

3       Q.   And then the larger ones you mentioned --

4  Orkin, Terminix, Catseye, and Fox -- would you

5  consider those to be more regional or national

6  brands?

7       A.   Regional.

8            I'm not sure how far Orkin or Terminix

9  goes.  But like I said, I know Catseye services

10 New England.

11      Q.   Are you aware of any discussions or

12 efforts of your company to expand outside of

13 Connecticut?

14      A.   No.

15           (Plaintiff's Exhibit 25 was previously

16 marked.)

17 BY MR. WINTER:

18      Q.   I'm handing you a document there, marked

19 PX -- or, Plaintiff's Exhibit 25.

20           Do you see that in front of you?

21      A.   I do.

22      Q.   On the bottom, do you see your company's

23 logo, the same one that's on PX-16?

24      A.   I do.

25      Q.   Have you ever seen the logo on the top

1    before?

2         A.    Never.

3         Q.    Would you agree both logos include the

4    words "Black Widow" in there?

5         A.    They do, in different fonts.

6         Q.    Do both logos include the color black?

7         A.    They do.

8         Q.    Do both logos include the color red?

9         A.    They do.

10        Q.    Do both logos include a drawing of a

11   spider?

12        A.    They do.  One is more animated.

13        Q.    Which one is more animated?

14        A.    The top one.

15        Q.    They both include the word "Pest"; is that

16   correct?

17        A.    They do.

18        Q.    The words "Black Widow" in both logos are

19   of the largest font size; is that correct?

20        A.    They do.

21        Q.    If you had to approximate the relative

22   font size in the bottom logo, what would you say it

23   is between "Black Widow" and "Pest Specialists"?

24              MR. CARROLL:  Objection.

25              THE WITNESS:  The difference in size?

1    BY MR. WINTER:

2        Q.    Is it like double?  Is it triple?

3              What do you think?

4        A.    I would say it's double.

5        Q.    And then in the logo on the top, would you

6    say it's roughly double or triple?

7        A.    Triple or quadruple.

8        Q.    Would you agree that the words

9    "Black Widow" are used with emphasis in both logos?

10             MR. CARROLL:  Objection.

11             THE WITNESS:  Yeah.

12             More so this one because of the font.

13   BY MR. WINTER:

14       Q.    "This one" meaning the top one?

15       A.    Correct.

16       Q.    When customers call your company or refer

17   to your company, they usually refer to them using

18   the words "Black Widow"; is that correct?

19       A.    They do.

20       Q.    And, again, when you call back customers,

21   you always use the words "Black Widow" to identify

22   the company; is that correct?

23       A.    I do.

24       Q.    Are you aware of what a "trademark" is?

25       A.    Sure, yeah.

  
1        Q.    What's your awareness of what a trademark

2   is?

3        A.    I would say what a company uses to

4   represent theirself.

5        Q.    Do you think the trademark is important

6   for the company to identify themselves to customers?

7               MR. CARROLL:  Objection.

8               THE WITNESS:  Sometimes, yeah.

9   BY MR. WINTER:

10       Q.    Would you agree that a trademark is how

11  customers recognize companies?

12               MR. CARROLL:  Objection.

13               THE WITNESS:  Sometimes.

14  BY MR. WINTER:

15       Q.    Have you ever heard of, before today, I'm

16  pointing to the top of Plaintiff's Exhibit 25,

17  "Black Widow Termite & Pest Control Corp."?

18       A.    Before this, no.

19       Q.    "Before this" meaning this deposition?

20       A.    Uh-huh.

21       Q.    You have to say "yes."

22       A.    Yes.

23       Q.    Prior to seeing that reference in front of

24  you, too, Black Widow Termite Pest Control Corp.,

25  had you ever heard of any other company using

1  "Black Widow" for pest control services?

2      A.    No.

3      Q.    Have you ever googled "Black Widow"?

4      A.    Other than our own, no.

5      Q.    So you would have searched on Google,

6  "Black Widow"?

7      A.    If I google "Black Widow Pest

8  Specialists," we're the only one that comes up.  And

9  the only other time I ever go on there is to look at

10 Google Reviews.

11     Q.    Why do you look at Google Reviews?

12     A.    To see what the customers are saying.

13     Q.    And so you have personally gone onto

14 Google and typed -- what would you type in?

15     A.    "Black Widow Pest Specialists."

16     Q.    And you said your company is the only one

17 that comes up?

18     A.    Uh-huh.

19           You know, I've never gone searching.  I'm

20 usually just going (indiscernible), like I said, our

21 Google Reviews, so....

22     Q.    Do you know who Jim Horton is?

23     A.    I know him, yeah, not personally.  But

24 I've seen him at conferences before.

25     Q.    So you've -- you've spoken to him

1  personally?

2      A.   I've met him, said Hi, but no personal

3  conversations.

4      Q.   Do you know where -- do you know what he

5  does for work?

6      A.   I think he has something to do with NWCO,

7  like the NWCO board, maybe.  I think he was at the

8  wildlife expo.

9      Q.   Where was the wildlife expo?

10     A.   In Houston.

11     Q.   Did you visit the wildlife expo in

12  Houston?

13     A.   Uh-huh -- yes.

14     Q.   Was that wildlife expo in Houston this

15  year in February?

16     A.   Yes.

17     Q.   Did you go with Blake?

18     A.   I did.

19     Q.   Did you meet anyone named

20  Shane Dietrich [ph.] there?

21     A.   Not me.

22     Q.   Did you meet Jonas Olson there?

23     A.   That name sounds familiar, but I didn't

24  meet him.

25     Q.   Why does that name sound familiar?

1    A.    I'm pretty sure I heard of him at the

2    expo.

3    **Q.    Under what -- sorry.  Did you finish your**

4    **answer?**

5    A.    I can't remember where I would have heard

6    him, though.  I think it was something along the

7    lines of me sitting in on, like -- they held, like,

8    individual classes and courses while I was there.

9          You know, it was just somebody saying, I'm

10   going to meet up with Shane after this.

11         But nothing personal.

12   **Q.    Have you ever heard of Pest Badger or**

13   **Turf Badger?**

14   A.    No.

15   **Q.    How about Pest Control Millionaire**

16   **podcast?**

17   A.    That one I have, yeah.

18   **Q.    How have you heard of that one?**

19   A.    That, I actually listened in to.

20   **Q.    Do you listen in to it regularly?**

21   A.    Uh-uh.  Just that one.

22   **Q.    "That one" meaning the one that Blake**

23   **appeared on?**

24   A.    Yeah.

25   **Q.    Why did you listen in on that one?**

1      A.    Just because he said he had did a podcast.

2  I don't -- I didn't know much about it.

3      **Q.    Did you have any impressions or thoughts**

4  **on the podcast or what it did for visibility of your**

5  **company?**

6           MR. CARROLL:  Objection.

7           THE WITNESS:  No.

8           (Plaintiff's Exhibit 24 was previously

9  marked.)

10  BY MR. WINTER:

11      **Q.    Getting back to Jim Horton, I'm handing**

12  **you a document marked Plaintiff's Exhibit 24.**

13           **Have you ever seen the photos?**

14      A.    No.

15      **Q.    Jim Horton, to your knowledge, does he --**

16  **do you have any knowledge of whether he services**

17  **New York customers?**

18      A.    I mean, I'm assuming so, he was able to

19  see some of their customers.

20      **Q.    When you say "their customers," what do**

21  **you refer to?**

22      A.    This Black Widow.

23      **Q.    So you're pointing to --**

24      A.    These glue boards.

25      **Q.    So in PX 24 there's a photo on the left**

1    side.

2            And when you're mentioning the glue

3    boards, it's one that displays the top logo on

4    Plaintiff's Exhibit 25.  Correct?

5        A.   Correct.

6        Q.   Just so you know the reason I did that is

7    because pointing doesn't show up on the written

8    record.

9        A.   Correct, yeah.

10        Q.   And so you recognize that logo as -- that

11    logo in the photo, PX 20 -- Plaintiff's Exhibit 24,

12    as the same logo on the top of Plaintiff's

13    Exhibit 25 immediately; is that correct?

14        A.   I do.  They're distinctively different.

15        Q.   And do you see this text message mentions

16    "It's Merina" [ph.]?

17        A.   Uh-huh.

18        Q.   Who's Merina?

19        A.   Our old office girl.

20        Q.   And what was her -- what were her job

21    responsibilities?

22        A.   Customer service, I guess.  Answering

23    phones.  Scheduling.

24        Q.   Is that the same role that Kara currently

25    holds?

1       A.    It is.

2       Q.    **Did Merina and Kara, I guess, share that**

3  **role?**

4       A.    You could say so, yeah.

5             They would relieve each other, if phone

6  call stress.  They would bounce back and forth.

7       Q.    **And are you aware that Merina was recently**

8  **fired?**

9       A.    Uh-huh -- yes.

10      Q.    **Do you know why?**

11      A.    No.

12      Q.    **Are you aware or have you -- did you**

13  **witness any insubordination by Maria?**

14      A.    No.

15            Merina?

16      Q.    **Merina.**

17            **Are you aware of any raised voices or**

18  **angry interactions between Merina and Blake?**

19      A.    No.  She's pretty sweet, actually.

20      Q.    **Are you aware of Merina failing to follow**

21  **directions or instructions?**

22      A.    No.

23      Q.    **Would it surprise you that it's been**

24  **alleged that she did fail to follow directions and**

25  **instructions?**

1              MR. CARROLL:  Objection.

2              THE WITNESS:  Yeah.

3    BY MR. WINTER:

4         Q.   Why do you say that?

5         A.   She was a good employee.

6         Q.   Would it surprise you to hear that it's

7    been alleged that there was insubordination by

8    Merina?

9              MR. CARROLL:  Objection.

10             THE WITNESS:  Sure.

11   BY MR. WINTER:

12        Q.   And, again, why would that be?

13        A.   Just 'cause -- I mean, I didn't --

14   I didn't really have a personnel relationship with

15   her.  I only know her as much as talking to her

16   through the office.

17             So from what I know of her, she seemed

18   like pretty straight, sweet person.

19        Q.   On the Pest Control Millionaire podcast,

20   do you recall Blake stating or referencing

21   rebranding or a name change?

22        A.   Yeah.  I didn't listen to the whole thing,

23   but I think I do.

24        Q.   Why is that something that you remember?

25        A.   Obviously, because that's something that

1  would stand out to me.  It would have an effect on

2  me and the company, I would assume.

3       **Q.    What sort of effect do you think that**

4  **would have?**

5       A.    Position, role.  I guess just any future

6  changes, you know, gets you thinking about anything.

7       **Q.    When referencing a name change or**

8  **rebranding, when that -- what did you think would**

9  **happen if that were to come to play?**

10            MR. CARROLL:  Objection.

11            THE WITNESS:  I mean, I don't -- I would

12  assume that I would be a part of it, if that's what

13  you're asking.

14  BY MR. WINTER:

15       **Q.    Why do you say that?**

16       A.    I'm a good employee here.  I'm -- I would

17  like to say that I would, you know, be carried on

18  into the future.

19       **Q.    Is there any other reasons that the**

20  **reference to a rebranding or name change stood out**

21  **to you from that podcast?**

22       A.    No.

23       **Q.    Did it concern you that there was**

24  **contemplations of that?**

25       A.    No.

1       Q.    When you call customers back, do you use a

2   company phone or your personal phone?

3       A.    Personal.

4       Q.    Does the company pay for your personal

5   phone?

6       A.    No.  But when we call, we usually call

7   through GorillaDesk, which -- it generates a phone

8   number for you.

9       Q.    I see.

10            So when a -- when you call through

11   GorillaDesk Desk, to your knowledge, would the

12   customer then see, say, the number on PX 16 --

13      A.    No.

14      Q.    -- called?

15      A.    No.

16      Q.    What do you mean by that, "it generates a

17   number"?

18      A.    So GorillaDesk uses an outsource app

19   called Grasshopper.

20      Q.    Okay?

21      A.    So I'm pretty sure it just generates --

22   like, it generates a phone number, I guess, for that

23   transaction.  I'm not exactly sure if it's a

24   different phone number every time.  I haven't asked

25   the customer what number comes through.

1         But I know that they -- when they receive

2    a text or call, they don't get our actual personal

3    numbers.

4         **Q.   And do you always communicate with**

5    **customers through Grasshopper/GorillaDesk?**

6         A.   Unless they have a landline, older

7    customers.

8         **Q.   And so then, if they have a landline, you**

9    **would call them on your personal cell phone; is that**

10   **correct?**

11        A.   Sure.  You -- in that instance, it's

12   usually just, Hey, I'm on the way, you know.

13        **Q.   Is there any reason or policy that you're**

14   **aware of for why all those calls, except for**

15   **landlines, are routed through GorillaDesk or**

16   **Grasshopper?**

17        A.   Not specifically.

18        **Q.   Do you have any reason why -- do you --**

19   **are you aware of any reason why that would be a good**

20   **thing to do?**

21             MR. CARROLL:  Objection.

22             THE WITNESS:  I guess it would keep a

23   record of your phone call history or text history.

24   BY MR. WINTER:

25        **Q.   Have you ever looked in GorillaDesk or**

1  **Grasshopper to see records of text messages with**

2  **customers?**

3      A.    You can only see, I mean, what's been said

4  between the office and -- anybody that sends a

5  message to that customer, like, we all have

6  individual profiles.  So, like, if each one of us

7  were to talk to one customer, it would come up with

8  each of our names.  So you can see previous

9  conversations, but beyond that it's not very

10  extensive.

11      **Q.    Have you ever received calls or texts, or**

12  **are you aware of any, from customers searching for a**

13  **New York Black Widow company?**

14      A.    Never.

15      **Q.    They could exist, but you're just not**

16  **aware of them; is that correct?**

17          MR. CARROLL:  Objection.

18          THE WITNESS:  I mean, I guess a company

19  could exist anywhere.

20      (Reporter clarification.)

21          THE WITNESS:  A company could exist

22  anywhere.

23  BY MR. WINTER:

24      **Q.    Are you aware of where my client's company**

25  **exists?**

1      A.    I've picked up from this deposition that

2 they're out of state.

3      **Q.    Are you aware that they're in New York?**

4      A.    I am now.

5      **Q.    All right.**

6           **Have you ever seen a customer list of your**

7 **company's customers?**

8      A.    No.  I don't have access to that stuff.

9      **Q.    When you say you don't have access to it,**

10 **is -- that access, would that be through**

11 **GorillaDesk Desk if you did have access?**

12     A.    So I can -- I can -- I guess I could

13 search a current customer base if we have serviced

14 them through GorillaDesk.

15          But like a personal complete customer

16 base, no.

17     **Q.    So when you go and search for a particular**

18 **customer, what sort of information is stored in**

19 **GorillaDesk?**

20     A.    Name, address, phone number, e-mail.

21     **Q.    Is there information concerning pricing or**

22 **invoices also stored in GorillaDesk?**

23     A.    If they had been sent an estimate or

24 pricing that they haven't decided on, yeah, you can

25 go back and look at previous invoices and estimates.

1      Q.    When you mentioned earlier that you're

2   involved in generating invoices or estimates, how do

3   they actually get sent to customers?

4      A.    Via e-mail.

5      Q.    So do you personally e-mail them to the

6   customers or does somebody else do that?

7      A.    The GorillaDesk.

8      Q.    So would you go into GorillaDesk, create

9   the invoice or the estimate contents, and then hit

10  and say, Send, and it would then automatically send

11  to the customer?

12     A.    Well, you'll typically always get a

13  signature, even on an estimate.  And then confirm

14  that you have the right e-mail, and, yeah, send it

15  right to their personal e-mail.

16     Q.    And then, when sending that, does that get

17  saved in GorillaDesk?

18     A.    Uh-huh.

19     Q.    You have to say --

20     A.    Yes.

21     Q.    You're getting a lot better -- you're

22  getting a lot better at it.

23            Have you ever heard the name David Cass

24  before?

25     A.    No.

1          Q.    Have you ever heard of the Burlington

2    Chamber of Commerce?

3          A.    Yes.

4          Q.    In what way have you heard of them?

5          A.    So I've heard of, like, the BNI network,

6    you know, like networking groups, and stuff like

7    that.

8                I assume it's just another networking

9    group.

10         Q.    What is "BNI"?

11         A.    It's like Connecticut networking groups.

12         Q.    Did you ever go to Burlington Day?

13         A.    I did.

14         Q.    What was Burlington Day?

15         A.    It was like a job fair, I guess, you know.

16         Q.    And did you go there with Blake?

17         A.    I did.

18         Q.    And were you wearing a shirt containing

19    your company's logo as shown on PX 16?

20         A.    I was.

21         Q.    What was the -- what was your company's

22    setup or display at that -- at Burlington Day?

23         A.    We just had a tent, with a table.

24         Q.    Did the tent and table have your company's

25    logo on it?

1      A.   It did.

2      Q.   Were there any pamphlets or flyers or

3  other things handed out?

4      A.   Brochures.

5      Q.   Would you call those a trifold brochure?

6      A.   Sure.

7      Q.   What's on the trifold brochure?

8      A.   On the front, our logo.

9           On the inside, like brief descriptions of

10  how we like to manage pests.  You know, services

11  that we offer.

12     Q.   Do you know whether or not your company is

13  a member of the Burlington Chamber of Commerce?

14     A.   I don't.

15     Q.   Was it ever explained to you or told why

16  you were going to Burlington Day?

17     A.   No.  Just to help out with some

18  advertising.

19     Q.   At Burlington Day, were there potential

20  customers that you spoke with and handed marketing

21  materials to?

22     A.   Sure.

23     Q.   And were those mostly residential

24  customers?

25     A.   Yes.

```
 1        Q.   Are you aware that Burlington Chamber of
 2   Commerce did a Facebook post about your company?
 3        A.   No, I did not.
 4        Q.   Are you aware that you can tag companies
 5   in a Facebook post?
 6        A.   (Witness nods head.)
 7        Q.   Have you ever tagged other people in a
 8   Facebook --
 9        A.   Yeah, of course --
10        Q.   -- post before?
11        A.   -- of course.
12        Q.   Looking at the second page, do you see
13   that spider logo at the top?
14        A.   I do.
15        Q.   And do you see that that refers to
16   Black Widow Termite & Pest Control Corp.?
17        A.   I do.
18        Q.   And that's not your company; correct?
19        A.   Correct.
20        Q.   And below that is your company's logo; is
21   that correct?
22        A.   Correct.
23        Q.   And so if you go back to the first page,
24   you can't see that other logo associated with
25   Black Widow Termite & Pest Control on the Facebook
```

1    post; is that correct?

2         A.    Correct.

3         Q.    Go to the third page of this.

4               Do you see your company logo on the third

5    page of that exhibit?

6         A.    I do.

7         Q.    And your company logo refers to the one at

8    PX 16; is that correct?

9         A.    Correct.

10        Q.    Were there any special offers delivered at

11   Burlington Day?

12        A.    Free inspections.

13        Q.    So you waived the $150 inspection fee?

14        A.    Correct.

15        Q.    Any idea why that was done?

16        A.    Just to generate a new customer base.

17        Q.    Other than you and Blake, who from your

18   company was there?

19        A.    That's it.

20        Q.    Do you know who Rochelle or Rachel Burr

21   is?

22        A.    Burr?

23        Q.    Burr.

24        A.    Uh-uh.

25        Q.    In Brookfield, Connecticut?

Page 72

```
 1       A.    Uh-uh.
 2             MR. CARROLL:  You have to say "yes" or
 3   "no."
 4             THE WITNESS:  No.
 5   BY MR. WINTER:
 6       Q.    We talked the rebranding or name change.
 7             Did you ever ask Blake about that?
 8       A.    No.
 9       Q.    Have you personally, on behalf of your
10   company, done pest control for commercial buildings?
11       A.    Sure.
12       Q.    And you've done so under the company name
13   Black Widow; is that correct?
14       A.    Correct.
15       Q.    And have you ever personally done, for
16   your company, pest control for residential homes
17   under the name Black Widow?
18       A.    I have.
19       Q.    Have you ever personally done, under the
20   name Black Widow, for your company termite and pest
21   control services other than for agriculture,
22   aquaculture, horticulture, and forestry?
23       A.    I have.
24       Q.    Have you done, throughout your time
25   employed with your company, all of those services?
```

1       A.   I have.

2       **Q.   Is that on a regular basis?**

3       A.   Everything, except for termites, very

4    seldom.

5       **Q.   Have you ever seen a black widow spider in**

6    **person?**

7       A.   No.

8       **Q.   To your knowledge, do black widow spiders**

9    **exist in Connecticut?**

10      A.   I don't think so.

11      **Q.   To your knowledge, do black widow spiders**

12   **exist in New York?**

13      A.   I don't think so.

14      **Q.   To your knowledge, going from Connecticut**

15   **towards California, where would you think the first**

16   **location you'd find black widow spiders is?**

17      A.   Probably in like western Virginias, maybe,

18   like where the climate starts to stay a little

19   warmer.

20      **Q.   So it's a southern pest?  Is that --**

21      A.   I would say, yeah.

22      **Q.   Prior to viewing the Pest Control**

23   **Millionaire podcast that Blake appeared on, did you**

24   **ever speak to him or hear from him about how he came**

25   **up with the name "Black Widow"?**

```
 1              MR. CARROLL:  Objection.
 2              THE WITNESS:  I think it's just his last
 3    name.
 4    BY MR. WINTER:
 5         Q.   His last name is not "Widow," though.  Is
 6    that correct?
 7         A.   No.  It's Black.
 8         Q.   For -- are you aware that, black widow
 9    spiders, the female is considered the aggressor
10    of --
11         A.   No.
12         Q.   So throughout New England, would you agree
13    with me that black widow spiders are not at all
14    common pests?
15         A.   I would.
16         Q.   So you have no personal experience of ever
17    eliminating or removing or otherwise treating black
18    widow spiders at any homes; is that correct?
19              MR. CARROLL:  Objection, asked and
20    answered.
21              THE WITNESS:  Correct.
22              I'm not sure if that's a typical service
23    for any pest control company.
24    BY MR. WINTER:
25         Q.   You don't think it's a typical service for
```

1  any pest control company?

2      A.   Not frequently at least, you know, not

3  around here.

4      **Q.   So you don't believe that the black widow**

5  **spider is a common pest?**

6      A.   Not in --

7           MR. CARROLL:  Objection, asked and

8  answered.

9           THE WITNESS:  -- Connecticut.

10  BY MR. WINTER:

11      **Q.   So it could be a common pest in, say,**

12  **Florida, but you just don't have personal knowledge**

13  **of that?**

14           MR. CARROLL:  Objection.

15           THE WITNESS:  I mean, sure, if they --

16  wherever they do live is probably where they would

17  be a more common issue.

18  BY MR. WINTER:

19      **Q.   How about spiders in general, do you often**

20  **get called to deal with spiders?**

21      A.   Sure.

22      **Q.   What type of spiders?**

23      A.   Typically your basement residers.

24           A lot of the times it's cobwebs and, you

25  know, daddy longlegs.  Nothing crazy.

1      Q.   So you wouldn't consider that to be like a

2  spider infestation, or something; is that right?

3      A.   No.

4        (Indiscernible overtalking.)

5      Q.   Sorry.  Continue.

6      A.   I mean, any -- any damp, cobweb-ridden

7  basement would technically be a, you know, spider

8  infestation.

9          However, spiders are easily treatable with

10  humidity regulation instead of insecticide.

11     Q.   So just getting your basement to be dry

12  generally eliminates spiders; is that correct?

13     A.   Correct.  A little IPM.

14        (Reporter clarification.)

15          THE WITNESS:  IPM (integrated pest

16  management).

17          (Plaintiff's Exhibit 34 was previously

18  marked.)

19  BY MR. WINTER:

20     Q.   I'm handing to you Plaintiff's Exhibit 34.

21          Turn to page 10, Interrogatory Number 18.

22          Do you agree with me?

23     A.   I do.

24     Q.   Do you see your name listed there?

25     A.   I do.

1      Q.    Were you ever informed that you may be

2    called as a witness in this lawsuit?

3      A.    Yeah.

4      Q.    At which point were you first informed

5    that you may be called as a witness?

6      A.    I think I was told about the deposition

7    like two weeks ago.

8      Q.    This --

9      A.    Other than that, that's all I knew.

10    I didn't know why or what reason I had anything to

11    do with it.

12      Q.    So I'm turning to the last page of this.

13    It's dated February -- or, the 15th page of this

14    document, do you see it's dated February 28, 2024?

15      A.    Uh-huh.

16      Q.    Prior to February 28, 2024, were you ever

17    informed that you may be a witness in this lawsuit?

18      A.    No.

19      Q.    You see there's several names on that

20    response in front of you on page 10?

21      A.    I do.

22      Q.    Jim Horton, I think you said earlier that

23    you've seen him or met him in person before?

24      A.    Uh-huh -- yes.

25      Q.    Then Merina Sabatucci [ph.], that is the

1    former office manager, or office girl as you put it,

2    for your company; is that correct?

3        A.    Yes.

4        Q.    And then next is your name; correct?

5        A.    Correct.

6        Q.    Who's Robert Scribner, to your knowledge?

7        A.    He owns Scribner Pest Control, I think

8    that's the name, in Connecticut --

9        Q.    What --

10       A.    -- or Scribner Pest Services.  I don't

11   remember.

12       Q.    What do you know about Robert Scribner,

13   other than he's in a pest control company?

14       A.    About him?

15       Q.    Well, let me strike that.

16             What do you know about his relationship to

17   your company?

18       A.    Other than being friends or acquaintances,

19   I don't think we have any personal relationship with

20   him.

21       Q.    Have you ever spoken to Robert Scribner

22   before?

23       A.    (Witness nods head.)

24             MR. CARROLL:  Is that a "yes" or "no"?

25             THE WITNESS:  Yes.

1  BY MR. WINTER:

2      **Q.    How frequently have you spoken to**

3  **Robert Scribner?**

4      A.    Maybe once every couple months.

5      **Q.    And under what context, or what's the**

6  **subject matter you're speaking to him about, in**

7  **general?**

8      A.    Him needing a quote on a job.

9            He's trying to dabble in wildlife.  So

10  he'll reach out and say, Hey, what kind of pricing

11  would you do on this home?  Or, How can I do this?

12            You know, he reaches out to me for advice

13  on how to do some of the work.

14      **Q.    Does Robert Scribner's service area**

15  **overlap with your company's service area?**

16      A.    It does.

17      **Q.    Do you know where his company is located?**

18      A.    I think in the New Milford area.

19      **Q.    Has he ever referred business to your**

20  **company, to your knowledge?**

21      A.    Yes.

22      **Q.    How does that come about?**

23      A.    Like I said, he's just dabbling in

24  wildlife.  So anything that he can't handle, like,

25  if he gets a call for a four-story bat job, that he

```
 1    doesn't know how to get access to the roof, that's
 2    something that he'd probably refer to us because he
 3    knows that we know how to do it.
 4         Q.   And how would that referral come through?
 5         A.   Word of mouth.
 6         Q.   So would he tell -- would you hear from
 7    the customer that he's referring you to first, or
 8    would they give you the name of the customer that
 9    you would then call them?
10         A.   I couldn't tell you.  I'm just the one
11    that shows up.
12         Q.   Got it.
13              Russell Sieb, do you know who that is?
14         A.   Never heard of him.
15         Q.   Drew Crowley [sic], do you know who that
16    is?
17         A.   Cowley?  Yeah, I do.
18         Q.   Who's that?
19         A.   He owns Cowley Pest in New Jersey.
20         Q.   And have you met him before?
21         A.   I have.
22         Q.   Where?
23         A.   They held a harness and rope training
24    course at his location.  I saw him there.  But the
25    first time I met him was at the expo.
```

1      Q.   The expo in Houston?

2      A.   Uh-huh -- yes.

3      Q.   **How did you come about meeting him at the**

4  **expo in Houston?  Who was there?**

5      A.   He taught a couple courses.

6      And, you know, we dabble, bouncing

7  information off of Keith.

8      I think Keith Marken [ph.] is his name,

9  who taught the rope course.

10     And they're all close.

11     So when we were there, we were all just

12  kind of, you know, shooting craps in a circle.

13     Q.   **Other than you and Merina on that list in**

14  **front of, to your knowledge, none of those**

15  **individuals have been associated with your company;**

16  **is that correct?**

17     A.   Correct.

18     MR. WINTER:  Why don't we take a break.

19     Let's see if -- I don't know if I have a

20  whole lot more.  I just want to look through my

21  notes.

22     THE WITNESS:  Sure.

23    (Off the record.)

24  BY MR. WINTER:

25     Q.   **At any time, have you discussed a**

1  rebranding or a name change with Blake?

2      A.   No.

3      Q.   **When was the first time you learned about**

4  **this lawsuit?**

5      A.   Other than what I knew about the

6  deposition, just letting me know that I had to come

7  here at a certain date and time, no, I didn't.

8      Q.   **And the trip to Houston, what was the**

9  **purpose of that trip?**

10     A.   To attend the expo, take courses, gain

11 some knowledge.

12     Q.   **Were there any discussions at that expo**

13 **about expansion of your company, that you're aware**

14 **of?**

15     A.   Not with me.

16          MR. WINTER:  I don't think I have anything

17 else.

18          MR. CARROLL:  Nothing from me.

19          MR. WINTER:  All right.  I think we've off

20 the record.

21      (At 11:47 a.m., the taking of the deposition

22     concluded.)

23      (The witness reserved the right to read and

24     sign the deposition transcript.)

25      (At 11:47 a.m., the record was closed.)

```
 1              C E R T I F I C A T E

 2

 3   STATE OF CONNECTICUT )
                         ) ss.
 4   COUNTY OF FAIRFIELD  )

 5

 6        I, MERCEDES SHELDON, a court reporter within the

 7   state of Connecticut, and a notary public in and for the

 8   State of Connecticut, do hereby certify:

 9        That MICHAEL CAMILINI, the witness whose deposition

10   is hereinbefore set forth, was duly sworn by me, and

11   that such deposition is a true record of the testimony

12   given by the witness.

13        I further certify that I am not employed by nor

14   related to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18   this 26th day of September, 2024.

19

20

21   _____
     Mercedes Sheldon - Shorthand Reporter
22   Notary Public - State of Connecticut
     Account Number:   167303
23   Date Appointed:   09/01/2024
     Expiration Date:  08/31/2029
24

25
```

1                          J U R A T

2

3    STATE OF CONNECTICUT              )
                                       ) ss.
4    COUNTY OF _____  )

5

6

7         I, MICHAEL CAMILINI, the witness herein, having

8    read the foregoing testimony of the pages of this

9    deposition, do hereby certify it to be a true and

10   correct transcript, subject to corrections, if any,

11   shown on the attached page(s).

12

13

14                    _____

15                         MICHAEL CAMILINI

16

17

18

19   Subscribed and sworn to before me this

20   _____ day of _____, 2024

21

22

23   _____

24   Notary Public

25

1               ERRATA SHEET

2    CASE: Black Widow Termite & Pest Control Corp. vs
           Black Widow Pest Specialists, LLC
3
     WITNESS:  Michael Camilini
4
     DEPOSITION DATE:  September 26, 2024
5
     PAGE  LINE
6    _____|_____| CHANGE: _____

7                   REASON: _____

8    _____|_____| CHANGE: _____

9                   REASON: _____

10   _____|_____| CHANGE: _____

11                  REASON: _____

12   _____|_____| CHANGE: _____

13                  REASON: _____

14   _____|_____| CHANGE: _____

15                  REASON: _____

16   _____|_____| CHANGE: _____

17                  REASON: _____

18   _____|_____| CHANGE: _____

19                  REASON: _____

20   _____|_____| CHANGE: _____

21                  REASON: _____

22   _____|_____| CHANGE: _____

23                  REASON: _____

24   _____|_____| CHANGE: _____

25                  REASON: _____











































